UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| PREDRAG CICVARA, | Civil Action No. 3:09-cv-2054 |
| | (JCH) (HF) |
| Plaintiff, | |
| v. | April 15, 2011 |
| THE GILLETTE COMPANY and PROCTER & GAMBLE COMPANY and DURACELL, AN ENTITY OF UNKNOWN FORM and LYNNE BURNETT, | |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANTS' STATEMENT OF UNDISPUTED
MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1(a)(1)**

Pursuant to Local Civil Rule 56.1(a)(1), defendants The Gillette Company and The Procter & Gamble Company ("P&G") (collectively, the "Defendants" or the "Company") respectfully submit this statement of undisputed material facts in support of their motion for summary judgment.[1]

**The Parties**

1. Predrag Cicvara ("Cicvara") was employed by the Company in its Bethel, Connecticut, office as a Quality Assurance Manager prior to his termination on June 15, 2009. (Am. Comp., ¶ 19; Answer, ¶ 19.)

---

[1] The undisputed facts set forth herein are followed by citations to their support in the record. Copies of all deposition testimony, deposition exhibits, and other documents cited herein are annexed to the Declaration of Edward Cerasia II, Esq., dated April 15, 2011, the Declaration of Lynne Burnett, dated April 11, 2011, the Declaration of Peggy Wilczewski, dated April 14, 2011, the Declaration of Dina Schmude, dated April 14, 2011, and the Declaration of Kevin Babis, dated April 15, 2011, submitted herewith.

2. On December 31, 1997, "Duracell, Inc." merged with and into "The Gillette Company." (Declaration of Peggy Wilczewski ("Wilczewski Decl."), ¶ 2.) As a result of that merger, Duracell ceased being a legal entity as of January 1, 1998. (*Id.*)

3. The Gillette Company ("Gillette") is a global supplier of various personal care products. (Wilczewski Decl., ¶ 2.) P&G purchased Gillette in 2005. (*Id.*)

4. P&G is a global company providing branded products and services in over 80 countries worldwide. (Wilczewski Decl., ¶ 1.) The Company produces several of its own products, as well as fully packaged products provided by suppliers. (Deposition of Predrag Cicvara ("Cicvara Dep.") at 17-18.)

**The Worldwide Business Conduct Manual And**
**The Company's Purpose, Values and Principles**

5. Each Company employee receives P&G's Worldwide Business Conduct Manual (the "Conduct Manual"). (Cicvara Dep. at 36.) Cicvara read the Conduct Manual "a couple of times." (*Id.,* at 36; Cicvara Dep. Ex. 1.) In its introductory page, the Conduct Manual provides:

> P&G has been built through the character of its people through generations. That character is reflected in our Purpose, Values and Principles, and in how well we live them as individuals and as a Company. It is consistent with our historic principle of doing the right thing. Integrity, trust and respect for others have been fundamental P&G values since the Company was founded in 1837. Our continued success depends on each of us doing our part to uphold these values in our day-to-day work and in all decisions we make.

(Cicvara Dep. Ex. 2 at 1.)

6. The Conduct Manual prohibits employees from engaging in personal relationships that might result in a conflict of interest. (Cicvara Dep. Ex. 2 at 30.) For example, the Conduct Manual lists the following as a situation that raises concern: "When an employee has a romantic relationship with a current or potential supplier, contractor or customer (or an employee of any

2

such entity) when the Company employee has direct or indirect decision-making authority or influence with respect to the underlying business relationship." (*Id.*)

7. The Conduct Manual specifically includes a "General Business Ethics" policy, which provides:

> The Core of the Company's business ethic is "doing the right thing." In addition to complying with any applicable legal requirements and the requirements described elsewhere in this Manual, you should ask the following questions in making decisions:
>
> • Is my action the "right thing to do?"
>
> • Would I feel comfortable if my action were reported broadly in the news, or reported to a person whose principles I respect?
>
> • Will my action protect the Company's reputation as an ethical company?
>
> • Am I being truthful and honest?
>
> If the answer to any of these questions about the action you are considering is not an unqualified "Yes," then simply do not take the action.

