# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

CIVIL ACTION NO. 3:09-CV-2054 (JCH)

-------------------------------------------x
PREDRAG CICVARA,                                 :

                              Plaintiff,         :

                                                 :

        -versus-                                 :

                                                 :

THE GILLETTE COMPANY and PROCTER &               :
GAMBLE COMPANY, Inc., DURACELL, AN
ENTITY OF UNKNOWN FORM and LYNNE                 :
BURNETT,
                              Defendants.
-------------------------------------------x



                Videotaped Deposition of PREDRAG CICVARA,

        taken pursuant to Notice and the Federal Rules of

        Civil Procedure, at the law offices of Levett

        Rockwood P.C., 33 Riverside Avenue, Westport,

        Connecticut, before June Keefer, RMR, RPR, Licensed

        Shorthand Court Reporter, License No. 108, a Notary

        Public in and for the State of Connecticut, on

        December 21, 2010, at 10:03 a.m.

**Page 11**

1  Q. No, no.
2  A. S-t-a-r-a, and then the second word is
3  M-o-r-i-v-i-c-a.
4  Q. And that's Yugoslavia?
5  A. Yeah. That was Yugoslavia at that time.
6  Q. Right.
7  A. So I'm just being precise.
8  Q. When did you first become employed with
9  Duracell or Gillette?
10  A. November 1st, 2000.
11  Q. And who was your employer at that time or what
12  entity was your employer as you understood it?
13  A. It was Duracell Corporation or Duracell, part
14  of Gillette Company.
15  Q. And that was in Bethel?
16  A. Bethel, Connecticut.
17  Q. What role were you hired into?
18  A. Manager of Worldwide Technical Services in the
19  OEM sales group.
20  Q. What does OEM stand for, for the record?
21  A. Original equipment manufacturer.
22  Q. And what were your job duties as the Manager of
23  Worldwide Technical?
24  A. I was in charge of technical issues which
25  salespeople were experiencing in that group. Also in

**Page 14**

time?
2  A. When I was Manager of Business Services I
3  reported to Mani Parmar. M-a-n-i, that's the first name.
4  The last name is P-a-r-m-a-r.
5  Q. And you held the position of Manager of OEM
6  Business Services from, what, 2002 to 2008?
7  A. From April of 2002 until March 31st, 2008.
8  Q. And then in March -- or excuse me, April 1st of
9  2008 you had a new role as the Duracell Lighting Quality
10  Leader?
11  A. I have to correct you. I didn't have new role.
12  I was transferred to that role, to the role of, yes,
13  exactly what you said, Duracell Lighting Quality Leader,
14  which pretty soon became something else in a few months.
15  Q. Okay. But the Duracell Lighting Quality Leader
16  role was different than the manager of OEM; right?
17  A. Yes.
18  Q. Whether it was a transfer or whatever, you had
19  a new job and a new role?
20  A. Yes, because partially I was asking for that
21  because I didn't want to report to the person that I told
22  or was sure was responsible for diversion.
23  Q. Okay. So in the role as the Duracell Lighting
24  Quality Leader you started to report to Harley Ballew?
25  A. Yes.

**Page 15**

1  Q. That's B-a-l-l-e-w?
2  A. Yes.
3  Q. Was there anybody else that you reported to at
4  that time?
5  A. Yeah. I reported to Kevin Babis a few months
6  after that because I was kind of promoted to the position
7  of QA manager. B-a-b-i-s, Kevin.
8  Q. How long did you remain in the role of Duracell
9  Lighting Quality Leader?
10  A. Just two months or three months maybe.
11  Q. So until the summer of --
12  A. Yes.
13  Q. -- 2008?
14  A. Yes.
15  Q. So your last year of employment at the company
16  what was your title?
17  A. QA manager.
18  Q. And you stopped reporting to Haley, right?
19  A. Yes, and I started to --
20  Q. Or Harley, I'm sorry.
21  A. Harley, yes. And I started to report to Kevin
22  Babis.
23  Q. Okay. And what was your -- what were your job
24  duties as a QA manager from about June of 2008 through
25  June of 2009?

**Page 16**

1  A. I was in charge of contractors. That's a broad
2  definition, but contractors. And just to make things
3  clear, Duracell bought many things directly from many
4  other companies and when they came in the form that is
5  ready to be sold directly to the shelves in retail, so if
6  you can brought product directly from the manufacturer,
7  which usually was in China to the retail, then in P&G
8  terms it is contractor. So I was in charge of
9  contractors, and Duracell had about let's say anywhere
10  from 45 to 55 contractors at any given time in the world.
11  That's throughout the world, so China, Indonesia, Taiwan,
12  Japan, Europe, everywhere. And also I was on my way to
13  become a section head in QA, which was I supposed to
14  become on July 1st, 2009 and I never did because I was
15  fired.
16  Q. Did you have a good working relationship with
17  Kevin Babis?
18  A. Excellent.
19  Q. Did you have any animosity or hostility towards
20  him?
21  A. No.
22  Q. Did he ever exhibit any kind of animosity or
23  hostility toward you?
24  A. No.
25  Q. Did you trust him?

Page 17

1    A.  Oh, I don't know.  I honestly cannot answer
2    that, because, you know, from the professional point of
3    view I didn't have any reason not to trust him, but, you
4    know -- and as I said we had an excellent relationship,
5    but to trust somebody you have to have a little bit
6    deeper thing.
7        Q.  Right, but from your professional dealings with
8    him you had no reason not to trust him?
9        A.  No.
10       Q.  In your dealings with him as your manager did
11   you find him to be a fair person?
12       A.  Yes.
13       Q.  Did you find him to be an honest person?
14       A.  I don't know.
15       Q.  In your dealings with him as a manager.
16       A.  In my dealings with him, yes, yeah, I would say
17   so.
18       Q.  Yeah, I'm just asking about your dealings with
19   him.
20       A.  Yeah, yeah.
21       Q.  Now, going back to when you said you were in
22   charge of contractors, does contractors also include
23   companies that supplied parts to the company?
24       A.  No.  No.  That was the distinction.  Whenever
25   somebody supplies the part, that is part for a product

Page 18

1    that is later manufactured, in P&G world that's not
2    contractor, so that's either supplier, vendor or you call
3    it whatever your name, whatever name you want.  The
4    definition of contractor is somebody who is supplying the
5    product that is already packaged in Duracell packaging
6    which is ready to be sent to the shelves in retail.
7        Q.  So it is the final product?
8        A.  The final product, yes.  It means like Duracell
9    would put its name on the products.  And that's usual,
10   you know, that's not just Duracell, everybody is doing
11   that.  So it includes different types of batteries that
12   Duracell did not manufacture but it did sell under
13   Duracell name, and it did include flashlights, you know,
14   memory cards, all these other things that are not
15   directly connected to the batteries.
16       Q.  Are you familiar with a company out of Hong
17   Kong called Practical Lighting?
18       A.  Yes.
19       Q.  And is Practical Lighting one of the
20   contractors?
21       A.  Oh, I have to correct you.  I'm sorry.  When
22   you said out of Hong Kong, they don't have name Practical
23   Lighting in Hong Kong; they have some other name.  They
24   cannot use that name in Hong Kong because it's already
25   sold to somebody.  So I think, I believe their name in

Page 19

1    Hong Kong is World Hint, I'm not sure, World Hint,
2    H-i-n-t, but I'm not sure even in that, but it's
3    different.  In Hong Kong per se it's a different name,
4    but it's Practical, yes.
5        Q.  Okay.  Where was -- where did you understand
6    Practical Lighting to be based out of?
7        A.  I had very good understanding of it.  Practical
8    Lighting had three manufacturing facilities.  One
9    facility was in Zhongshan, China.  It's
10   Z-h-o-n-g-s-h-a-n, Zhongshan, okay, that's in China.  The
11   other facility is in Bangkok, Thailand.  And the third
12   facility is in Medan, M-e-d-a-n, Indonesia.  So they had
13   three manufacturing facilities, and the third facility
14   didn't have even name Practical.  The name Practical was
15   only in Thailand and in Zhongshan in China.  The third
16   facility, let me try to refresh my memory just a second.
17   Oh, okay.  So here you can actually see exactly, if you
18   want, this P.T. Era Cipta, that's the name of the
19   company.
20       Q.  Can I see the card you're looking at?
21       A.  Yeah, sure.  That's the director.
22       Q.  What are the other cards that you have in your
23   hand?
24       A.  Oh, the other card, this is the owner of the
25   Practical Company, Mr. Andrew Yau.  I have Yuen Yau,

Page 20

1    which is Practical Flashlight Company in Thailand.  And I
2    have Mr. Willies Kurniawan, P.T. Cipta Elektrik
3    Kreasindo; that is the second part of the P.T. Era Cipta
4    in Indonesia, which is son of the owner, who actually
5    drove us when we were doing audit in Indonesia.
6        MR. SIKORSKY:  May we have those copied
7    and then put in?
8        MR. CERASIA:  Sure, that's what I'll do.
9        MR. SIKORSKY:  Just a photocopy, since
10   they've become part of the testimony.
11       THE WITNESS:  These are originals, maybe
12   I would like to have them.
13       Q.  Andrew Yau --
14       A.  Yes.
15       Q.  -- was the chairman of Practical?
16       A.  Yes; correct.  He was the boss of Bel Liu,
17   B-e-l, L-i-u.
18       Q.  And he ran the Practical Company was your
19   understanding?
20       A.  Plus he ran some -- many other businesses.
21       Q.  Okay.  I need to go back to a question I asked
22   before you told me what the different name of Practical
23   was, maybe in Hong Kong.  Was Practical one of the
24   contractors that you've identified?
25       A.  Yes.  Yes, one of the contractors, with the

