DEFENDANT'S
EXHIBIT NO.
FOR IDENTIFICATION
DATE:

| Job Posting Summary | | Application Deadline | |
|---|---|---|---|

| | | | |
|---|---|---|---|
| **Hiring Manager Name:** | Harley Ballew Jr | **Date Posted:** | |
| **Hiring Manager Email:** | ballew.hg@pg.com | | |
| **Contact Name:** | Dina Schmude | **Anticipated Start Date:** | |
| **Contact Email:** | schmude.dl@pg.com | | |
| **Organization Name:** | Duracell | **Anticipated Length of Assignment:** | 3 Years |
| **Business Unit:** | Corporate Functions - Research & Development | **Full Time/Part Time:** | Full Time |
| **Function/Sub-Function:** | Research & Development - Quality Assurance | **Number of Positions Available:** | 1 |
| **Country:** | United States | **Pre-Selected Candidate:** | No |
| **City:** | Bethel, CT | **Job Level:** | Band 3 |
| **Site:** | Duracell | | |
| **Applicants Accepted From Outside Job Location Country:** | No | **Eligible Geography:** | Within commuting distance of job location only. |
| **Relocation Expenses Paid:** | Yes | | |
| **Business Purpose of Job:** | Electrical Devices Quality Leader | | |
| **Important Responsibilities of Job:** | Single Point of Contact (SPOC) for all Duracell Lighting products (Duracell & Garrity branded). Direct responsibility for P&G Quality Systems (QAKE) integration at Garrity sites. Responsible for monitoring customer / consumer complaint information and managing corrective and preventative actions to resolve issues. Coordinate transition of consumer service information into the P&G system. Design approval of all Duracell electrical devices (Lighting, Chargers, and Licensing). | | |
| **Job Qualification 1:** | Single Point of Contact (SPOC) for all Duracell Lighting products (Duracell & Garrity branded). Responsible to fulfill qualification of new lighting products within launch plan timing. Provide timely responses to any lighting questions from Bethel or field personnel. Responsible for all Quality activities on the lighting team. | | |
| **Job Qualification 2:** | Direct responsibility for P&G Quality Systems (QAKE) integration at Garrity sites. Define plan and manage project to implement QAKE at all Garrity sites. This will include the Ashaway Pack Center. This position will supervise the Quality Technician at the Ashaway facility. Maintain QAKE capability (QAC scores) at all lighting product Contractors. | | |
| **Job Qualification 3:** | Responsible for monitoring customer / consumer complaint information and managing corrective and preventative actions to resolve issues. Review complaint data from lighting products and ensure effective corrective and preventative actions are implemented. This information also provides product improvement information for new product launches. | | |
| **Job Qualification 4:** | Coordinate transition of consumer service information into the P&G system. Facilitate changes to packaging to include the P&G consumer service 1-800 number and ensure proper information is provided to consumer service representatives to respond to consumer complaints and / or questions. | | |
| **Job Qualification 5:** | Design approval of all Duracell electrical devices (Lighting, Chargers, and Licensing). Ensure proper testing and validation is completed and acceptable for all electrical devices. Ensure design qualification documentation is completed before approval. | | |
| **Job Qualification 6:** | Provide professional representation of Duracell / P&G per the P&G World Wide Business Conduct Manual. This is vitally important in dealing with Contractors and Suppliers in that plans, decisions, and commitments could have significant impact from a financial and / or confidentiality perspective. | | |

Confidential

**Job Qualification 7:**    BS in Electrical Engineering or equivalent. Prefer training / certification in Six Sigma, MQS, QAKE, and the Quality Pillar of IWS.

**Other Information:**    Travel can be domestic and / or international (20 - 25 %).

**Related Website:**

Confidential



**From:** Bel [bell@practical.com.hk]
**Sent:** Friday, June 12, 2009 3:02 AM
**To:** Bel
**Subject:** P's msg on 6/9

After Yuen told Predrag I was on sick leave.

------ SMS ------
From: +12032430079
Sent: Jun 9, 2009 10:52
Subject: I hope you will bew better soon.

I hope you will bew better soon. Feel terrible that can't be with you and pamper you.
Sent via BlackBerryR from 3

12/14/2009

Confidential

B's reply on 6/9                                                           Page 1 of 1

**From:** Bel [bell@practical.com.hk]
**Sent:** Friday, June 12, 2009 3:04 AM
**To:** Bel
**Subject:** B's reply on 6/9

------ SMS ------
To: +12032430079
Sent: Jun 9, 2009 11:04
Subject: Thx P.

Thx P. I'm fine but I have to re-emphasis that we are not either couples or lovers. Pls stop thinking about me.
Sent via BlackBerryR from 3

12/14/2009

Confidential                                                              PG000471



**From:** Bel [bell@practical.com.hk]
**Sent:** Friday, June 12, 2009 3:07 AM
**To:** Bel
**Subject:** P's msg-II on 6/9


------ SMS ------
From: +12032430079
Sent: Jun 9, 2009 11:14
Subject: Right.

Right. No need to emphasize the obvious. Thx for the good time though. P.
Sent via BlackBerryR from 3

12/14/2009

**From:**    Bel [bell@practical.com.hk]
**Sent:**    Friday, June 12, 2009 3:12 AM
**To:**      Bel
**Subject:** P's msg-II on 6/10



After he left the hotel for airport

------ SMS ------
From: +12032430079
Sent: Jun 10, 2009 11:15
Subject: Just wanted to tell you that I am...

Just wanted to tell you that I am still in a shock and disgusted by myself and my poor judgment of things that were going btw us. Forgive me if you can. P.

Sent via BlackBerryR from 3

12/14/2009

Confidential

Re: Please Read This E-mail                                    Page 1 of 2

| From: | Cicvara, Predrag [IMCEAEX-_O=PG_OU=FIRST+20ADMINISTRATIVE+20GROUP_CN=RECIPIENTS_CN=CICVARA+2EP@excl |
|---|---|
| Sent: | Wednesday, June 10, 2009 6:49 AM |
| To: | bell@practical.com.hk |
| Subject: | Re: Please Read This E-mail |

Life seems better now Bel. It would be very difficult wIthout you. Listening (still in the car with Lori, River and Tanya) to Ali Farka song Ai Du (blues you listened to in Singapore). Sweet memories!

I can promise that never again I will be a "dirty man" with you.

Thank you.


Predrag Cicvara

----- Original Message -----
From: Bel <bell@practical.hk>
To: Cicvara, Predrag
Cc: Bel <bell@practical.com.hk>
Sent: Wed Jun 10 03:42:01 2009
Subject: Re: Please Read This E-mail



I'm sorry because I don't love you but I know you love me so. I appreciated you in the past because we were just friend. What I cannot accept is what you did in the last few days. Without those dirty things, we can be friend.
I'm on the way to airport now. Will call you in about 30 mins.

Bel

Sent via BlackBerry® from 3


From: "Cicvara, Predrag"
Date: Wed, 10 Jun 2009 02:51:19 -0400
To: <bell@practical.com.hk>
Subject: Please Read This E-mail

Hi ma Belle,

Having nothing more urgent to occupy my mind in the plane I am thinking about all the wonderfull moments that I had a privilege to experience in the last year or so, all connected to you. From your Bethel's visit last year, to our December's moments together, through the European winter, our exchange of short e-mails while traveling, receiving a postcard from you, my warm feelings about you, my desire to protect you and inexplicable closeness that I felt towards you all this time.

It was you whom I chose to confine my thoughts when I had troubles, and it appeared you chose the same by starting to confine your personal dilemmas and doubts to me. I have cherished our secret friendship deeply all the way feeling extremely strong respect for you as a person, successful business woman, as a woman and as a friend.

This is NOT changed today I guess I have desire to say and would like you to understand. I would love nothing more than to take back few emotional outbreaks that I experinced last few days. Had I known that I have risked losing such a precious thing as our friendship, I wouldn't ever have attempted what I so foolishly did misjudging the nature of our closeness in the last few days.

Maybe the cultural differences that you so graceously tried to point out in one of our conversations did ironically played the

Confidential                                                      PG000475

part in what transpired lately. I believe if you had taken a strong stance against my foolish attempts to get more out of our relation stopping it from the very beginning, I would have stopped then and would have still be in that special relation with you that meant so much to me. By being so polite and trying not to hurt my feelings you have unconciously encouraged my (macho? possessive? animouse? stupid?) efforts to get more than you were ready to give.

Foolish dirty old man! How quickly such a wonderfool friendship (at least on my part) could be destroyed!?

So I guess I am trying to tell you that regardless of what your decision about us and our friendship will be, I still will have all these little precious pieces of happiness deeply carved in my memory and nothing will take these from me ever.

I can only hope that you will understand me and remain beeing my true friend in the future. Again I can only say I am sorry for what I did to you and I know there is no real excuse for it. Not sure that I described correctly what I really feel but probably can't do it better anyway. Maybe, just maybe you could understand what went wrong a bit better.

I hope I will have a strength to send this e-mail after landing.

Sorry if reading this stream of thoughts took too much of your time, which I know you don't have much of. I simply had to write it.

Your friend Predrag


Predrag Cicvara

Confidential                                                                        PG000476

DEFENDANT'S
CICVARA 11
EXHIBIT NO.
FOR IDENTIFICATION
DATE: 12/1/10 RPTR. 2

Monday, June 15, 2009

Conversation with Predrag Cicvara in conf room 1W02 @ 9:15 am

Present:  Lynne Burnett, Kevin Babis, and Peggy Wilczewski

Lynne took the lead on asking questions of Predrag with Kevin Babis assisting.
Peggy recorded notes of the conversation.

**Where have you been the last week with Ms. Bel Liu?**
I've been in Indonesia and Thailand with her.

**Did you see her for meetings and other times?**
I saw her for meetings, dinner, and after dinner.

**After dinner where?**
In the bar.

Lynne shared that we have documentation of emails and a recorded phone
conversation.  She shared too that hotels have cameras in elevators and in lobby
areas on the main level and the floors outside the elevators.

**Did you go to her room?**
Yes

**Why did you go to her room?**
I went to her room to discuss things with her.

**What kinds of things?**
Some are a bit personal with her and with me.

**Did she invite you to her hotel room?**
Did she ask you to leave and did you refuse to leave?

**Did you touch her in any way?**
Yes, I was sorry for her.  She confined certain things to me that I'd rather not discuss
here.  I did not have many business discussions in her hotel room.  She confined to me
that she broke with somebody in her life.

**Did you take off your clothes in her hotel room?**
No.

**Have you sent an email to her for being a dirty old man?**
She was at some point misunderstanding my intentions.

**Did you tell her that you wanted to rape her?**

Confidential

PG000498

Look, it was in a hotel and she was dressed in a way. I told her that I had a feeling I would rape her but I never had that in my mind and I didn't thin she'd think about it seriously.

**What did you do or say to make her uncomfortable?**
I asked if I could come to her room and she was dressed in very short shorts. I'm a man and it looks like I could rape you like that. You are showing off. I had a feeling with Bel that was very warm to her as she confined certain things to me. I had the feeling I had to protect her from the harm. She could be in harms way by her boyfriend. I wanted to help her about what I came to her room to talk to her. She said don't touch me. I touched her because she felt pain. She talked about the guy who left. I said I could rape you because she was showing off. She said please can you go and I left the room. I didn't want to harm her.

