## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
PREDRAG CICVARA,                                    : Civil Action No.3:09-cv-2054
                                                    : (JCH) (HF)
        Plaintiff,                          :
                                                    :
                                                    :
        v.                                  : April 14, 2011
                                                    :
THE GILLETTE COMPANY and PROCTER &                  : **DECLARATION OF**
GAMBLE COMPANY and DURACELL, AN ENTITY              : **PEGGY WILCZEWSKI**
OF UNKNOWN FORM and LYNNE BURNETT,                  :
                                                    :
        Defendants.                         :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

I, PEGGY WILCZEWSKI, declare under the penalty of perjury:

1.      I am currently employed by The Procter & Gamble Company (the "Company"),

global company providing branded products and services in over 80 countries worldwide, as the

Senior Human Resources Manager for its Bethel, Connecticut office.  I submit this Declaration,

which is based upon personal knowledge and my review of records maintained by the Company

in the regular course of its business, in support of the defendants' motion for summary judgment.

2.      I began my employment with the Company in September 1995, when I started

working for Duracell, Inc. ("Duracell").  Duracell merged with and into The Gillette Company

("Gillette"), global supplier of various personal care products, on December 31, 1997, and

ceased being a legal entity as of January 1, 1998.  In 2005, the Company purchased Gillette.

3.      Throughout my employment with the Company, I held several positions of

increasing seniority within the Human Resources Organization until on or about February 2006,

when I was promoted to Senior Human Resources Manager, the position I currently hold.  As

Senior Human Resources Manager, I am responsible for recruiting and training employees, assisting with employee development, and investigating allegations of employee misconduct.

4.      In early-June 2009, I learned from Dina Schmude, an employee in the Human Resources Organization in Bethel, that Austin Lin, a Company employee, had reported to her possible misconduct by plaintiff Predrag Cicvara.  Specifically, I learned that Bel Liu, who was an employee of a Company supplier named Practical Lighting, told Mr. Lin that Mr. Cicvara had made repeated unwanted sexual advances toward Ms. Liu during a business trip in Asia.

5.      Thereafter, on June 11, 2009, Ms. Schmude and I called Ms. Liu in Hong Kong and spoke with her for approximately an hour and half regarding Mr. Lin's allegation.  Both Ms. Schmude and I took notes of our conversation with Ms. Liu.  During that call, Ms. Liu told us that Mr. Cicvara repeatedly made unwanted sexual advances toward her while he was in Asia auditing Practical Lighting's facilities.  Specifically, Ms. Liu said that Mr. Cicvara visited her hotel room in Thailand when she was sick, removed his pants, refused to leave when asked, inappropriately touched her, and told her that he wanted to "rape" her.  Ms. Liu also stated that Mr. Cicvara sent her several inappropriate e-mail and text messages.  It appeared to me that Ms. Liu was upset as she spoke to us about the events that occurred in Asia.

6.      After ending our call, Ms. Schmude and I combined our notes from our conversation with Ms. Liu into one document.  Thereafter, I sent Ms. Liu two e-mails; in the first e-mail, I asked Ms. Liu to forward the text messages and e-mails exchanged between her and Mr. Cicvara to Ms. Schmude and myself, and in the second e-mail, I attached our notes from the call and asked Ms. Liu to review them for accuracy.  A true and correct copy of each of these e-mails is attached hereto as Exhibits A and B, respectively.

2

7.      I later forwarded my notes from our conversation with Ms. Liu to Lynne Burnett, who was then the Company's Global Human Resources Director in Bethel and my supervisor.  A true and correct copy of my e-mail to Ms. Burnett forwarding these notes is attached hereto as Exhibit C.

8.      The next day, June 12, 2009, Ms. Liu e-mailed her corrections to our draft notes to Ms. Schmude and me.  In her cover e-mail, Ms. Liu explained that she had tried to be polite with Mr. Cicvara, whom she viewed as a customer.  Ms. Liu also attached an e-mail chain and five text messages exchanged between her and Mr. Cicvara, and explained that she had forwarded an additional eight text messages that she could not convert to an e-mail format to my mobile phone.  In these text messages, Mr. Cicvara admitted his conduct and at one point referred to himself as a "dirty old man."  A true and correct copy of the e-mail message with attachments that I received from Ms. Liu on June 12, 2009, is attached hereto as Exhibit D.

9.      Later that day, I typed the additional text messages that I received from Ms. Liu onto a Microsoft Word document.  The additional text messages revealed that Mr. Cicvara repeatedly asked Ms. Liu if he could visit her room on June 8, until Ms. Liu finally relented.  I thereafter forwarded Ms. Liu's e-mail and all of the text messages to Ms. Burnett.  A true and correct copy of my June 12, 2009 e-mail and attachments to Ms. Burnett is attached hereto as Exhibit E.

10.     Thereafter, on June 15, 2009, I, along with Ms. Burnett and Kevin Babis, who was Mr. Cicvara's manager, met with Mr. Cicvara in a conference room and interviewed him regarding Ms. Liu's allegations.  I took notes of the meeting, while Ms. Burnett took the lead in asking questions.  A true and correct copy of my notes is attached hereto as Exhibit F.

