UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------- x
PREDRAG CICVARA,

        Plaintiff,

v.

THE GILLETTE COMPANY and PROCTER &
GAMBLE COMPANY and DURACELL, AN ENTITY
OF UNKNOWN FORM and LYNNE BURNETT,

        Defendants.

------------------------------------------- x

Civil Action No. 3:09-cv-2054
(JCH) (HF)

April 11, 2011

**DECLARATION OF
LYNNE BURNETT**

I, LYNNE BURNETT, declare under the penalty of perjury:

1. I began my employment at The Procter & Gamble Company (the "Company") on April 25, 1977, and assumed positions of increasing responsibility until May 1, 1999, when I was promoted to the position of Global Human Resources Director working in Cincinnati, Ohio. I assumed the Global Human Resources Director position in Bethel, Connecticut on October 1, 2007, a position which I held until my retirement on January 4, 2010. I submit this Declaration, which is based upon personal knowledge and my review of business records maintained by the Company, in support of the defendants' motion for summary judgment.

2. As Global Human Resources Director, I was responsible for managing the Human Resources Organization for the Duracell business division globally, which included, among other responsibilities, recruiting and training employees, employee development, employee evaluations and performance, overseeing investigations involving allegations of employee misconduct, and participating in decisions regarding the termination of employment.

3. In early-June 2009, Dina Schmude, an employee in the Human Resources Organization in Bethel, informed me that Austin Lin, a Company employee, had reported to her possible misconduct by plaintiff Predrag Cicvara. Specifically, Ms. Schmude informed me that Bel Liu, who was an employee of a Company supplier named Practical Lighting, told Mr. Lin that Mr. Cicvara had made repeated unwanted sexual advances toward Ms. Liu during a business trip in Asia. I gave Ms. Schmude guidance on how to handle Mr. Lin's report, including that the Human Resources Organization should speak with Ms. Liu and Mr. Cicvara to investigate the allegations.

4. Ms. Schmude and Peggy Wilczewski, the Company's Senior Human Resources Manager in Bethel, thereafter contacted Ms. Liu and spoke with her regarding the incident. While I did not participate in that phone conversation, Ms. Schmude and Ms. Wilczewski sent me copies of their typed notes from their conversation with Ms. Liu. I reviewed those notes at the time, which revealed that Ms. Liu claimed that Mr. Cicvara repeatedly made unwanted sexual advances toward Ms. Liu while he was in Asia auditing Practical Lighting's facilities. In particular, Ms. Liu alleged that Mr. Cicvara visited her hotel room in Thailand when she was sick, removed his pants, refused to leave when asked, inappropriately touched her, and told her that he wanted to "rape" her.

5. At that time, I also read e-mail and text messages between Mr. Cicvara and Ms. Liu, which Ms. Liu had forwarded to Ms. Schmude and Ms. Wilczewski. In those messages, Mr. Cicvara admitted his conduct, referenced his feelings toward Ms. Liu, and at one point referred to himself as a "dirty old man" and said that he would never do what he had done again.

6. Thereafter, on June 15, 2009, I, along with Ms. Wilczewski and Kevin Babis, who was Mr. Cicvara's manager, met with Mr. Cicvara in a conference room and interviewed him

regarding Ms. Liu's allegations. Because I have an extensive background in employee relations, the three of us decided that I would take the lead in asking questions, while Ms. Wilczewski took notes of the meeting. I reviewed Ms. Wilczewski's notes and believe they are a true and accurate reflection of the meeting. A copy of Ms. Wilczewski's notes is attached hereto as Exhibit A.

7. During this meeting, I asked Mr. Cicvara whether he had visited Ms. Liu's hotel room while in Asia, and he responded "yes." When I asked him whether he had touched Ms. Liu, he stated that he did touch her because he felt "sorry" for her. Mr. Cicvara admitted that Ms. Liu told him not to touch her and asked him to leave her room.

8. I also asked Mr. Cicvara whether he told Ms. Liu that he wanted to "rape" her. In response, Mr. Cicvara stated: "Look, it was in a hotel and she was dressed in a way. I told her that I had a feeling I would rape her but I never had that in my mind and I didn't thin[k] she'd think about it seriously." (Exhibit A.) Mr. Cicvara suggested that Ms. Liu's attire excused or prompted his comment; he informed me that Ms. Liu was "dressed in very short shorts," which prompted him to tell her, "I'm a man and it looks like I could rape you like that. You are showing off." (*Id.*) I was shocked that Mr. Cicvara admitted to telling Ms. Liu that he could "rape her," which I viewed as egregious misconduct by him.

9. After Mr. Cicvara admitted that he told Ms. Liu "I could rape you," I asked him: "Do you realize you were a company representative and this is one of our suppliers?" Mr. Cicvara responded that he did not believe what he did was inappropriate, although he admitted that his wife would find his conduct inappropriate. (Exhibit A.)

10. Based on Mr. Cicvara's admissions and statements during this meeting, coupled with the information I learned from Ms. Wilczewski and Ms. Schmude's interview with Ms. Liu

3

and from reading the e-mails and text messages that Ms. Liu provided to us, I concluded that Mr. Cicvara's misconduct clearly violated the Company's policy against harassment and the Company's Purpose, Value and Principles ("PVPs"). True and correct copies of the Company's policy and PVPs are attached hereto as Exhibit B.

11. At the end of our interview, I asked Mr. Cicvara to remain in the conference room while I stepped out of the room to discuss the matter with Mr. Babis and Ms. Wilczewski. After speaking for approximately ten minutes, the three of us unanimously decided that the Company should terminate Mr. Cicvara's employment for engaging in his egregious misconduct in violation of the Company's policy and PVPs. We then returned to the conference room, and I told Mr. Cicvara that his employment was being terminated for violating the Company's harassment policy and its PVPs.

12. In my view, Mr. Cicvara engaged in egregious misconduct toward Ms. Liu. While the Company did not condone any such conduct, Mr. Cicvara's conduct was particularly troubling because, as a management employee, he was representing the Company while on business trips. His misconduct negatively reflected on the Company as a whole and detrimentally impacted the Company's relationship with Practical Lighting.

13. On the same day that I informed Mr. Cicvara of his termination, Ms. Wilczewski informed me that Mr. Cicvara had contacted her to ask whether he could exercise his stock options. I then contacted Jason Muncy, one of the Company's in-house attorneys who specializes in corporate law, to determine the impact of Mr. Cicvara's termination for cause on his stock options. Later on that same day, Ms. Wilczewski and I participated in a telephone conference with Mr. Muncy. During that conference call, I explained the reasons for Mr. Cicvara's termination and Mr. Muncy stated that Mr. Cicvara's stock options were automatically

cancelled as a result of his termination for cause. Mr. Muncy pointed us to Section 6(f) of The Gillette Company 1971 Stock Option Plan (the "Plan"), which states that an employee's stock options are automatically forfeited if the employee is terminated for cause. The section defines "Cause" as, among other things, engaging in "gross misconduct."

14. I completely agreed with Mr. Muncy. It was clear to me that Mr. Cicvara had engaged in gross misconduct and, therefore, by the express terms of the Plan, he forfeited his stock options by virtue of his termination for cause.

15. The next day, Ms. Wilczewski informed me that she spoke with Mr. Cicvara and told him that his stock options had been automatically forfeited.

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated this 11th day of April, 2011, at Las Cruces, New Mexico.

_Lynne Burnett_
Lynne Burnett