# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

PREDRAG CICVARA,          :        Civil Action No. 3:09-CV-2054(JCH) (HF)
            **Plaintiff,**       :

**V.**

THE GILLETTE COMPANY and PROCTER &     :
GAMBLE COMPANY and DURACELL, AN ENTITY :
OF UNKNOWN FORM and LYNNE BURNETT      :
                 **Defendants.**     :   **May 26, 2011**

## PLAINTIFF'S
## STATEMENT OF MATERIAL
## ISSUES IN DISPUTE

1) Was Plaintiff's conduct "gross misconduct" <u>as a matter of law</u>?

2) Prior to voiding Plaintiff's stock options did Defendant make a good faith effort (or for that matter any effort) to determine what effect plaintiff's conduct had on Gillette business?.

3) Can Defendant rely on conclusory allegations unsubstantiated to meet the specific language of the plan?.

4) Whether if there are any ambiguities in the plan, should any ambiguity be construed against the drafters of the plan?.

5) Did Gillette comply with the provisions of 6(f)A which were stated to be the basis of termination?.

6) Did Gillette terminate Cicvara based on section 6(f) A or 6(f) B, <u>contrasting Gillette's statement in Para 50 and Peggy Wilczewski's letter Ex.H</u>) of her affidavit in Gillette's Motion for Summary Judgment

7)  Did any termination for cause "automatically" (Gillette's word) void Cicvara's stock option, or did the language of the Plan create a factual issue?.

8)  Defendants paragraph 48 is disputed in that nothing in the record permits the statement that the Plaintiff's conduct "reflected poorly on the company and negatively affected the company's relationship" since absolutely no evidence was offered to support this allegation and therefore it is disputed.

## Plaintiff's Answers to the "Defendant's Statement of Undisputed Material Facts"

Throughout this document, as well as the other documents submitted to the Court, Defendant is using the Plaintiff's Deposition by pulling out the pieces from Plaintiff's statements and answers, creating either half-truths or plain lies, in an attempt to paint the picture that would benefit them, misrepresenting and skewing Plaintiff's words and constantly distorting the truth. Generally Defendant is using two shady principles in building their case – the first one follows the quote: "A lie told often enough becomes truth" (Rule #1), and the second principle is: "use only a part of the statements or sentences, presented in a way that will skew the truth to your advantage" (Rule #2). The other two documents that Defendant is using very often are the fabricated "Official notes" from the termination meeting held in Duracell on June 15, 2009, and the statement of Bel Liu about alleged Plaintiff misconduct, that is full of lies. Defendant did not produce the Declaration under oath from neither Bel Liu, nor Austin Lin, two individuals that initiated the allegations, which, after only a few days (in fact in just one full day; from June 11 to June 12, 2009) of investigation, conducted only unilaterally, with Bel Liu, but not with Plaintiff, and without checking any of the many untruthful statements or plain lies from Bel Liu, resulted in a swift and surgical Plaintiff's termination "for Cause", that was obviously pre-planned and prepared by Duracell HR, and executed in the morning, on Monday, June 15th, 2009.

## Paragraphs 1, 2, 3, and 4 are true statements.

**Paragraph 5**.

    When Defendant stated: "Cicvara read the Conduct Manual *"a couple of times"* (Id. at 36, Cicvara Dep. Ex.1)" the Defendant failed to disclose the Cicvara's statement that immediately follows: *"Yes, I was trying to find certain things in it"* (Cicvara Dep. page 36.). Plaintiff was trying to find what is it that he has done "per WW Conduct Manual" that caused P&G decision to fire him with the cause? Plaintiff has never received an answer to his very directly worded question in his e-mail from June 29, 2009 to Duracell's HR representative Peggy Wilczewski (Exhibit A, Cicvara Dep. Page 147-148): Please provide to me: "A copy of an Employee Manual or a Company Policy where it is stated that in case an employee violates *a particular policy*, he*/she can be immediately "Terminated for Cause"*.  The answer from Peggy Wilczewski and Lynne Burnett was: (Id.) "You were fired for violating the "WW Conduct Manual"", but no specifics were offered. The specific reason for firing was never disclosed to Plaintiff during the termination meeting on June 15, 2009 (why would Plaintiff asked for it repeatedly, if it were told?). Plaintiff did not, to this date, ever receive a reason. Therefore Defendant either did not want to provide the answer, or did not know what to answer. The answer oscillated between: "romantic relationship with the supplier", which is partially true, through the "harassing of supplier" which is completely untrue and never proven by Defendant in any instance, to the "sexually harassing the supplier" that is a complete lie. The cause for firing "for Cause" was never established, as it was deemed unnecessary, as Defendant probably never expected that the matter will come to Court <u>where only facts are important and not beliefs, opinions or following of orders from above.</u>

**Paragraph 6.**

Defendant is trying to involve a "conflict of interest" here, in spite of the fact that Plaintiff clearly stated that even if he had a romantic relationship with the contractor it would be: "against company policy to have such a relationship only if the decision-making authority is involved". Cicvara explained that he did not have any decision making authority, and never was the main Quality Assurance Auditor who has an authority, he just accompanied them for technical explanations (Cicvara Dep, pages 80-81-82).

    Plaintiff stated his position about having a romantic relationship with the contractor very clearly – and said: That it is against company policy to have such a relationship only if the

decision-making authority is involved" – <u>and he explained that he did not have any decision making authority</u>, and never was the main Quality Assurance Auditor who has an authority – just accompanied them for technical explanations (Cicvara Dep, pages 80-81-82).

**Paragraph 7.**

Defendant is using the "doing the right thing" statements to try to prove what? These same statements from WW Conduct Manual should apply to all employees, including Lynne Burnett, Peggy Wilczewski and Dina Schmude, especially the statement: "<u>Am I being truthful and honest?</u>" It will be hard for Burnett and Wilczewski to answer "yes" to that question, after falsifying the notes from the meeting on June 15th, 2009; after allowing Bel Liu to falsify the text messages exchanged with Cicvara, after lying about "the recording from Bel's room from the night of June 8th, 2009, that was recorded on Bel's boss' answering machine" and then omitting that same statement from the notes, omitting to put Cicvara's statement "No, I did not come to her room uninvited – she invited me to come in. She sent me an SMS inviting me to her room" on the notes, just to record the most obvious lies. I do not need to mention all of the fabrications that these individuals have done, as majority of them were mentioned in my affidavit. However, to further prove my point, I have attached an Exhibit B – part c) - an electronic file (MS Word), written on July 20, 2009, named "Letter to Hong Kong – 10 minutes on Monday.doc". Please check the date the file was created as that is altered only when something is changed in the file and then saved to preserve new version – which proves that the content of that file was written on July 20, 2009. I intended to send that letter to Bel Liu, but my lawyer at the time advised me not to do that. From that file it is clear that all what I stated here and in my affidavit, as well as pointed out in the numerous pages during my deposition, is true and it is also clear that the notes from the termination meeting on June 15, 2009, <u>were fabricated with the intent to: cover up the lies told during that meeting,</u> <u>omit some of my statements, and completely twist and alter my other statements.</u> This letter to Bel Liu was my naïve attempt to plead to Bel's conscience and ethics, as at that time I still did not  have her statement, I did not realize that she falsified the text messages we have exchanged before I came to her room on June 8th, 2009 (*as the Bates page 000612 was produced only on April 15, 2011 by Defendants*) and I did not realize that she attempted to gather "more evidence" by setting up another event on June 10, 2009 – where she was ready to record my words after I would come to her room to return the T-shirt she left out of my hotel room door earlier that morning. These recordings (*from June 10,*

*not June 8, 2009 as Lynne Burnett lied*) are also put onto the USB memory (Exhibit B, files d) and e)) as they actually prove my statements that she has apologized to me – and stated again "that she cannot tell me what is that terrible thing that she has done to me". How interesting it is, that the "most important evidence (?) used against Cicvara, to prove his guilt during the meeting on June 15th, 2009 (*and than promptly and entirely removed from the fabricated meeting notes*) is not used at all by Defendant in his documentation served to the Court on April 15th, 2011, but ironically it is used by Plaintiff to prove the facts he is pointing to.

### Paragraph 8.

The statements cited in this paragraph are correct with respect to the WW Conduct Manual Harassment Policies. However, here again there is a Rule #2 at its best. Cicvara always treated everybody he was communicating with, with the utmost respect, including Bel Liu, and Cicvara agreed that all the statements cited in this paragraph were true and that it "would be a serious misconduct if I (Cicvara) made (*but I did not*) unwelcomed, etc.. (Cicvara Dep, page 43). Also Cicvara stated that the proper investigation would be needed to prove the allegations (Cicvara Dep. page 39) which was never done by P&G.