(Cicvara Dep. Ex. 2 at 10.)

8. The Conduct Manual also contains a Harassment/Discrimination policy which requires that all employees "treat their colleagues with respect" and refrain from behaving in an "intimidating, hostile or offensive" manner. (Cicvara Dep. Ex. 2 at 18.) Cicvara read this policy and understood that it prohibited him from making sexual advances toward customers, contractors, or employees. (Cicvara Dep. at 40-41.) Cicvara also understood that it was a violation of the Conduct Manual to make unwelcomed sexual advances toward a supplier and that such harassment would be viewed as serious misconduct by the Company. (Cicvara Dep. at 43.)

9. Every employee, including Cicvara, also received a copy of the Purpose, Values and Principles ("PVPs") booklet referenced in the Conduct Manual. (Wilczewski Decl., ¶ 11.)

3

The PVPs outline the Company's principles and values, which include integrity and trust. (Cicvara Dep. at 38; Cicvara Dep. Ex. 3 at PG000181.)

10. Cicvara acknowledges that *every* Company employee must uphold the PVPs, and that this is particularly important for management-level employees, such as himself, who are entrusted with upholding the Company's reputation in the industry. (Cicvara Dep. at 38, 46.)

**Cicvara's Employment With The Company**

11. On or about November 1, 2000, Cicvara began his employment at the Company as Manager of Worldwide Technical Services, in the Original Equipment Manufacturer sales group. (Cicvara Dep. at 11.)

12. On April 1, 2008, the Company transferred Cicvara to the position of Duracell Lighting Quality Leader, which he held for approximately two months until becoming the Quality Assurance ("QA") Manager. (Cicvara Dep. at 14-15.) Cicvara held the position of QA Manager until his termination on June 15, 2009. (*Id.* at 15.)

13. As QA Manager, Cicvara reported to Kevin Babis ("Babis"), with whom he had an excellent working relationship. (Cicvara Dep. at 15-16.) Cicvara found Babis to be a fair and honest manager. (*Id.* at 17.)

14. The QA Manager position was an important role for the Company. (Cicvara Dep. at 34.) As QA Manager, Cicvara was the "face" of the Company, and had significant interaction with the Company's suppliers regarding quality issues. (*Id.* at 34-35.) As such, his QA Manager position specifically included the following job responsibility: "[p]rovide professional representation of Duracell/P&G per the P&G Worldwide Business Conduct Manual. This is vitally important in dealing with Contractors and Suppliers in that plans, decisions, and commitments could have significant impact from a financial and/or confidentiality perspective." (Cicvara Dep. at 49-52; Cicvara Dep. Ex. 4 at PG000172.)

4

15.     Cicvara's job duties as QA Manager included managing Duracell branded lighting products, interacting with the Company's suppliers on all quality-related issues, and auditing the suppliers' factories. (Cicvara Dep. at 24; Cicvara Dep. Ex. 4.) The audits required Cicvara to travel to the suppliers' factories and ensure that the facilities met the Company's quality standards. (Cicvara Dep. at 24.)

**The Practical Lighting Company**

16.     Practical Lighting ("Practical") is a Company supplier that provides the Company with certain types of flashlights, including a flashlight known as "Daylite." (Cicvara Dep. at 20-21.)

17.     Practical is based out of Hong Kong, China, and has three manufacturing facilities, located in Zhongshan, China, Bangkok, Thailand, and Medan, Indonesia. (Cicvara Dep. at 18-19.)

18.     In 2008, the Company initially launched two models of the Daylite product, which utilized "AA" and "AAA" cell batteries, with one of Practical's competitors. (Cicvara Dep. at 21-22.)