Page 21

1  three manufacturing facilities, yes.
2      Q.  Correct.  And it was a contractor with respect
3  to the flashlights?
4      A.  Yes.
5      Q.  Which ones, the Daylite?
6      A.  Well, no.  There were many other contractors
7  for flashlights.
8      Q.  No.  I'm just asking about Practical, what did
9  it contract --
10     A.  Yeah, and in order for me to answer I have to
11  explain.  So if you allow me I will try to explain.
12  Daylite is a new product that Duracell launched and there
13  are many different types of flashlights for Daylite, it's
14  double A, triple A, there is a C and D, so five models at
15  least.  Two first models that were launched were not
16  given to Practical, they were given to Smart Light which
17  was another Chinese company that manufactured for
18  Duracell, which actually Practical didn't like, and they
19  didn't know that at the point.  We were trying not to
20  interfere with the businesses between the companies, but
21  they come to know it, and I don't even know how, but they
22  come to know it, so they actually make a lot of pressure
23  to Duracell to give them C and D businesses for Daylite,
24  which we did.
25      So that answers your question, yes, they were

Page 22

1  involved in the Daylite product, but they were not
2  involved at the beginning, which they didn't like at all,
3  because they felt they're losing business that they are
4  entitled to have.  So I think it's very important to say
5  that.
6      Q.  So the relationship at some point was a little
7  bit strained --
8      A.  Yes.
9      Q.  -- is that fair to say?
10     A.  Yes.
11     Q.  Because Mr. Yau and the folks at Practical were
12  upset with Duracell that they weren't getting more of the
13  business?
14     A.  Exactly.
15     Q.  What year was that?
16     A.  We launched Daylite in 2008 at the end.  So
17  basically the Daylite started to be, you know, processed
18  and manufactured throughout -- to be designed and
19  manufactured, double A and triple A, first two models, in
20  2008 throughout the year, and that was all with Smart
21  Light.  So the first time that Practical got involved was
22  towards the end of 2008 where they get D cell flashlight,
23  Daylite, and they were supposed to get certain orders by
24  the end of 2008 which they didn't, which again made them
25  very, very unhappy because their manufacturing facility

Page 24

1  his e-mail you promised that the business is going to
2  grow with Practical, we expected lots of orders and it
3  never come, so maybe when we see each other next time we
4  should sit down and talk about how this is going to
5  change, which means that he actually used my firing and
6  my alleged harassing of Bel Liu, alleged harassing of Bel
7  Liu, in order to gain leverage over Duracell, which he
8  actually did straightforwardly in that e-mail.
9          MR. CERASIA:  By the way, Erik is with a
10  K.
11         THE WITNESS:  Oh, I'm sorry.
12         MR. CERASIA:  That's okay.  And Daylite
13  is D-a-y-l-i-t-e.
14         THE WITNESS:  D-a-y-l-i-t-e, yes.  It's a
15  very unusual spelling.  It's probably to avoid certain
16  things and to give it brand mark.
17     Q.  You've referred to the fact that you audited
18  one of Practical's facilities in China.  What do you mean
19  by auditing the facility?
20     A.  Well, auditing is about a two-day event where
21  you go over what they call QAKE 1 through 19, Q-A-K-E
22  capitalized, 1 through 19, which means Quality Assurance
23  Key Elements 1 through 19, which is P&G quality assurance
24  way of auditing facilities, and again this is important
25  for the whole story so I'll give a little bit of

Page 34

1      Q.  And she was a quality assurance person as well?
2      A.  Yes, and she was also inspector that we used
3  very heavily on inspecting flashlights, Daylite
4  flashlights especially, before the shipments are sent to
5  U.S.A., but she actually worked same as River, she worked
6  in Chinese Duracell factory.
7      Q.  Now, the position that you held over the last
8  year of your employment as the QA manager reporting to
9  Kevin Babis --
10     A.  Yes.
11     Q.  -- would you consider that to be a very
12  important role for the company?
13     A.  Yes, it was important.  I wouldn't say very
14  important.  It was important, yes.
15     Q.  Okay.  And in that role that you were the
16  Duracell face from a quality point of view to the
17  contractors?
18     A.  Yeah.
19     Q.  And you had interaction with the contractors;
20  right?
21     A.  Yes, I had interactions with the contractors,
22  yes.
23     Q.  On important quality issues?
24     A.  On every quality issues, on each and every
25  quality issue, not just important or not important, every

Page 35

1  quality issue, starting with any document, with
2  everything that you can imagine from the quality point of
3  view, so yes.
4      Q.  And your relationship with those contractors
5  was important for Duracell's business, right?
6      A.  Yes.  Yes, it was.
7          MR. CERASIA:  Why don't we take a break
8  because there are some documents here that Mr. Cicvara
9  gave us that we have not seen before.  They were never
10  produced to us.  So I'd like to make copies of these.  I
11  don't know if you want to look at them first.  I don't
12  know if you've seen them.
13          MR. SIKORSKY:  Yes, if you want to mark
14  them for identification.
15          THE VIDEOGRAPHER:  Off the record at
16  10:52 a.m.
17          (Recess:  10:52 to 11:09 a.m.)
18          (Cicvara Exhibits 1 through 3: Described
19  in Index - marked for identification.)
20          THE VIDEOGRAPHER:  On the record at 11:09
21  a.m.
22  BY MR. CERASIA:
23      Q.  Mr. Cicvara, I'm going to show you what's been
24  marked as Cicvara Deposition Exhibits Numbers 1 and 2.
25  If you'd take a look at Exhibit 1, it's a document

Page 36

1  entitled P&G Worldwide Business Conduct Manual Receipt
2  Confirmation.
3      A.  Yes.
4      Q.  And my question is, is that your signature
5  there?
6      A.  Yes.
7      Q.  Okay.  And that's dated 12/12/2005; correct?
8      A.  Yes.
9      Q.  And the second document you have in front of
10  you is a copy of the Worldwide Business Conduct Manual.
11  Have you seen that document before?
12      A.  Sure, I did, yes.  I actually read it a couple
13  of times.
14      Q.  You read it a couple of times?
15      A.  Yes, trying to find certain things in it.
16      Q.  Did you read it when you were employed with
17  Procter & Gamble?
18      A.  Yeah.  Everybody had to read it, so.  This is
19  stating that I actually did read it.
20      Q.  Why don't you take a look at the -- put Exhibit
21  1 to the side for a minute.  Take a look at Exhibit 2.
22  If you go to the bottom you'll see there's small
23  numbers in the bottom right-hand?
24      A.  Yeah, sure.
25      Q.  And I'll refer to those numbers so we know

Page 38

1  Exhibit 2.  Put Exhibit 3 just to the side for a minute.
2  So in that sentence it says, in our purpose, values and
3  principles and in how well we live them as individuals
4  and as a company, right, and then it says It is
5  consistent with our historic principle of doing the right
6  thing, period.
7      A.  Yes.
8      Q.  Integrity, trust and respect for others have
9  been fundamental P&G values since the company was founded
10  in 1837.
11      A.  Yep.
12      Q.  Did you understand that P&G lived by the PVPs?
13      A.  Sure, and I actually lived by PVPs as well.
14      Q.  And you believe that as a management level
15  employee of Procter & Gamble that it was important for
16  you to act with integrity?
17      A.  Yes.
18      Q.  So that the contractors and people with whom
19  you dealt trusted you; right?
20      A.  Yes.
21      Q.  And it was important for you as a manager of
22  the company to treat others with respect; right?
23      A.  Yes.
24      Q.  And you would have expected any employee to
25  report to you to also carry out those PVPs; right?

Page 40

1  employment?
2      A.  I would like you to be much more specific in
3  what you just said.  What does it mean violate?  I don't
4  understand that at all.
5      Q.  Okay.  That's fair enough.
6      A.  Violation of PVP doesn't tell me anything, I'm
7  sorry.
8      Q.  Okay.  Why don't you look at the document
9  numbered Exhibit 2 on page PG 346.
10      A.  346, okay.
11      Q.  It's section 6, called behavior in the
12  workplace.
13      A.  Okay.  Yep.
14      Q.  Do you remember being familiar with this
15  harassment discrimination policy?
16      A.  I don't really particularly remember that, but
17  I probably read it, yes.
18      Q.  Did you understand as a management level
19  employee of Procter & Gamble that it was against company
20  policy to make sexual advances towards women?
21      A.  I'm sorry, I don't understand that question.
22  Could you be more specific.
23      Q.  Sure.  Did you understand in your role as, for
24  example, QA manager --
25      A.  Yes.