**When you were in her hotel room, was she afraid of you and she called her boss?**
When she asked me to leave, I left.

**You never touched her, never chased her, never took your clothes off? Did you ever come to her room when she did not want you?**
No.

**Was she sick in bed when you went there?**
She never told me she was sick.

**Where did this take place?**
In Bangkok at the Emporium Suites.

We were in the restaurant with the Laurie, Mr. ?????, Andrew, Andrew's wife.

I was stoking her head and tried to get her head here (pointing to his chest).

After we ate desert, I left.

**How many nights did you go to her hotel room?**
That was the night.

**How many days were you together?**
For 6 days.

**Did you attend sexual harassment training?**
Yes.

**Do you understand our company policy?**
Yes.

**Do you realize you were a company representative and this is one of our suppliers?**

Confidential

I think what I did was not inappropriate.

**Do you think the things you did your wife would find it appropriate?**
Strickly speaking, probably not. My wife might think I did something inappropriate. She wouldn't like me to feel for other woman.

**What do you feel for Bel?**
I have very warm feeling for Bel. I feel she is probably in not too good of a relation with her husband. She's married and didn't tell me that she was married.

**How old is Bel?**
30 I think.

**How old are you?**
54

**Is she an attractive woman?**
She a good looking woman. I don't know if she is attractive. This doesn't have anything to do with attractiveness. This kind of relationship didn't happen in ????. I'm not saying it's appropriate. She emailed things about her. It was more than a normal relationship that is in a business relationship.

**If there is a recording that you are asked to leave a room and you didn't, how do you explain that?**
I left the room. Why is there a recording? I left the room without harming her.

She apologized to me and I didn't understand why. The night when she didn't come on 2nd day of audit, she apologized and said she was sorry for what she did. Now I understand why. Oh my God.

**Why did you ask her who she had told?**
I tried to understand why she as apologizing. I asked her who she told because I couldn't sleep. I even sent her an SMS message asking why she was apologizing. She said you'll understand one day.

**Do you realize that harassment is illegal and the company and you can be sued for harassing behavior?**
I didn't want to harass anybody.

**Is there anything else that you'd like to tell us?**
Listen... I .... This is a situation that I'm sorry if I did to harm the company. I did not mean to hurt anybody. She apologized to me. I fell that to a point I was provoked. I shouldn't be saying this. If I was thinking of things the way it turned out, I should not have been touching her the way....It didn't come from one day. I believe it came close in the sense I was the person she wanted to confine in. It was a warm relationship between

us. I'm trying to explain why maybe at some point it became personal. When she told me to leave the room, I left her room. There was nothing between us.

*Lynne Burnett, Kevin Babis, and Peggy Wilczewski asked Predrag to remain in the conference room while they left to discuss their decision about the matter. After about 10 minutes, they returned to the conference room where Predrag was waiting.*

**Lynne informed Predrag that he was being terminated from the company because he had violated our company PVPs and company policy by engaging in harassing behavior by harassing a company supplier.**

Predrag told Lynne that she has destroyed his life.

----------------------------------------------------

At @ 10 am Peggy and Kevin escorted Predrag to his office so he could gather his belongings. Peter from Security met them there with packing boxes. Predrag took about an hour to go through his things and pack them up in one box. He did not want to take her personal books (he was asked twice) and did not want to gather his things from the fitness center. Peggy told him that she would get his belongings from the fitness center and send them to him. Predrag left the building at about 11 am. Before he left, he told Peggy in the lobby that she has destroyed his life.

Confidential



**From:**   andrew [andrew@ji-net.com]
**Sent:**   Sunday, June 14, 2009 10:44 PM
**To:**   Singh, Nitesh
**Subject:** Private

## PRIVATE AND CONFIDENTIAL

## Dear Nitesh,

**Prediag - your factory auditor from Duracell, has been making inappropriate sexual advances towards Bel during his last trip to Practical. She is very upset and so am I.**

**I want to let you know in no uncertain terms that he is no longer welcome in Pracical in the future. Kindly send someone else for the job next time.**

**I do not want to blow this up unncessarily so I come to you as you know everyone involved. Kindly help us in handling this problem.**

## Thanks and regards

## Andrew

**P&G**



June 16, 2009

Mr. Predrag Cicvara
2122 North Benson Road
Fairfield, CT 06824

Dear Predrag:

The purpose of this letter is to provide you with additional information regarding the treatment of your Gillette stock options as a result of your recent termination from the Company. As we discussed earlier today, your stock options were cancelled because your employment was terminated for cause.

Section 6(f)(A) of The Gillette Company 1971 Stock Option Plan (the "Gillette Plan") states that "[i]f any employee Participant is discharged for Cause, as hereinafter defined, all his options shall immediately be cancelled effective as of the date of termination of his employment." The Gillette Plan's definition of "discharge for Cause" includes each of the following:

> (A)  the Participant's continued failure to perform substantially his duties with the Company or any of its subsidiaries (other than any such failure resulting from incapacity due to physical or mental illness), after a written demand for performance is delivered to Participant by an officer or a senior manager of the Company or the subsidiary which identifies the manner in which the Board or the elected officer or manager believes that Participant has not performed his duties;

> (B)  the Participant's engaging in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Company or the subsidiary; or

> (C)  the Participant's conviction of a felony or a plea of nolo contendere by Participant with respect thereto.

I have enclosed a copy of The Gillette Company 1971 Stock Option Plan for your review.

Confidential

I apologize again for any confusion that resulted from conflicting information provided by the Company's stock option administrators. However, the Gillette Plan is clear on this point and the administrators did not have access to all of the facts associated with your inquiry. I have also enclosed a copy of the Gillette Plan for your review.

Regards,

Peggy Wilczewski
Sr. Human Resources Manager

Enclosure

Confidential

PG000507

Confidential

**Wilczewski, Peggy**

| | |
|---|---|
| **From:** | Wilczewski, Peggy |
| **Sent:** | Wednesday, September 16, 2009 10:31 AM |
| **To:** | Predrag Cicvara |
| **Subject:** | RE: FY08-09 Bonus |
| **Attachments:** | STAR Bonus Information.pdf |

Predrag,

Per the attached guidelines, you must be an active employee as of June 30 (the close of the fiscal year for which the award is payable) to receive an award.  Since you were terminated prior to this date, you are not eligible to receive a STAR award for 08-09.

Peggy

**From:** Predrag Cicvara [mailto:predrag.cicvara@gmail.com]
**Sent:** Tuesday, September 15, 2009 6:46 AM
**To:** Wilczewski, Peggy
**Subject:** FY08-09 Bonus

Hi Peggy,

Last time we spoke about my options and bonus, in June 2009, you have stated that, while my options are not going to be valid anymore, I will be eligible for bonus and will receive it in September 2009.

Could you please check this and let me know when can I expect payment, and in what form (electronic transfer to my account on file with P&G, or check in the mail?).

Thank you very much for your help.

Best regards,

Predrag

1

Confidential

# Short Term Achievement Reward (STAR)

## Purpose

The Short Term Achievement Reward (STAR) program is designed to support outstanding P&G business results. The purpose of the STAR program is to reward truly outstanding business achievements with compensation greater than competitive market levels. It also puts pay at risk to encourage our leaders to overcome challenges and win in the marketplace. At the same time, the STAR program rewards collaboration among business units to help P&G meet or exceed its objectives.

## Eligibility

Employees at Band 3 and above who worked at least 4 weeks during the fiscal year are eligible for any STAR award that will be paid for that year.

### Newly Eligible Participants

There are a few notes relevant to first time STAR participants:

- Newly promoted Band 3 participants and new hires will receive a prorated STAR award based on time worked at Band 3 as recorded in SAP as the official record date.
- Previous Band 2 assignments will not be considered when assigning STAR units to newly promoted Band 3s.
- All newly eligible participants during the fiscal year will receive their award in cash (excluding Belgium). Please review the section on Award Payment Preferences.
- Acquisitions and divestitures could be treated differently. Make sure you reference these guidelines for your specific situation.

### Company Separations

For reasons other than retirement or special circumstances agreed to by P&G in advance, you must be an active employee as of June 30 (the close of the fiscal year for which the award is payable) to receive an award.

If you have earned a STAR award and leave the Company prior to the STAR payment date, you will receive a cash payment in September or as soon thereafter as possible. Stock options can only be issued to active employees.

### Change in Band

STAR Target Percents are dependent on your band worked throughout the year. If you work more than one band in a fiscal year, each STAR target percent will be adjusted based on the time at each band. For example, an employee who is promoted from Band 3 to Band 4 effective April 1 would have a STAR target of 10% [(8% X 9 months) + (15% X 3 months) = 9.8% rounded up to 10%]. Reductions in band will follow the same calculation regardless of whether the move was voluntary or involuntary.

Confidential

Retirements / Special Separations
If you retire or separate under approved special circumstances you must work at least four weeks of
the fiscal year to be eligible for an award.  Your award will be prorated based on the number of
days worked in the fiscal year.

Leave of Absence (LOA), Disability (DB), Working Less Than Full Time (LTFT)
If you work less than 2/3 (35 weeks) of the fiscal year due to LOA/DB/LTFT, your STAR award is
prorated.  Prorata factors are scaled from 100% at 35 weeks worked or more, down to 0% for less
than four weeks.  If you work less than full time, such as a reduced work schedule, the equivalent
in full time weeks worked will determine the appropriate prorata factor.  Because time away from
work is tracked in differently around the world, we gather the **number of weeks physically
worked** directly from HR and/or line managers and the corresponding prorata factor is used to
calculate your award.  Vacation time and holidays will not be counted as time worked when it is
taken adjacent to or in the middle of a Leave.

The following table shows the prorata percent used at certain numbers of weeks worked.
Questions about individual situations should be directed to your local HR resource.

| Weeks Worked (or equivalent) | Prorata % |
|---|---|
| 35-52 | 100% |
| 34 | 97% |
| 33 | 94% |
| 32 | 91% |
| 31 | 88% |
| 30 | 85% |
| 29 | 83% |
| 28 | 80% |
| 27 | 77% |
| 26 | 74% |
| 25 | 71% |
| 24 | 68% |
| 23 | 65% |
| 22 | 62% |
| 21 | 59% |
| 20 | 56% |

| Weeks Worked (or equivalent) | Prorata % |
|---|---|
| 19 | 54% |
| 18 | 51% |
| 17 | 48% |
| 16 | 45% |
| 15 | 42% |
| 14 | 39% |
| 13 | 36% |
| 12 | 33% |
| 11 | 30% |
| 10 | 27% |
| 9 | 25% |
| 8 | 22% |
| 7 | 19% |
| 6 | 16% |
| 5 | 13% |
| 4 | 10% |
| 0-3 | 0% |

Confidential

## STAR Award Calculation

The formula for the STAR award calculation is:

**(Base Salary) x (STAR Target Percent) x (Business Unit Performance Factor) x (Total Company Results Factor) x (Prorata Factor if applicable)**

*Annualized Base Salary* as of June 30 will be used in calculating the STAR award.

| Level | STAR Target* as % of Base Salary |
|---|---|
| Band 3 | 8% |
| Band 4 - Associate Director | 15% |
| Band 5 - Director | 25% |
| Band 6 - Vice President | 45% |

Band 7 and above are handled by Executive Compensation and approved by the Compensation Committee.