11.     During the June 15 meeting, Mr. Cicvara admitted that he had visited Ms. Liu's hotel room while in Asia, and that he had touched Ms. Liu while in her room.  When Ms. Burnett asked Mr. Cicvara whether he told Ms. Liu that he wanted to "rape" her, Mr. Cicvara stated: "Look, it was in a hotel and she was dressed in a way.  I told her that I had a feeling I would rape her but I never had that in my mind and I didn't thin[k] she'd think about it seriously."  (Exhibit F.)  Mr. Cicvara suggested that Ms. Liu's attire excused or prompted his comment; he stated that Ms. Liu was "dressed in very short shorts," which prompted him to tell her, "I'm a man and it looks like I could rape you like that.  You are showing off."  (*Id.*)  I was shocked that Mr. Cicvara admitted to telling Ms. Liu that he could "rape her," which I viewed as serious misconduct and a violation of the Company's policy against harassment and the Company's Purpose, Values and Principles ("PVPs"), which Cicvara, and every employee of the Company, received.

12.     At the end of our interview, Ms. Burnett asked Mr. Cicvara to remain in the conference room while she, Mr. Babis, and I stepped out of the room to discuss the matter with each other.  After speaking for approximately ten minutes, the three of us unanimously decided that the Company should terminate Mr. Cicvara's employment for engaging in his egregious misconduct in violation of the Company's policy and PVPs.  We then returned to the conference room, and Ms. Burnett told Mr. Cicvara that his employment was being terminated for violating the Company's harassment policy and PVPs.

13.     In my view, Mr. Cicvara engaged in egregious misconduct toward Ms. Liu. While the Company did not condone any such conduct, Mr. Cicvara's conduct was particularly troubling because, as a management employee, he was representing the Company while on business trips.  His misconduct negatively reflected on the Company as a whole and detrimentally impacted the Company's relationship with Practical Lighting.  In fact, I later

4

learned that, at around the same time that we were investigating Mr. Cicvara's conduct, the

Chairman of Practical Lighting, Andrew Yau, sent an e-mail to Nitesh Singh, the Company's

Senior Purchasing Manager, informing Mr. Singh that Mr. Cicvara was no longer welcome at

Practical and that the Company should send someone else for future audits.

      14.     On the same day of his termination, Mr. Cicvara contacted me and asked whether

he would receive a bonus for the year and whether he could still exercise certain stock options

that he had with the Company.  I informed him that I would research his questions.

      15.     I relayed Mr. Cicvara's question regarding his stock options to Ms. Burnett, who

contacted Jason Muncy, one of the Company's in-house attorneys who advises the business on

securities and corporate law.  Later on that same day, Ms. Burnett and I participated in a

telephone conference with Mr. Muncy.  During that conference call, Ms. Burnett explained the

reasons for Mr. Cicvara's termination and Mr. Muncy stated that Mr. Cicvara's stock options

were automatically cancelled as a result of his termination for cause.  Mr. Muncy pointed us to

Section 6(f) of The Gillette Company 1971 Stock Option Plan (the "Plan"), which states that an

employee's stock options are automatically forfeited if the employee is terminated for cause.

That section defines "Cause" as, among other things, engaging in "gross misconduct."

      16.     I agreed with Mr. Muncy.  It was clear to me that Mr. Cicvara had engaged in

gross misconduct and, therefore, by the express terms of the Plan, he forfeited his stock options

by virtue of his termination for cause.

      17.     The next day, on June 16, 2009, I spoke with Mr. Cicvara and erroneously told

Mr. Cicvara that he would receive a bonus when they were paid out in September 2009.  I also

informed Mr. Cicvara that his stock options had been automatically forfeited.  Mr. Cicvara

informed me that he received conflicting information the previous day when he called the stock

plan administration number.  Mr. Cicvara stated that the administrator informed him that employees terminated for cause could exercise their options within thirty days of their termination.  I told Mr. Cicvara that I would call the stock plan administrator and clarify the issue.  After speaking with the stock plan administrator, I called Mr. Cicvara again and informed him that the information I had provided to him earlier was correct and that he could not exercise his stock options because they had been forfeited by virtue of Section 6(f) of the Plan.  I further explained to him that the erroneous information relayed to him by the stock plan administrator did not change the clear terms of the Plan, which determined how options are handled and which stated that options are forfeited if an employee is terminated for cause.  A true and correct copy of my notes from the various calls I had with Mr. Cicvara discussing his stock options is attached hereto as Exhibit G.

18.     Later that day, I sent Mr. Cicvara a letter memorializing our last conversation and explaining that the stock plan administrator provided incorrect information because she did not know all of the relevant facts regarding Mr. Cicvara's termination for cause.  I reiterated that Mr. Cicvara could not exercise his stock options because of his misconduct, which constituted grounds for forfeiture under the Plan.  A true and correct copy of my June 16, 2009, letter to Mr. Cicvara is attached hereto as Exhibit H.

19.     Notwithstanding our conversations, Mr. Cicvara attempted to exercise his stock options on July 3, 2009.  The Company rejected his attempt because his stock options already had been cancelled.  On July 6, 2009, I sent Mr. Cicvara a second letter once more explaining that his stock options had been forfeited because he had been terminated for cause.  A true and correct copy of my July 6, 2009, letter is attached hereto as Exhibit I.

6

20.     On September 15, 2009, Mr. Cicvara sent me an e-mail inquiring about the status of his bonus.  I responded that he was not entitled to a bonus.  I attached a copy of the Company's Short Term Achievement Reward ("STAR") plan and explained that, pursuant to the terms of the STAR plan, Mr. Cicvara had to be employed on June 30th, the date that bonuses are paid, to be entitled to a bonus.  A copy of my e-mail to Mr. Cicvara is attached hereto as Exhibit J.

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated this 14 day of April, 2011, at Bethel, Connecticut.

Peggy Wilczewski

7