Defendant is also trying to connect Plaintiff, artificially, with the Harassment / Discrimination policy and then continue with the same (Rule #2) approach by introducing terms: "intimidating, hostile or offensive" manner, and immediately jumping to the "prohibiting him from making sexual advances toward customers, contractors or employees" without offering any proof of such alleged behavior by Plaintiff, using again Plaintiff's own words, from the cited page 43 of the deposition, but to construct the sentence with the different meaning.

### Paragraph 14.

In the paragraph 14 Defendant is using the well known facts trying to paint the portrait of Cicvara as being opposed to the values prescribed by the WW Conduct Manual. Nothing further from the truth. By carefully reading the pages that Defendant is pointing to, and some additional pages that Defendant is avoiding, one can easily see that Plaintiff actually was punished by the company for standing by the principles prescribed by that same WW Conduct Manual. Plaintiff caught Austin Lin stealing money and days from P&G and had to endure a terrible retaliation action and its consequences, from that same individual, that was unreservedly supported by the company officials (not just from HR) as they did not do anything to check the validity, correctness and sincerity of Austin Lin's actions and motives. Then Plaintiff protected

the company interests by uncovering falsified statements by Practical's QA officials, and by justly defending the P&G Company positions and interests in the accident that destroyed the packaging of about 46,000 D type Daylite flashlight shipped from Practical, China. The reward for those Plaintiff's just actions was the "harassment set-up" manufactured by Bel Liu and her boss, executed by Bel Liu and Austin Lin (who had a romantic relationship ongoing between them) that again was wholeheartedly supported by the Duracell officials (not just HR). And finally, Plaintiff discovered and reported a terrible diversion scheme inside the Duracell, where tens of millions of dollars of profit were stolen from the P&G taxpayers (from the company bottom line),  that actually was the main reason why he was finally terminated in a such surgical and overwhelmingly cruel way (Cicvara Dep. page 12-14, page 46-48, pages 57-58, pages 112-115, page 130-131, **pages 189-191**).

One  thing is very worth mentioning here. The Plaintiff deposition has 195 effective pages of text. Only 71 out of 195 pages are used by Defendant in their documentation. That is a fact that is telling by itself – as it was the deposition hosted by Defendant, where evidence was supposed to be collected that overwhelmingly would prove that Defendant was right in his actions that led to the Plaintiff termination. However, only 71 pages were used, which is less than 37% - means only a bit over every third page produced, was actually used by Defendant, and even then the Plaintiff statements are often skewed and twisted (Rule #2). Then Defendants packaged them in sets of fours, so that is not obvious how many exactly were actually used. What is the real reason why the rest of 124 pages were never shown to Your Honor by Defendant? One can judge only by actually reading the whole deposition, and that is the reason why the entire text of the deposition is part of the Plaintiff's documentation (Exhibit B, **electronic file f, Exhibit C – paper version**)

**Paragraph 15.**

In this paragraph Defendant is presenting the words that Defendants' lawyer used, as being stated by Cicvara (using Rule #2). On page 24 of the deposition notes, the question (Cicvara was asked) is: "You have referred to the fact that you audited one of…" and then uses that to construct the sentence which included: "….and auditing the suppliers' factories…". However, Defendant heard from Cicvara not once but many times during the deposition: "I could audit only internally. So ..I was always accompanying other auditors.." (Cicvara Dep. page 32), and then "I was there only to help (her) from the technical point of view" (Id.).  Then again later

Cicvara stated: "..don't forget I am not the leading auditor, I'm there just in technical capacity.." (Cicvara Dep. page 82). Yet Defendant picked only the page from the deposition that suited their goals (*even if by construction*), misrepresenting the truth again. Speaking about the deposition, Plaintiff will include the complete transcript of the deposition to the documentation that will be submitted to the court as an Exhibit C (paper version) – as there is no reason to pick the pages – to the contrary, it is Plaintiff's position that after reading the deposition in its entirety, coupled with the additional evidence in other exhibits and all submitted documents from both parties, Your Honor will be able to decide the just outcome of this case, even without the trial.

**Paragraph 23**.

Many statements in this paragraph are incorrect. However, they are not so important, as it was already proven that Bel Liu intentionally lied and falsified the material evidence she provided to Duracell HR. Since Duracell HR did not provide the sworn statement by Bel Liu – everything that she provided to Duracell HR is nothing more than hear-say and should not be regarded by the Court as admissible evidence.

**Paragraph 24.**

The importance of this paragraph is that it introduces Austin Lin. Bel Liu surely contacted Austin Lin numerous time before that day and numerous time after, but even if it was the first time since June 1, 2009, there was plenty of time to think about how two of them (Austin and Bel Liu) could retaliate to Plaintiff. Even though Defendant knew that it was Austin Lin who reported alleged harassment of Bel Liu, allegedly committed by Plaintiff, P&G HR personnel did not do absolutely anything to investigate the motives behind such a behavior. Also, repeated requests to produce the e-mails and phone records between Bel Liu and Austin Lin were stubbornly denied by Defendant as being: "vague, ambiguous, and seeking information that is neither relevant to the subject matter nor reasonably calculated to lead to discovery of admissible evidence". With all due respect to the Defendant lawyers, it is not up to them to unilaterally prevent Plaintiff from receiving important evidence just by issuing statements as the one cited above. The last time Plaintiff asked for the production of evidence of e-mails exchanged between Bel Liu and Austin Lin, this time with a very specific time frame (from June 7, 2009 until July 15th, 2009), was on January 3, 2011 in the Motion for Production Letter (Exhibit D, page 2, part of paragraph 5). There were seven requests in this Motion from the Plaintiff, in seven different paragraphs. To mud the water, the Defendant inexplicably, but understandably, as this was,

throughout this period of 18 months, a part of their shady strategy, actually produced answers, not to seven but only to <u>the first four Plaintiff's requests</u>, pretending that the second page of Plaintiff document did not exist at all. That would be again use of Rule #2 at its best, as the second page actually asked for these evidences: E-mails between Austin Lin and Bel Liu (already cited Exhibit D, paragraph 5), then: The expense reports for the China – Korea trip of Austin Lin, from March through May 2009 (Exhibit D, paragraph 6), and then: The official Blackberry phone records and bills used by Austin Lin for the period May through July, 2009 (Exhibit D, paragraph 7). Arrogance again: We (the Omnipotent) stated that this is not connected to the case, and we have the right to withhold the obvious evidence as we please. No comments Your Honor. The Defendant answers to Plaintiff Motion for Production is included, in its entirety, with all 23 pages, as the Exhibit E, hereto. Again, this is a blatant obstruction of justice, possibly even purposely introduced "error" just to avoid producing of documents that could further damage the credibility of the Defendant actions. Let's face it – it <u>is an answer of utmost arrogance</u> to be able to claim that e-mails exchanged  between Austin Lin and Bel Liu are "irrelevant for this case" and that "they will not lead to the discovery of permissible evidence". Let's not forget that it is Austin Lin who reported the case to HR and whose sworn statement <u>was not produced by Defendant</u>.  And it is also Bel Liu, who supposedly was harassed by Plaintiff, but who <u>served lots of lies and untruthful statements to Defendants and whose sworn statement also was not produced in the documents submitted to the Court by Defendant</u>.

**<u>Paragraph 25.</u>**

The statement "Cicvara, Liu, Yau and Yuen Yau" in this paragraph, is incorrect. Only Plaintiff, Bel Liu and Dave Arnsperger, the official QAKE auditor from P&G, traveled, and did not traveled directly to Bangkok, but traveled through Singapore as there were no direct flights from Medan to Bangkok (Cicvara Dep. page 73). During the flight Bel put her head on Plaintiff's shoulder and teased him with "You are the dirty old man" under circumstances that Plaintiff clearly described in his deposition "when referring to the double deck bus without the upper roof – as being topless" (Cicvara Dep. Page 126 – 129). The fact this was written by Plaintiff in his e-mail to Bel Liu was repeatedly used by the Defendants to help them in painting the Plaintiff as being villain and sexually aggressive person (Rule #1 again), while in fact these words were used by Bel Liu, not by Plaintiff and became a kind of teas/joke between Plaintiff and Bel Liu (Id. page 126-129).