19.     The Company's relationship with Practical became strained when Practical learned that the Company had given the Daylite business to one of its competitors. (Cicvara Dep. at 21-22; Declaration of Edward Cerasia II, Esq. ("Cerasia Decl."), Ex. C.) As a result, the Company thereafter contracted with Practical to produce Daylite flashlights utilizing type "C" and "D" cell Duracell batteries. (Cicvara Dep. at 21-22.)

5

**During A Business Trip, Cicvara Visits The Hotel Room Of Practical's General Manager, Sits On Her Bed With Only His Underwear On, And Tells Her "One Could Rape You"**

20.  At the time of Cicvara's employment as QA Manager, Bel Liu ("Liu") was a general manager at Practical and one of the Company's primary contacts at Practical. (Cicvara Dep. at 53-54.)

21.  Cicvara first met Liu in or about September 2008, when Liu visited Duracell's facilities in Bethel, Connecticut, in connection with the Company's development of the Daylite flashlight. (Cicvara Dep. at 52.) He met Liu again during December 2008, when he visited Practical's facilities in China. (*Id.* at 53.)

22.  In June 2009, Cicvara traveled to Indonesia, Thailand, and China for a multi-day audit of four of Practical's factories. (Cicvara Dep. at 53; Declaration of Kevin Babis ("Babis Decl."), Ex. A.) The trip included overnight stays in Jakarta and Medan, Indonesia; Singapore; Bangkok, Thailand; and Guangzhou, China. (Babis Decl., Ex. A.) Liu and Andrew Yau ("Yau"), Practical's Chairman, traveled from Practical's headquarters in Hong Kong to meet with Cicvara and the Company's auditors at the various factories. (Cicvara Dep. at 53; Wilczewski Decl., Exs. B-D & E at PG000601-602.)

23.  While in Indonesia, Cicvara asked Liu if he could visit her hotel room to look at the view. (Wilczewski Decl., Exs. B-D & E at PG000602.) Although Liu was not comfortable with him visiting her room, she said yes because she did not want to offend Cicvara, whom she viewed as a valuable customer. (*Id.*) Shortly after entering Liu's room, Cicvara began hugging her. (*Id.*) Liu informed Cicvara that she was not comfortable with him hugging her, and asked him to leave her hotel room. (*Id.*)

24.  Thereafter, Liu sent Austin Lin, a Company employee with whom she had worked in the past, a text message informing him that she was afraid of Cicvara, and did not know how

6

to handle the situation because Cicvara was a customer.  (Wilczewski Decl., Exs. B-D & E at PG000602.)

25. After completing the audit in Indonesia, Cicvara, Liu, Yau, and Yuen Yau, another Practical employee, traveled to Thailand to visit Practical's facilities in that country. (Wilczewski Decl., Exs. B-D & E at PG000602.)

26. On June 8, 2009, while in Thailand, Cicvara had dinner with Liu, Yau, and Yuen Yau.  (Wilczewski Decl., Exs. B-D & E at PG000603.)  Liu left and returned to her hotel room shortly after dinner because she was not feeling well.  (*Id*.)

27. After dinner, Cicvara sent Liu a text message asking if he could visit Liu's hotel room to bring her a "special dessert."  (Cicvara Dep. at 69, 129; Wilczewski Decl., Exs. B-D & E at PG000603.)  Although Liu initially said no, Civara continued to press her until Liu finally relented because she did not want to offend her customer.  (Wilczewski Decl., Exs. B-D & E at PG000603 & PG000612.)  Cicvara took the opportunity and went to Liu's room with a "special dessert" for her.  (Cicvara Dep. at 69.)

28. When he entered Liu's hotel room, Cicvara inexplicably stripped off his pants and sat on Liu's bed wearing nothing but his underwear and shirt.  (Cicvara Dep. at 136-138; Wilczewski Decl., Exs. B-D & E at PG000603.)