Page 41

1    Q. -- did you understand during the time that last
2 year you were employed that company policy prohibited you
3 from making sexual advances towards either female
4 customers or contractors or employees?
5    A. Yes, I understood that, yes.
6    Q. And did you understand that you could be fired
7 from Procter & Gamble if you in fact had made sexual
8 advances towards female contractors or employees?
9    A. It would depend on the circumstances I would
10 say.
11    Q. What do you mean by that?
12    A. I wouldn't say that straightforwardly if I made
13 any sexual advances to contractor that I would be fired.
14 I don't think that that's written anywhere in here. If
15 you find it you can read it to me. I would really
16 appreciate that.
17    Q. If you look at the summary of company policy
18 statement.
19    A. Where is the summary?
20    Q. That's on this page that you're looking at.
21    A. Okay.
22    Q. It's on the left-hand side.
23    A. Okay.
24    Q. It says the company's fundamental position is
25 that all employees should treat their colleagues with

Page 43

1    Q. And then in parentheses it says what do I need
2 to do or refrain from doing?
3    A. Yes.
4    Q. It's kind of a guide to you, right, as an
5 employee?
6    A. Oh, sure, and I would strongly agree that's a
7 guide, yes.
8    Q. And it says one of the things don't engage in
9 discrimination or harassment?
10    A. Agreed, yeah.
11    Q. Did you understand under the company's policy
12 in its Worldwide Business Conduct Manual that if you made
13 an unwelcomed sexual advance towards a contractor that
14 that would be a violation of the policy?
15    A. Yes, if I made unwelcomed sexual advances to
16 the contractor it would be violation of this policy, yes,
17 I do agree with that wholeheartedly.
18    Q. And you would agree with me that that would be
19 serious misconduct; right?
20    A. That would be a serious misconduct if I had
21 done that, yes. If I harassed a contractor it would be a
22 serious misconduct, I would agree with that, yes.
23    Q. And would you agree that that would be -- that
24 kind of conduct would be something that could injure the
25 company's relationship with the employee of that

Page 46

1 being very straightforward with the things that were
2 performed in auditing, so that if the company A were
3 audited and company A had 60 then you would say company B
4 if it had 60 you would expect more or less the same
5 circumstances as the company A had. So if B and A had
6 the same score you would expect that those two companies
7 are equitable. It's very important.
8    Q. As far as Duracell's reputation, it obviously
9 can only impact its reputation through its managers like
10 yourself; right?
11    A. Yeah, through every employee, not just
12 managers.
13    Q. Right, I understand.
14    A. Yes.
15    Q. But you as a manager, let's just focus on you
16 for a minute, your conduct impacted Duracell's
17 reputation, whether negative or positive; correct?
18    A. Yes.
19    Q. All right. So that your -- what you wanted to
20 do is you -- your charge from the company, so to speak --
21    A. Yes.
22    Q. -- was to act in accordance with its PVPs so
23 that you would enhance its reputation in the industry;
24 correct?
25    A. Correct, yes, and I actually did act in

Page 49

1 you were always supposed to try to do the right thing;
2 correct?
3    A. Yes, which I always did.
4    Q. And that you knew that you had to be honest and
5 straightforward in your dealings with contractors?
6    A. Yes.
7    Q. And that you had to respect the employees of
8 those contractors with whom you dealt; right?
9    A. Sure, I understand that.
10    Q. And that you were held personally accountable
11 for your conduct towards those employees of contractors;
12 correct?
13    A. Yes.
14    Q. Why don't you take a look at what's been
15 marked as Cicvara Exhibit 4 --
16    A. Yeah, okay.
17    Q. -- which is a job description.
18    A. This description was just for the few months.
19    Q. This was the job description you had when you
20 reported to Harley Ballew?
21    A. Yes.
22    Q. And it was for the time period of roughly you
23 thought from March -- or, excuse me, April 1 until --
24    A. July probably.
25    Q. July of 2008?

Page 50

A. Yes. Just to be -- I don't even know, but just to be straight.

3  Q. Roughly about that time period?

4  A. Roughly, yes.

5  Q. I understand that it's your best guess. Did

6  your job duties when you became a quality assurance

7  manager change at all from this job?

8  A. Yes. Yes. They changed considerably, because

9  I got two employees who are reporting to me. Before this

10 Austin Lin was not a person who reported to me, he was a

11 person who reported to Harley. Francisco Restrepo was

12 the other which I couldn't remember. So Francisco,

13 F-r -- Francisco is Francisco. Restrepo is

14 R-e-s-t-r-e-p-o. Okay.

15 Q. So Francisco and Austin started reporting to

16 you when you became a quality assurance manager?

17 A. Yes.

18 Q. So they reported to you roughly your last 11

19 months of employment at Procter & Gamble?

20 A. Roughly, yes, you're right.

21 Q. Okay.

22 A. And they brought certain things with them which

23 they used to do before which I couldn't agree with, which

24 particularly affected Austin Lin very heavily.

25 Q. Okay. Why don't you look at qualification

Page 51

number 6 on Exhibit 4 right on the first page right at

2  the bottom.

3  A. Okay. It says -- could I read that?

4  Q. You can read it to yourself right now.

5  A. Okay, excellent.

6  Q. Tell me when you're done. You should read

7  anything I give you.

8  A. Okay. Thank you. Yes.

9  Q. So job qualification number 6, which refers to

10 the P&G Worldwide Business Conduct Manual?

11 A. Correct.

12 Q. Do you believe that that was one of your job

13 qualifications when you were --

14 A. Sure.

15 Q. You've got to let me finish.

16 A. Yeah, I believe that was.

17 Q. You've got to let me finish. Do you believe it

18 was one of your job qualifications when you were a

19 quality manager from July of 2008 through June 15th,

20 2009?

21 A. Yes. It was my duty to do according to this

22 not only from July to June 2009, but I would say

23 throughout my employment. So that is nothing new there.

24 Q. So job qualification 6 applied to every

25 position you held at the company?

Page 52

1  A. Yes, every position, and not only me but every

2  employee.

3  Q. I understand.

4  A. So if I find that employees who are not doing

5  their job according to this, it's my duty to report that

6  too, which I did.

7  Q. Can you give me Exhibits 3 and 4.

8  A. Yes.

9  Q. I'm done with those for now.

10 A. Sure (handing.) Okay.

11 Q. I just want to make sure that, you know, you

12 don't leave home with them, it's a holiday present or

13 something.

14 A. Yeah, I have that at home. Don't worry about

15 that.

16 Q. When did you first meet Bel?

17 A. You mean first -- I think in September 2008

18 when Practical visited Duracell with respect to Daylite

19 development.

20 Q. Right. And when I refer to Bel, you understand

21 I'm speaking about Bel you pronounce her name Liu?

22 A. Yes.

23 Q. L-i-u?

24 A. L-i-u, yes.

25 Q. I'll refer to her as Bel, though, okay?

Page 53

1  A. Okay.

2  Q. All right. So you first met her in September

3  of '08 when she came to Bethel, Connecticut?

4  A. Yes.

5  Q. Between September of '08, counting that trip,

6  until your last day of employment on June 15th of 2009,

7  how many times did you -- how many different trips did

8  you see Bel on?

9  A. Two.

10 Q. Two?

11 A. Yes.

12 Q. When else, other than September of '08 when was

13 the next time?

14 A. The next time was December 2008 in China and

15 then it was June 2009 first in Indonesia and then in

16 Thailand.

17 Q. So you saw her a total of three times?

18 A. Yes.

19 Q. Three different times?

20 A. Three times, yes.

21 Q. Multiple-day trips some of them; right?

22 A. Correct, yes.

23 Q. And what was her role within Practical as you

24 understood it?

25 A. That was, as I understood she was general

manager of Practical, and if I'm not mistaken she became
vice president of Practical recently, but I'm not sure.
3    Q.   So while you knew her during that, you know,
4  eight, nine month period she was a general manager at
5  Practical?
6    A.   Yes, she was general manager at Practical.
7    Q.   Do you know what her job responsibilities
8  entailed?
9    A.   She was always in contact with design people in
10 Duracell, with marketing people in Duracell, with program
11 management in Duracell, with purchasing people in
12 Duracell, with QA people in Duracell.  So she was
13 basically in contact with everybody in Duracell,
14 everybody, very, very -- position which entailed many,
15 many different venues, and she was very strongly aligned
16 with Austin Lin.
17   Q.   What do you mean by strongly aligned?
18   A.   I mean that during the course of 18 months that
19 I was without work, since I was fired, I learned a lot of
20 things about Austin Lin and Bel Liu, but I actually
21 noticed things even before that.
22        So, for example, in September when she visited
23 Duracell she -- Austin Lin was not there, he had to go
24 somewhere, but she told me that Austin bought a bag for
25 her and that he told her that I will show her how to come

1  felt -- she didn't feel good, and when I came to her
2  room --
3    Q.   Was that in her room?
4    A.   Yes.  When I came to her room, she opened up
5  dressed very inappropriately.  When I say that I mean she
6  was dressed nearly undressed and it was very, very
7  unusual because I was before in her room and she would
8  never be dressed like that, especially when she called me
9  to come.
10   Q.   Okay.  What do you mean by she was dressed
11 inappropriately?
12   A.   She was dressed in shorts which was very, very
13 short, very, very short, naked legs, dressed in a blouse
14 which was white, clear basically, nearly clear, so you
15 would -- you know, you would kind of see her through it,
16 and I was very surprised because the reason I actually
17 asked her can I come to your room to have dessert with
18 you, before that we had dinner and after dinner there was
19 a special dessert brought to each of us which was mango
20 with rice, which was very special, which was special
21 dessert for Thailand.  I sent text message to her asking
22 her I would like to come to your room to have dessert
23 with you.  The second text message was I don't want you
24 to come, I'm tired.  The third was, okay, I accept that,
25 from me.  The fourth was I changed my mind, you can come

1    Q.   One time --
2    A.   Except that time at the airport.
3    Q.   So one time was at the airport?
4    A.   Yeah.
5    Q.   And where were the -- what were the other
6  times?
7    A.   Well, the other times were on June 8th in the
8  room, you know, in that room.
9    Q.   When you say in that room, you're referring to
10 her hotel room?
11   A.   Yes, to the hotel room where she invited me to
12 come.  This is very important.  I would like you to put
13 that in.  She invited me to come to the room.
14   Q.   Did you ever -- when you hugged her did you
15 ever put your hands on her body other than her back?
16   A.   No.  No, I never touched her body.  I never
17 touched her breasts, if you mean that.  I never touched
18 any part of her body which would be considered private,
19 never.  I touched her back, I touched her legs, I
20 massaged her feet for a while, which I'm actually ashamed
21 of doing because I usually do that to my wife, ashamed of
22 doing now, but I never touched her body in a sexual
23 sense, never.
24   Q.   Why did you massage her legs and her feet?
25   A.   Because she told me that she felt bad, that she

1  and forth by text messages, was this June 8th, 2009 that
2  you're referring to?
3    A.   Yes, it was June 8th, 2009 between 8 -- I would
4  say 8:50 p.m. Thailand time and 9:05 p.m. Thailand time,
5  so in the span of five or ten minutes.  That time,
6  Pacific Time is between 7:00 something a.m.  I'm telling
7  that because everything that you have, all the trace of
8  records that you have, phone records, are Pacific Time
9  U.S.A. and there is a 14 hours difference.  It's not that
10 easy to decipher.  It's very important, though.
11   Q.   And when you said you massaged her feet and her
12 legs, that was on June 8th, 2009?
13   A.   Yes.
14   Q.   Is that the only time that you claim that you
15 touched her other than hugging her?
16   A.   Yes.
17   Q.   You never touched her any other time?
18   A.   No, not in that sense, no.
19   Q.   Did she ask you to massage her feet?
20   A.   She didn't object.
21   Q.   Did she ask you to massage her feet?
22   A.   No.
23   Q.   Did she ask you to massage her legs?
24   A.   I didn't massage her legs, just her back.  I'm
25 sorry.