The **Business Unit Performance Factor** is assigned to each business unit as a measure of success based on a retrospective assessment of unit performance over the fiscal year. Business unit factors range from 53% to 167% with a target of 100%. Business Unit Results are determined by the STAR Committee in August after fiscal year results are known. The chart below shows STAR measures that are assessed however the STAR Committee (CEO, CFO, CHRO) will take into consideration any factors that have had a significant impact on the units' results.

| MEASURE | GBU | DEVELOPED MDO | DEVELOPING MDO | GBS | CF |
|---|---|---|---|---|---|
| TSR | X | | X | | |
| After Tax Profit | X | | X | | |
| Volume | X | X | X | | |
| Net Sales | X | X | X | | |
| Value Share | X | X | X | | |
| Free Cash Flow | X | | X | | |
| Value Contribution | | X | | | X |
| Competitive Assessment | X | X | X | | |
| Cross Organization Input | X | X | X | X | X |
| Organization Head Self Assessment | X | X | X | X | X |

The **Total Company Results Factor** measures the Total Company success based on a formula that includes Earnings Per Share (EPS) growth and Organic Sales Growth over the fiscal year. It ranges from 80% to 130%, also with a 100% target. It is applied to all STAR award calculations and is used to encourage collaboration among all Business Units. The grid on the following page shows how these two factors combine to determine the Company Results Factor. We use a more complete table of Factors that includes the full range of Organic Sales Growth factors and EPS Growth rates.

Confidential

For FY 09/10, we are adjusting our one year targets for the Total Company Results Factor in recognition of the reality faced in the global economy, but still focusing on the need to get back on track versus our long term goals.

- If we meet the top of the range in our external guidance (3% Organic Sales and 4% EPS growth) we will earn a 100% Total Company Results Factor.
- If we exceed external guidance, but fall short of our long term goals (5% Organic Sales and 10% EPS growth) the payout will stay at 100%.
- We can earn a factor greater than 100% if we exceed our long term goals.

| | Organic Sales Growth | | | |
|---|---|---|---|---|
| | Below 1% | 3% | 5% | 6.5% & Higher |
| 0% & Lower | 80% | 93% | 93% | 93% |
| 4% | 86% | 100% | 100% | 101% |
| 10% | 86% | 100% | 100% | 121% |
| 13% & Higher | 95% | 108% | 108% | 130% |

(EPS Growth shown as the left-hand row labels.)

## STAR Units

STAR Units are used to link you with the Business Unit(s) in which you made a significant contribution during the fiscal year. Each of the Global Business Units (GBUs), some GBU sub-units, Market Development Organizations (MDOs), Corporate Functions (CF) and Global Business Services (GBS) are identified as single STAR units.  Individual STAR Unit assignments are confirmed by Business Unit's Human Resources.

STAR Unit Weighting
The STAR Units are weighted depending on the type of assignment and business unit.  Each GBU determines the weighting of their STAR units. Some individuals have "double-hatted" roles, where weights will be split evenly between GBUs.

Transfer in assignment during fiscal year
In the event you transfer to another business unit during the year, each business unit is considered as if they were in effect for the entire year.  Automatically, the highest business unit factor is used to calculate your STAR award.  Note: Base salary as of June 30 is used in calculating all STAR awards regardless of assignments.

## Award Timing and Payment Forms

STAR awards are calculated after the close of the fiscal year. Payments start on September 15 or as soon thereafter as possible. You will receive an Individual Award Summary that details your STAR Target, your Business Unit Performance Factor(s) for each STAR Unit, the Corporate Adjustment Factor (and Prorata factor if needed) used to determine your award.  The summaries are distributed to participants' salary managers in mid August.

PG000520

Generally, STAR awards are paid in cash however; you can choose your upcoming award in forms other than cash, such as stock options. This selection must be made before the end of the calendar year preceding the award date. In order to determine how many stock option shares should be granted we use the following formula:

STAR Award (converted to US$ if needed) ÷ stock price at close on grant date x 4.0 and then rounded up to the next whole share.

This formula, which is reviewed annually, currently yields 4.0 option shares for each theoretical share of stock. This means that a before-tax award equivalent to 100 shares of P&G stock translates to 400 stock option shares. Specific stock option terms and conditions are provided in the annual preference materials. For example, employees can keep STAR stock options as long as they leave the Company in good standing.

Remember you must be an active employee on date of payment to receive stock options. The award form choices and relevant considerations are explained at the time award payment preference materials are distributed. STAR awards for those who become eligible within the fiscal year are paid in cash. You can view your payment form at any time on Employee Resources > Compensation Program > Incentive Compensation > Award Payment Preferences.

If you selected stock options in the previous calendar year, you will be informed of your stock option details via email within two weeks of the September 15 grant date.

PG000521

# Award Payment Preferences

## Preference Process

In November of each year, if you have previously received a STAR payment, you are given the opportunity to select your payment choice for your upcoming awards payable in the following calendar year.  There are various selections such as cash, stock options, local deferrals, and restricted stock units. Not all award forms are available for all plans or participants.  You must make your selections in the calendar year prior to the award payment and these selections **cannot** be changed after the beginning of the calendar year of payment due to tax and legal restrictions.  This link to the Award Payment Preferences website provides information about the most recent choices.  Selections are not binding on the Company.

Confidential

# THE GILLETTE COMPANY
# 1971 STOCK OPTION PLAN
(Amended and Restated as of December 13, 2005)



1. <u>PURPOSE</u>. The purpose of the 1971 Stock Option Plan (hereinafter referred to as the "Plan") is to provide a special incentive to selected key salaried employees of The Gillette Company (hereinafter referred to as the "Company") and of its subsidiaries and to the non-employee members of the Board of Directors of the Company to promote the Company's business. The Plan is designed to accomplish this purpose by offering such employees and non-employee directors a favorable opportunity to purchase shares of the common stock of the Company so that they will share in the success of the Company's business. For purposes of the Plan a subsidiary is any corporation in which the Company owns, directly or indirectly, stock possessing fifty percent or more of the total combined voting power of all classes of stock or over which the Company has effective operating control.

1.1 **ASSUMPTION OF THE PLAN.** As of the Effective Time, The Procter & Gamble Company, an Ohio corporation, has assumed the Plan according to the Merger Agreement. Unless otherwise specified, amendments to the Plan made in connection with the Merger Agreement shall be effective upon the Effective Time. Should the Merger not become effective, the Plan shall revert to the form as last amended by The Gillette Company through October 2004, without prejudice to any Awards then outstanding.

2. <u>ADMINISTRATION</u>. The Plan shall be administered by the Compensation Committee heretofore established by the Board of Directors of the Company, no member of which shall be an employee of the Company or of any subsidiary. The Committee shall have authority, not inconsistently with the Plan, (a) to determine which of the key salaried employees of the Company and its subsidiaries shall be granted options; (b) to determine whether the options granted to any employees shall be incentive stock options within the meaning of the Internal Revenue Code or non-qualified stock options or both; provided, however, that with respect to options granted after December 31, 1986, in no event shall the fair market value of the stock (determined at the time of grant of the options) subject to incentive stock options within the meaning of the Internal Revenue Code which first became exercisable by any employee in any calendar year exceed $100,000 (and, to the extent such fair market value exceeds $100,000, the later granted options shall be treated as non-qualified stock options); (c) to determine the time or times when options shall be granted to employees and the number of shares of common stock to be subject to each such option provided, however, subject to adjustment as provided in Section 9 of the Plan, in no event shall any employee be granted options covering more than 1,250,000 shares of common stock in any calendar year; (d) with respect to options granted to employees, to determine the option price of the shares subject to each option and the method of payment of such price; (e) with respect to options granted to employees, to determine the time or times when each option becomes exercisable and the duration of the exercise period; (f) to prescribe the form or forms of the instruments evidencing any options granted under the Plan and of any other instruments required under the Plan and to change such forms from time to time; (g) to make all determinations as to the terms of any sales of common stock

Confidential

-2-

of the Company to employees under Section 8 of the Plan; (h) to adopt, amend and rescind rules and regulations for the administration of the Plan and the options and for its own acts and proceedings; and (i) to decide all questions and settle all controversies and disputes which may arise in connection with the Plan. All decisions, determinations and interpretations of the Committee shall be binding on all parties concerned.

3. <u>PARTICIPANTS</u>. The participants in the Plan shall be such key salaried employees of the Company or of any of its subsidiaries, whether or not also officers or directors, as may be selected from time to time by the Committee in its discretion, subject to the provisions of Section 8 of the Plan. In addition, each non-employee director shall be a participant in the Plan. In any grant of options after the initial grant, or any sale made under Section 8 of the Plan after the initial sale, employees who were previously granted options or sold shares under the Plan may be included or excluded.

4. <u>LIMITATIONS</u>. No option shall be granted under the Plan and no sale shall be made under Section 8 of the Plan after April 21, 2005, but options theretofore granted may extend beyond that date. Subject to adjustment as provided in Section 9 of the Plan, the number of shares of common stock of the Company, which may be delivered under the Plan, shall not exceed 198,800,000 in the aggregate. To the extent that any option granted under the Plan shall expire or terminate unexercised or for any reason become unexercisable as to any shares subject thereto, such shares shall thereafter be available for further grants under the Plan, within the limit specified above.

5. <u>STOCK TO BE DELIVERED</u>. Stock to be delivered under the Plan may constitute an original issue of authorized stock or may consist of previously issued stock acquired by the Company, as shall be determined by the Committee. The Committee and the proper officers of the Company shall take any appropriate action required for such delivery.

6. <u>TERMS AND CONDITIONS OF OPTIONS GRANTED TO EMPLOYEES</u>. All options granted to either non-employee directors or employees shall be subject to Paragraphs (3) and (4) of Section 6(c) below. All options granted to employees under the Plan shall be subject to all the following additional terms and conditions (except as provided in Sections 7 and 8 of the Plan) and to such other terms and conditions as the Committee shall determine to be appropriate to accomplish the purposes of the Plan:

(a) <u>Option Price</u>. The option price under each option shall be determined by the Committee and shall be not less than 100 percent of the fair market value per share at the time the option is granted. If the Committee so directs, an option may provide that if an employee Participant who was an employee participant at the time of the grant of the option and who is not an officer or director of the Company at the time of any exercise of the option, he shall not be required to make payment in cash or equivalent at that time for the shares acquired on such exercise, but may at his election pay the purchase price for such shares by making a payment in cash or equivalent of not less than five percent of such price and entering into an agreement, in a form prescribed by the Committee, providing for payment of the balance of such price, with interest at a specified rate, but not less than four percent, over a period not to exceed five years and containing such other provisions as the Committee in its discretion determines. In

Confidential

addition, if the Committee so directs, an option may provide for a guarantee by the Company of repayment of amounts borrowed by the Participant in order to exercise the option, provided he is not an officer or director of the Company at the time of such borrowing, or may provide that the Company may make a loan, guarantee, or otherwise provide assistance as the Committee deems appropriate to enable the Participant to exercise the option, provided that no such loan, guarantee, or other assistance shall be made without approval of the Board of Directors as required by law.