In the chronology of the events listed by the Defendant, certain things that were happening in Indonesia are completely missing as well as the trip to Singapore and things that were happening there, as explained above. For example Bel Liu grabbed the Plaintiff's thigh while driving in the SUV in Medan and asked him: "You don't like Austin Lin do you?" (Cicvara Dep. pages 72-73 and 90-92). On that same page (Cicvara Dep. page 92) Plaintiff also explained how Austin cheated on his expense report and again wanted to take advantage from the company on the following trip to Florida seminar in May 2009.

**Paragraph 27.**

This paragraph contains several untrue statements by Defendant. Defendant is desperately trying to alter Bel Liu's statement that was cited through numerous places in the Defendant documents previously: "Predrag was suddenly standing at my door", after she mentioned only two text messages (Dep. of Peggy W. Bates page PG000583). Realizing from the hard evidence (Bates pages 000415-000416 and Cicvara Dep. Pages 69-71 and page 140) that Bel did not tell the truth, Defendant is here constructing Bel statement around that fact: "Although Liu initially said no, Cicvara **continue to press her** (*a blatant lie directly by the Defendant – not by Bel Liu, as Plaintiff did not press Bel Liu at all*) until Liu finally relented because she did not want to offend her customer". So all of the sudden, now Defendant, <u>that have stated that Plaintiff came to Bel's room uninvited as one of the starting points during the dismissal meeting on June 15th</u> (Cicvara Dep. pages 139, 140, 141) is taking a completely opposite stance! Why? Because it is trying to construct the story that could better justify their act of firing Plaintiff for cause (after 10 minutes of "investigation"), after they learned and realized that Bel did not  state the facts truthfully in her phone conversation with Peggy Wilczewski and Dina Schmude, and she in fact willfully invited Plaintiff to come to her room. <u>This is the reason why they produced the document that was, intentionally, never produced before</u>, provided on the Bates page 000612 (<u>a part of Exhibit F, hereto</u>). Bel Liu was <u>given an opportunity to **forward**</u> the SMS messages exchanged between her and Cicvara in a period from 8:57 PM until 9:07 PM Thailand time. <u>When messages are forwarded the text of the original message can be altered without limitations</u>. That is exactly what Bel did – she has altered the content of certain messages. <u>However, she has made **a simple but extremely significant error**, as in her desire to add more fuel to her accusations, she miscounted the number of messages that were exchanged and **created the sixth message that did not exist** at all</u>. On the official T-mobile bill it is clearly

9

stated that <u>they were five messages exchanged in this time period – not six (Exhibit F – phone bill pages 000415 and 000416).</u> The message Bel invented was: " I know you are not and just wanted to be with you without dirty thoughts …….so let me know I need few minutes for e-mails and then can bring desert (sic) to your room if you want" and she invented it for the obvious reasons – to fortify her own lies (*Plaintiff never sends such wordy text messages anyway*).<u>The second big error that she has done was that **the time stamps** on the messages</u> she has forwarded **<u>are all wrong</u>** (as she injected one message, she lost the track of the proper timing of messages). Bel's phone was 8 minutes ahead, which is clearly explained in the table that is a part of the Exhibit F, and which is visible from the other messages she has listed on that page, sent in Singapore, (*that are also tampered with, as four messages were exchanged, not just two, and she has altered both of the messages she has sent to Peggy Wilczewski, adding similar comments to make them "dirty, and in process of doing it made them long as well – very uncharacteristic for the SMSs*). However, inexplicably, some of the messages correspond to that time gap, but others do not. So **<u>there exist not just one, but two hard proofs</u>** that **<u>she has purposely falsified the text messages that were exchanged between her and Plaintiff</u>**. Now, if her statement were truthful, she wouldn't have to do that, as it would have been sufficient to just send the messages that would have matched the official records (see Exhibit F explanations, on the table that is a part of that exhibit).

The fact that these messages were fabricated and falsified begs some more questions <u>about the credibility of Lynne Burnett and Peggy Wilczewski.</u> They both new, before June 15, 2009,  that there exist a record that shows text messages were exchanged, yet Lynne Burnett stated during the June 15, 2009 termination meeting that Plaintiff came to Bel's room uninvited and "just appeared at Bel's room door". Even after Cicvara explained about the text messages and stated that he was invited and the text messages from his Blackberry will show that fact, Lynne Burnett stated: Yes, but she (Bel Liu) claims the opposite, therefore you came uninvited". However, **<u>mysteriously this entire conversation is missing from the "official notes"</u>** from that meeting that were in fact **<u>manufactured by Peggy Wilczewski</u>**, but we will come to these details later. It is also worth mentioning here that the Bates page 000612 was never submitted to the Plaintiff as a part of Production of documents phase, even if Plaintiff repeatedly asked for additional documents. <u>This shows that Defendant used plain lies in his Documents presented to the Court, as for example the Defendant stated: "Defendants further stated that they have been</u>

unable to locate additional responsive documents. Thus Defendants have fully responded to this Document Request". (Exhibit G - Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Compel Discovery, from July 7, 2010, page 12, Response to Request No.20). Also, on page 3 (Id.) there is the following statement: "Despite Defendants' representations to Cicvara's counsel that they are unaware (?) of and cannot locate (?) any additional documents responsive to the document requests, Cicvara stubbornly, and without any legitimate basis, insists that P&G is withholding certain documents". Also on page 14 (Id.) in paragraph 30 there is the following statement: "they (Defendant) produced all responsive documents in their possession (?). Despite that representation, Cicvara boldly maintains that additional documents existed between Practical and P&G regarding the litigation. Again, Defendants have complied with this Request, and are not aware (?) of any additional responsive documents." So here in one document, there are three plain lies served by Defendants to Your Honor, since the Bates page 000612 was received on June 12, 2009, and clearly was in the Defendant possession all the time, including July 7, 2010, and until April 15, 2011, when the document was finally – but even this time – only indirectly given to the Plaintiff. And now it appears that **Cicvara was right in insisting, "being bold", and "being stubborn"**, although the insistence was based on Cicvara's beliefs that there exists **another audio recording – the one Lynne Burnett started her interrogation with – from the Bel's room on the night of June 8, 2009,** supposedly recorded on the Bel's boss answering machine – a blatant lie by Lynne Burnett.. How do you legally qualify (or classify) such repeated statements (***lies?***) by Defendant,  when a piece of evidence, as important as page 000612, was continuously withheld from the Plaintiff, until now, when it is presented to the Court, and only now Plaintiff came into the possession of it. This is why Plaintiff stated that: "She never sent all text messages" during his deposition (Cicvara Dep. page 140), not knowing that all the time the Defendant were in the possession of some of  the additional ones – Bates page 000612, although most of them were falsified, as can be seen from the evidence in Exhibit F.

There are other plain lies in the Defendant document in the Exhibit G which Defendants used to lie directly to the Court. On the page 4 (Exhibit G - Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Compel Discovery, from July 7, 2010, page 4.) Defendants stated: "On or about June 9, 2009, Liu called Andrew Yau, Chairman of Practical Group of Companies, and informed him that Cicvara made unwanted sexual advances toward Liu during the course of their travel together. **Yau subsequently alerted P&G**

**Human Resources Department to Liu's** allegations. Upon hearing of the incident, Peggy Wilczewski ……etc". At that time most of the e-mails were released and it was a well known fact <u>that Austin Lin was the person who initiated the HR investigation, not Andrew Yau – yet there is this inexplicable statement found here</u>. On the page 15, in the paragraph about the request #33 (Id.) there is the following statement by the Defendant: "There is no evidence of Lin's "significant expense account fraud", let alone that it had any impact on Cicvara's termination". <u>Again a plain lie as Cicvara stated in his deposition (Cicvara Dep. pages 56-57, pages 112-113)</u> and the one they could have easily check by simply reviewing his expense account records, or by simply asking Kevin Babis, which they continuously refused to do. Then they go on: "It is also irrelevant, given that Cicvara *admitted to inappropriate sexual behavior towards Liu*" (Id.). <u>Another lie as Cicvara never admitted that (Cicvara Dep. page 78,  page 108)</u>. Defendant is just repeating the lie after lie, following his modus operandi that is at its best display throughout this particular document – the Rule #1: "A lie repeated often enough becomes truth".

Also, Plaintiff did not bring "special dessert" for Bel, he brought his own dessert, and Bel had her identical dessert. It was mango with rice – Thailand specialty, bought for all dinner participants on the night of June 8th, 2009, outside of the hotel where the dinner was held, and given to each of participants by Yuan Yau who brought it from outside. Therefore Plaintiff did not: "went to Liu's room with the "special dessert" for her" but simply brought his own dessert with him, so that Plaintiff and Liu could eat the desserts together, each its own one, as that was his intent when asking her: "Do you want to eat the desserts together" in his text message to her (the first of five exchanged ones).