29. After sitting on her bed in his underwear, Cicvara touched Liu's back, and "massaged her feet for a while."  (Cicvara Dep. at 68.)  Liu, who was lying in bed sick, told Cicvara "stop this, I don't like this."  (*Id*. at 126.)  At no point did Liu ask Cicvara to massage her back or feet.  (*Id.* at 71-72.)

30. Rather than ceasing his inappropriate behavior, Cicvara told Liu that he could "rape her."  (Cicvara Dep. at 86-87; Cicvara Dep. Ex. 11; Wilczewski Decl., Exs. B-D & E at

7

PG000603.) Uncomfortable with the situation, Liu asked Cicvara to leave her room. (Wilczewski Decl., Exs. B-D & E at PG000603.)

31.     The next morning, on June 9, 2009, Liu left a Hard Rock Café shirt that Cicvara had bought for her earlier during the trip outside of his hotel room door. (Cicvara Dep. at 109-10; Wilczewski Decl., Exs. B-D & E at PG000604.) When he found the shirt, Cicvara went to Liu's hotel room and asked her why she had returned the shirt. (Cicvara Dep. at 111; Wilczewski Decl., Exs. B-D & E at PG000604.) Liu told Cicvara that she was scared of him. (Wilczewski Decl., Exs. B-D & E at PG000604.) At that point, Liu called Austin Lin, but received his voicemail, which recorded portions of the conversation between Cicvara and Liu. (*Id.*) After asking Liu a few more times why she had returned the shirt, Cicvara finally left Liu's room. (*Id.*)

32.     After visiting Liu's room and asking her why she had returned his gift of a Hard Rock Café tee shirt, Cicvara sent Liu a text message from his BlackBerry stating: "I hope you will bew [*sic*] better soon. Feel terrible that can't [*sic*] be with you and pamper you." (Cicvara Dep. at 97-98; Cicvara Dep. Ex. 5.) Less than fifteen minutes later, Liu responded, "Thx P. I'm fine but I have to re-emphasize that we are not either couples or lovers. Pls stop thinking about me." (Cicvara Dep. at 99-100; Cicvara Dep. Ex. 6.) Cicvara then responded: "Right. No need to emphasize the obvious. Thx for the good time though. P." (Cicvara Dep. at 103-04; Cicvara Dep. Ex. 7.)

33.     On the morning of June 10, Cicvara sent Liu a text message stating that he was "in a shock and disgusted by [himself] and [his] poor judgment of things." (Cicvara Dep. at 105-06; Cicvara Dep. Ex. 9.)

34. Later on June 10, during his plane ride from Thailand to China, Cicvara typed a detailed e-mail to Liu, which he sent to Liu after landing in China. (Cicvara Dep. at 116-17.) In that e-mail, Cicvara acknowledged his inappropriate behavior in writing by stating:

> I would love nothing more than to take back few emotional outbreaks that I experinced [*sic*] last few days. Had I known that I have risked losing such a precious thing as our friendship, I wouldn't ever have attempted what I so foolishly did misjudging the nature of our closeness in the last few days.
>
> Maybe the cultural differences that you so graceously [*sic*] tried to point out in one of our conversations did ironically played the part in what transpired lately. I believe if you had taken a strong stance against my foolish attempts to get more out of our relation stopping it from the very beginning, I would have stopped then and would have still be in that special relation with you that meant so much to me. By being so polite and trying not to hurt my feelings you have unconciously [*sic*] encouraged my (macho? possessive? animouse? [*sic*] stupid?) efforts to get more than you were ready to give.
>
> Foolish dirty old man! How quickly such a wonderfool [*sic*] friendship (at least on my part) could be destroyed!?
>
> . . . .
>
> I can only hope that you will understand me and remain beeing [*sic*] my true friend in the future. Again[,] I can only say I am sorry for what I did to you and I know there is no real excuse for it.

(Cicvara Dep. Ex. 10; Cicvara Dep. at 116-29.)