1    Q.  I think you testified that you massaged her
2  feet and her legs.
3    A.  I didn't massage her legs.  I massaged her feet
4  and back.
5    Q.  And her back?
6    A.  Yeah.
7    Q.  Did she ask you to massage her back?
8    A.  She didn't ask me to massage anything, but --
9    Q.  You just -- so you did it on your own?
10   A.  Yes, I did it on my own, yes.
11   Q.  Okay.  And do you think it was appropriate for
12 you as a quality manager to massage the feet of a general
13 manager for a contractor?
14   A.  In the circumstances that we were on, yes, in
15 the circumstances that we were on I would say that,
16 because she did -- as I said she touched my leg when we
17 were driving in the SUV in Indonesia.
18   Q.  You said she touched your tie.
19   A.  (Indicating.)
20   Q.  Oh, your thigh?
21   A.  Thigh, not this tie (indicating).  She put her
22 hand on my thigh.  She was sitting in front.  I was
23 sitting in back.  She put it and she actually did grab my
24 thigh, and the man who was next to me who was auditor in
25 Indonesia, Dave Arnsperger -- girl, I'm not sure how to

1    Q.  When you do what with your legs?
2    A.  What she did with her legs is she actually
3  uncovered herself and she spread her legs just enough so
4  that you can take a look and then she closed her legs and
5  she was laughing at me, and then I said when you do such
6  things one could rape you, and then we had academic
7  discussion about rape.  She probably expected me to act
8  upon that, and actually when she said what is rape, I
9  started to explain that, whatever is on the bed, you know, she was
10 somebody is, you know, attempting to forcefully have sex
11 with you and blah, blah, blah.  That was the extent of
12 it.
13   Q.  What do you mean by --
14   A.  And I'm very sorry.
15   Q.  What do you mean by when you say she uncovered
16 herself?
17   A.  Oh, she was like -- you know, she was in -- how
18 you call that, whatever is on the bed, you know, she was
19 covered by that, and then she actually did this and she
20 showed her leg to me (indicating).
21   Q.  Do you claim that she was in the bed in
22 something other than this blouse and her shorts?
23   A.  No.  No.  She was in her blouse and her shorts,
24 but when she did that she was turning -- spreading her
25 legs and putting her legs like this (indicating).  I

    mind, but I didn't come to that room to have sex, and I
2  would never, I would never have sex with a woman who said
3  no, never.  So I'm just not that person.
4    Q.  Okay.  When you saw her at the door did you
5  then want to have sex with her?
6    A.  No, at that point, no, I was very surprised
7  actually.
8    Q.  How about when you were rubbing her feet, did
9  you want to have sex with her?
10   A.  That is sensual, yes.  I didn't want to have
11 sex with her, but I thought about that, yes.  It wouldn't
12 be, you know.
13   Q.  How about when you were rubbing her back, did
14 the thoughts come to your mind to have sex with her?
15   A.  I don't -- I'm not sure.  For me it's much more
16 sensual to have feet than the back.  I'm not sure I was
17 thinking about that.  As I said I massage my wife and I'm
18 really sorry of what I did to my wife.  That would be the
19 extent of what I did to her.
20   Q.  Did you ever tell her that you had a feeling
21 that you would rape her?
22   A.  No.  That is very misinterpreted in that -- in
23 those notes.  I never said I would rape you.  I said when
24 you do that with your legs one could rape you.  That's
25 exactly what I said.

1  don't know why she did that.
2    Q.  But she had her shorts on?
3    A.  Yes, yes, she had her shorts on.
4    Q.  And you claim she spread her legs and then she
5  crossed her legs?
6    A.  Yes, and she did that repeatedly.
7    Q.  Why didn't you walk out?
8    A.  Well, you know, I ask myself that question
9  because there was something strange about all of the
10 situation I must say.  I didn't because it's just that, I
11 felt I would be with her, and I actually was invited to
12 the room, don't forget that.
13   Q.  I understand, but she didn't tie you down, did
14 she?
15   A.  No, she didn't.  I mean why would I leave the
16 room?  What did I do to leave the room?  I mean why would
17 I leave the room?
18   Q.  Were you uncomfortable when she spread her legs
19 and crossed them?
20   A.  I was feeling very strange, yes.
21   Q.  And you still didn't leave the room?
22   A.  No, I didn't.
23   Q.  Did you think that was poor judgment on your
24 part?
25   A.  Yes, it was.  I would agree it was poor

Page 97

1 because she apologized to me, she apologized to me twice,
2 once on Tuesday night and once on Wednesday morning, and
3 she apologized profusely, she said I'm so sorry that this
4 is happening to you but it was out of my control, that's
5 exactly what she said, she said out of my control.  Now
6 you think --
7    Q.  Did you ask her what she meant?
8    A.  Yes.  And she said I can't tell you, you will
9 see, I can't tell you.  Apologized to me.  Why would
10 somebody that I harassed apologize to me?
11    Q.  There's no question.
12    A.  She had all the time in the world --
13    Q.  There's no question, Mr. Cicvara.
14    A.  Okay.  I understand.
15        MR. CERASIA:  Mark that as 5 please.
16        (Cicvara Exhibit 5: Email - marked for
17 identification.)
18    Q.  Showing you what's been marked as Exhibit 5, if
19 you look down at the bottom, first of all it's a document
20 bearing number PG 470?
21    A.  Uh-huh.
22    Q.  Under the section marked SMS, the text, you see
23 it down at the bottom?
24    A.  Yeah.
25    Q.  Was (203)243-0079 either your cell phone or

Page 98

1 BlackBerry number?
2    A.  BlackBerry number.
3    Q.  Okay.  And did you send this text message or
4 SMS to Bel?
5    A.  Yes.
6    Q.  Was this the day after you were in her hotel
7 room June 8th?
8    A.  Yes, it was.
9    Q.  When you say -- I think there's a typo there,
10 it says I hope you will, it says b-e-w, but I assume it's
11 to be be, be better soon, what was wrong with her?
12    A.  I don't know.  She was -- we were told that she
13 is not there the second day on audit.  I don't know what
14 was wrong.  She said she's -- the guy said she's sick.
15    Q.  Who told you that?
16    A.  After Yuen told Predrag I was -- let me just
17 take a look, because I don't want to guess.  I think this
18 gentleman, Yuen Yau.
19    Q.  Y-u-e-n?
20    A.  Y-u-e-n, and last name Y-a-u.  He told us that,
21 because he picked me and Lori at hotel that morning and
22 he said she's going to be out for today because she's
23 sick.
24    Q.  And then you say to her in this text feel
25 terrible that can't be with you and pamper you?

Page 99

1    A.  Yes, I did say that.
2    Q.  How were you going to pamper her?
3    A.  Just to make her feel good.  I don't think --
4    Q.  Rub her feet?
5    A.  -- there was anything special in the word
6 pamper.  Maybe I used the wrong word.  Just -- you know,
7 just to make her feel good.  I still didn't understand
8 what I understood after the next message, which was, hey,
9 we are not a couple so why are you saying this, and I
10 just couldn't understand that coldness coming out of her
11 at that moment.  I was really shocked with that.
12        MR. CERASIA:  Mark that as 6 please.
13    Q.  All right, Mr. Cicvara, why don't you give me
14 number 5, if you can give me that back, please.
15    A.  Sure.  I think you have to put --
16    Q.  Yeah, you've got to wait.  You took it from
17 her.  Give it back.
18    A.  Sorry.
19        (Cicvara Exhibit 6: PG000471 - marked for
20 identification.)
21    Q.  Showing you what's been marked as Cicvara
22 Exhibit 6, which is another text message, it's PG 471.
23 If you look at the bottom, is that the reply you received
24 from Bel?
25    A.  Yes.