(b) <u>Period of Options</u>.  The period of an option shall not exceed ten years from the date of grant.

(c) <u>Exercise of Option</u>.

(1) Each option held by a participant other than a non-employee director should be made exercisable at such time or times, whether or not in installments, as the Committee shall prescribe at the time the option is granted.  In the case of an option held by a participant other than a non-employee director which is not immediately exercisable in full, the Committee may at any time accelerate the time at which all or any part of the option may be exercised.

(2) Options intended to be incentive stock options, as defined in the Internal Revenue Code, shall contain and be subject to such provisions relating to the exercise and other matters as are required of incentive stock options under the applicable provisions of the Internal Revenue Code and Treasury Regulations, as from time to time in effect, and the Secretary of the Committee shall inform optionees of such provisions.

(3) Payment for Delivery of Shares.  Upon exercise of any option, payment in full in the form of cash or a certified bank, or cashier's check or, with the approval of the Secretary of the Committee, in whole or part Common stock of the Company at fair market value, which for this purpose shall be the closing price on the business day preceding the date of exercise, shall be made at the time of such exercise for all shares then being purchased thereunder, except in the case of an exercise to which the provisions of the second sentence of Section 6(a) above are applicable.

The purchase price payable by any person, other than a non-employee director, who is not a citizen or resident of the United States of America and who is an employee of a foreign subsidiary at the time payment is due shall, if the Committee so directs, be paid to such subsidiary in the currency of the country in which such subsidiary is located, computed at such exchange rate as the Committee may direct.  The amount of each such payment may, in the discretion of the Committee, be accounted for on the books of such subsidiary as a contribution to its capital by the Company.  The Company shall not be obligated to deliver any shares unless and until, in the opinion of the Company's counsel, all applicable federal and state laws and regulations have been complied with, nor, in the event the outstanding common stock is at the time listed upon any stock exchange, unless and until the shares to be delivered have been listed or authorized to be added to the list

PG000186

-4-

upon official notice of issuance upon such exchange, nor unless or until all other legal matters in connection with the issuance and delivery of shares have been approved by the Company's counsel. Without limiting the generality of the foregoing, the Company may require from the Participant such investment representation or such agreement, if any, as counsel for the Company may consider necessary in order to comply with the Securities Act of 1933 and may require that the Participant agree that any sale of the shares will be made only on the New York Stock Exchange or in such other manner as is permitted by the Committee and that he will notify the Company when he makes any disposition of the shares whether by sale, gift, or otherwise. The Company shall use its best efforts to effect any such compliance and listing, and the Participant shall take any action reasonably requested by the Company in such connection. A Participant shall have the rights of a shareholder only as to shares actually acquired by him under the Plan.

(4)(a)  Notwithstanding any other provision of this Plan, upon the occurrence of a Change of Control, as hereinafter defined, all outstanding options held by employee Participants and non-employee directors which are not yet exercisable shall become immediately exercisable and all the rights and benefits relating to such options including, but not limited to, periods during which such options may be exercised shall become fixed and not subject to change or revocation by the Company except as otherwise provided under Section 6(i).

(b) In the event that, within two years of a Change of Control, the employment of an employee Participant is terminated by the Company for any reason other than for Cause, or the employee Participant terminates employment for Good Reason, or the service as a director of a non-employee director is terminated, the applicable exercise period for all options, other than options granted prior to June 21, 2001 and designated as incentive stock options hereunder, then held by him shall be the greater of (i) a period of two years from the date of termination, and (ii) the post-termination exercise period otherwise applicable to the employee Participant under Section 6(f), or to the non-employee director under Section 12(d); provided, however, that in no event shall any option be exercisable beyond ten years from its date of grant.

(c) A Change of Control shall mean the occurrence of any of the following events:

(1) The acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20% or more of either (A) the then-outstanding shares of common stock of the Company (the "Outstanding Company Common Stock") or (B) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); *provided, however*, that, for purposes of this Paragraph (1), the following acquisitions shall not constitute a Change of Control: (i) any acquisition directly from the Company, (ii) any acquisition by the Company, (iii) any acquisition by any employee benefit plan (or related trust) sponsored or maintained

Confidential

by the Company or any of its subsidiaries or (iv) any acquisition by any corporation pursuant to a transaction that complies with clauses (A), (B) and (C) of Paragraph (3) below;

(2) Individuals who, as of December 16, 1999, constitute the Board of Directors (the "Board") of the Company (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board; *provided, however,* that any individual becoming a director subsequent to the date hereof whose election, or nomination for election by the Company's stockholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board;

(3) Consummation of a reorganization, merger, consolidation or sale or other disposition of all or substantially all of the assets of the Company (a "Business Combination"), in each case, unless, following such Business Combination, (A) all or substantially all of the individuals and entities that were the beneficial owners of the Outstanding Company Common Stock and the Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 60% of the then-outstanding shares of common stock and the combined voting power of the then-outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation that, as a result of such transaction, owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership immediately prior to such Business Combination of the Outstanding Company Common Stock and the Outstanding Company Voting Securities, as the case may be, (B) no Person (excluding any corporation resulting from such Business Combination or any employee benefit plan (or related trust) of the Company or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 20% or more of, respectively, the then-outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then-outstanding voting securities of such corporation, except to the extent that such ownership existed prior to the Business Combination, and (C) at least a majority of the members of the board of directors of the corporation resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement or of the action of the Board providing for such Business Combination; or

(4) Approval by the stockholders of the Company of a complete liquidation or dissolution of the Company.

Confidential

-6-

(d) For the purposes of the Plan, unless otherwise provided under the terms of an employment agreement with the Company or any of its subsidiaries, in which case the definition contained therein shall control, an employee Participant shall be treated as terminating his employment for "Good Reason" if he does so as a direct result of:

(i) the assignment to the Participant of any duties materially inconsistent in any respect with the Participant's position (including status, offices, titles and reporting requirements), authority, duties or responsibilities as in effect immediately prior to the Change of Control, or any other action by the Company or its subsidiaries that results in a diminution in such position, authority, duties or responsibilities, excluding for this purpose an isolated, insubstantial and inadvertent action not taken in bad faith and that is promptly remedied by the Company and/or the subsidiary;

(ii) a decrease in the Participant's compensation, other than an isolated, insubstantial and inadvertent failure not occurring in bad faith and that is promptly remedied by the Company and/or the subsidiary; or

(iii) the Company's or the subsidiary's requiring the Participant to be based at any office or location other than (A) the office or where the Participant was based and performed services immediately prior to the Change of Control or (B) any other location less than 35 miles from such office, or the Company's or the subsidiary's requiring the Participant to travel on business to a substantially greater extent than required immediately prior to the Change of Control.

(d) Nontransferability of Options.

(1) Except as provided in Paragraphs (2) and (3) below, no option may be transferred by a Participant otherwise than by will or the laws of descent and distribution, and during the Participant's lifetime the option may be exercised only by him.

(2) In the case of options other than (i) those options designated as incentive stock options or (ii) those options excluded from the application of this Paragraph pursuant to a Schedule to this Plan, the Committee in its sole and exclusive discretion may provide in the option agreement covering an option granted hereunder (either at the time of grant or, with the consent of the Participant, at any time thereafter) that the Participant may transfer by gift all or any part of such option to (x) his spouse, child, grandchild or other "family member" (as such term is defined for purposes of applicable securities and tax laws), to a trust having only family members as beneficiaries or to a partnership or company having only family members as partners or owners, or (y) a charitable organization described in Section 501(c)(3) of the Internal Revenue Code. Any options so transferred shall remain subject to the otherwise applicable terms of the option agreement and this Plan, and also shall be subject to such terms and conditions as the Committee may prescribe. Subsequent transfers of options shall be permitted under this Paragraph only to the extent, and subject to the rules, prescribed by the Committee.

(3) A Participant may transfer all or any part of an option granted hereunder to a former spouse pursuant to the terms of a qualified domestic relations order. Any options so transferred shall remain subject to the otherwise applicable terms of the option agreement and this Plan. No subsequent transfers of options shall be permitted under this Paragraph.

(e) Nontransferability of Shares. If the Committee so determines, an option granted to an employee may provide that, without prior consent of the Committee, shares acquired by exercise of the option shall not be transferred, sold, pledged or otherwise disposed of within a period not to exceed one year from the date the shares are transferred to the Participant upon his exercise of the option or prior to the satisfaction of all indebtedness with respect thereto, if later.

(f) Termination of Employment. The provisions of this Subsection (f) shall govern in the event of the termination of a Participant's employment with the Company and its subsidiaries. If the employment of an employee Participant terminates for any reason other than his death, he may (unless discharged for Cause as hereinafter defined) thereafter exercise his option as provided below:

(i) If such termination of employment is voluntary on the part of the employee Participant, he may exercise his option only within 30 days after the date of termination of his employment (unless a longer period not in excess of three months is allowed by the Committee).

(ii) If such termination of employment is involuntary on the part of the employee Participant, he may exercise his option only within three months after the date of termination of his employment.

(iii) If such termination of employment is on account of the employee Participant's total and permanent disability, he may exercise (I) any option granted prior to January 1, 2002 within the period ending one year after the date of termination of his employment, and (II) any option granted after December 31, 2001 within the period ending three years after the date of termination of his employment.

(iv) If such termination of employment is on account of the employee Participant's retirement (as defined below), he may exercise (I) any option granted prior to January 1, 1994, other than an option designated as an incentive stock option hereunder, within the period ending two years after his retirement date, (II) any option granted after December 31, 1993 and prior to April 17, 1997, other than an option designated an incentive stock option hereunder, within the period ending three years after his retirement date, (III) any option granted prior to April 17, 1997 and designated an incentive stock option hereunder within the period ending three months after his retirement date, (IV) any option granted after April 16, 1997 and prior to January 1, 2002 within the period ending five years after his retirement date and (V) any option granted after December 31, 2001 over the remaining option period, provided that an option described in clause

Confidential

(IV) or (V) which was designated at grant as an incentive stock option shall cease to qualify as an incentive stock option under the Internal Revenue Code if not exercised within three months after his retirement date. For the purposes of his Plan, an employee Participant's termination of employment is on account of "retirement" if either (A) at the time the Participant leaves the employ of the Company and its subsidiaries, the Participant qualifies for an early or normal retirement pension under the terms of a retirement plan maintained by or to which the Company or any subsidiary contributes for the benefit of the Participant, (B) the Participant leaves the employ of a subsidiary that does not maintain or contribute to a retirement plan for the benefit of the Participant, and at such time the Participant would have qualified for an early or normal retirement pension under the terms of The Gillette Company Retirement Plan had the individual been a participant of that plan, or (C) solely in the case of a Company-initiated termination of employment (other than for Cause), at the time the Participant leaves the employ of the Company and its subsidiaries, the sum of Participant's attained age and years of service (each measured in full and partial years) totals at least 80. An employee Participant's "retirement date", as used in this paragraph, means the first day the Participant is no longer on the active payroll of the Company or any subsidiary following the Participant's retirement.