**Paragraph 28.**

Plaintiff did not claim that "he inexplicably stripped off his pants" in his deposition but rather he explained it in details (Cicvara Dep. 136-138).

**Paragraph 30.**

Many statements in paragraph 30 are again just plain lies. What the Plaintiff said was: "When you do the things like that (with your legs), one could rape you", which was very clearly explained during the deposition (Cicvara Dep. Page 140, Page 138, and pages 86-88). <u>Plaintiff never said: "I want to rape you"</u> which again is repeatedly used by Defendant in many documents served to the Court, again in an effort to portray the plaintiff as being "sexually

abusive" and as acting in the "harassing manner" towards the supplier, which is not true (**Rule #1 at work**). Plaintiff also stated it and accurately described why he said that, and the "academic discussion about what "rape" means" that followed it, during the June 15th termination meeting in Duracell, but it was wrongly (and obviously with the intent) interpreted in the officially fabricated notes from the meeting <u>(that were never seen by the Plaintiff before May 28, 2010 and never reviewed or signed by the Plaintiff)</u>.

Also, Defendant failed to mention here that Bel called her boss while Plaintiff was in her room that night, and could have told him about the "harassing that she experienced" if she really did, as the call came after her feet were massaged and after she said: "Don't do it anymore" (Cicvara Dep. page 83, Pages 101-102). She also talked to her husband as well, in Chinese for at least 15 minutes and could have alarmed him, and she did not (Cicvara, Dep. Page 108). She could have screamed, she could have called somebody and she did not (Id. page 108). <u>Why? Because absolutely no reasons existed for her (Bel Liu), to behave in such a way and she did not. It is as simple as that.</u>

**Paragraph 31.**

The statement in this paragraph is wrongly dated, just one of many mistakes (again) committed by the Defendant. The shirt was left on Wednesday, June 10th, 2009, not on Tuesday, June 9th, 2009. It is important, as the recording that was mentioned in this paragraph, and that was used as a preamble to the June 15th termination meeting in Duracell, actually happened on the morning June 10th, and it was recorded on Austin Lin's answering machine, **not during the night on June 8th, and recorded on Andrew Yau's answering machine as Lynne Burnett intentionally lied during that meeting** (and her statement was never captured in the notes from the meeting). In the recording  you can hear Cicvara asking her why she has apologized and who knows what was going on (emotionally) between them? Plaintiff explained this in more details during the deposition when he stated that Bel was asked: "Why did you apologize to me" repeatedly by the Plaintiff and her answers were: "They did not leave me any choice" and "I can't tell you as you will be very angry on me" (Cicvara Dep. page 96-97 and pages 109-111)

**Paragraph 33.**

In this paragraph Defendant did not explain why the Plaintiff said that "he was in shock and…used poor judgment" (Rule #2). The plaintiff clearly explained that by stating: "because I thought that there could be something going on between us and it did not, so I had

poor judgment" (Cicvara Dep. pages 105-107) and also describing "as poor judgment" his decision not to leave the hotel room after certain things happened in Bel's hotel room on June 8th, 2009 (Cicvara, Dep. page 88). "Shocked" was explained also as Plaintiff stated that "the it was kind of shocking, the way she wrote this……". (Cicvara Dep. page 99).

**Paragraphs 34 & 35.**

As pointed out by Defendant the Plaintiff explained in details why the e-mails were written the way they did in his deposition (Cicvara Dep. Pages 116-129). What was not mentioned by Defendant is the explanation for the "dirty old man" phrase explained already in the answers above – to the paragraph 25 and also in the Cicvara's Deposition  (Id. pages 126-127).

**Paragraph 36.**

In this paragraph Defendants again are playing with words, following the famous statement by Lenin, as they do throughout their documents hoping it will materialize: "A lie told often enough becomes the truth"

This paragraph continue to show deep connection between Bel Liu and Austin Lin, an American of Taiwanese origin, who worked in Duracell's Quality Assurance Department before Plaintiff was transferred there (Cicvara Dep. Page 14). Defendant did not disclose the following important facts about Austin Lin:

Austin Lin spent 7 weeks in China in March/April 2008, while the business he has done could have been completed in just two to three weeks. He was spending lots of time with Bel Liu and they become very intimate during that period. In his deposition Plaintiff mentioned their intimacy and how " he learned a lot of things about them in 18 months since he was fired" (Cicvara Dep. Page  31, page 54), the bag that Austin bought for Bel as a present in September 2008 (Id. page 55), about Bel stating repeatedly, many, many times that Austin was "a very good friend of her" (Id. page 55). Plaintiff also learned about their intimate relationship from Brian Hesse (an Associate marketing Director in charge of flashlights in Duracell) and Dave Mathieu (Ideaz Company – the designer of Daylite line of flashlights) and that these people are willing to confirm their statements as witnesses in the Court of Law (Id. pages 55-56). Also that Bel Liu wanted strongly and openly to seduce Dave Mathieu (Id. Page 55).

It is very important to stress out that HR personnel did not ever try to understand why it was Austin Lin who came to HR offices and claimed that Plaintiff is making sexual advances

towards Bel Liu, and harassing her. If they were asking themselves why, they could have had a different way of checking Austin's claims and Bel's statements, especially after realizing that she has stated they were good friends from March 2008. They have never asked an obvious question – why would somebody **who was not suppose to have any business contact** with Austin Lin for at least 14 full months (from April 1, 2008 when Plaintiff was transferred to Quality Assurance Department) ever go to that person to report "harassment" (Cicvara dep. Page 95).

        " In April 2009 Austin Lin lied on his expense report to the company when he went into China and Korea" (Cicvara Dep. Page 56). He was caught by the Plaintiff and the matter was discussed between Plaintiff's boss Kevin Babis, Plaintiff and Austin Lin (Id. pages 56 and 57). Plaintiff was never allowed to complete his statement at that moment in the deposition, so here it comes: the unfortunate part about this is that Austin was humiliated in front of Kevin Babis, the director of QA for Duracell, which did not spell well for his career in Duracell. Therefore he was looking for revenge against the Plaintiff and the opportunity served itself soon after Austin talked to Bel several times during Plaintiff's trip to Asia in June. <u>Lynne Burnett, Peggy Wilczewski and Dina Schmude did not know that this ever happened, as Kevin did not have any reason to tell them, as he could not connect Austin Lin with this case, from whatever he has learned about it during the ten minute interrogation on June 15, 2009.</u>  Kevin Babis was, most likely, never told by HR that it was Austin Lin (Cicvara Dep. page 133) who reported Plaintiff's alleged misconduct to HR. Kevin Babis was under the impression that it was Bel Liu herself, and also that the recording from her boss' answering machine mentioned by Lynne Burnett during the termination meeting really existed (the same way as Plaintiff had that same impression until May 28, 2010 and even later). **So, Kevin Babis was also lied to by HR personnel (even if indirectly), and also being used up by Lynne Burnett and Peggy Wilczewski**. If he was told, Kevin, most likely (this is Plaintiff's assumption, not the statement), would have had disclosed the facts he knew about Austin Lin to HR and they might have (although that probably would not change anything, as there were much stronger Duracell's authorities than what Kevin was, directing the moves of HR personnel from the shadow, and through Lynne Burnett) conducted the whole investigation in a different manner (Cicvara Dep. page 133). The fact they all did not know all facts prevented them from acting correctly **but still does not relieve them from the responsibility to conduct the investigation in a just manner that allows the person to defend himself by disclosing to him all relevant facts that he**

**should know.** On the contrary, such an important fact – that Austin, and not Bel, was the person who reported the alleged misconduct (Cicvara Dep Page 95), Plaintiff learned only after receiving the first set of production documents on May 28, 2010 – almost a full year after being terminated "for cause".

**Paragraphs 37, 38, 39 & 40.**

Lynne Burnett "advised Schmude to investigate the incident by speaking with both Liu and Cicvara" (paragraph 37). However, while Bel Liu was given every opportunity to voice her opinion about what happened between June 3rd and June 10th, 2009, in a period from June 9th through June 12th, 2009 and later, <u>Dina Schmude and nobody else from Duracell, ever contacted Plaintiff to try to get his side of the story, to provide him with the facts and to allow him to defend himself in a normal, legal and human way.</u> While Plaintiff was working very hard during his trip to protect the interest of the company and to do as much work as possible during the two weeks he spent on the trip, Duracell HR was calmly preparing the "evidence" that would enable them to terminate Plaintiff after 10 minutes of interrogation on June 15th, 2009 and after nine years of the hard work the Plaintiff invested in The Company. They had a chance to talk to Plaintiff throughout the week of June 8th but they chose not to, intentionally. Why? One can only conclude that either this statement by Defendant is not true, or Dina Schmude who was instructed "to investigate the incident by speaking with both Liu and Cicvara" purposely did not do the second part of what she was instructed to do, violating basic Plaintiff's legal rights.