35. Liu once again politely rebuffed Cicvara by stating: "I'm sorry because I don't love you but I know you love me so. I appreciated you in the past because we were just friend. What I cannot accept is what you did in the last few days. Without those dirty things, we can be friend." (Cicvara Dep. Ex. 10.) Cicvara replied, "I can promise that never again I will be a 'dirty man' with you." (*Id.*; Cicvara Dep. at 128.)

36. On June 9, 2009, the day after Cicvara inappropriately touched Liu and told her that he "could rape" her, Liu spoke with Lin and informed him of what had occurred the night

9

before.  (Wilczewski Decl., Exs. B-D & E at PG000603.)  Lin reported Cicvara's conduct to Dina Schmude ("Schmude"), the Company's Human Resources Manager in Bethel, and encouraged Liu to speak with her boss, Andrew Yau.  (Declaration of Dina Schmude ("Schmude Decl."), ¶ 2; Wilczewski Decl., Exs. B-D & E at PG000603.)

37. Shocked by Liu's allegations, Schmude immediately relayed Lin's report to Lynne Burnett ("Burnett"), the Company's Global Human Resources Director in Bethel, who advised Schmude to investigate the incident by speaking with both Liu and Cicvara.  (Schmude Decl., ¶ 3; Burnett Decl., ¶ 3.)  Thereafter, Schmude contacted Liu to schedule a time to speak with her.  (Schmude Decl., ¶ 3, Ex. A.)

**The Company's Investigation Confirms Liu's Complaint,
<u>Leading To Cicvara's Termination For Cause</u>**

38. On June 11, 2009, Schmude and Peggy Wilczewski, the Company's Senior Human Resources Manager in Bethel, called Liu in Hong Kong and inquired about Cicvara's behavior in Asia.  (Schmude Decl., ¶ 4; Wilczewski Decl., ¶ 5 & Exs B-D & E at PG000601-PG000604.)  Over the next hour and half, Liu provided Schmude and Wilczewski with details of Cicvara's inappropriate conduct during the audit and, in particular, his egregious behavior in her hotel room on June 8, 2009.  (Schmude Decl., ¶ 4; Wilczewski Decl., ¶ 5 & Exs. B-D & E at PG000601-PG000604.)

39. After ending their telephone conversation, Wilczewski e-mailed Liu and asked Liu to review her notes from their conversation for accuracy and to forward the text messages between Liu and Cicvara.  (Wilczewski Decl., ¶ 6 & Exs. A & B.)

40. On June 12, 2009, Liu forwarded the text messages and e-mails between Cicvara and herself to Schmude and Wilczewski, and provided her edits to Schmude's notes.  (Schmude Decl., ¶ 6 & Ex. C.; Wilczewski Decl., ¶ 8 & Ex. D.)  In her cover e-mail to Schmude and

10

Wilczewski, Liu explained that she tried to be polite with Cicvara, whom she did not want to offend because he was a customer of Practical. (Schmude Decl., ¶ 6 & Ex. C; Wilczewski Decl., ¶ 8 & Ex. D at PG000613.)

41. Wilczewski forwarded the text messages and e-mails received from Liu to Burnett and provided Burnett with the notes from her June 11, 2009 call with Liu. (Burnett Decl., ¶¶ 4, 5; Wilczewski Decl., ¶ 9 & Ex. E.)

42. While the Company was investigating Liu's complaint, Yau, who had by then learned of the incident from Liu, sent an e-mail to Nitesh Singh, the Company's Senior Purchasing Manager, informing Singh that Cicvara had made "inappropriate sexual advances" toward Liu during his trip to Asia. (Cicvara Dep. Ex. 12; Wilczewski Decl., ¶ 13.) Yau made clear that Cicvara was no longer welcome at Practical in the future, and the Company should send someone else for future audits. (Cicvara Dep. at 148-49; Cicvara Dep. Ex. 12.)