Page 100

1    Q.  And that's the reply to Exhibit 5; right?
2    A.  Yes.
3    Q.  Okay.
4    A.  And that was really kind of shocking, the way
5 she wrote it, because first of all I never thought that
6 we are couples and I never thought we are lovers, and
7 when she said please stop thinking about me that was
8 really strange because she actually did everything in her
9 power for me to think about her within six months, you
10 know, from December to June.
11    Q.  Right.
12    A.  I just couldn't, you know, get rid of her
13 messages, e-mail messages, which I asked for and they
14 were never produced because computer was -- disappeared.
15    Q.  So that's the reply.  But let me ask you this.
16 Do you have any female friends?
17    A.  Do I have any female friends?
18    Q.  Yeah.
19    A.  I probably do.
20    Q.  Any of them who get sick and you write to them
21 that you want to pamper them?
22    A.  No.  No.  No.  Sometimes maybe.  I don't know.
23 If I'm very close maybe I don't pamper but I would like
24 to help.
25    Q.  Right.  Pamper suggests that you wanted to be

Page 103

1    to hear me, you know, saying things sort of, or, you
2    know, whatever it was in the room, so I said, no, you
3    don't have to play it because I know what happened in
4    that room and I was in that room.  She also mentioned,
5    you know, like cameras, but she mentioned specifically
6    there was a recording from her boss' answering machine of
7    what was going on in that room, which came out not to be
8    true as you know.  The recording was from Wednesday, June
9    10th, in the morning.  There was no ever any recording
10   from that room.
11             MR. CERASIA:  Can you mark this as 7.
12       A.  So I was lied to.
13       Q.  Okay.  There's no question.
14       A.  Okay.  I think it's important.  And it's not in
15   the notes.
16       Q.  There's no question.
17       A.  It's not in the notes, which means the notes
18   are not valid.  I never saw the notes too.
19       Q.  Mr. Cicvara, there's no question, please.
20       A.  Okay.  Good.  I got this --
21       Q.  There's no question.
22       A.  I'm saying I shouldn't be reading this.
23             (Cicvara Exhibit 7: PG000472 - marked for
24   identification.)
25       Q.  I'm showing you what's been marked as Exhibit

Page 104

1    7, which is Bates number PG 472.  Let me ask you if this
2    is the response to your text message which was Exhibit 6?
3        A.  Right.  It says Thanks for the good time
4    though, P.  It might be.  I'm not sure that I ever
5    used --
6        Q.  Well, that's your --
7        A.  -- P point after I sent a message.  I usually
8    use either Predrag or I'm not using anything.  So
9    obviously it is, but somehow it doesn't look like I did
10   it.  It must have been a new computer --
11       Q.  Well, you were doing different things that you
12   had never done before according to you during that time,
13   right, like rubbing the feet --
14       A.  Oh, like rubbing another woman's feet, yes, I
15   would agree, yes, I was doing that.
16       Q.  All right.  I have no other question about
17   Exhibit 7.
18       A.  Okay.
19       Q.  Give it back.
20             MR. CERASIA:  Mark this as 8 please.
21             (Cicvara Exhibit 8: PG000473 - marked for
22   identification.)
23             (Cicvara Exhibit 9: PG000474 - marked for
24   identification.)
25       Q.  I'm going to show you what's marked as Exhibit

Page 105

1    9, which is Bates number PG 474, it's a text message from
2    you June 10th, 2009 at 11:15.  And if you look at Exhibit
3    7, you had sent that at 11:14, right?
4        A.  That was June 9 and this is June 10.
5        Q.  Oh, it's a whole day difference.  Okay.  I
6    might have been looking at Exhibit 8.  Thank you for
7    correcting me.
8        A.  Okay.
9        Q.  So on the 10th you write to her, just wanted to
10   tell you that I am, and dot, dot, dot, just wanted to
11   tell you that I am still in a shock and disgusted by
12   myself and my poor judgment of things that were going
13   between us, forgive me if you can, P.
14       A.  Yeah.
15       Q.  What did you mean by that?
16       A.  I was trying to apologize for the thinking that
17   at some point it might be -- instead of friendship our
18   relationship might be a little bit more than that, and I
19   actually found out that it was very unusual that she sent
20   message as she did like we are not couple and we are not
21   this, so I apologized for me ever thinking about -- that
22   there could be something more going on between us than
23   that.  That was the reason why I did this.
24       Q.  Because you thought that there was more going
25   on between you, right?

Page 106

1        A.  As I said, I can't deny that it's crossed my
2    mind, yes.  I wouldn't deny that.  And I also said that
3    one of the things I really did wrong is I did wrong to my
4    wife on whatever I did with this woman.  So that -- I
5    feel strongly about that, but I didn't harm the company
6    at all, at all.
7        Q.  Then why were you in shock?
8        A.  I don't know.  It might be a poor choice of
9    words again.
10       Q.  You've got a lot of poor choice of words; do
11   you blame that again on your lack of command of the
12   English language?
13       A.  No, I don't blame it on lack of command.  I
14   blame it maybe on text messaging where you are expected
15   to send answer quickly.
16       Q.  Well, did anybody tell you you had a certain
17   amount of time to send her this text message?
18       A.  No, nobody told me that.  I had all the time in
19   the world to do it, but usually what I did when I
20   answered text message is I answered immediately.  You
21   will notice that from the text messages that were
22   exchanged.  You have the record.
23       Q.  Why were you disgusted with yourself?
24       A.  I don't know.  I thought that it's not a good
25   thing that you would go over friendship if the other

**Page 109**

1  never even told me that she felt bad.  She told me don't
2  rub -- don't rub my feet anymore; I stopped.
3  Q.  Why don't you look at Exhibit 8, which is a
4  June 10th, 2009 text message from you to Bel 6:27,
5  bearing Bates number PG 473.
6  A.  Okay.  Yes.
7  Q.  Did she --
8  A.  That was when she apologized to me.
9  Q.  Did you buy her a T-shirt?
10  A.  Yes.
11  Q.  And she returned it to you?
12  A.  She returned it to me after all this happened,
13  yes.
14  Q.  Why did you buy her a T-shirt?
15  A.  Because she was like, oh, I need to buy this
16  T-shirt, she bought two already, and then, well, I spent
17  already too much for this, oh, should I buy this T-shirt,
18  no, I spent too much already, and she's actually
19  collecting T-shirts from -- what's the name of the store
20  that the stars, the rock stars -- I forgot, it doesn't
21  matter -- Hard Rock Cafe, okay, so she's collecting those
22  shirts and she wanted to buy the shirt but she already
23  bought two, so I said I'll buy it as a present for you.
24  I paid with my personal card and my wife found that, so I
25  had something to explain to my wife about this.  But,

**Page 110**

1  yes, I bought her a shirt and she returned -- she put it
2  on the door outside of my room on Wednesday morning.  But
3  you wouldn't talk about the other text message that I
4  sent her, which was like why did you apologize to me.
5  Q.  I didn't get to there, Mr. Cicvara.
6  A.  Okay.  Sorry.
7  Q.  Remember I ask the questions.
8  A.  Sorry, sorry, you ask the questions.
9  Q.  And according to her you sent this text message
10  before you saw her returning the shirt.  In the first
11  message you send to her, the first line says good
12  morning, still sleeping or don't want to answer after
13  all?
14  A.  Because I sent a message before this that she
15  didn't answer it, where it was the same question, what is
16  it that you did that you told me you were so sorry about
17  and that you told me you didn't have a way to influence
18  it?  She said that, she said I didn't have a way to
19  influence what happened.
20  Q.  But you don't know what -- you don't have --
21  A.  Let me see.  I actually wrote down what she
22  said.  I was left no choice; that's exactly what she
23  said.
24  Q.  When did you write that down in front of you,
25  at lunch?

**Page 111**

1  A.  In front of me.  We talked in the car, and he,
2  my lawyer, asked me exactly please try to recall --
3  MR. SIKORSKY:  All right.  That's --
4  A.  -- what did she say exactly.  I was left no
5  choice, that was one sentence.  It was out of my control
6  and I really apologize to you, I did terrible thing to
7  you.
8  In the middle of the night I couldn't sleep
9  about thinking what the heck is terrible thing what she
10  did, and I asked once, she didn't answer, then I sent
11  another, and I said are you sleeping, I have a question,
12  why did you say I will understand, why are you sorry,
13  sent to her BlackBerry, okay, and she didn't answer this
14  one either, and then in the morning I found that shirt
15  outside of my room and that is when I went to her room
16  asking her, you know, why did you return this to me, I
17  bought it, it's a present, I bought it for you, keep the
18  present, and she kept it, and that is when I asked again
19  please tell me what did you do, because honestly I felt
20  she maybe said something to my wife, you know, like I had
21  a relationship, because I realized that she is -- I don't
22  even know how to say that, might be a little bit unstable
23  in relationships, so she was quick to make decisions like
24  decision don't come to my room and then five minutes
25  later come to my room, I changed my mind, decisions like

**Page 116**

1  You will be a very busy man.  And I have enough evidence,
2  so.  Because you did say unfounded claims in your
3  response.  I would like to see those unfounded claims.
4  MR. CERASIA:  Could you mark that as 10,
5  please.
6  A.  I apologize if I'm falling into flames
7  sometimes.  I will try to get calm.  It's just that I
8  want truth to come out, all of it.
9  (Cicvara Exhibit 10:  PG000475-476 -
10  marked for identification.)
11  Q.  Why don't you take a look at what's been marked
12  as Exhibit 10.  It's two pages of e-mail identified as
13  PG 475 to 476.  Tell me after you've had a chance to look
14  at this.
15  A.  Yes.  Okay.
16  Q.  Am I correct that the bottom e-mail you wrote
17  an e-mail while you were in the plane or typed the e-mail
18  while you were in the plane?
19  A.  I guess.
20  Q.  On the way back to the United States?
21  A.  No.  This was not written on the way back to
22  United States.
23  Q.  Where was it written?
24  A.  This was written on my way to China.
25  Q.  China?

Page 117

1    A.  Yes.
2    Q.  From Indonesia or from --
3    A.  I was doing a lot of work for company, so in
less than two weeks I went to Indonesia, I had two
4
5    quality assurance inspections there, then I went to
6    Thailand, I had one quality assurance inspection there,
7    then I went to China and I had another quality assurance
8    there, and I returned to United States on Saturday, June
9    13th, very late in the night.
10   Q.  So you were on the plane when you typed this?
11   A.  Yes, to China.
12   Q.  Right.  And you didn't see her after you sent
13   this message?
14   A.  No.
15   Q.  The last time you saw Bel was on June 8th or
16   June 9th?
17   A.  No.  It was June 10th when I went to her room
18   to return the returned T-shirt and that was when she
19   actually -- when you had those recordings that Lynne
20   Burnett says that there are recordings from the answering
21   machine of her boss, those recordings came out to be from
22   the answering machine of Austin Lin that he -- she called
23   in the morning, I don't know why, to probably record me
24   trying to threaten her, which I never wanted to, I was
25   just asking her what did you do.