The Committee may, in its sole discretion, terminate any such option at or any time after the date of termination of the Participant's employment (and prior to the expiration of the exercise periods specified above), if it deems such action to be in the best interests of the Company. In no event may any Participant exercise any option that was not exercisable on the date he ceased to be an employee, except (A) as to options granted prior to January 1, 2002, those options granted at least one year prior to Participant's cessation of employment on account of retirement or total and permanent disability and (B) as to options granted after December 31, 2001, if the Participant's cessation of employment is on account of retirement or total and permanent disability. In no event may any Participant exercise any option after the expiration of the option period. For the purposes of this Subsection (f), a Participant's employment shall not be considered terminated in the case of a sick leave or other bona fide leave of absence approved by the Company or a subsidiary in conformance with the applicable provisions of the Internal Revenue Code or Treasury Regulations, or in the case of a transfer to the employment of a subsidiary or to the employment of the Company.

If an employee Participant is discharged for Cause, as hereinafter defined, all his options shall immediately be cancelled effective as of the date of termination of his employment. For the purposes of the Plan, unless otherwise provided under the terms of an employment agreement with the Company or any of its subsidiaries, in which case the definition contained therein shall control, a discharge for "Cause" shall have occurred where a Participant is terminated because of:

(A) the Participant's continued failure to perform substantially his duties with the Company or any of its subsidiaries (other than any such failure resulting from

PG000191

incapacity due to physical or mental illness), after a written demand for performance is delivered to Participant by an officer or a senior manager of the Company or the subsidiary which identifies the manner in which the Board or the elected officer or manager believes that Participant has not performed his duties;

    (B) the Participant's engaging in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Company or the subsidiary; or

    (C) the Participant's conviction of a felony or a plea of nolo contendere by Participant with respect thereto.

    (g) <u>Death</u>.  In the event a Participant dies while holding options granted hereunder, (I) any option granted prior to January 1, 2002 may be exercised within a period not to exceed one year after the date of death, and (II) any option granted after December 31, 2001 may be exercised within a period not to exceed three years after the date of death, as to all or any of the shares covered by such option, by his executor or administrator of the person or persons to whom the option is transferred by will or the applicable laws of descent and distribution, and except as so exercised the option shall expire after the expiration of such period.  In no event, however, may any option be exercised after the expiration of the option period.

    (h) <u>Deferral Election</u>.  In accordance with such rules and procedures as the Committee may prescribe from time to time, if provided by the Committee, in its sole and exclusive discretion, in the option agreement covering an option granted hereunder, a Participant may elect to defer the delivery of the shares acquired upon the exercise of the option; provided that such election may not be made with respect to any incentive stock option or any option transferred pursuant to the provisions of Section 6(d) above.  The Participant's deferral election must be made at least six months prior to the date such option is exercised or at such other time as the Committee may specify.  Payment of the option exercise price must be made in the form of shares of common stock which the Participant has held for at least six months.  Deferral elections will be allowed only for option exercises that occur while the Participant is an active employee of the Company and its subsidiaries or is actively serving as a non-employee director, as the case may be.  Any election to defer the delivery of the stock shall be irrevocable as long as the Participant remains an employee of the Company and its subsidiaries or a non-employee director, as the case may be.

    Upon the exercise of an option as to which a deferral election has been made in accordance with this Subsection (h), the Company shall credit to a bookkeeping account a number of deferred stock units equal to the number of shares that otherwise would have been delivered to the Participant.  During the period of deferral, the deferred stock units shall accrue dividends at the rate paid upon the Company's common stock, which dividend equivalents shall be credited in the form of additional deferred stock units. Deferred stock units shall be distributed in shares of common stock (with cash payment in lieu of any fractional share) upon the Participant's termination of employment with the Company and its subsidiaries or following the date the Participant's membership on the Board of Directors ceases, as the case may be, or if the Participant's termination is on account of retirement, at such other date or dates as may be

PG000192

approved by the Committee over a period extending no later than 10 years following such termination date.

The Committee may, in its sole discretion, allow for the early distribution of an employee Participant's deferred stock units in the event of an immediate and heavy financial hardship or in the event of the death or disability of the Participant. Distribution on account of financial hardship shall be limited to the amount necessary to satisfy the hardship. In addition, the Committee in its discretion may direct the distribution of an employee Participant's deferred stock units if it believes such action is in the best interest of the Company. Deferred stock units shall not be assigned or alienated by any Participant, and shall not be subject to attachment, garnishment, encumbrance, pledge or charge of any nature.

(i) <u>Additional Conditions of Option Awards</u>.  Unless otherwise provided pursuant to an employment agreement between an employee Participant and the Company, the following additional provisions shall govern options awarded under the Plan.

(1) With respect to any option granted prior to June 21, 2001, and to any option granted on June 21, 2001 under The Gillette U.K. Approved Stock Option Plan ("2001 UK approved option"), the Committee may, in its sole discretion, cancel any such option at or any time after the date of termination of an employee Participant's employment (and prior to the expiration of the exercise periods specified above), if it deems such action to be in the best interests of the Company.

(2) With respect to any option granted on or after June 21, 2001 (other than any 2001 UK approved option) ("covered option"), the following terms and conditions shall apply:

(a) Unless otherwise provided pursuant to a termination settlement agreement with the Company or any of its subsidiaries, while the Participant is employed by the Company and for a period of eighteen (18) months after the termination or cessation of such employment for any reason, the Participant shall not directly or indirectly:

(i) as an employee, consultant, independent contractor, officer, director, individual proprietor, investor, partner, stockholder, agent, principal, joint venturer, or in any other capacity whatsoever (other than as the holder of not more than one percent of the combined voting power of the outstanding stock of a publicly held corporation or company), be employed, work, consult, advise, assist, or engage in any activity regarding any business, product, service or other matter which: (A) is substantially similar to or competes with any business, product, service or other matter regarding which the Participant worked for the Company, or any of its subsidiaries, during the three (3) years prior to Participant's termination of employment; or (B) concerns subject matters about which Participant gained proprietary information of the Company, or any of its subsidiaries, during the three (3) year period prior to the Participant's termination of employment;

(ii) either alone or in association with others, solicit, divert or take away, or attempt to divert or to take away, the business or patronage of any of the clients, customers or accounts, or prospective clients, customers or accounts, of the Company which were contacted, solicited or served, directly or indirectly, by Participant while employed by the Company; or

(iii) either alone or in association with others: (A) solicit or encourage any employee or independent contractor of the Company to terminate his/her relationship with the Company; or (B) recruit, hire or solicit for employment or for engagement as an independent contractor, any person who is or was employed by the Company at any time during the Participant's employment with the Company; provided, that this Paragraph (iii) shall not apply to such person whose employment with the Company has been terminated for a period of six months or longer.

(b) The Participant shall not disclose or use at any time any secret or confidential information or knowledge obtained or acquired by the Participant during, after, or by reason of, employment with the Company or any of its subsidiaries, as provided under applicable law and any and all agreements between the Participant and the Company or any of its subsidiaries regarding Participant's employment with the Company or the subsidiary.

(c) In accordance with any and all agreements between the Participant and the Company or any of its subsidiaries regarding the Participant's employment, the Participant shall disclose promptly and transfer and assign to the Company all improvements and inventions in certain fields made or conceived by the Participant during employment with the Company or the subsidiary and within the prescribed periods thereafter.

(d) To the extent permitted by law, the Participant shall not make, publish or state, or cause to be made, published or stated, any defamatory or disparaging statement, writing or communication pertaining to the character, reputation, business practices, competence or conduct of the Company, its subsidiaries, shareholders, directors, officers, employees, agents, representatives or successors.

(3) The geographic scope of the provisions of Paragraph (2)(a) above shall extend to anywhere the Company or any of its subsidiaries is doing business, has done business or intends to do business.

(4) If any restriction set forth in Paragraph (2)(a) above is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend only over the maximum period of time, range of activities or geographic area as to which it may be enforceable.

PG000194

(5) In the event of a Change of Control, the restrictions contained in Paragraphs (2)(a)(i), (2)(a)(iii) and (2)(d) above shall cease and the Participant shall no longer be bound by the obligations thereunder.

(6) If the Company reasonably determines that a Participant has materially violated any of the Participant's obligations under Paragraph (2) above, or if a Participant is terminated for Cause, then, in addition to any other remedies at law or in equity it may have, the Company shall have the following rights and remedies:

(a) The Company may cancel any and all covered options granted to the Participant, including grants that according to their terms are vested, effective as of the date on which such violation began (the "Violation Date"); and

(b) The Company may demand the return of any gain realized by the Participant as a result of the Participant's exercise of any covered option during the period commencing one year prior to the Participant's termination of employment and continuing through the Violation Date. Upon demand, the Participant shall pay to the Company the amount of any gain realized or payment received as a result of such exercises. At the option of the Company, such payment shall be made by returning to the Company the number of shares of common stock of the Company which the Participant received in connection with such exercise (with the Company then refunding the option price paid by the Participant), or in cash in the amount of the gain realized. If after such demand the Participant fails to return said shares or amounts, the Company shall have the right to offset said amounts against any amounts, including compensation, owed to the Participant by the Company or to commence judicial proceedings against the Participant to recover said shares or amounts.

(7) The non-competition restrictions set forth in Paragraph (2)(a) supersede any non-competition restrictions of less than eighteen (18) months in duration set forth in any agreement between a Participant and the Company or any subsidiary or predecessor.

7. REPLACEMENT OPTIONS. The Company may grant options under the Plan on terms differing from those provided for in Section 6 of the Plan where such options are granted in substitution for options held by employees of other corporations who concurrently become employees of the Company or a subsidiary as the result of a merger or consolidation of the employing corporation with the Company or subsidiary, or the acquisition by the Company or a subsidiary of property or stock of the employing corporation. The Committee may direct that the substitute options be granted on such terms and conditions as the Committee considers appropriate in the circumstances.

Notwithstanding anything contained in this Plan, the Committee shall have authority, with respect to any options granted or to be granted to employees or outstanding installment Purchase Agreements of participants other than non-employee directors under this Plan, to extend the time for payment of any and all installments, to modify the amount of any installment, to amend outstanding option certificates to provide for installment payments or to take any other action which it may, in its

Confidential

discretion, deem necessary, provided that: (1) interest on the unpaid balance under any outstanding Purchase Agreement at the rate of at least four percent (4%) per annum shall continue to be due and payable quarterly during the period of any deferral of payment; (2) all such installment Purchase Agreements and unexercised options, shall at all times be in accordance with the applicable provisions of Regulation G of the Board of Governors of the Federal Reserve System, as from time to time amended, and with all other applicable legal requirements; (3) no such action by the Committee shall jeopardize the status of stock options as incentive stock options under the Internal Revenue Code.