It was already pointed out that Bel Liu's statement (paragraph 38) is full of lies and half-truths constructed in a manner that guarantees that the Plaintiff would be at least removed from his position and prohibited to interact with the Practical Company in the future. However, they are not so important, as it was already proven that Bel Liu intentionally lied and falsified the material evidence she provided to Duracell HR. Since Duracell HR did not provide the sworn statement by Bel Liu – everything that she provided to Duracell HR is nothing more than hear-say and should not be regarded by the Court as admissible evidence. During the trial, it would be easy to prove all of the lies, and there are many (more than a dozen), in Bel's statement.

Regarding Bel's overall statement about what happened on the night of June 8th, 2009, Plaintiff gave very exhaustive deposition to the Defendant describing what happened and why (Cicvara Dep. page 83, pages 101-103, pages 140 – 145).

From paragraphs 39.and 40.it was obvious that Bel Liu was offered to carefully review her own statements, as written down by Dina Schmude and Peggy Wilczewski, which is a normal and expected procedure in such cases. <u>Yet the Plaintiff was completely denied that opportunity, as even the notes from the termination meeting on June 15th, 2009, were not shown to him at all, even after his direct request by e-mail sent to Peggy Wilczewski, to be provided with the "documents related to his termination" (Exhibit A).</u>

**<u>Paragraphs 42 &43.</u>**

The purpose of an E-mail sent by Andrew Yau to Nitesh Singh was described by the Plaintiff in his deposition as just an additional insurance by one of his executors (Austin Lin, Andrew Yau, Lynne Burnett) to make sure that Plaintiff will never again act as a QA manager again (Cicvara Dep. pages 148-153).

The statement by the Defendant (Paragraph 43) that "Mr. Yau noted a few days later to Eric Lawson, the Company's Associate Director that Practical was "very disappointed" with its business with the company" very accurately describes the state of the business relationship between Practical and Duracell. Indeed as Plaintiff pointed out in his deposition, Practical was not chosen to manufacture Duracell Daylite models AA and AAA that were launched to the market as the first models of new line of Duracell flashlights. They were very unhappy that this business was assigned to their competitor Smartlite (Cicvara Dep. page 21). They were promised by Duracell the C and D models of the same line, however, the development was very slow and they felt they were losing the business and importance to Duracell (Cicvara Dep. page 22). Their manufacturing facility in China was completely empty at the time the initial QA audit was performed in December 2008 (the Plaintiff was there and witnessed it), a factory that could employ more than 800 people and had 15 manufacturing lines. Bel Liu was angrily complaining about these facts to the Plaintiff during the QA audit (Id. page 22).

In his e-mail from June 25, 2009, it was obvious that Mr. Andrew Yau's intention was to use alleged sexual harassment of Bel Liu as leverage, to improve his business with Duracell (Exhibit H, Cicvara Dep. page 23, 24) by stating: "There will be a lot of issues we need to discuss in terms of business. Practical's hope has been on the growing our business with Duracell – however with all the hard work we put in during the last 2 to 3 years **<u>our order book is not supporting our operation  now and in the foreseeable future. This is the most urgent challenge facing Practical at the moment</u>**. We are very disappointed with the level of order for

17

the Daylites, as well as other business with your company." This statement clearly asks for significantly more business with Duracell – and the leverage immediately follows – same e-mail continues with:  "Please be rest assured that Bel is doing fine and she is committed to Practical and will alway (sic) do her best for both of our companies." (Exhibit H). In this same exhibit – on the second page there is an interesting statement by Erik Lawson: "This incident has been managed very confidentially within P&G (*for the obvious reasons*) and only myself, Human Resources and **a few others in executive (!!!) management** are aware of the details." These words point out **that Mark Bertolami must have known about all of the details of my termination "for Cause" as I suspected, as he was Lynne Burnett's direct supervisor, and he was the person who chose Lynne Burnett for the Duracell HR position** at the time when nobody in P&G wanted to come to Duracell (in 2007) as there was a word that P&G will sell Duracell, as the Duracell technically heavy main business drivers (batteries) did not fit in the P&G business model. This is important because there had to exist a very strong reason for Lynne Burnett to leave the position of HR Director in P&G (that has 120,000 employees) and come to be a HR Director in Duracell Headquarter only – with mere 400 people in Bethel, CT. In other words, her transfer was, probably, a forced act – certainly not because P&G was happy with her performance, and she must have been very thankful to the person who decided to accept her and allow her to continue to receive a salary belonging to a Director's position. The previous HR Director in Duracell was at a Band 4 level (per P&G classification) but Lynne Burnett had a Band 5 level, which she probably maintained while at Duracell. It would be interesting to learn what was the real reason behind Lynne Burnett retirement at the end of 2009 (January 1, 2010), as well as find the real reasons for the quiet replacement of Mark Bertolami (Duracell President), Duncan Adamson (VP of Finance) and Rick June (VP of Marketing – also chosen directly by Mark Bertolami in or about February 2008), that happened in October 2010 and was completed on January 1, 2011.

To make matters worse for Practical, their first shipment of 46,000 D type Daylite flashlights, was rejected by Duracell, because they have used inexpensive, low quality pallets for overseas transport, that were not approved by Duracell. Bel Liu contacted Plaintiff by phone and e-mails practically begging him to help Practical and do not reject the shipment. However, Plaintiff resisted (Cicvara Dep. pages 26-31, pages 57-58, page 188).  This additionally affected already very bad state of their business with Duracell and caused a lot of strains in their

organization. Mr. Andrew, together with Bel Liu was quietly plotting the way to get rid of the General Manager of their Zhongshan facility (where the 46,000 flashlights were manufactured and packaged for transport) – actually telling Bel Liu – "you are doing great job, the next thing we need to do is to find  the way to sack manager of the Zhongshan factory" in his e-mail to Bel that Plaintiff saw on Bel's Blackberry while he was in her room on June 8th, 2009 (Cicvara Dep. pages 101-102). Bel then said to the Plaintiff: "you know too much, you are not supposed to read these messages" (Id. page 102).

During the audit at their factory in Medan, Indonesia, Plaintiff asked a direct question about the usage of the prohibited pallets in that factory, the same type that caused the disaster with their first shipment of D type Daylites. They provided an incorrect statement that they did not use this type of pallets there (in Medan, Indonesia) for the overseas shipments, after Plaintiff found the same type of pallets on the manufacturing floor there, even though they new at that time that another shipment was indeed on its way from Indonesia to USA, where the same type of pallets was used. Sure enough, another shipment was affected and returned to them (Cicvara Dep. page 190). This certainly did not help Practical to get more work from Duracell. Duracell has a smart policy with contractors, always making sure that there is never a dependency on any single one, making sure there is always a replacement ready. Also, there was never any contract signed with them; Duracell always operated on issuing specific purchase order every time they needed new set of flashlights. That way all flashlights manufacturers were kept in total dependency of Duracell, and always hungry for business, it was never the other way around (Cicvara Dep. page 44-45). That is why the Plaintiff's alleged harassment of Bel Liu was looking as such a strong card in the hands of Andrew Yau, and he attempted immediately to use it as leverage and to the advantage of Practical – to get more orders from Duracell as soon as possible (Cicvara Dep. pages 22-23).

In June 2009 the economic crisis in the entire world was at its peak and the overall level of business for any company, but especially for the company that depends a lot on western economies and the consumer spending in western world, such as a flashlight manufacturers, Practical being just another one of many, were in fairly tough positions, as the level of orders from all of their customers was at a low point. Practical knew that they would need to score more than 50% on the initial audit in their factories if they are to remain on the approved vendors list for P&G. That is why it is important to understand that, what had happened during the day on

June 8th, the first day of the official QAKE audit there (usually a two-day event), had a very strong influence on the events during the evening of June 8th (in Bel Liu's hotel room) and the events after that as well.