43. Yau's e-mail about Cicvara's egregious conduct came at a time when the relationship between the Company and Practical was strained; indeed, Yau noted a few days later to Eric Lawson, the Company's Associate Director for the Duracell Division, that Practical was "very disappointed" with its business with the Company. (Cerasia Decl., Ex. C.)

44. On June 15, 2009, Burnett, Wilczewski, and Babis met with Cicvara in a conference room and interviewed him regarding Liu's allegations. (Cicvara Dep. at 132-33; Burnett Decl., ¶ 6; Wilczewski Decl. ¶ 10 & Ex. F; Babis Decl., ¶ 3.) Burnett asked the majority of the questions during this conversation, while Wilczewski took notes of the meeting. (Burnett Decl. ¶ 6; Wilczewski Decl. ¶ 10 & Ex. F.)

45. At the meeting, Cicvara admitted that he had gone to Liu's hotel room while in Asia and that he had touched her. (Burnett Decl., ¶ 7; Wilczewski Decl. ¶ 11 & Ex. F at

11

PG000498; Babis Decl., ¶ 4.)  When asked whether he told Liu that he wanted to rape her, Cicvara stated: "Look, it was in a hotel and she was dressed in a way.  I told her I had a feeling I would rape her but I never had that in my mind and I didn't thin[k] she'd think about it seriously."  (Burnett Decl., ¶ 8; Wilczewski Decl. ¶ 11 & Ex. F at PG000499; *see also* Cicvara Dep. at 87-88.)  Cicvara admitted that he told Liu: "one could rape you."  (Cicvara Dep. at 87.)  However, he claims that he did so because Liu crossed her legs in what he perceived to be a provocative manner.  (*Id.* at 87-88.)  Cicvara then attempted to excuse his comment by suggesting that Liu's attire somehow provoked him; specifically, he stated that Liu was "dressed in very short shorts," which prompted him to tell her, "I'm a man and it looks like I could rape you like that.  You are showing off."  (Burnett Decl., ¶ 8; Wilczewski Decl. ¶ 11 & Ex. F at PG000499.)

46.     After Cicvara admitted that he told Liu "I could rape you," Burnett asked him: "Do you realize you were a company representative and this is one of our suppliers?"  (Burnett Decl., ¶ 9; Wilczewski Decl., Ex. F at PG000499-500.)  Cicvara responded that he did not believe what he did was inappropriate, although he admitted that his wife would find his conduct inappropriate.  (*Id.*)

47.     When asked if he had anything else to say, Cicvara stated, "If I was thinking of things the way it turned out, I should not have been touching her that way."  (Wilczewski Decl., Ex. F at PG000500.)

48.     At the end of their meeting, Burnett, Babis and Wilczewski asked Cicvara to remain in the conference room while they left to discuss the matter.  (Burnett Decl., ¶ 11; Wilczewski Decl. ¶ 12 & Ex. F at PG000501; Babis Decl., ¶ 5.)  During that time, the three unanimously determined that Cicvara's employment should be terminated for his egregious

12

misconduct, which not only violated the Company's policy and PVPs, but also reflected poorly on the Company and negatively affected the Company's relationship with Practical. (Burnett Decl., ¶¶ 11-12; Wilczewski Decl. ¶ 13 & Ex. F; Babis Decl., ¶ 5.) They then returned to the conference room, and Burnett informed Cicvara that he was being terminated for violating the Company's PVPs and company policy by engaging in harassing behavior toward a company supplier. (Burnett Decl., ¶ 11; Wilczewski Decl. ¶ 12 & Ex. F at PG000501; Babis Decl., ¶ 5.)

**Cicvara's Stock Options Were Forfeited By Virtue Of His Termination For Cause**

49. During his employment, Cicvara was awarded stock options pursuant to The Gillette Company 1971 Stock Option Plan (the "Plan"). (Cicvara Dep. Ex. 15.) Under the choice of law provision in Section 13 of the Plan, the Plan and each option issued under it are governed and issued in accordance with the laws of the State of Ohio. (Cicvara Dep. Ex. 15 at PG000199.)