Page 118

1    Q.  Okay.  So the simple answer to my question is
2    the last time you saw her was June 10th?
3    A.  June 10th in the morning, yes, before I went to
4    the airport to China.
5    Q.  In the first line to her it says Hi ma Belle,
6    B-e-l-l-e, Hi, m-a, ma Belle?
7    A.  Yes.
8    Q.  What did you mean by that?
9    A.  It was between me and Bel.  It came out to be
10   the way of writing e-mails back and forth.  She liked it
11   a lot.  Ma Belle means there is a song from Beatles which
12   is Michelle, ma belle, so I told her that and then I used
13   ma Belle as my how are you Bel.  So it was just a polite
14   way of addressing her, nothing, between us again.
15   Q.  In the last sentence -- line of that first
16   paragraph it talks about your warm feelings about her?
17   A.  Yes.
18   Q.  And that's what you've already testified to or
19   is there something different?
20   A.  No.  I had feelings about her, yes, which were
21   pretty normal feelings about a human being.
22   Q.  And then it says my desire to protect you and
23   inexplicable closeness that I felt towards you all this
24   time?
25   A.  Yes.

Page 119

1    Q.  What's the inexplicable closeness?
2    A.  That's -- I don't want to say because you are
3    going to attack me, but that's maybe a way of expressing
4    my thoughts in English, nothing -- it doesn't mean
5    anything special.  I felt close to that person, nothing
6    else, because of the --
7    Q.  You just said you don't want to say.  What is
8    it you don't want to say?
9    A.  No, no.  I don't want to say -- I don't want to
10   excuse myself because of my English language.  So, yes, I
11   felt close to that person and that's why I said that.
12   Q.  Okay.  What were you protecting her from?
13   A.  Oh, from the pain that she had; you know, she
14   was complaining about having broken heart because older
15   gentleman left her while she was married to her husband
16   three months in marriage, which I didn't know at the
17   time.  She told me that she's married only in June.  I
18   didn't know that she was married.  I didn't know she went
19   to Spain with her husband.  She never told me that.  She
20   said I'm going alone.
21   Q.  But you knew she was married when you rubbed
22   her feet?
23   A.  Yes, I did.  She told me that.
24   Q.  Second paragraph, it says, It was you whom I
25   chose to confine my thoughts when I had troubles.  Like

Page 120

1    what?
2    A.  That means nothing, I'm really sorry.
3    Q.  You just write words you don't mean?
4    A.  No, I don't write words that I don't mean.
5    This was -- this e-mail is the worst thing and the worst
6    piece of written material that I ever did.  I did it
7    partially because I was still afraid that she might go to
8    my wife and tell her what was going on between me and
9    her, and I actually got the brunt of my wife in spite of
10   her telling me, because I was forced to tell my wife the
11   truth obviously and I did tell my wife the truth.  So
12   partially this e-mail was written as trying to appease
13   somebody who is dangerous.  So I did actually learn that
14   she can do very bad things and I was trying to protect
15   myself actually.  So I was trying to come out as good as
16   possible towards her and I really don't enjoy myself
17   writing these things but I did write them.  So this is to
18   the point exactly what I wrote.
19   Q.  So you say that what you wrote here is a lie?
20   A.  No.  It was trying -- I didn't lie.  I was
21   trying to appease a woman who was dangerous.
22   Q.  Is there anything in here that's not truthful?
23   A.  Oh, let me go through it.  Maybe there is.  If
24   I have to do it under oath I'll try to.  So let's go
25   sentence by sentence.

1   This paragraph is true.  This is no change
2  today --
3      Q.  Okay.  The question was whether there's
4  anything untruthful, it's either yes or no.
5      A.  No, there is nothing really untruthful here,
6  no.
7      Q.  In the last -- third paragraph, the second
8  sentence says I would love nothing more than to take back
9  few emotional outbreaks that I experienced last few days.
10 What emotional outbreaks did you have?
11     A.  I don't think I had any outbreaks.  I --
12 emotionally probably, I can say that, you know, doing
13 that rubbing of feet and getting close in that way it was
14 not really a good thing to do.  So it probably is the
15 only thing I could refer to that was experienced last few
16 days, and also the shock that I had when she sent me that
17 text message where she said we are really not lovers and
18 we are not couple, which meant actually I don't want to
19 go on with this relationship anymore, so it was kind of
20 surprising to me, it was a shock.
21     Q.  But what emotional outbreaks did you have?
22     A.  Well, maybe when I returned the e-mail, my
23 message I did say, you know, okay, thank you for whatever
24 and ever, yes, we are not, you don't have to state the
25 obvious.  It was not really the nice thing to say.  So I

had a few things which I could have worded probably
better than what I did actually.
3      Q.  It then says Had I known that I have risked
4  losing such a precious thing as our friendship, I
5  wouldn't ever have attempted what I so foolishly did.
6      A.  Which is --
7      Q.  What did you attempt?
8      A.  I didn't attempt physically anything, but in my
9  mind there was that thing about possibility that we have
10 more than just friendship, emotional, and I would stop
11 right there.
12     Q.  So you didn't really -- when you wrote the word
13 I wouldn't ever have attempted, you're now saying that
14 you never attempted anything?
15     A.  No, beyond what I did, I never attempted
16 anything, no.
17     Q.  And then it says you were misjudging the nature
18 of our closeness in the last few days.
19     A.  Yeah, because I told her there is more than
20 just friendship and then she said very coldly and calmly,
21 no, it's not even friendship.  The other reason why this
22 e-mail was written the way it is I realized that I
23 will have to stay in business relationship and we are
24 coming here to business, so basically in order to try to
25 bridge the misunderstandings between us I did try to say

1  let's stay in friendship and let's forget what happened.
2  She did say pretty strongly that she didn't want what she
3  did, but she also apologized for what she did twice,
4  which is very important because you wouldn't do it if you
5  were harmed by somebody.  She also said in her statement,
6  if I'm not mistaken, we will come to that, but she said
7  that -- she said I never meant any harm, I never did any
8  harm to her, never, and was always very polite, that's
9  what she said.
10     Q.  Do you know if she was ever afraid of you?
11     A.  No, she never said that, so I wouldn't say that
12 she was -- ever had any reasons to be afraid of me.  I
13 never did anything to jeopardize her safety in any way,
14 and as I said it's not in my nature to be forceful with
15 any human being, let alone with a woman.  I wouldn't ever
16 do that.
17     Q.  The last sentence on the first page says, Maybe
18 the cultural differences that you so graciously tried to
19 point out in one of our conversations did ironically
20 played the part in what transpired lately.
21     A.  Yeah.
22     Q.  What do you mean by she so graciously tried to
23 point out; did she try to tell you at some other point
24 that you were just friends?
25     A.  No.  No, no, no, she didn't try to point that

1  out.  I think in one of the conversations she did say
2  that she would do a lot of things for the customers,
3  things that her boss is asking her to do, she would just
4  do it.  So I think that she once said that in China when
5  somebody -- somebody is trying to be polite to the point
6  where they wouldn't say no ever, and I think what I meant
7  here is if you said one time you don't want any
8  relationship with me over our friendship I would have
9  accepted that immediately, which I did actually.
10     Q.  So you blamed her for not coming out so
11 strongly?
12     A.  No, no, I didn't blame her.  I didn't blame
13 her.  If you read this carefully there is no blame in
14 this.  It just said maybe ironically it played a little
15 bit of something.  Let me just read it.  I said maybe the
16 cultural differences that you so graciously tried to
17 point out in one of our conversations did ironically
18 played the part in what transpired lately.  So what I was
19 trying to say is if you ever just said no, I would accept
20 no, and when she said no I accepted no as a word.
21     Q.  And at the top of page 2 it says I believe if
22 you had taken a strong stance against my foolish attempts
23 to get more out of our relation stopping it from the very
24 beginning, I would have stopped then and would have still
25 be in that special relation with you that meant so much

1  to me.
2      A.  Yeah.
3      Q.  You again use the word attempts.  What attempts
4  did you make, what foolish attempts did you make to get
5  more out of the relationship other than rubbing her feet
6  and her back?
7      A.  Those were the attempts and it probably
8  switched in my mind at some point where I thought that
9  there is possibly more, and I'm not blaming anybody for
10  that, it's me.
11      Q.  And then you use some words that are harsh of
12  your conduct, where it says if she wasn't so polite and
13  she wasn't trying to hurt your feelings, you have
14  unconsciously encouraged my, and then you got in brackets
15  macho, possessive, blah, blah, blah, efforts to get
16  more --
17      A.  That might be massaging --
18      Q.  Excuse me.
19      A.  Okay.  Sorry.
20      Q.  -- to get more than you were ready to give.  So
21  you think that, you know, you were being possessive with
22  her?
23      A.  No, I don't think I have been possessive with
24  her.  I think exactly what I write here.
25      Q.  It says she encouraged your macho, possessive,