8.   FOREIGN EMPLOYEES.  The Company may grant options under the Plan on terms differing from those provided for in Section 6 of the Plan where such options are granted to employee Participants who are not citizens or residents of the United States of America if the Committee determines that such different terms are appropriate in view of the circumstances of such Participants, provided, however, that such options shall not be inconsistent with the provisions of Section 6(a) or Section 6(b) of the Plan.

In addition, if the Committee determines that options are inappropriate for any key salaried employees who are not citizens or residents of the United States of America, whether because of the tax laws of the foreign countries in which such employees are residents or for other reasons, the Board of Directors may authorize special arrangements for the sale of shares of common stock of the Company to such employees, whether by the Company, or a subsidiary, or other person.  Such arrangements may, if approved by the Board of Directors, include the establishment of a trust by the foreign subsidiary, which is the employer of the key salaried employees, designated by such subsidiary, to whom the shares are to be sold.  Such arrangements shall provide for a purchase price of not less than the fair market value of the stock at the date of sale and a maximum annual grant per participant of options to purchase 1,250,000 shares of common stock and may provide that the purchase price be paid over a period of not more than ten years, with or without interest, and that such employees have the right, with or without payment of a specified premium, to require the seller of the shares to repurchase such shares at the same price, subject to specified conditions.  Such arrangements may also include provisions deemed appropriate as to acceleration or prepayment of the balance of the purchase price, restrictions on the transfer of the shares by the employee, representations or agreements by the employee about his investment purposes and other miscellaneous matters.

9.   CHANGES IN STOCK.  In the event of a stock dividend, split-up or combinations of shares, recapitalization or merger in which the Company is the surviving corporation, or other similar capital change, the number and kind of shares of stock or securities of the Company to be subject to the Plan and to options then outstanding or to be granted thereunder, the maximum number of shares or securities which may be issued or sold under the Plan, the maximum annual grant for each participant, the automatic annual grant for each non-employee director, the option price and other relevant provisions shall be appropriately adjusted by the Board of Directors of the Company, whose determination shall be binding on all persons.  In the event of a consolidation or a merger in which the Company is not the surviving corporation or which results in the acquisition of substantially all the Company's outstanding stock by a single person or entity or by a group of persons and/or entities acting in concert, or in the event of complete liquidation of the Company, all

PG000196

-14-

outstanding options shall thereupon terminate, provided that (i) at least twenty days prior to the effective date of any such consolidation or merger, the Board of Directors shall with respect to employee participants either (a) make all outstanding options immediately exercisable, or (b) arrange to have the surviving corporation grant replacement options to the employee Participants and (ii) in the case of option grants to non-employee directors, all outstanding options not otherwise exercisable shall become exercisable on the twentieth day prior to the effective date of the merger.

10. <u>EMPLOYMENT RIGHTS</u>.  The adoption of the Plan does not confer upon any employee of the Company or a subsidiary any right to continued employment with the Company or a subsidiary, as the case may be, nor does it interfere in any way with the right of the Company or a subsidiary to terminate the employment of any of its employees at any time.

11. <u>AMENDMENT OF PLAN OR OPTIONS</u>.  The Board of Directors of the Company, or the Compensation Committee of the Board of Directors if and to the extent authorized, may at any time or times amend the Plan or amend any outstanding option or options or arrangements established under Section 8 of the Plan for the purpose of satisfying the requirements of any changes in applicable laws or regulations or for any other purpose which may at the time be permitted by law, provided that (except to the extent required or permitted under Section 9 of the Plan and, with respect to clauses (b) and (f) below, except to the extent required or permitted under Section 7 of the Plan) no such amendment shall, without the approval of the stockholders of the Company, (a) increase the maximum number of shares available under the Plan or the maximum annual grant per participant other than as permitted under Section 9 of the Plan, (b) reduce the minimum option price of options thereafter to be granted below the price provided for in Section 6(a) of the Plan, except that the Plan may be amended to provide that the minimum option price of non-qualified stock options thereafter to be granted to employees may be not less than 95% of the fair market value at the date of grant if the Board determines that such amendment is necessary for tax reasons to carry out the objectives of the Plan, (c) reduce the price at which shares of common stock of the Company may be sold under Section 8 of the Plan below the price provided for in said Section 8, (d) reduce the option price of outstanding options, (e) extend the time within which options may be granted, or (f) extend the period of an outstanding option beyond ten years from the date of grant; and further provided no such amendment shall adversely affect the rights of any Participant (without his consent) under any option theretofore granted or other contractual arrangements theretofore entered into or after a Change of Control deprive any Participant of any right or benefit which became operative in the event of a Change of Control.

12. <u>TERMS AND CONDITIONS OF OPTIONS GRANTED TO NON-EMPLOYEE DIRECTORS</u>.  Effective at the close of business on the second business day after the 1992 Annual Meeting of Shareholders of the Company and on the second business day after each Annual Meeting thereafter, each non-employee director shall be automatically granted a non-incentive stock option to purchase 4,000 shares (5,000 shares for options granted after 2001 and before 2004, and 7,500 shares for options granted after 2003) of the common stock of the Company under the generally applicable provisions of the Plan and upon the following specific terms and conditions:

Confidential

(a) <u>Option Price</u>. The option price under each option shall be the fair market value on the date of grant, which for this purpose is defined as the average between the high and the low price of the common stock as reported by the New York Stock Exchange.

(b) <u>Option Period</u>. The period of an option shall be ten years from the date of grant.

(c) <u>Option Exercisability</u>. Each option granted prior to 2001 shall become exercisable in full on the earlier of the first Annual Meeting following the date of grant or the first anniversary of the date of grant, except as otherwise provided under Paragraph (4) of Section 6(c) of the Plan. Each option granted after 2000 shall become exercisable ratably over a three year period (for options granted after 2003, this means 2,500 after one year, an additional 2,500 after two years and the remaining 2,500 after three years) on the earlier of the Annual Meeting or the anniversary of the date of grant in each such year, except as otherwise provided under Paragraph (4) of Section 6(c) of the Plan.

(d) <u>Exercise Period</u>. Any option, otherwise exercisable, may be exercised during the period a non-employee director remains a member of the Board of Directors and for a period of three months following the date a non-employee director ceases to be a director; provided that, in the case where the non-employee director either has attained age 65 or has served as a non-employee director for at least five years when membership on the Board of Directors ends, all of that non-employee director's options shall be exercisable for a period of two years with respect to options granted before 1994, three years for options granted after 1993 and before 2001, five years for options granted after 2000 and before 2002, and the remaining option period for options granted after 2001, each such period commencing on the date membership on the Board of Directors ceases.

If a non-employee director dies while a member of the Board of Directors, or following the date membership on the Board of Directors ceases while an option remains exercisable in accordance with the preceding paragraph, then (I) for options granted before 2002, at any time or times within one year after that non-employee director's death, and (II) for options granted after 2001, at any time or times within three years after that non-employee director's death, that non-employee director's option may be exercised in accordance with the provisions of Section 6(g) of the Plan. In no event shall any option be exercised after the expiration of the option period.

**13. GOVERNING LAW.**

(a)      **Prior to Effective Time:** Except as to matters concerning the issuance of shares or other matters of corporate governance, which shall be construed under the General Corporation Law of the State of Delaware, the Plan and each Award issued under it shall be governed by the laws of the Commonwealth of Massachusetts, excluding any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of the Plan to the substantive law of another jurisdiction. Recipients of an option under the Plan are deemed to submit to the exclusive jurisdiction and venue of the federal or state courts of Massachusetts, to resolve any and all issues that may arise out of or relate to the Plan or any option.

Confidential

(b)  **Upon and following Effective Time:** The Plan and each option issued under it shall be governed by and construed in accordance with the laws of the State of Ohio, United States of America, excluding any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of the Plan to the substantive law of another jurisdiction. Recipients of an option under the Plan are deemed to submit to the exclusive jurisdiction and venue of the federal or state courts of Ohio, to resolve any and all issues that may arise out of or relate to the Plan or any option.

## 14. SPECIAL MERGER PROVISIONS

**14.1  Acceleration of Options.** Notwithstanding any other provision in the Plan, each option outstanding under the Plan (the "Accelerated Options") shall be vested and fully exercisable effective immediately prior to the Effective Time as determined by the Authorized Officer.

**14.2  Special Merger Elections.** Under procedures established by the Authorized Officer, each holder of an Accelerated Option may exercise such Accelerated Option immediately prior to the Effective Time, in whole or in part, and in respect thereof shall be entitled to receive, at such holder's election, either (i) the Merger Shares or (ii) a cash payment equal to the product of (A) the excess (if any) of the per share value of the Merger Shares over the per share exercise price, multiplied by (B) the number of Shares with respect to which the Accelerated Option is exercised, in each case subject to applicable withholding taxes.

**14.3  Termination Following the Effective Time.** Unless otherwise provided under the terms of an employment agreement with the Company or its subsidiaries, notwithstanding any other provision in the Plan, a termination of employment for Good Reason within two (2) years of the Effective Time shall be treated for purposes of Accelerated Options the same as (A) a Special Separation or (B) in the case of a Participant eligible for retirement under the Company's benefit plans, as a Retirement.

**14.4  Post-Merger Conversion of Outstanding Accelerated Options.** Each Accelerated Option outstanding at the Effective Time (together, "Gillette Stock Options") shall cease to represent a right to acquire Shares and, after the Effective Time, shall be deemed an option to acquire, on the same terms and conditions as were applicable under the Gillette Stock Option (but taking into account any applicable changes thereto provided for in this Plan as revised or by reason of the Merger Agreement), that number of Shares of Parent Common Stock determined by multiplying the number of Shares subject to such Gillette Stock Option by the Exchange Ratio, rounded, if necessary, to the nearest whole share of Parent Common Stock, at a price per share (rounded to the nearest one-hundredth of a cent) equal to the per share exercise price specified in such Gillette Stock Option divided by the Exchange Ratio; *provided, however,* that in the case of any Gillette Stock Option to which Section 421 of the Code applies by reason of its qualification under Section 422 of the Code, the option price, the number of shares subject to such option and, except to the extent otherwise required by the Plan as revised, the terms and conditions of exercise of such option shall be determined in a manner consistent with the requirements of Section 424(a) of the Code.

**14.5  Provisions concerning Options to Nonemployee Directors.** Options held by Nonemployee Directors of The Gillette Company immediately prior to the Effective Time must be exercised within the term of the original grant or within five (5) years from the Effective Time, whichever is shorter.

PG000199

-17-

**14.6    Assumption of Gillette Stock Options and Certain Undertakings.**  Subject to the terms of the Merger Agreement, on the Effective Time The Procter & Gamble Company shall assume the Plan (as revised herein) and each Gillette Stock Option.  To the extent permitted by law but not in derogation of the provisions of this Article 14, The Procter & Gamble Company shall take such reasonable steps as may be necessary to cause the Gillette Stock Options which qualified under Section 422 of Code as incentive stock options prior to the Effective Time to continue to qualify as incentive stock options of The Procter & Gamble Company after the Effective Time.