During the day on June 8, 2009, false statements were discovered by the Plaintiff, due to his technical knowledge, which was the reason and the purpose of his attendance on the QA audits (Cicvara Dep. pages 32-33). Lori Leach (an official auditor) then started to scrutinize many other things during that day and it was, to say the least, a disastrous day for Practical. They were very afraid of not passing 50% threshold that would automatically disqualify them from the approved contractors list (Cicvara Dep. page 25, pages 146-147). They considered that Plaintiff started it and wanted to retaliate and gain the leverage with Duracell to improve their business position at the same time. Bel was a logical choice, as it seems she was usually used for these kinds of tasks anyway (Cicvara Dep. pages 54-56, page 61, pages 74-75, pages 94-95, pages 144-145).  That may explain why Bel first stated (at 9:00 PM Bangkok time) that she is tired (in the exchange of text message on the night of June 8, 2009), but after 5 minutes (at 9:05 PM – Bangkok time) she sent an SMS stating that she wants me to come to her room. In those 5 minutes the plan might have been made, by her boss Andrew Yau, to destroy my life forever, for his own advantage, and he succeeded handsomely, at least in that part – to remove me forever from the QA position I was in, and destroy my life in the process. They had an excellent ally in Austin Lin, who also waited for a chance to retaliate to me for many reasons (Cicvara Dep. page 24-25, page 56-57, page 67, page 92, and another excellent partner (even if not expected by them) among the Duracell's highest ranked management individuals.

**Paragraphs 44, 45, 46, 47 & 48**

The Plaintiff asked a very simple question in his e-mail to Peggy Wilczewski on June 29, 2009: "What is the specific reason that I was fired with "the Cause"?" (Exhibit A). The answer, received on June 30, 2009 was a very vague statement: "You were terminated for Cause, because you violated WW Conduct Manual."

The Plaintiff was not offered to read the notes from the termination meeting, conducted by Lynne Burnett, Peggy Wilczewski and Kevin Babis, after the hearing was over, and to agree or disagree on the content (representation of the conversation during the meeting), let alone to sign the notes, after he was told that his employment is terminated for cause. The plaintiff was never given a copy of the notes even when he was directly asking for them in his e-

mail to Peggy Wilczewski (Exhibit A, page 1) when the answer was: "There is no documentation in your personnel file that references your recent termination." (Id. Page 2)

If the notes did not exist on June 29th, 2009, one could ask **how they magically appeared** during production of documents phase, on May 27, 2010. Also, it is a bit ironic that these same people (Dina Schmude, Peggy Wilczewski and Lynne Burnett) were making absolutely sure that what they wrote as Bel's statements  is "confirmed by Bel for accuracy" (Bates pages PG000584, Declaration of Peggy Wilczewski page 2, paragraph 6),  and yet denied completely, not even mentioning, those same rights to the  Plaintiff while making a decision with the catastrophic consequences for his life and life of his immediate and broader family members. The fact the notes were not seen by Plaintiff until May 28, 2010 is a direct violation of his basic rights as a human being, and just one of many others violation of basic rights to defend himself from false accusations, committed by the P&G company towards the Plaintiff.

The notes, when later produced, omitted many statements by Plaintiff that denied the alleged harassment behavior towards Bel Liu, and pointed out the lies that were used by Bel Liu and Lynne Burnett in constructing the set of assumptions that led to Plaintiff's firing for "Cause". Plaintiff pointed out on these discrepancies throughout his deposition (Cicvara Dep. pages 138-141). Also, the notes purposely omitted a blatant, pompously announced lie (actually two lies) with which Lynne Burnett started the meeting with Plaintiff on June 15th, 20009: "We have a recorded conversation, of what went on between you and Bel Liu during your **uninvited** (Lie #1) visit to her hotel room on June 8th, 2009 that **was left on her boss' (Andrew Yau) answering machine** (Lie #2)**)" (Cicvara Dep. page 84)**. Burnett even went on to add on to her own lie, and stated (speaking under her chin, to herself, but yet load enough that all could hear it): "we are not sure did Bel recorded it by leaving her phone on accidentally or intentionally, but it does not make any difference, good thing that she did that." Then she has asked Plaintiff: "Do you want to hear the recording, we have it and we can bring it in the room?" to which Plaintiff answered: "No, I know exactly what happened in Bel's hotel room on the night of June 8th, 2009, and there is no need to listen to it now**.** Not a single word of this conversation is reproduced in the notes that were served to the Plaintiff and to this Court as part of the production of documents. It is not difficult to conclude why. These lies, told by Lynne Burnett, can be easily proved by cross-examination of Peggy Wilczewski, Lynne Burnett and Kevin Babis during the trial, as it would be very hard, and very unlikely, for all three of them to deny, under the oath,

that this conversation have happened. Plaintiff pointed this out during his deposition very strongly (Cicvara Dep. Pages 69-71, 101-103 and pages 132 through 145, specifically for these lies – on pages 69, 70, 102, 103, 135 and 139). In the letter that Plaintiff intended to send to Bel Liu, written on July 20, 2009, one can see that all what was stated above by Plaintiff is true (Exhibit B, electronic file c)) as it was written way before (in July 2009) Plaintiff has gotten any documents from Defendants (in May 2010). Just to stress a well known fact: **An electronic file cannot be saved without the time stamp being changed. Since the time stamp on this file is July 20, 2009 – all that was written in that file was written on or before July 20, 2009. Therefore Plaintiff statements about what was stated during the termination meeting are completely accurate.**

The lie about "coming to Bel's room uninvited" was pointed out by Plaintiff during his deposition (Id. Page 70-71, page 139). Also, it was proven above, in answers to paragraph 27 – so it is not going to be repeated here.

It is important to stress that Plaintiff immediately denied that he "came to Bel's hotel room uninvited" by answering to Lynne Burnett's question with: " No, I did not come uninvited, in fact Bel invited me to come. We have exchanged text messages, where I asked Bel: Can I come to your room to eat dessert that we both got after dinner together? Bel's answer initially was "No, I am tired now" but then she changed her mind and sent another text message where she directly invited me to her hotel room (Cicvara Dep. Pages 69 and 70). Lynne Burnett then said exactly: "Whatever you say, but she claims that you were "just suddenly standing at her hotel room door" (Dep.of Peggy W. Bates page PG000603)". Not a single word of this conversation is captured in the notes produced by Defendant, and again it is easy to figure out why? Defendants took full and unscrupulous advantage of the fact that notes were never reviewed or seen by Plaintiff, and then picked and chose to put in the notes only their skewed interpretation of the conversation that was going on during those 10 minutes that irreversibly destroyed all aspects of Plaintiff's life.

Bel's lie that "Predrag was suddenly standing at my door", after she mentioned only two text messages, the first one Plaintiff asking her can I come to the room, and the second one her answering: No I am tired  (Id. Page 000583) can be  materially proven as a lie by reviewing the text message records from Plaintiff's official business Blackberry (Exhibit F, Bates pages

000415-000416) where it is clearly stated that five messages were exchanged between Bel Liu and Predrag, as Plaintiff pointed out during his deposition (Cicvara Dep. Pages 69-71, page 140, page 146).The messages were: to Bel (8:57 PM – Thailand time, June 8th, 2009): "Can I come to your room". From Bel (9:00 PM) "No, I am tired", To Bel (9:05 PM): "OK then, good night"; **From Bel – immediate answer (9:05 PM): "I changed my mind – you can come"** and the final one to Bel (9:07 PM): "OK then see you soon" (times on the official phone records are 14 hours behind – Pacific Standard Time – USA- Bates pages 415-416). What Bel did with **those five messages**, as **she transformed them in six, with the different time stamps** – was already described above in the paragraph 27, and it does not need to be repeated here.