50. Section 6(f) of the Plan defines "Cause" as, among other things, engaging in "gross misconduct":

> If an employee Participant is discharged for Cause, as hereinafter defined, all his options shall immediately be cancelled effective as of the date of termination of his employment. For the purposes of the Plan . . . a discharge for "Cause" shall have occurred where a Participant is terminated because of
>
> . . . .
>
> (B) the Participant's engaging in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Company or the subsidiary.

(Cicvara Dep. Ex. 15 at PG000191-192; Wilczewski Decl., ¶ 15; Burnett Decl., ¶ 13.)

51. On June 21, 2001, Cicvara was awarded 1,950 incentive stock options at a purchase price of $28.98 per share. (Cerasia Decl., Ex. D.)

13

52.     On June 20, 2002, Cicvara was awarded 1,950 incentive stock options at a purchase price of $36.49 per share.  (Cerasia Decl., Ex. D.)

53.     On June 19, 2003, Cicvara was awarded 1,950 incentive stock options and 975 non-qualified stock options at a purchase price of $33.21 per share.  (Cerasia Decl., Ex. D.)

54.     On June 17, 2004, Cicvara was awarded 812 incentive stock options and 1,626 non-qualified stock options at a purchase price of $44.20 per share.  (Cerasia Decl., Ex. D.)

55.     On June 16, 2005, Cicvara was awarded 1,950 incentive stock options at a purchase price of $53.29 per share.  (Cerasia Decl., Ex. D.)

56.     On June 15, 2009, the same day of his termination, Cicvara contacted Wilczewski and asked whether he would receive a bonus for the year and whether he could still exercise certain stock options that he had with the Company.  (Wilczewski Decl., ¶ 14 & Ex. G at PG000504.)  Wilczewski informed him that she would research his questions.  (*Id.*)

57.     Wilczewski then participated in a telephone conference with Burnett and Jason Muncy ("Muncy"), one of the Company's in-house attorneys who advises the business on securities and corporate law.  (Wilczewski Decl., ¶ 15; Burnett Decl., ¶ 13.)  During that conference call, Burnett explained the reasons for Cicvara's termination, at which point Muncy stated that Cicvara's stock options were automatically cancelled as a result of his termination for cause.  (*Id.*)  Muncy pointed Wilczewski and Burnett to Section 6(f) of the Plan, which states that an employee's stock options are automatically forfeited if the employee is terminated for "Cause."  (Wilczewski Decl., ¶ 15; Burnett Decl., ¶ 13; Cicvara Dep. Ex. 15.)

58.     The next day, Wilczewski erroneously told Cicvara that he would receive a bonus when they were paid out in September 2009, and informed Cicvara that he could not exercise the options because they were forfeited by virtue of his termination for cause.  (Cicvara Dep. at 153;

14

Wilczewski Decl., ¶ 17 & Ex. G at PG000504.)  Cicvara informed Wilczewski that he received conflicting information the previous day when he called the stock plan administration number.  (Cicvara Dep. at 153-155; Wilczewski Decl., ¶ 17 & Ex. G at PG000504.)  Cicvara stated that the administrator informed him that employees terminated for cause could exercise their options within thirty days of their termination.  (Cicvara Dep. at 155; Wilczewski Decl., ¶ 17 & Ex. G at PG000504.)  Cicvara, however, did not provide the administrator with details regarding the grounds for his termination.  (Cicvara Dep. at 155.)