1  animouse, stupid efforts.
2      A.  Which is massaging her back and getting her to
3  the point where she actually said no, stop this, I don't
4  like this, and then I stopped it, and because of that I
5  think we lost the precious thing, which is friendship,
6  and if she said that before, I would stop.
7      Q.  And then you refer to yourself as a foolish
8  dirty old man.
9      A.  Oh, there you go.  Okay.  Foolish dirty old man
10  is something that is again between us, it was just
11  attempt to diffuse the situation to the point where we
12  could laugh it off, and I'll explain why.
13      Q.  How long did it take you to think of that
14  answer, since you got fired?
15      A.  No, no.  I didn't think of the answer.  I'm
16  telling the truth.  In the plane when we were flying to
17  Singapore she picked up the brochures of Singapore.  In
18  the brochure there was a sentence which was saying you
19  can take a tour in the topless bus.  I was laughing at
20  topless bus and telling her in the plane, wow, that must
21  be exciting to be in the topless bus.  I just said that,
22  didn't mean anything else.  I meant what I meant.  And
23  she read it and she said, well, you dirty old man.  So
24  what she meant by that is I meant topless as a meaning of
25  topless.  That became words between us.  I didn't think

1  about that or think that I was fired.  It was just a
2  thing that happened on the plane between us and she said
3  to me you dirty old man.  That's why I used it here,
4  nothing else.
5      Q.  And then in the next -- you skip a paragraph,
6  it says, Again I can only say I am sorry for what I did
7  to you and I know there is no real excuse for it.  What
8  is it that you did to her that you have no excuse for?
9      A.  You know, when she acted like she acted, when
10  she sent that text message where she said that there is
11  nothing between us, I have to tell you that was really
12  shocking to me, because I just couldn't understand it.
13  You know, she was confining to me things like her husband
14  went to China and had inappropriate relationship with
15  somebody.  She hated her husband.  She was confining to
16  me things like her boss was forcing her to marry the guy
17  so that he stops rumors about them going together on
18  trips, like if you are married woman that will stop the
19  rumors.  That came from her.  So she was confining to me
20  these things and then all of a sudden she's telling me
21  stop being close to me.  I was not even close to you, you
22  were close to me.  It was shocking to me.  I just
23  couldn't understand where this is coming from, so.
24      Q.  So she's telling you this stuff, but in
25  exchange you're rubbing her feet and her back and you're

1  saying that she was the one who was inappropriate but you
2  weren't?
3      A.  No, I'm not saying it was inappropriate.  I
4  said it was very inappropriate with respect to my wife,
5  nothing else.  I didn't -- I was never in the position to
6  make any decision about business relationships.
7      Q.  I know.  You said that about four times now.
8      A.  Well, I would like you to understand that.
9      Q.  That's what you keep saying.  All right.  And
10  my response to you was, I'm sorry because I don't love
11  you but I know you love me so.  I appreciated you in the
12  past because we were just friend.  What I cannot accept
13  is that -- is what you did in the last few days.  Without
14  those dirty things, we can be friend.
15      A.  You will have to ask her.
16      Q.  Well, you then respond to her and you never say
17  I haven't done any dirty things to you?
18      A.  No.  I just said I can promise that never again
19  I will be a dirty man and I did put this in parentheses
20  because that was meant again to be between me and her and
21  to laugh it off.
22      Q.  Oh, it's just a joke then?
23      A.  No, it's not just a joke.  It's something that
24  happened between me and her and she will understand in
25  what context this was.  So it's not just a joke.  And if

Page 129

1   you want to ask her what she meant by what I did in last
2   few days ask her why did she apologize, ask her why did
3   she do the same thing that she did to me to Al Peterson,
4   tried to do it to Dave Mathieu, did it to Austin Lin,
5   wanted me replaced because she counted Austin who was in
6   charge of flashlights before I came will become in charge
7   of flashlights again.  We never talked about what
8   happened on the audit the first day, which actually was
9   the trigger I think for whatever happened from that day
10  on, and actually changed her relationship with me
11  immediately.
12      Q.  By the way --
13      A.  So we talk about that or not?
14      Q.  Just so I'm clear, when you went to her room on
15  June 8th you were the one who first reached out to her to
16  find out if you could bring the special dessert to her
17  room, right?
18      A.  Yes.  I was, yes, but I didn't come uninvited.
19      Q.  I only had one question and you answered it.
20      A.  Okay.
21          MR. CERASIA:  Why don't we take a break.
22          THE VIDEOGRAPHER:  Off the record at 2:27
23  p.m.
24          (Recess:  2:27 to 2:37 p.m.)
25          THE VIDEOGRAPHER:  On the record at 2:37

Page 132

1   I think we're on 11.
2           (Cicvara Exhibit 11:  PG000498-501 -
3   marked for identification.)
4       Q.  Mr. Cicvara, I'm showing you what's been marked
5   as Exhibit 11, a series of notes identified with numbers
6   PG 498 through 501, and have you seen these before?
7       A.  I've seen this on May 28, 2010 --
8       Q.  Okay.
9       A.  -- when it was provided to us.
10      Q.  Okay.  The answer would be yes.
11      A.  Oh, yes.  I believe the answer was yes.
12      Q.  I just asked you whether you saw it.
13      A.  Yes, I did.
14      Q.  And isn't it true that on May 15th, 2009 you
15  met with --
16          MR. SIKORSKY:  June 15th.  You just said
17  May I think.
18          MR. CERASIA:  Oh, then I have the wrong
19  date.  Thank you, Igor.
20      A.  June.
21      Q.  Isn't it true on June 15th, which by the way is
22  my birthday, you'd think I'd remember the date, but June
23  15th, 2009 you met with Lynne Burnett, your boss Kevin
24  Babis, and Peggy Wilczewski?
25      A.  Yes, it's true.

Page 133

1       Q.  And it was at that meeting that you were
2   notified that you were going to be terminated; correct?
3       A.  Correct.
4       Q.  Okay.  Do you have any reason to believe that
5   meeting did not start at 9:15 a.m.?
6       A.  It's irrelevant.  It doesn't matter.  It might
7   have been 9:14 or 9:17, it doesn't matter.
8       Q.  Did Kevin speak at all during the conversation,
9   during the meeting I mean?
10      A.  I don't think he did.  I also don't think he
11  did know that it was Austin Lin who reported this.
12      Q.  That's not the question.
13      A.  It is because he told me --
14      Q.  No, no.  You've got to just answer my
15  questions, okay?
16      A.  Okay, yeah.  He didn't know that, by the way.
17      Q.  Do you know whether or not Kevin knew what was
18  going to be discussed at this meeting?
19      A.  No, I didn't know that.  I was not told that he
20  knew or he doesn't know.
21      Q.  Do you know who made the decision to terminate
22  your employment?
23      A.  I believe that was Lynne Burnett.
24      Q.  And on what basis do you have that belief?
25      A.  Because she is a HR director.

Page 136

1   a pre-intent to fire me immediately when I say I was in
2   the room, which I never denied.  It was like they expected
3   me to struggle with the fact that I was in the room
4   because I was told there are cameras in hotel which can
5   prove that you went to her room uninvited.  This is very
6   important.  I'm stressing this.  I was told that I came
7   into her room uninvited, almost forcefully came into her
8   room.  No, I was not, and I said that.
9       Q.  Okay.  Mr. Cicvara, do you have any idea or any
10  personal knowledge as to what was considered or discussed
11  in making the decision to terminate your employment?
12      A.  No, I don't.
13      Q.  Okay.
14      A.  I never said -- heard that.
15      Q.  It says here when they asked you the question
16  at the bottom of page 1, did you take off your clothes in
17  her hotel room, and you said no?
18      A.  No, I didn't.
19      Q.  You never took off a shirt, you never took off
20  your socks?
21      A.  I took off my shorts, yes, because --
22      Q.  Your shorts?
23      A.  Yes, because I wouldn't lay on somebody's bed,
24  you know, even, you know, sit on somebody's bed without
25  taking off the stuff that I was out in.  So I --

Page 137

```
1      Q.  So you took your pants off?
2      A.  I wouldn't say pants, because I had my shorts,
3   it was 110 degrees.
4      Q.  Okay.  When you say shorts, you mean like
5   Bermuda shorts kind of shorts or do you mean shorts as
6   in, you know, short term for underwear, what did you take
7   off?
8      A.  No, no, no.  I took Bermuda shorts, yes.  I had
9   underwear on myself, yes.
10     Q.  Okay.  So you took your shorts off and you only
11  had your underwear on?
12     A.  Yes, I did.
13     Q.  Did you take your shirt off?
14     A.  No, I didn't.
15     Q.  So you had a shirt on and your underwear?
16     A.  Yes, as far as I -- yes, I think so.
17     Q.  Okay.  And do you believe that that was
18  appropriate conduct?
19     A.  No, I don't believe it was appropriate conduct,
20  but in the circumstances where somebody went directly
21  into the bed and dimmed the lights and I was left
22  basically with no choice but to sit down on her bed, I
23  actually did it just so that I don't, you know, spoil
24  somebody's bed sheets.
25     Q.  All right.  Was there something that you sat on
```

Page 138

```
1   with your shorts, like you sat in mud or you sat on oil?
2      A.  No.  I just don't do that.
3      Q.  So you took your shorts off and sat on the bed
4   with your underwear to be polite?
5      A.  Yes, I did, yes.  Yes.  Before we go on can I
6   just say something?
7      Q.  No.  I don't have a question.
8      A.  Well, these notes here --
9      Q.  I don't have a question.
10     A.  There wasn't --
11     Q.  I don't have a question.
12     A.  Okay.
13     Q.  And then they asked you the question did you
14  tell her that you wanted to rape her?
15     A.  No, I never said that.  I never told her --
16     Q.  Did you ever say, look, it was in a hotel and
17  she was dressed in a way, I told her that I had a feeling
18  I would rape her --
19     A.  No.
20     Q.  -- but never had that in my mind and didn't
21  think she'd think about it seriously?
22     A.  No, I never said that.  I said I never said I
23  would rape her and that's what I said, and that's why I
24  said these notes don't reflect what was talking about at
25  that meeting, they don't reflect it.
```