14.7 **Special Separation.**  In the case of a Special Separation, any option must be exercised within the term of the original grant or five (5) years from the date of Special Separation, whichever is shorter.

## 15. DEFINITIONS

Whenever used in the Plan, the following terms shall have the meanings set forth below, and when the meaning is intended, the initial letter of the word shall be capitalized.

15.1    **"Accelerated Options"** has the meaning accorded such term in Article 14.

15.2    **"Authorized Officer"** means each of (i) the Chairman, Chief Executive Officer and President, (ii) the Vice Chairman, (iii) the Senior Vice President, Finance, and Chief Financial Officer, (iv) the Senior Vice President, Strategy and Business Development, (v) the Senior Vice President and General Counsel, (vi) the Secretary and (vii) such other officers of the Company as any of the foregoing may designate in writing.

15.3    **"Board"** or **"Board of Directors"** means the Board of Directors of the Company.

15.4    **"Closing"** means the closing of the Merger upon the terms and subject to the conditions set forth in Article 6 of the Merger Agreement

15.5 **Committee"** means:

(a)    If describing rights, obligations, conditions, and/or circumstances prior to the Effective Time, the Compensation and Human Resources Committee of the Board of The Gillette Company.

(b)    If describing rights, obligations, conditions, and/or circumstances at or following the Effective Time, the Compensation & Leadership Development Committee (or its functional successor by another name) of The Procter & Gamble Company

15.6 **"Company"** means:

(a)    If describing rights, obligations, conditions, and/or circumstances prior to the Effective Time, The Gillette Company, a Delaware corporation;

(b)    If describing rights, obligations, conditions, and/or circumstances at or following the Effective Time, The Procter & Gamble Company, an Ohio corporation.

15.7    **"Effective Time"** has the meaning accorded such term in the Merger Agreement.

Confidential

-18-

**15.8 "Exchange Act"** means the Securities Exchange Act of 1934, as amended from time to time, or any successor act thereto.

**15.9 "Exchange Ratio"** has the meaning accorded such term in the Merger Agreement.

**15.10 "Merger"** means the consummation of the transactions contemplated by the Merger Agreement.

**15.11 "Merger Agreement"** means the Agreement and Plan of Merger dated as of January 27, 2005 among The Procter & Gamble Company, Aquarium Acquisition Corp. and The Gillette Company.

**15.12 "Merger Shares"** has the meaning accorded such term in the Merger Agreement.

**15.13 "Nonemployee Director"** has the same meaning set forth in Rule 16b-3 promulgated under the Exchange Act, or any successor definition adopted by the United States Securities and Exchange Commission.

**15.14 "Parent"** means The Procter & Gamble Company.

**15.15 "Parent Common Stock"** has the meaning accorded such term in the Merger Agreement.

**15.16 "Participant"** means any eligible person to whom an Award is granted.

**15.17 "Plan"** means The Gillette Company 1971 Stock Option Plan as from time to time amended and in effect.

**15.18 "Retirement"** means: (a) retirement in accordance with the provisions of any appropriate retirement plan of the Company or any of its subsidiaries; or (b) termination of employment under the total and permanent disability provision of any retirement or disability plan of the Company or any of its subsidiaries or any plan to which the Company or its subsidiaries contribute for purposes of the retirement or disability of Employees.

15.19 **"Share"** means a Share of common stock of the Company

15.20 **"Special Separation"** means any termination of employment that occurs prior to the time a Participant is eligible to retire, except a termination for Cause or a voluntary resignation that is not initiated or encouraged by the Company.

15.21 **"Subsidiary"** means any corporation or other entity, whether domestic or foreign, in which the Company has or obtains, directly or indirectly, a proprietary interest of more than fifty percent (50%) by reason of stock ownership or otherwise.

Confidential

DEFENDANT'S
EXHIBIT NO.  16
FOR IDENTIFICATION
DATE: ____  RPTR: ____

July 3, 2009

TE-3 G.O. Box 5B
Two Procter & Gamble Place
Cincinnati, OH 45202

Re:   Stock Options Exercise and Cash Liquidation

Dear Stock Option Administration,

I am writing to request a complete exercise and cash liquidation of my stock option awards resulting from my employment with Gillette and Procter & Gamble.  Per the Attached Notice to Exercise Forms (2 Sets), I direct you to immediately exercise and completely liquidate, for cash, the following share grants:

| Grant Date: | Shares | Type |
|---|---|---|
| 6/21/2001 | 1950 | ISO |
| 6/20/2002 | 1950 | ISO |
| 6/19/2003 | 1950 | ISO |
| 6/19/2003 | 975 | NQ |
| 6/17/2004 | 812 | ISO |
| 6/17/2004 | 1626 | NQ |
| **TOTALS** | 9263 | |

Please take note on the Notice to Exercise Forms that I am no longer an employee of P&G, but I fully intend to exercise the final grant (1950 shares granted on 6/16/2005) should it become economically feasible.  Thank you for your prompt attention in this matter and if there are any questions or concerns, please contact me at (203) 255-7544.

Very Truly Yours,

Predrag Cicvara

Confidential

## NOTICE TO EXERCISE 05/05

Please complete and return to Stock Option Administration. Your request cannot be processed without a legible, fully completed notice.

| Global Compensation Payments Stock Option Administration | Phone: 513-983-5050 FAX: 513-983-0158 www.pg.com/investors/stock_options.jhtml | TE-3 G.O. Box 5B Two Procter & Gamble Plaza Cincinnati, OH 45202 |
|---|---|---|

**CHOOSE GRANT DATE TO EXERCISE**

| 6 | / | 21 | / | 2001 | for | 1950 | shares | Type (circle one) | NQ | ISO | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6 | / | 20 | / | 2002 | for | 1950 | shares | Type (circle one) | NQ | ISO | Other |
| 6 | / | 19 | / | 2003 | for | 1950 | shares | Type (circle one) | NQ | ISO | Other |
| 6 | / | 19 | / | 2003 | for | 975 | shares | Type (circle one) | NQ | ISO | Other |

**CHOOSE METHOD OF EXERCISE** (Note: exercise of a SAR will automatically result in cash, skip to next section.)

**U.S. CITIZENS, PERMANENT RESIDENTS (U.S. Green Card), or currently residing in the U.S:** choose one of the following methods:

To receive Cash, select: ⇩                    To receive Stock, select one of the following four methods: ⇩

**Sell All:**
____ Broker sells all shares indicated above.
You receive cash.
**X** ____ Sell at Market
____ Sell at Limit $_____ *

**Sell to Cover:**
____ Pay no cash. Broker sells enough shares to cover option cost and taxes.
You receive the balance of shares.
____ Sell at Market
____ Sell at Limit $_____ *
____ Deposit the resulting shares to my SIP account.
____ Mail the resulting shares to me at my home address.

> Contact Stock Option Administration for cash payment amount

**Pay Cash:**
____ Pay cash to cover option cost and taxes. You receive shares.
____ Enclosed is a check for US$_____ payable to P&G.
____ I have transmitted US$_____ via wire transfer.
____ Deposit the shares to my SIP account.
____ Mail the shares to me at my home address.

**Pay Cash, Cover Taxes with Shares:**
____ Pay cash to cover option cost (option price x shares).
P&G withholds shares to cover taxes.
____ Enclosed is a check for US$_____ payable to P&G.
____ I have transmitted US$_____ via wire transfer.
____ I authorize P&G to determine the number of shares to withhold from me in order to pay applicable taxes and to transfer shares from me to P&G
____ Deposit the resulting shares to my SIP account.
____ Mail the shares to me at my home address.

**Share Exchange:**
____ Pay no cash. Cover option cost with currently owned shares. P&G withholds shares to cover taxes.
____ I wish to tender shares of P&G stock, which I certify that I have owned for at least six months, in full payment of my option cost. Under existing law, I am entitled to keep my current shares. I authorize P&G to determine the number of shares necessary to pay my option cost and applicable taxes and to issue to me the remaining shares.
____ Deposit the resulting shares to my SIP account.
____ Mail the stock to me at my home address.

**RESIDENTS OF:** Algeria, Azerbaijan, Bangladesh, Bosnia, China, Colombia, Croatia, Greece, India, Indonesia, Italy, Kazakhstan, Lebanon, Malaysia, Morocco, Russia, South Africa, South Korea, Sri Lanka, Thailand, Turkey, Ukraine, United Arab. Emer., Uzbekistan, Vietnam, Yugoslavia check below:

____ **Sell All:** Broker sells all shares indicated above. You receive cash.
____ Sell at Market
____ Sell at Limit $_____ *

**ALL OTHER OPTIONEES:** choose one of the following methods:

To receive Cash, select: ⇩                    To receive Stock, select one of the following two methods: ⇩

**Sell All:**
____ Broker sells all shares indicated above.
You receive cash.
____ Sell at Market
____ Sell at Limit $_____ *

**Sell to Cover:**
____ Pay no cash. Broker sells enough shares to cover option cost and taxes.
You receive the balance of shares.
____ Sell at Market
____ Sell at Limit $_____ *
____ Deposit the resulting shares to my SIP account.
____ Mail the resulting shares to me at my home address.

> Contact Stock Option Administration for cash payment amount

**Pay Cash:**
____ Pay cash to cover option cost and taxes. You receive shares.
____ Enclosed is a check for US$_____ payable to P&G.
____ I have transmitted US$_____ via wire transfer.
____ Deposit the shares to my SIP account.
____ Mail the shares to me at my home address.

*If Limit is not reached by the time of expiration for the grant series indicated above, the grant will expire unexercised.

**CERTIFICATION OF EMPLOYMENT INTENT** *(required for "active" employees)*

Confidential

**NOTICE TO EXERCISE (page two)**

The right to exercise any stock option or stock appreciation right under The Procter & Gamble Stock Plans is conditional upon certification by the recipient at the time of exercise that the recipient intends to remain in the employ of the Company or one of its subsidiaries for at least one year following the date of exercise.  To comply with this certification provision, select one of the following:

☐ 1. I intend to remain in the employ of the Company or one of its subsidiaries (except in the case of retirement or disability) for at least one year following the date of exercise.

_____    _____
Optionee Signature                    Date

OR:

☐ 2. I intend to leave the Company or one of its subsidiaries within one year following the date of exercise, but I have no intent to engage in any activity that would violate the non-compete, which I have read and understand.
*I also understand that it is my responsibility to have this "Notice to Exercise" approved by my Vice President.*

_____   _____   _____   _____   _____
Optionee Signature    Date    Vice President Signature*    Date    Print Vice President Name

*This confirms, as required by the Compensation Committee, that the optionee has not acted significantly contrary to the best interests of the Company.

**INDICATION OF INTERNATIONAL ASSIGNMENTS:**

While you were a P&G employee, please list the countries you have worked in from 1992 -- present, as well as the assignment type you had in that country (e.g. WES/International Manager or local employee):

| location | dates worked in that location | assignment type |
|---|---|---|
| location | dates worked in that location | assignment type |
| location | dates worked in that location | assignment type |

**BANK INFORMATION (required for "Sell All" method of exercise and exercise of Stock Appreciation Rights)**

By using this application, I hereby authorize P&G to initiate electronic entries to the financial institution named within this application.  If technical problems occur which prohibit electronic entries being made, a regular check will be issued.