The second lie from Lynne Burnett is also easy to prove, as the only recordings that Defendant produced are two audio files **from Austin Lin's answering machine** (Exhibit B, electronic audio files d) page 000526, and e) page 000527). The recording took place around 7 AM Thailand Time, on Wednesday, June 10th, 2009. There is absolutely nothing about what went on in the room on June 8th, 2009 on these recordings. That morning Plaintiff left Thailand and flew to China and he brought back the T-shirt he bought for Bel Liu in Hard Rock Café in Singapore – on Saturday, June 6th, 2009. Bel "returned" the T-shirt by leaving it on the outside side of the Plaintiff hotel room door, most likely actually setting him up again as she hoped that Plaintiff might say something that would further strengthen hers and Austin Lin's false accusations which did not work as planned – but it did not matter, because HR personnel <u>had an intent to fire Plaintiff anyway, without ever attempted to check any of the statements form Austin and Bel Liu.</u>

The explanation of what went on during Plaintiff's visit of Bel's room on June 8th, 2009, with respect to the phone calls and recordings was provided by Plaintiff during the deposition (Cicvara Dep. Page 101-103). During the deposition Plaintiff repeatedly stated that his words were not captured in the notes, like when he said that <u>"There is a question here which says did she invite you to her hotel room? There is no answer here. Why do you think there is no answer here? There is another question, did she ask you to leave and did you refuse to leave? There is no answer." (Cicvara, Dep. Page 139).</u>

Plaintiff never stated "I am a man and it looks like I could rape you like that. You are showing off" (Page 000499) and that is just plain fabricated lie that was the notes writer's free interpretation of what actually was said in the room during the interrogation. What Plaintiff said

was: "When you do such thing with your legs one could rape you" and then Bel and him had an academic discussion about meaning of the word rape as Bel asked Plaintiff: What is rape? (Cicvara Dep. pages 86-88, page 138). Also, Cicvara did not admit to saying "one could rape you" but "when you do such thing with your legs, one could rape you" – **again the words are pull out of context and only partially cited to paint very different picture** – the one Defendants want to paint (same as the "termination for cause" is enough to lose the stock options used later – forgetting three additional conditions for this to happen, the same "Rule #2" approach).

Plaintiff never admitted, <u>because he couldn't, as he never said those words</u>, that he told Liu "I could rape you" – just "**When you do such thing with your legs, one could rape you**" which is a big difference (even if it were "When you do such thing with your legs, I could rape you" – it would still be a big difference). Bel Liu ended her statement about what happened in her room on June 8th with "he did not threaten me or shout at me, he was gentle and **he did not do any violent action".** Again Lenin's: "A lie told often enough becomes the truth" – this seems to be the modus operandi of the Defendants' lawyers (as well as pulling the statements out of context and using them as a fully contained ones).

**<u>Paragraph 50, 56, 57, 58, 60 and 61.</u>**

Once one understands the Defendants motto (rules #1 and #2 previously defined), it is easy to see the patterns. Here the "Rule #2" is in place again, as it was throughout the last 18 months. Defendants are pretending that they do not understand very logical rules.

So here is an exact and very simple explanation of the logic contained in the Section 6 of The Gillette Company 1971 Stock Options Plan (**<u>Exhibit B, electronic file b)</u>**),  in the further text called "Plan", that would result in the cancellation of the participants options:

**Condition #1**:  <u>The participant must be terminated</u>. In the "Plan" it would correspond to the **<u>section 6 (f) only</u>**.

**Condition #2**:   It is not enough that participant is just terminated; <u>he must be terminated "for Cause".</u> In the "Plan" it would correspond to the next to the last paragraph on the page 8 that states:

 "If an employee Participant is discharged for Cause", **<u>as hereinafter defined</u>** *(this is preamble of the Condition #3)*, "all his options shall immediately be cancelled effective

24

as of the date of termination of his employment. For the purposes of the Plan, unless otherwise provided under the terms of an employment agreement with the Company or any of its subsidiaries, in which case the definition contained therein shall control" (*this is not the case with the Plaintiff*) "<u>a discharge for "Cause" shall have occurred where a Participant is terminated because of</u>:" (*it is here that the definitions of possible - A, B or C - Conditions #3 will be written – and we will see all three in the continuation of what follows in the "Plan"*).

**<u>Condition #3</u>**:        It is not enough that participant is just terminated "for Cause"; in addition to that, at least **one of the three conditions listed under A, B or C also must be fulfilled.** In the "Plan" these conditions are stated in the text that <u>immediately follows</u> the one stated above in the Condition #2 (Exhibit B, file b), page 8 – last paragraph)":

> (A) the Participant's continued failure to perform substantially his duties with the Company or any of its subsidiaries (other than any such failure resulting from incapacity due to physical or mental illness) after a written demand for performance is delivered to Participant by an officer or a senior manager of the Company or the subsidiary which identifies the manner in which the Board or elected officer or manager believes that participant has not performed his duties;

> (B) the Participant's engaging in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Company or the subsidiary; or

> (C) the Participant's conviction of a  felony or a plea of nolo contendere by participant with respect thereto.

So, there it is – very simple, very easy to understand and very straightforward. Even if one assumes that Plaintiff is <u>terminated</u> for the right and just reasons (*which he is certainly not and it is a matter of dispute*), and even if one assumes that Plaintiff is terminated for "Cause" for the right and just reasons (*which he is certainly not and it is a matter of dispute*), it **is still far from enough, for the cancellation of his stock options.** These two (Condition #1 and Condition #2 together) conditions only satisfy 6 (f) alone but; in addition, the Condition #3 **must be fulfilled as well.**

So let's now analyze the three possible variations (A, B or C) of the Condition #3 – following the Defendants' documentation chronologically.

In her letter to Plaintiff, sent on June 16, 2009 Peggy Wilczewski stated that the Plaintiff stock options were cancelled due to the Section 6 (f) (A) – please see an Exhibit I, page 1, the beginning of paragraph 2: "Section 6 (f) (A) of The Gillette …..".

However, it is undisputed fact that Plaintiff has never received any written demand for his performance, from anybody in Duracell, during his employment there that lasted almost nine years. On the contrary, Plaintiff has an excellent work performance year in, year out and was on his way to receive more responsibilities as of July 1, 2009 (Cicvara Dep. page 16). Therefore it is easily proven that the actions of Defendants, when they canceled my stock options for the reason stated in the Exhibit I, were illegal, as the condition #3 - option (A) – was not fulfilled.

On July 7, 2010 in the Defendant s' Memorandum of Law in Opposition to Plaintiff Motion to Compel Discovery (Exhibit G) the following statements can be found:

On the page 1 (or 4 of 20) in the second paragraph: "…..because the options were cancelled by operation of the terms of the Stock Option Plan when he was terminated for cause". This is **an incorrect statement** as it does not specify three necessary conditions described above. It is the beginning of the repeated application of the combinations of the Defendant's Rule #1 (*repeat lies*) and Rule #2 (*use skewed or partial statements to your advantage*) to the stock options issue.

On the page 5 (or 8 of 20) at the top of the page: "..Wilczewski informed Cicvara that pursuant to Section 6 (f) (A) of The Gillette Company Stock options Plan, Cicvara's stock options were cancelled as a result of his termination for cause". This particular statement is complete and it adheres to the requirements of the "Plan" as it specifies all three required conditions: 6 (f) (A). The problem is – the condition (A) cannot be applied to the Plaintiff as already was explained above.

After the deposition by Plaintiff, in which Plaintiff himself asked about the Condition #3 (Cicvara Dep. page 156-157, page 159), the Defendant changed their definition of the reasons for the cancellation of stock options from 6 (f) (A) described above (as they realized it did not make much sense) to the newly defined 6 (f) (B) reason – specified in the paragraph 50 – this time finally the same way as it is described above. While this could seem more appropriate way

to justify the Plaintiff's stock cancellations, it will later be proven that it cannot be applied to this case. It should be stated that this switch in the Defendant's reasoning more than 18 months after the cancellation occurred should not be tolerated, but that will be proven irrelevant anyway. Before the proof though, let's just go through the documentation provided by Defendant to prove how, by spreading the lies and untruthful statements throughout the submitted documents, they are trying to divert the focus from the simple facts that point just to the opposite of what the are trying to prove. Here we are:

In the paragraph 57: "at which point Muncy stated that Cicvara's stock options were automatically cancelled as a result of  his termination for cause". Here, by using the incorrect statement of Mr. Muncy Defendant is trying to justify the illegal actions of Peggy Wilczewski and Lynne Burnett that led to the cancellation of Plaintiff' stock options. Then the text continues by repeating: "to Section 6 (f) of the Plan, which states that an employee's stock options are automatically forfeited if the employee is terminated for "Cause"". Well this is not only incorrect; it is a plain lie, as, by looking at the document in question, **this statement simply does not exist there**, as everything that relates to the stock options in connection with the termination for Cause in the Exhibit B – b)), was written above, while explaining the necessary Conditions #1, #2 and #3. <u>Therefore this statement is a lie, and a lie remains a lie, regardless was it Mr. Muncy, or Wilczewski in her declaration, or Burnett in her declaration – all of them hopefully know how to read and could have read the Exhibit B (file b)) by themselves.</u>