59. Wilczewski informed Cicvara that she would call the stock plan administrator and clarify the issue.  (Wilczewski Decl., ¶ 17 & Ex. G at PG000504.)  Later that day, Wilczewski called Cicvara and told him that the information she provided to him earlier was correct and he could not exercise his stock options because they had been forfeited by virtue of Section 6(f) of the Plan.  (Wilczewski Decl., ¶ 17 & Ex. G at PG000504.)  Wilczewski apologized for the incorrect information Cicvara received from the stock plan administrator.  (Wilczewski Decl., ¶ 17 & Ex. G at PG000504.)  Wilczewski further explained that the erroneous information relayed to him did not change the clear terms of the Plan, which determined how options are handled and stated that options are forfeited if an employee is terminated for cause.  (Wilczewski Decl., ¶ 17 & Ex. G at PG000504-505.)

60. After speaking with Cicvara, Wilczewski sent him a letter memorializing their conversation.  (Wilczewski Decl., ¶ 18 & Ex. H.)  Her letter, dated June 16, 2009, explained that the administrator provided incorrect information because she did not know all of the relevant facts and reiterated that Cicvara could not exercise his stock options because of his misconduct, which constituted grounds for forfeiture under the Plan.  (Cicvara Dep. at 155; Cicvara Dep. Ex. 13; Wilczewski Decl., ¶ 18 & Ex. H.)

61. Notwithstanding Wilczewski's statements, Cicvara attempted to exercise his stock options on July 3, 2009. (Wilczewski Decl., ¶ 19 & Ex. I; Cicvara Dep., Ex. 16.) The Company rejected his attempt to do so because his stock options already had been cancelled. (Wilczewski Decl., ¶ 19 & Ex. I; Cicvara Dep., Ex. 17.) On July 6, 2009, Wilczewski sent Cicvara a second letter, once more explaining that his stock options had been forfeited because he had been terminated for cause. (Wilczewski Decl., ¶ 19 & Ex. I.)

**Cicvara Was Not Entitled To A Bonus Under The STAR Plan**

62. Certain Company employees are eligible for a yearly bonus, known as a "Short Term Achievement Reward" or "STAR." (Cicvara Dep. Ex. 14.) These bonuses are calculated based on a formula which takes into consideration each employee's performance, as well as the employee's business unit's performance, and the Company's total results for that fiscal year. (*Id.* at PG000519.)

63. The STAR plan specifically provides that an employee "must be an active employee as of June 30 (the close of the fiscal year for which the award is payable) to receive an award." (Cicvara Dep. Ex. 14 at PG000517; Cicvara Dep. at 161-62.)

64. On September 15, 2009, Cicvara sent Wilczewski an e-mail inquiring about the status of his bonus. (Cicvara Dep. at 160; Cicvara Dep. Ex. 14 at PG000516.) Wilczewski responded that Cicvara was not entitled to a bonus because the STAR plan provided that Cicvara must be employed on June 30th, the date that bonuses are paid, to receive a bonus. (Cicvara Dep. at 161; Cicvara Dep. Ex. 14 at PG000516.)

65. Cicvara was not entitled to a bonus pursuant to the terms of the STAR plan because he was not actively employed on June 30, 2009. (Cicvara Dep. at 161-62.)

**Cicvara Was Never Promised A Severance Package And Is Not Entitled To One**

66. Cicvara has never seen any written document referring to a severance package and he was never promised severance pay. (Cicvara Dep. at 169.)

67. Cicvara believes that there is a severance package for people "who are normally fired. . . . without cause," such as during a reduction-in-force. (Cicvara Dep. at 169.)

68. Cicvara was not laid off or terminated without cause during a reduction-in-force. (Burnett Decl., ¶ 11; Wilczewski Decl. ¶ 12 & Ex. F; Babis Decl., ¶ 5.)

Dated this 15th day of April, 2011, at New York, New York.

Respectfully submitted,

SEYFARTH SHAW LLP


By  s/ Edward Cerasia II
    Edward Cerasia II (ct 13096)
    Hema Chatlani (phv 04023)
620 Eighth Avenue, 32nd Floor
New York, New York 10018
(212) 218-5500
ecerasia@seyfarth.com

Attorneys for Defendants
 The Gillette Company
 and The Procter & Gamble Company