Page 148

```
1   answer.  At this meeting I was told you are fired for
2   cause, nothing else.  That's how I was fired, in ten
3   minutes; nine years of work in ten minutes.
4      Q.  That's what happens when you strip to your
5   underwear.
6      A.  Sure, yes.  Good.  And that's why computer
7   disappeared with all the reports about the diversion.
8      Q.  I don't know what you're talking about,
9   Mr. Cicvara.
10     A.  I know you don't, because the judge says, and
11  you said it was unfounded claim in your answer.
12     Q.  Okay.  There's no question pending.
13     A.  Good.
14         (Cicvara Exhibit 12: PG000525 - marked
15  for identification.)
16     Q.  Okay, Mr. Cicvara, I'm showing you what's been
17  marked as Exhibit 12, which is identified as PG 525, it
18  is an e-mail of June 14th, 2009 from Andrew to Nitesh
19  Singh, and you understand that to be Andrew Yau?
20     A.  Yes.
21     Q.  And when did you first see this, during
22  discovery in the lawsuit?
23     A.  May 28th.
24     Q.  2010?
25     A.  Yes.
```

Page 149

```
1      Q.  Second paragraph says I want to let you know in
2   no uncertain terms that he is no longer welcome in
3   Practical in the future, kindly send someone else for the
4   job next time.
5      A.  So?  What do you want me to say?
6      Q.  I didn't ask a question yet.
7      A.  Okay.
8      Q.  I'm just pointing you to something, okay?
9      A.  Okay.
10     Q.  So you got the chairman of Practical Lighting
11  saying that you're not welcome there anymore, right?
12     A.  Yeah.  That's the same chairman who is sending
13  e-mail messages to Bel saying we need to sack that guy
14  who is reporting to him.
15     Q.  Okay.  What's that have to do with the price of
16  tea in China?
17     A.  Nothing.  It has nothing to do with anything.
18     Q.  All right.  So Procter & Gamble, would you
19  agree that if one of their contractors said that they
20  didn't want you on site because you had been sexually
21  harassing one of its employees, that they should no
22  longer send you there, would you agree with that?
23     A.  Sure, as long as the investigation that will
24  prove that there were inappropriate sexual advances is
25  conducted in a proper way and they prove that that is
```

Page 153

1   knew him because he was buyer, nothing else.
2       Q.   On the day that you were fired do you recall
3   whether or not you called Peggy to ask her about your
4   stock options and your bonus?
5       A.   On the date when I was fired. I'm not sure was
6   it on that date or day after. I did call, yes, but I'm
7   not sure was it on that date or day after.
8       Q.   And you spoke to Peggy?
9       A.   Yes.
10      Q.   And she -- do you remember her telling you that
11  you could not exercise your stock options because they
12  were forfeited when you were terminated from the company?
13      A.   I remember that she said that, yes.
14      Q.   And in response to that did you call somebody
15  else in the stock option administration department?
16      A.   No. I called them before. I called them the
17  day before and they told me that I have 30 days to
18  exercise.
19      Q.   Do you remember who you spoke with in the stock
20  option administration?
21      A.   No.
22      Q.   When you called stock option administration to
23  ask questions about your ability to exercise your stock
24  options, did you tell them that you had been terminated
25  for cause?

Page 154

1       A.   Yes.
2       Q.   Did you tell them the reasons you had been
3   terminated, what the cause was?
4       A.   No, because I didn't know that.
5       Q.   Well, you knew the allegations against you were
6   that you had engaged in inappropriate conduct towards
7   Bel, right?
8       A.   As I said, until today's date I really don't
9   know why I was fired. I don't know why I was fired. I
10  asked not once, I asked many times and I asked in
11  writing, I said please, because I was advised by my
12  lawyers to ask, and I was always told you were terminated
13  because of violating Worldwide Conduct Manual. Look --
14      Q.   So you were told the reason?
15      A.   No, I was not told the reason. Because in
16  Worldwide Conduct Manual there are about 20,000 reasons
17  for why you can be fired, and I was asking for a reason,
18  specific reason, not violating conduct, tell me what did
19  I violate. I don't know to this date why I was fired.
20  You are saying alleged harassment. She did write that in
21  the notes, but I was never told that during the meeting.
22  I was only told you are fired for cause, as of this date,
23  that's it.
24      Q.   So all you did was you told the person in the
25  stock option administration that you were fired for

Page 155

2   cause?
2       A.   For cause, yes.
3       Q.   You didn't give any specific facts, nothing?
4       A.   No, I didn't get into specifics because I
5   couldn't even tell specifics, I would be lying.
6       Q.   Right. And you didn't know if this was a
7   person who had made decisions under the stock option
8   plan?
9       A.   She -- no, the person told me if you are fired
10  for cause, and she didn't tell me that there are
11  specifics, you have 30 days until when you left the
12  company to exercise those stock. That is when I called
13  Peggy -- I think next day I called about that, and then I
14  was told that I was -- it was not a correct answer and
15  they regret that they gave me incorrect answer. Then I
16  called Peggy about what is going on and asked her to
17  explain this to me.
18      Q.   Okay.
19      A.   And then she -- I was sent, you know, that
20  rules about how you exercise and I was told that because
21  of certain things materially injurious to the company, I
22  cannot exercise. I think that's what came out.
23          MR. CERASIA: Mark that as 13 please.
24          Do you have an exhibit there?
25          THE WITNESS: No. I don't have anything

Page 160

1       A.   No. It could be affected by many things. It's
2   not discretionary, it's 8 percent of my salary, but it
3   does include, you know, how P&G performed in that year,
4   how the specific division of P&G performed. There are
5   many things going into the formula. So it could be 8
6   percent, it could be 5 percent, it could be 10 percent.
7   That's why I'm saying it's irrelevant, it's given.
8       Q.   I understand. And you claim that there's no
9   discretion in it?
10      A.   I claim there is no discretion in it except
11  maybe in the case you are fired, maybe. So I didn't
12  receive bonus, but I was told I will receive bonus, but,
13  hey, it doesn't matter, it really doesn't matter. I was
14  told that I would receive bonus.
15      Q.   Look at Exhibit 14, please.
16      A.   Yes.
17      Q.   This is an e-mail that you sent to Peggy on
18  September 15th, 2009?
19      A.   Yes.
20      Q.   Where you ask her about the bonus, right?
21      A.   Yes. And I said that last time we spoke you
22  have stated that while my options are not going to be
23  valid I will be eligible for bonus and will receive it in
24  September; that's what she said.
25      Q.   Okay. And she wrote back to you, per the

Page 161

```
 1    attached guidelines, which are attached to the e-mail,
 2    you must be an active employee as of June 30th of the
 3    fiscal year to get the bonus?
 4        A.   Perfectly clear.
 5        Q.   And you were terminated before June 30th of the
 6    fiscal year, right?
 7        A.   As I said perfectly clear.
 8        Q.   So do you admit that if you were fired that you
 9    were not entitled to the bonus because you had not been
10    there on June 30th?
11        A.   I don't have to admit anything, it's here, it's
12    written.  I just say I was told differently, nothing
13    else, and I was told differently.  I have to admit I
14    probably didn't read this document carefully.  If I read
15    it, I probably would find the same thing, but as I said I
16    was told by human resources person that I would receive
17    it.  I wouldn't otherwise ask.
18        Q.   Okay.  But let's go back to the question.
19    Wouldn't you agree that under the short term achievement
20    award policy that you do not receive a bonus if you are
21    not employed on June 30th of that year?
22        A.   Just a second.
23             Yes, because it says remember you must be an
24    active employee on date of payment -- oh, these are stock
25    options, I'm sorry.  But it's probably the same thing,
```

Page 162

```
      yes, I would agree.
 2        Q.   Okay.  So you agree that you were not entitled
 3    to a bonus for that year?
 4        A.   Sure, if I am fired, no.  The question is why
 5    I'm fired, but that's beyond the point.
 6        Q.   But you were fired before June 30th of that
 7    year?
 8        A.   Sure.
 9        Q.   So you were not an active employee; correct?
10        A.   True.  All I'm saying is I was told
11    differently, nothing else, and obviously anybody can tell
12    you anything, but what is written is true, so yes.
13        Q.   Did you ever rely on the statement that you
14    claim Peggy made to you that you would be eligible to
15    receive a bonus in September?
16        A.   In what sense?  I don't understand.
17        Q.   Did you make any decisions based on it, did you
18    spend the money?
19        A.   How would I spend the money that I don't have?
20        Q.   Okay.  According to this e-mail, in June of '09
21    you say she told you you're going to get your bonus and
22    you're going to get it in September?
23        A.   Yes.
24        Q.   Okay.  From June '09 to September '09 did you
25    make any decisions to spend money in reliance on your
```

Page 169

```
 1        A.   Yeah.
 2        Q.   Right?  You were seeking what you call a
 3    severance package; correct?
 4        A.   Yes.
 5        Q.   And then you said that you were seeking an
 6    annual bonus, right?
 7        A.   Yes.
 8        Q.   Okay.  My question was the annual bonus, were
 9    you seeking the annual bonus under the STAR plan?
10        A.   Yes.
11        Q.   Okay.  That we already addressed, right?
12        A.   We already addressed the case if you are fired
13    you don't have a right to have bonus, yes.  The question
14    is why was I fired.
15        Q.   I understand.  Is there any other bonus that
16    you are seeking other than the STAR bonus in this
17    lawsuit?
18        A.   No.  It was about that, yes.
19        Q.   Okay.  What is the severance package you're
20    referring to; is there any written document relating to
21    this severance package?
22        A.   I didn't receive any written document that I
23    recall about severance package, no, but there is a
24    severance package for people who are normally fired.  It
25    means normally without cause.
```