Payee Bank Name: WACHOVIA BANK, N.A.   Payee Bank Location: FAIRFIELD, CT
                                                                                              City, State

Payee Bank Transit Route #: 021101108    Payee Bank Account #: 101 0041 56 2800
                                    (9 digits)

If your account is with a non-US Bank, the following information is also required.  Your bank can provide this information:

Correspondent Bank Name: _____   Correspondent Bank Location: _____
                                                                                                      City, Country

Correspondent Bank Account #: _____

**DISCLAIMER:** Procter & Gamble shall have no responsibility for the failure to complete, for any reason, any requested transaction.  In the event that the sale price on "Market" orders is lower than the grant price, you must pay the difference to The Company.

**AUTHORIZATION**   ✓

X Regardless of the Company's withholding obligations, I understand I'm responsible for any taxes due as a result of the exercise.

x  PREDRAG CICVARA        Predrag Cicvara    07/02/2009
   Name (please print)                Signature              Date

P&G Employment Status  active / retired / (separated)   P&G Global ID 00145927   Phone # 203-255-7544
                              (circle one)                           (if known)

U.S. Social Security # 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   E-Mail Address predrag.cicvara@gmail.co

Home Address 2122 NORTH BENSON ROAD    FAIRFIELD    CT   06824
                          (Street)                              (City)      (State)      (ZIP)

P&G Office Address DURACELL                  BETHEL        CT / USA
                    (Legal Entity/Company Name)        (City)         (Country)

**NOTICE TO EXERCISE 06/05**

Please complete and return to Stock Option Administration. Your request cannot be processed without a legible, fully completed notice.

| Global Compensation Payments - Stock Option Administration | Phone: 813-983-8060 FAX: 813-983-0189 www.pg.com/investors/stock_options.jhtml | TE-3 G.O, Box 8B Two Procter & Gamble Plaza Cincinnati, OH 45202 |
|---|---|---|

**CHOOSE GRANT DATE TO EXERCISE**

| | | | | | |
|---|---|---|---|---|---|
| 6 / 17 / 2004 | for | 912 | shares Type (circle one) NQ **ISO** Other |
| 6 / 17 / 2004 | for | 1626 | shares Type (circle one) **NQ** ISO Other |
| ___ / ___ / ___ | for | ___ | shares Type (circle one) NQ ISO Other |
| ___ / ___ / ___ | for | ___ | shares Type (circle one) NQ ISO Other |

**CHOOSE METHOD OF EXERCISE (Note: exercise of a SAR will automatically result in cash, skip to next section.)**

**U.S. CITIZENS, PERMANENT RESIDENTS (U.S. Green Card), or currently residing in the U.S:** choose one of the following methods:

To receive Cash, select:  ⇩            To receive Stock, select one of the following four methods:  ⇩

**Sell All:**
____ Broker sells all shares indicated above. You receive cash.
**X** Sell at Market
____ Sell at Limit $_____ *

*(callout)* Contact Stock Option Administration for cash payment amount

**Sell to Cover:**
____ Pay no cash. Broker sells enough shares to cover option cost and taxes. You receive the balance of shares.
____ Sell at Market
____ Sell at Limit $_____ *
____ Deposit the resulting shares to my SIP account.
____ Mail the resulting shares to me at my home address.

**Pay Cash:**
____ Pay cash to cover option cost and taxes. You receive shares.
____ Enclosed is a check for US$ _____ payable to P&G.
____ I have transmitted US$ _____ via wire transfer.
____ Deposit the shares to my SIP account.
____ Mail the shares to me at my home address.

**Pay Cash, Cover Taxes with Shares:**
____ Pay cash to cover option cost (option price x shares). P&G withholds shares to cover taxes.
____ Enclosed is a check for US$ _____ payable to P&G.
____ I have transmitted US$ _____ via wire transfer.
____ I authorize P&G to determine the number of shares to withhold from me in order to pay applicable taxes and to transfer shares from me to P&G
____ Deposit the resulting shares to my SIP account.
____ Mail the resulting shares to me at my home address.

**Share Exchange:**
____ Pay no cash. Cover option cost with currently owned shares. P&G withholds shares to cover taxes.
____ I wish to tender shares of P&G stock, which I certify that I have owned for at least six months, in full payment of my option cost. Under existing law, I am entitled to keep my current shares. I authorize P&G to determine the number of shares necessary to pay my option cost and applicable taxes and to issue to me the remaining shares.
____ Deposit the resulting shares to my SIP account.
____ Mail the stock to me at my home address.

**RESIDENTS OF: Algeria, Azerbaijan, Bangladesh, Bosnia, China, Colombia, Croatia, Greece, India, Indonesia, Italy, Kazakhstan, Lebanon, Malaysia, Morocco, Russia, South Africa, South Korea, Sri Lanka, Thailand, Turkey, Ukraine, United Arab. Emer., Uzbekistan, Vietnam, Yugoslavia** check below:

____ **Sell All:** Broker sells all shares indicated above. You receive cash.
____ Sell at Market
____ Sell at Limit $_____ *

**ALL OTHER OPTIONEES:** choose one of the following methods:

To receive Cash, select:  ⇩            To receive Stock, select one of the following two methods:  ⇩

**Sell All:**
____ Broker sells all shares indicated above. You receive cash.
____ Sell at Market
____ Sell at Limit $_____ *

*(callout)* Contact Stock Option Administration for cash payment amount

**Sell to Cover:**
____ Pay no cash. Broker sells enough shares to cover option cost and taxes. You receive the balance of shares.
____ Sell at Market
____ Sell at Limit $_____ *
____ Deposit the resulting shares to my SIP account.
____ Mail the resulting shares to me at my home address.

**Pay Cash:**
____ Pay cash to cover option cost and taxes. You receive shares.
____ Enclosed is a check for US$ _____ payable to P&G.
____ I have transmitted US$ _____ via wire transfer.
____ Deposit the shares to my SIP account.
____ Mail the shares to me at my home address.

*If Limit is not reached by the time of expiration for the grant series indicated above, the grant will expire unexercised.

**CERTIFICATION OF EMPLOYMENT INTENT (required for "active" employees)**

Confidential

**NOTICE TO EXERCISE (page two)**

The right to exercise any stock option or stock appreciation right under The Procter & Gamble Stock Plans is conditional upon certification by the recipient at the time of exercise that the recipient intends to remain in the employ of the Company or one of its subsidiaries for at least one year following the date of exercise. To comply with this certification provision, select one of the following:

☐ 1. I intend to remain in the employ of the Company or one of its subsidiaries (except in the case of retirement or disability) for at least one year following the date of exercise.

_____     _____
Optionee Signature                          Date

OR:

☐ 2. I intend to leave the Company or one of its subsidiaries within one year following the date of exercise, but I have no intent to engage in any activity that would violate the non-compete, which I have read and understand.
*I also understand that it is my responsibility to have this "Notice to Exercise" approved by my Vice President.*

_____ _____     _____ _____     _____
Optionee Signature   Date        Vice President Signature*   Date        Print Vice President Name

*This confirms, as required by the Compensation Committee, that the optionee has not acted significantly contrary to the best interests of the Company.

**INDICATION OF INTERNATIONAL ASSIGNMENTS:**

While you were a P&G employee, please list the countries you have worked in from 1992 – present, as well as the assignment type you had in that country (e.g. WES/International Manager or local employee):

| location | dates worked in that location | assignment type |
|---|---|---|
| | | |
| location | dates worked in that location | assignment type |
| | | |
| location | dates worked in that location | assignment type |

**BANK INFORMATION (required for "Sell All" method of exercise and exercise of Stock Appreciation Rights)**

By using this application, I hereby authorize P&G to initiate electronic entries to the financial institution named within this application. If technical problems occur which prohibit electronic entries being made, a regular check will be issued.

Payee Bank Name: __WACHOVIA BANK, N.A.__   Payee Bank Location: __FAIRFIELD, CT__
                                                                              City, State

Payee Bank Transit Route #: __021 101 108__   Payee Bank Account #: __101 004 156 2800__
                                    (9 digits)

If your account is with a non-US Bank, the following information is also required. Your bank can provide this information:

Correspondent Bank Name: _____   Correspondent Bank Location: _____
                                                                              City, Country

Correspondent Bank Account #: _____

**DISCLAIMER:** Procter & Gamble shall have no responsibility for the failure to complete, for any reason, any requested transaction. In the event that the sale price on "Market" orders is lower than the grant price, you must pay the difference to The Company.

**AUTHORIZATION** ✓

X Regardless of the Company's withholding obligations, I understand I'm responsible for any taxes due as a result of the exercise.

x __PREDRAG CICVARA__        __Predrag Cicvara__        __07/02/2009__
   Name (please print)              Signature                    Date

P&G Employment Status __active / retired / (separated)__ P&G Global ID __00145927__  Phone # __203-255-7544__
                          (circle one)                                                      (if known)

U.S. Social Security # __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__   E-Mail Address __predrag.cicvara@gmail.com__

Home Address __2122 NORTH BENSON ROAD__   __FAIRFIELD__   __CT__   __06824__
                          (Street)                              (City)      (State)    (ZIP)

P&G Office Address __DURACELL__        __BETHEL__        __CT__
                          (Legal Entity/Company Name)      (City)            (Country)

PG000513

**P&G**



July 6, 2009

Mr. Predrag Cicvara
2122 North Benson Road
Fairfield, CT  06824

Dear Predrag:

We are in receipt of your letter faxed on July 3, 2009 to Procter and Gamble Stock
Option Administration.  I am sending this letter to remind you that your stock options
were cancelled on your last day of employment, June 15, 2009 and, as such, your notice
to exercise received on July 3, 2009, was denied.

As previously explained in my letter to you dated June 16, 2009, your stock options were
cancelled pursuant to The Gillette Company 1971 Stock Option Plan (Gillette Plan)
because you were terminated for cause.  Please refer to my June 16, 2009 letter and the
copy of the Plan that I provided to you for additional explanation.

Regards,

*Peggy Wilczewski*

Peggy Wilczewski
Sr. Human Resources Manager

Confidential

**U.S. Postal Service**
**CERTIFIED MAIL. RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

**OFFICIAL USE**

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

7005 3110 0000 2996 4858

Sent To *Mr. Predrag Cicvara*
Street, Apt. No.; or PO Box No. *2122 North Benson Rd*
City, State, ZIP+4 *Fairfield CT 06824*

PS Form 3800, June 2002      See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)  *P. Cicvara*   B. Date of Delivery *7/8/09*

C. Signature
X ☐ Agent ☐ Addressee

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

1. Article Addressed to:

*Mr. Predrag Cicvara*
*2122 North Benson Road*
*Fairfield, CT  06824*

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number (Transfer from service label)   *7005 3110 0000 2996 4858*

PS Form 3811, March 2001      Domestic Return Receipt      102595-01-M-1424

Confidential