In paragraph 58: "and informed Cicvara that he could not exercise the options because they were forfeited by virtue of his termination for cause (Cicvara Dep. at 153)". While Defendants obviously understand (*at least now after 18 months of pretending differently*) that all three Conditions needs to be met, and they are actually fulfilling those in the newly invented reason, under the paragraph 50 (6(f) (B)), they still repeat the incorrect and illegal statement by Peggy Wilczewski, even as they must have realized it is incorrect. What follows is interesting as <u>the fact that the stock administrator told Plaintiff that he could exercise the stocks, even though the Plaintiff stated that he was terminated for "Cause", proves that indeed the stock are NOT automatically cancelled because of  the termination for "Cause" per se. Again it would be funny, if it did not cause such tragic consequences for the Plaintiff, to observe, how illogical the next sentence was: "Cicvara, however, did not provide the administrator with the details regarding the</u>

ground for his termination. **What grounds? If it is automatic, it is automatic isn't it? Or it is not all of the sudden?**

In paragraph 59 the story continues: "Wilczewski informed Cicvara that she <u>would call the stock plan administrator and clarify the issues</u>". Again the statement deserves a good laugh (***what is to be clarified, if it is automatic***) as it cannot contradict more the previous statement by Mr. Muncey, Wilczewski in her declaration, and Burnett in her declaration too: "<u>that options are forfeited if an employee is terminated for cause</u>". It is amazing how strong the level of arrogance is here – as either the Defendants treat the Court and all involved in this case as totally incapable to see how grotesque this contradiction is (throughout all of the submitted documents) or they, in their arrogance, are not aware of the enormous mess that they are causing by repeating their untruthful and contradictory statements. We can go on and on with similar examples not only in this particular document (in the following paragraphs) but in all of them, but that would not serve the purpose anymore, and would just be the waste of time.

It is obvious that the <u>section 6 (f) (C) couldn't be applied</u> as Plaintiff was not convicted of a felony as required in sub-paragraph C of the aforementioned.

What is stated in paragraph (B) clearly defines that the condition (#3) for cancelling the options of somebody who was terminated for "Cause" is if: "the Participant's engaging in illegal conduct or gross misconduct **which is materially and demonstrably injurious** to the Company or its subsidiary".

Therefore the part that Defendant would have to prove, which they absolutely failed to do, would be: "<u>materially and demonstrably injurious to the company</u>". They also would <u>first</u> have to prove that Plaintiff conduct was illegal – which it was not, or that it represents "gross misconduct", which they do claim, but failed to prove, throughout their documents, in spite of the fact that they carefully crafted the <u>fabricated evidence to strengthen their case, and allowed the others (Bel Liu) to freely do the same, as explained above.</u>

The Defendant never even tried to prove that this statement indeed applies in this case. Defendants stubbornly and repeatedly refused to disclose the business results, level of their business with Practical, and lists of purchase orders issued by Duracell to Practical in the last several years, that Plaintiff had asked for many times. Why? Because **there was not any negative impact to Duracell business that Plaintiff's behavior, even if the Defendant allegations were true,** (*and they are obviously not*) would have caused to the Duracell business.

28

The e-mail that Mr. Andrew Yau sent to Erik Lawson (Exhibit H), only confirms that Practical was in position to beg Duracell for more business (Cicvara Dep. page 23-24). Ironically, the accusations by Austin Lin are actually emphasized by Mr. Yau, for the reasons completely opposite from what paragraph B of the The Gillette Company 1971 Stock Plan is asking for (negative impact to the company's results – a material impact). Andrew sets me up, using Bel (*and destroying my life in a process*) in order to gain leverage with Duracell, that in his mind, would enable Practical **to get more business from P&G, not less.**

Duracell business could not materially suffer, even if Practical would have decided to completely cease their cooperation with Duracell (jut the opposite of what they were actually doing). Plaintiff have explained Duracell policy with the contractors, as always keeping them hungry and always having more than just one solution for what was needed from them (Cicvara Dep. pages 44-45).

Because Plaintiff's termination, for alleged "Cause" **did not cause any material losses to the company**, the stock options that Plaintiff deserved and was awarded from 2001 until 2005, must be reinstated, even if it is assumed that Plaintiff actually committed what Defendants are accusing him of  (**which he did not**). From all of the previous answers to the Defendants' Undisputed Facts, from Plaintiff's Affidavit and all other Plaintiff's documents provided, it is very obvious that, not only already awarded stock options, but also Plaintiff's lost salaries, lost bonuses, lost pension contribution, lost future stock options and lost future raises and promotions are unjustly taken away from him, **by the illegal actions and decisions of the Duracell / P&G employees**.  Therefore, the decision about this case should be brought, without wasting any more of tax payers' money – just by Your Honor, without proceeding with the trial activities, as the ample evidence exist to support such a decision.

## Paragraphs 51-55

The statements listed in these paragraphs are true and correct.

## Paragraphs 61 through 64.

The statements in these paragraphs are all true, under <u>one condition - that is not fulfilled in this case</u>. In order for them to be true, Defendant needs to prove that the Plaintiff <u>was terminated for the reasons that are justified, true and properly investigated</u>. If the termination process involved illegal activities by the Defendants then all the truths listed in these paragraphs are entirely irrelevant, as the Plaintiff shouldn't have been terminated to start with. That is a

factual matter of dispute for this Count, as is for some other Counts – **was the decision by Defendants to terminate the Plaintiff for "Cause" proper, just and was it based on the facts that were thoroughly checked, screened, and unquestionably truthful?** After going through the evidence and the hard facts that Plaintiff pointed out, it will be impossible to characterize the Defendants actions as being honest, justified and truthful, as they were just the opposite of that.

**Paragraphs 66 through 68.**

The statement form the Defendant that Plaintiff did not see any written document referring to a severance package is true only with the respect to the P&G company. Plaintiff actually has in his possession The Gillette Company Severance Plan for Exempt Employees – Summary Plan Description (Exhibit J). P&G Company acquired The Gillette Company in 2005 (Wilczewski Decl. paragraph 1).

Since all legal rights that employees in The Gillette Company had, are preserved after the acquisition of The Gillette Company by P&G, it is obvious that there exists the similar plan within P&G Company, although it could be a bit different. It certainly does exist, as the employees are terminated (without the "Cause") daily within P&G for various business reasons. What Defendants are stating in a paragraph 66. is just the fact that they have never provided a written document that describes the employee rights to a severance package to Plaintiff even though Plaintiff repeatedly asked for such a document specifically.

Having said that, the Plaintiff agrees with the Defendants' statement in paragraph 68. Plaintiff <u>indeed was not laid off or terminated without cause</u>. **Plaintiff was improperly and unjustly terminated (for "Cause"), by the illegal action of several individuals that will cast a dark shadow over the Duracell and P&G reputation, if it goes unpunished.**

**List of Exhibits used in this document:**

**A) E-mail to Peggy Wilczewski – June 29, 2009 and her answer June 30, 2009.**

**B) USB Memory Stick with the following files in the electronic form:**

    a. P&GBusinessConductManualWBCMREDUCED_Single_Page.pdf
    **b. 1971_SOP_plan_10_2004_Gillette_Stock_Plan.pdf**
    **c. Letter to Hongkong – 10 minutes on Monday.doc**
    **d. Page 000526 – audio file: Morning of June 10, Bangkok, Bel's Hotel Room, 1 minute, Austin Lin's answering machine**
    **e. Page 000527 – audio file: Morning of June 10, Bangkok, Bel's Hotel Room, 1 minute, Austin Lin's answering machine**
    **f. Entire Deposition by Plaintiff – December 21, 2010 – 200 pages**

**C) Complete transcript from the Cicvara Deposition – December 21, 2010**

**D) Plaintiff Motion for Production of Documents (January 3, 2011)**

**E) Defendant Responses and Objections to Plaintiff's Second Request for Production of Documents, from February 7, 2011**

**F) T-mobile bill for June 2009 – Bates pages 000415 and 00416 + Bates Page 000612 + Exact Explanation Table**

**G) Defendant s' Memorandum of Law in Opposition to Plaintiff Motion to Compel Discovery, July 7, 2010**

**H) E-mail from Andrew Yau to Eric Lawson from June 25, 2009.**

**I) A Letter about the stock options from Peggy Wilczewski – June 16, 2009**

**J) The Gillette Company Severance Plan for Exempt Employees – Summary Plan Description**

Respectfully Submitted

By          L/S

     Igor I. Sikorsky, Jr.
     P.O. Box 38
     Unionville, CT 06085
     (860) 675-5313
     CT Fed Bar No. 04233

## **CERTIFICATION**

This is to certify that the copy of the foregoing was sent by U.S. Mail to:

Attorney Edward Cerasia, II
Seyfarth Shaw, LLP-NY
620 Eight Avenue
New York, NY 10018


        L/S
_____
Igor I. Sikorsky, Jr.