UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| **PREDRAG CICVARA,** : | Civil Action No.3:09-CV-2054(JCH) (HF) |
| Plaintiff, : | |
| V. : | |
| **THE GILLETTE COMPANY and PROCTER** : | |
| **& GAMBLE COMPANY and DURACELL.** : | |
| Defendants. : | MAY 25, 2011 |

### AFFIDAVIT
### OF
### PREDRAG CICVARA

Personally appeared Predrag Cicvara and gave oath to the facts herein after set forth:

1. The factual data concerning my dates of hire, job duties and responsibilities as set forth in paragraphs 1 – 4 in Defendant's Statement of Undisputed Material Facts are accurate and agreed upon.

2. On June 15, 2009 I was terminated for "Cause" by P&G Company. The specific reason for termination, at the time of termination, was never, either verbally or in written form, disclosed to me. The circumstances will be explained later in my affidavit. Let's, for now, concentrate on the stock options as a Count 1 of this particular case.

3. The options that I have received are correctly listed in paragraphs 51 – 55 of Defendants' statement of Undisputed Material Facts.

4. Following my termination I made a timely effort (in early July, 2009) to exercise the options accrued to me as an employee of the defendant. My attempt to exercise was denied, for the reason stated in the letter from Peggy Wilczewski, of Duracell's HR Department, sent on, or around June 16th, 2009 (Exhibit A).

5. In this letter, Peggy Wilczewski wrote: "**Section 6 (f) (A)** of the Gillette Company 1971 states that "if any employee Participant is discharged for Cause**, as hereinafter defined**, all his options shall immediately be cancelled effective as of date of termination of his

1

employment". The Gillette Plan's definition of "discharge for Cause" includes each of the following:

> (A) the Participant's continued failure to perform substantially his duties with the Company or any of its subsidiaries (other than any such failure resulting from incapacity due to physical or mental illness), after a written demand for performance is delivered to Participant by an officer or a senior manager of the Company or the subsidiary which identifies the manner in which the Board of the elected officer or manager believes that participant has not performed his duties;
>
> (B) the Participant's engaging in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Company or the subsidiary; or
>
> (C) the Participant's conviction of a felony or a plea of nolo contendere by Participant with respect thereto. "

6. In her letter Peggy Wilczewski clearly stated that it is because of the **Section 6 (f) (A)** that I was denied in my attempt to exercise stock options. An **(A)** reason, cited above, refers to the continued failure (*by a participant*) to perform substantially his duties.

7. At no time throughout my employment I was given any of the procedural warnings mandated by said Section 6. (f) (A).

8. On the contrary, throughout my employment in Duracell, I was always an excellent worker, and have never received any yearly review that was less than fully satisfactory. I received the stock options rewards for my contribution to the company results in 2001, 2002, 2003, 2004 and 2005. In 2005 Gillette Company was acquired by P&G. In January 2005, I have also received an award from Duracell VP of Sales (Jim O'Donnell) for advancing and exponentially growing the Company's OEM business.

9. In May 2009 I received notice of an increase in my salary as set forth in Exhibit B hereto. On July 1, 2009 I was to be given even more responsibility, increasing number of direct reports to me from two to five (Cicvara Dep. page 16, and page 33).

10. Therefore the Section 6 (f) (A) couldn't be applicable at all in my case, and it could be attributed to a possible error by Ms. Peggy Wilczewski, as she may not be an expert in explaining, or did not really care to explain the legal issues to the already former employee,

whose life was destroyed by, amongst the others, her careless actions. Also, it is interesting that this error would be committed at the moment when Peggy was "apologizing" in this letter for another error committed by the stock administrator in Cincinnati who told me when I called, that in spite of the fact that I was terminated for "cause" I can exercise stock options within 30 days of the day of termination. The fact <u>that I was told that</u>, would actually contradict the statement from Mr. Muncy: "automatically cancelled as a result of his termination for cause", used throughout various documents served by the Defendant to Your Honor. The numerous errors that Duracell HR committed while giving these explanations, only confirm the fact that they did not even bother to precisely justify their actions, taking an arrogant position with the motto: "the facts are what <u>we tell you that they are</u>".

      11. Inexplicably, in their July 7, 2010 document "Defendant Memorandum of Law in Opposition to Plaintiff's Motion to Compel Discovery" at page 5 (8 of 20), served to Your Honor, the Defendant Lawyers repeated the same: "By letter, dated June 16, 2009, Wilczewski informed Cicvara that, pursuant to **Section 6 (f) (A)** of The Gillette Company 1971 Stock Options Plan, Cicvara's stock options were cancelled as a result of his termination for cause." This document was created more than one year after the letter (Exhibit A) was created and all that time was at Defendant hands to make a proper determination as to what exact paragraph was applicable in this particular case. What exact paragraph is applicable indeed? <u>The short answer is – none</u>.

      12. It is obvious that the section 6 (f) (C) couldn't be applied as I was not convicted of a felony as required in sub-paragraph C of the aforementioned. Thus <u>through logical deduction</u>, one would have to conclude that it must be the condition listed in section 6 (f) under paragraph (B). During the deposition I have asked Edward Cerasia II, not once but twice, about what paragraph (A, B or C) is applicable in my case (Cicvara Dep. page 156-157, page 159) and finally, after the deposition (*and 18 months after my life was completely destroyed*) it seems that Defendant understood <u>that the cancellation is not automatic</u>, as now, they finally admitted and agreed, through their "Statement of Undisputed Facts" (page 13, paragraph 50) that it is <u>indeed B paragraph</u> that is applicable to this case (*except it actually is not, but it is the only one that makes some sense*). However that did not prevent Defendant's Lawyer to **wrongly claims**, throughout the document that Cicvara's stocks are "**automatically cancelled** as a result of his termination for cause" (Id. page 14, paragraph 57). Here, the Defendant is hoping that the

maxima: "A lie told often enough becomes truth" will work wonders in this case. Granted, they have found another person to "blame" as it was Mr. Jason Muncy – who has stated this, therefore the Defendant position is: It is not wrong, for Lynne Burnett, Peggy Wilczewski, and for the Defendant lawyer, to repeat this untrue statement numerous times throughout many documents served to the Court, as "Mr. Muncy stated that, so it must be true". It seems they are pretending that they don't understand <u>that it is not Mr. Muncy opinion that counts</u>, as it is completely irrelevant what he "thinks" or what his "opinion is". <u>The only relevant thing here is The Gillette Company 1971 Stock Plan and what is written in it.</u>

       13. What is stated in paragraph (B) clearly defines that the condition for cancelling the options of somebody who was terminated for "Cause" is if: "the Participant's engaging in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Company or its subsidiary".

       14. Therefore the part that Defendant would have to prove, which they failed to do, would be: "<u>materially and demonstrably injurious to the company</u>". They also would <u>first</u> have to prove that my conduct was illegal – which it was not, or that it represents "gross misconduct", which they do claim, but failed to prove, throughout their documents, in spite of the fact that they were carefully crafted the <u>fabricated evidence to strengthen their case, and allowed the others (Bel Liu) to freely do that</u>. This will be explained later in my affidavit. However, just for the sake of argument, let's suppose here that I actually "did harass and did make unwanted sexual advances towards Bel Liu" and let's see if that qualifies for cancelling of my stock options. I will only list the facts.

       15. Not only that the Defendant never even tried to prove that this statement indeed applies in my case, they actually refused to disclose the business results, level of their business with Practical, and lists of purchase orders issued by Duracell to Practical in the last several years, that Plaintiff had asked for repeatedly. Why? Because there was not any negative impact to Duracell business that Plaintiff's behavior, <u>even if the Defendant allegations were true</u> (*and they are obviously not*) would have caused.

      **16.** The e-mail that Mr. Andrew Yau sent to Erik Lawson (Exhibit C), only confirms that Practical was in position to beg Duracell for more business (Cicvara Dep. page 23-24). Ironically, the accusations by Austin Lin are actually emphasized by Mr. Yau, for the reasons completely opposite from what paragraph B of the The Gillette Company 1971 Stock Plan is

4

asking for (negative impact to the company's results – a material impact). Andrew sets me up, using Bel (*and destroying my life in a process*) in order to gain leverage with Duracell, that in his mind, would enable Practical <u>to get</u> **more business from P&G, not less.**

17. Duracell business could not materially suffer, even if Practical would have decided to completely cease their cooperation with Duracell (jut the opposite of what they were actually doing). I have explained Duracell policy with the contractors, as always keeping them hungry and always having more than just one solution for what was needed from them (Cicvara Dep. pages 44-45).

18. Because my termination, for alleged "Cause" **did not cause any material losses to the company**, the stock options that I deserved and was awarded from 2001 until 2005, must be reinstated, even if it is assumed that I actually committed what Defendant is accusing me of (<u>which I did not</u>). Since, in the paragraphs to follow, I will prove that, similarly as for the cancelled - already awarded options, my lost salaries, my lost bonuses, my lost pension contribution, my lost future stock options and my lost future raises and promotions are unjustly taken away from me, **by the illegal actions and decisions of the company's employees**, the decision about this case should be brought, without wasting any more of tax payers money – just by Your Honor, without even proceeding with the trial activities, as the ample evidence exist to support such a decision. So let's now continue to describe the other facts.

19. I was born on September 19, 1954 in former Yugoslavia. I graduated from secondary school in 1973, as the best student that ever attended the school and from college in 1977, at University of Zagreb, Croatia (Electrical Engineering – Control Systems Theory) as the second best student in Class of 1973. I got three Best Student Awards from the Rector of University of Zagreb during my studies. I married in 1983 with my wife Lillian and our son Viktor was born in 1984. In 1991, I was General Manager of "TPK – Service Division" in Zagreb, Croatia, on my way to become General Manager of the entire TPK company (about 4,000 employees). I have enrolled in the first (pilot) MBA program in Croatia, in 1990, a joined effort of Florida State University, Tallahassee, Florida and University of Zagreb – School of Economics, with the best GMAT (administered by University of Florida) score of all students who were accepted.

20. After the outbreak of a civil war in Yugoslavia, in 1991 we immigrated to USA in 1991. My wife acquired two Master Degrees, in French Language and Literature in 2002, and in Spanish Language, in 2008. She currently works (*very hard*) at two places (*as we had to survive on her income only*), as a World Language Teacher (French and Spanish Language) in a High School and as a Spanish Teacher at University. I have acquired Master of EE degree at Polytechnic University, Brooklyn, NY (Hawthorne, NY campus). Our son Viktor graduated from Fairfield High School in Fairfield, CT, in 2002, and was the first student from that school, in the last 25 years, who was chosen as one of two Presidential Scholars from the State of CT in 2002, when he, together with us, travelled to Washington DC in June, and spent four days there, together with the other 119 presidential scholars for 2002, to meet, among the others, with the president George W. Bush. Viktor graduated from Columbia University, New York, NY in 2006, and is currently employed and lives in New York City.

21. On November 1st, 2000 I started to work for Duracell, at the time owned by The Gillette Company, as a Manager of WW Technical and Consulting Services. In April 2002, after massive resource cuts in the company, I got additional responsibilities that included forecasting, developing new business opportunities, analyzing business results, promoting new, more efficient processes, marketing and pricing responsibilities, all on top of my technical and consulting responsibilities.

22. Because of my extraordinary analytical abilities and my strong mathematical background, I was an instrumental part of the unprecedented growth of Duracell OEM sales business, that grew from about $18 MM and 75MM cells in 2002, to over $70MM and over 400MM cells in 2006-2007 fiscal year. Little did I know at that time that at least a part (but a significant one) of that growth was actually causing a great harm to Duracell as a company, as the whole profit that our OEM Sales Group generated (roughly about $40MM from 2002-2006) was nearly completely wiped out by the harm that the diversion sales, that must have been known to the very influential people within the company, caused to Duracell's net income (Cicvara Dep. pages 181-183, Exhibits D, E and F). Vast evidence of this activities existed on my business computer, which was very well known to the influential people in Duracell and P&G (please see statement of Rob DaPra on the page 2 of the Exhibit F).

23. In April 2008, I was transferred to QA Department where I held the position of Lighting QA Leader for a few months, and then I was promoted to the position of QA Manager

in July 2008. After that, due to the excellent job that I was doing at my position, there was a plan in place (by Kevin Babis, my supervisor) to broaden my responsibilities with a new position that would include five (up from two) people reporting to me, as of July 1st, 2009 (three of them being in Asia). This did not happen as I was terminated from my employment with P&G Company on June 15th, 2009.

24. From May 31, 2009 until June 13, 2009 I went on the multiple-country business trip to help in auditing of four different manufacturing facilities, belonging to three different companies. Mid part of this trip included the audit of two Practical's factories, one in Indonesia, called Era-Cipta, situated in Medan the other in Thailand, called Practical, situated in Bangkok. The first one was audited on June 4-5, the second on June 8-9. Bel Liu, from Hong Kong, Practical General Manager, was accompanying Duracell's audit team on these trips.

25. On June 8, 2009 I exchanged five (5) text messages with Bel in a period of 8:57 PM until 9:07 PM local Bangkok time (part of Exhibit G attached to this affidavit – Bates pages 000415 and 000416, Cicvara Dep. page 184, Cicvara Dep. Exhibit G). In the message #4, sent on 9:05 PM on June 8th, Bangkok time, Bel, freely and entirely by her our decision, invited me to come to her room, even though previously, in message #2, she stated that she is tired and want to rest, and then inexplicably changed her mind, which did make me wonder, but I did not give it too much thought. I answered, in the 5th message that I will come in a minute or so, which I did.

26. During about 50 minutes that I was in her room, she was on the phone with her husband for more than 15 minutes (Cicvara Dep. page 101-103). She also called her boss to give him some details for tomorrow's call to Duracell purchasing – as they were trying to lower their price for one of the flashlights in order to capture the business with Duracell that hey desperately needed (Cicvara Dep. Id.). The things that happen between us were somewhat sensual. I have never done anything to physically, or in any other way harm her (Cicvara Dep. page 68, pages 85-86). Bel Liu confirmed that in her statement to Peggy Wilczewski and Dina Schmude on June 11, 2009: "In conclude, he did the rude thing but he didn't threaten me or shout at me. Every word he said was gentle. He did not do any violent action." (Bates page 000617). .

27. On June 9th, 2009, Austin Lin, an employee of Duracell QA Department who reported to me at the time, went to Duracell HR to report that "Mr. Cicvara had made repeated unwanted sexual advances toward Ms. Liu during a business trip in Asia" (Dina Schmude, Dec. page 1, par.3)

7

28. After my termination on June 15th, I thought about the motives that fueled the actions of Austin Lin, Andrew Yau (and indirectly Bel Liu, through the strong influence of Austin Lin and her boss Andrew Yau) and Lynne Burnett that directly caused my termination "for cause". Immediately after my termination, I suspected that my visit to Bel's room, of June 8th, was a set-up, but I was not sure that is the case, even though I stated that it was my belief during the deposition (Cicvara Dep. pages 111-115, pages 142-143, ). However, after carefully reviewing all material that was presented by Defendant on April 15th, 2011, **as parts of it were purposely not disclosed to Plaintiff during the discovery phase**, even after repeated requests and Defendants' claims that they have provided all of the evidence they had in their possession, the conclusion can be made, with certainty and by the independent observers as well, that this surely was the case. Three forces were at work to make sure that I will be fired from P&G in June 2009, and each one was additionally fueled by the other. The first one was Austin Lin's strong desire to retaliate to me (completely independent of the other two) that I will explain later. The second one was an attempt by Andrew Yau to gain a strong leverage with Duracell/P&G that would help Practical to accomplish multiple goals. The third one was the desire of certain people at Duracell helm, to get rid of the person (me) who have learned and alerted Duracell management (*I alerted them instead of P&G hot alert line and that was a terrible error on my part*) about the diversion of batteries to Latin America (Cicvara Dep. page 181-183). To them, the fact that they can accuse me of "sexual harassment" and get rid of me immediately (as they actually did on June 15th,2009) came as a god given gift (Cicvara Dep. page 7, page 12-13, page 14, page 191, Exhibits D, E and F).

29. Austin Lin made the decision to report me to HR <u>entirely by himself</u>, practically deciding in lieu of Bel Liu what "must be done"( Exhibit H - page 2, Cicvara Dep. page 95,). Austin Lin spent 7 weeks in China (although the work could have been completed in three weeks at most, Cicvara Dep. pages 112- 113) during February, March and April 2008. While in China, Bel Liu taught him Mandarin and he engaged in an intimate relationship with her, the fact that I have found only after I was terminated, on or about June 19, 2009 (Cicvara Dep. pages, 55-56, pages 112 -113), from Brian Hesse (Duracell) and David Mathieu (Ideaz). Brian and Dave are willing to support their statements as witnesses in the Court of Law, if required. In April 2009 Austin lied on his expense report from another long trip in China and Korea, where he added about 9 additional days of his own leisure, about seven of them spent in Korea (with his

girlfriend), to attend a one hour meeting with one company (Cicvara Dep. pages 56-57). I contacted Kevin Babis, my supervisor and we had a long conversation with Austin. Austin admitted to lying and paid certain portion of bills by his own money, and took several days of vacation to cover the days. However, this was never reported to HR, and only Kevin Babis, I and Austin Lin have any knowledge about it. The official expense trip records do exist in the P&G database but the Defendant stubbornly refused to produce them, even after my repeated requests.

30. While Defendant produced the declarations of Lynne Burnett, Peggy Wilczewski, Dina Schmude and Kevin Babis, <u>they did not produce the declaration from Austin Lin, and they did not produce the declaration from Bel Liu either (for the very obvious reasons)</u>. Therefore all that Lynn, Peggy, Dina and Kevin are stating is just their opinion based on hear-says and lies fabricated by Bel Liu and Austin Lin. Produced declarations are not based on facts, <u>because Defendant did not produce any facts</u>, except for constantly trying to fabricate my statements starting with the "notes from the meeting on June 15, 2009" (**a document that is fabricated itself**) and then manufacturing their opinions by combining my statements from the manufactured notes or by misrepresenting my statements, partially, and sometimes entirely.

31. The second force was an attempt by Andrew Yau to try to gain a strong leverage with Duracell/P&G that will help Practical to accomplish multiple goals: a) To get rid of the person (myself) who discovered false QA records made by Practical during the first day of audit in Bangkok (June 8th, 2009), which was a threat for them to lose all of the business with P&G (QAKE score less than 50% - Cicvara Dep. pages 25-26, pages 145-146) and who contributed to the rejection of the shipment of 46,000 D flashlights in May 2009 (Cicvara Dep. pages 26-31, pages 60-61, page 188-189) as I always had the best intent to act justly and to protect best interests of the company I worked for (Cicvara Dep. page 46-47, page 190-191) -  b) To gain more business from Duracell in times, as at the peak of the economic crisis, in June 2009 they desperately needed it (Cicvara Dep. page 21-23, ) knowing that their position was very weak (Cicvara Dep. pages 44-46) and by directly using my alleged "harassment" of their employee (Bel Liu), to put Duracell/P&G in a defensive position (Cicvara Dep. page 23-24). They had to act fast, as it was important to them to get the "harassment case" going on before the official audit results were disclosed and recorded in P&G database – as, in the case the score came out to be less than 50% the additional claims could easily be fabricated – that is for example: "Predrag

9

Cicvara wanted to retaliate to Bel Liu, because his "unwanted sexual advances" were not fulfilled by her". However, this further statements were not necessary, as their score was 55% (Lori and I agreed to give them a chance to improve), and I believe that fact they actually got the passing score (55%), coupled with the fact that it was Austin who reported "my misconduct", without even waiting for Bel's approval, contributed to the strong sense of guilt and suddenly found conscience by Bel Liu, leading her to profusely apologize to me for her actions, not once but twice, the first time during the night of June 9th, 2009 (Cicvara Dep. pages 109-112).

32. So Mr. Andrew Yau decided to activate the controlling element that he carefully put in place over the years, through Bel Liu. One of her tasks indeed was to entertain Practical's customers in a strange way that would enable Practical to exert a strong control over their business partners after certain period of time (Cicvara Dep. pages 54-56, page 94).

33. The third force was a very subtle one and came from inside the Duracell high management structure. My termination on June 15th, 2009 was orchestrated by a person who must have been at the Duracell top position or very close to it, as the things that HR Department has done to get rid of me in the most surgical manner, couldn't have been done in a normal business environment that would allow the accused to at least learn who he is accused from, what is the true nature of allegations and what true evidence exist about the accusations. All of this was denied to me – as I was accused, investigated, prosecuted, judged and convicted all by the same set of people and all of it done in about 10 minutes on June 15th, 2009. I have talked about this in my deposition (Cicvara Dep. page 12-14, pages 115-116, page 140, pages 190-191), for example about the fact that my computer and my Blackberry just disappeared (Cicvara Dep. page 148) and Defendant never produced any documents that I have asked them to produce off of these two devices, in spite of the fact that my lawyer at the time asked Defendant, in his letter to a Duracell's lawyer, dated July 9, 2009, to preserve these devices as a part of a preservation of evidence (Exhibit I). Sure enough, in his e-mail about the diversion, Rob DaPra (Duracell VP of Business Development) mentioned the fact that all evidence for the diversion case was on my computer (Exhibit F, page 2) so it is no wonder the computer promptly disappeared, with all of the evidence related to the diversion case and to this case as well. Obviously, it was much more important for somebody in Duracell, to destroy the evidence for diversion, than to preserve the evidence about my wrongful termination but the act actually served their goals in both of these cases (leading to the tragic consequences for my life after the termination).

Here are just facts, and I would leave it to Your Honor to make conclusions about what was going on here.

34. On or about June 9th, 2009 Lynne Burnett (Lynne Burnett Dec. Page 2, Parag. 3) "gave Ms. Schmude guidance on how to handle Mr. Lin's report (*she knew it was Austin Lin who reported it and yet did not question the motives*), including that the Human Resources Organization should speak with Ms. Liu and Mr. Cicvara to investigate the allegations". This statement is very carefully constructed by Defendant lawyers, to exclude any single individual (*as if the Human Resources Organization could and should speak?)* from the responsibility to talk to me (at the same time as with Bel Liu) to determine if the accusations are real or not.

35. In the Defendant notes of Undisputed Facts, page 10, paragraph 37, it is written: "who (Lynne Burnett) advised Schmude (*this time it is a human being*) to investigate the incident by speaking with both Liu and Cicvara". Nobody from HR ever contacted me even if they had ample opportunities from June 9, 2009, until June13, 2009 when I left Asia flying back home from Hong Kong. They certainly did have time to talk and communicate to Bel Liu, constantly apologizing for inconvenience they have causing to her, and gave her ample of opportunities to add to her lies and manufactured "evidence" that will be proven later.

36. In Dina Schmude Declaration (page 1, paragraph 3) Dina stated: "Ms. Burnett advised me to investigate the allegations by speaking to Mr. Liu". There is absolutely no mentioning of speaking to Mr. Cicvara. This way, the Defendant lawyer has a construction where everybody can claim that the right orders were issued, but they were just misunderstood by Dina Schmude. Yet, does it relieve the head of Human Resources Department (Lynne Burnett) from the responsibility to conduct a just and proper investigation? No, it does not, and the point is Lynne Burnett did not want anybody to talk to me – her plan was to get rid of me on June 15th, in a surgical manner, which she did. In fact, instead of contacting me immediately and disclosing the allegations against me promptly, Duracell HR personnel spent all their efforts in collecting the additional proofs against me, even allowing the blatant manufacturing of the evidence as it will be proven later, once again under the motto: "Somebody else (Bel Liu) did it, and we just accepted her statements as the truth, so we are not responsible for our claims that we believe it is the truth". I am not sure if that is enough to legally protect them but Your Honor will certainly know that better than me.

11

37. There is nothing that Lynne Burnett did to investigate the motives of the person who actually initiated the case – Austin Lin. Was he in Liu's room on June 8th, 2009? No, he did not. Did Bel Liu told Austin to go to HR Department? No, she did not. Bel said to me, while she was apologizing that "she was left no choice" (Cicvara Dep. pages 96-97, pages 108-112). Also, Bel's own statement said that "…he (Austin) encouraged me to report to Andrew because Predrag made me felt fear of him (*that fear was never, ever disclosed to me by Bel, so I had no knowledge of it (Cicvara Dep. Pages 101-102), even if she had –which she did not – reason to feel the fear*) no matter what the excuse was". (Bates page PG 000617). This statement directly shows that Austin did not even warn Bel that he will be the one who will report this to HR, in fact "leaving her with no choice" – which were exactly the words Bel told me while apologizing. Also, at the same page she wrote: "I told Andrew (her boss, and quite possibly more than just a boss) that I spoke to Austin and he told me to follow what Austin tells me about reporting this to P&G team. I told him I felt bad about getting Predrag in trouble. Andrew told me not to being kind to Predrag. He said he was going to tell Nitesh (Singh) that Predrag is not to work with me". (Bates page 000617). The first time Bel Liu **spoke** (not counting e-mails) to HR was on June 11th, 2009 – way after June 9th, 2009 when Austin Lin reported this to HR.

38. Lynne Burnett also manipulated Kevin Babis, leaving him under impression that it was Bel Liu (or her boss Andrew Yau) who reported my alleged misconduct to HR, **by never disclosing to him that it was Austin Lin**. Had she done that Kevin would have questioned the motives behind Austin Lin's actions. But all that he (Kevin) learned about this case was what he has heard from Lynne Burnett during the meeting on June 15th – and we will soon come to these details.

39. After I returned home, on Saturday, June 13, very late at night, I went to work on early on Monday, June 15th, 2009. After sending few e-mails, ironically one of them to Bel Liu, where I sent her QAKE (Quality Assurance Key Elements) book in Chinese, as I promised, so that they can better prepare themselves for the follow up audits, Kevin Babis, my boss came to my room and told me that HR needs to talk to me about "certain things". Even then, I did not realize what I will soon face, as there was nothing to face really, except the fact that the emotional relationship existed between Bel and me, and that certainly is not the cause to fire anybody, especially not "for cause" with such severe consequences that my whole life is entirely (and very negatively) altered by what was done to me by Duracell HR Department. I remember

that I actually thought this might have to do something with what me and my boss Kevin Babis talked to Austin Lin, who lied on his expense report back in April 2009 and we did not report it to HR, as we wanted to give him the second chance.

40. After asking me do I know Bel Liu and did I visit her on June 8th in her room in Bangkok hotel, she (Lynne Burnett), without waiting for my answer, proceeded by telling me "we have recording from her boss (Andrew Yau) answering machine (Cicvara Dep. page 141), with a lot of things that were told in that room while you were there" (which would be June 8, 2009). Then she continued with " I am not sure did she (Bel Liu) did it intentionally or not, but one way or another we know what went between two of you in that room", adding immediately: "Do you want us to bring the recording so that you and we can hear it".(Cicvara Dep. pages 102-103). *This conversation was in its entirety omitted from the notes that were officially provided by the Defendant, even though Lynne Burnett and Peggy Wilczewski stated that the notes are "a true representation" of what was said during the meeting on June 15th* (Bates pages 000498-000501).

41. I was in a state of shock as I realized that something serious is happening. I couldn't comprehend where all of this was coming from. I simply answered: "Yes I was in her room on June 8th" and "no, there is no need to listen to the recording as I know exactly what was going on between us and what we were talking about". In a hindsight that was a big mistake, as from June 15, 2009 until May 28, 2010 when we received some of the documentation we asked for, I was continuously under impression that June 8th recording really existed and that the recording will show what I was stating all along – that there was nothing even close to "sexual harassment, forced physical contact, me stating "I would rape you" etc. However, the particular recording that Lynne Burnett mentioned was never produced during the document production phase, and obviously did not even exist – therefore Lynne Burnett has intentionally lied during this meeting (Cicvara Dep. 102-103). My statements cited above are *omitted from the notes that were officially provided by the Defendant, even though Lynne Burnett and Peggy Wilczewski stated that the notes are "a true representation" of what was said during the meeting on June 15th* (Bates pages 000498-000501).

*42.* The only recording that Defendant has is the recording from Bel's room from June 10th, 2009, that only proves my statements that Bel apologized to me twice, as I was continuously asking her why she is apologizing for. We included these two audio files for Your

13

Honor to hear and make a judgment herself, as Defendant did not include them in their set of documents (Exhibit J, parts d) and e) – on the USB flash memory).

43. Lynne also stated "you came to her room uninvited as she (Bel) told us that you just appeared on her room's door and she let you in because you were her customer and she did not want to offend you". I have strongly opposed such a statement as it was a blatant lie (Cicvara Dep. page 141). During the meeting I stated: "it is not true and it is easy to prove that she (Bel) invited me to come, as there are text messages on my Blackberry that can prove it easily". So, Lynn Burnett's statement cited here was another lie as she must have known, by reviewing Bates page 000612 (which she indeed did know according to her own Declaration, see page 2, paragraph 4), that I did not come uninvited, and that I was telling the truth about the text messages exchanged between us (as the page 000612 is all about these messages). Lynne Burnett answered: You can say whatever, but she (Bel) claims that you just appeared at her door uninvited" – which was partially true, as that actually was a part of Bel's statement. *This conversation was in its entirety omitted from the notes that were officially provided by the Defendant, even though Lynne Burnett and Peggy Wilczewski stated that the notes are "a true representation" of what was said during the meeting on June 15th* (Bates pages 000498-000501). Not only that it was omitted but the notes that were provided as an "official and true representation" from the June 15th meeting, do not list even one word of my answer, as there is only a question typed **"Did she invite you to her hotel room?",** followed immediately by another question but not typed in bold so that it appears as an answer: "Did she asked you to leave and did you refuse to leave?" – <u>where another answer I have provided was also completely omitted from the notes.</u>

44. During the meeting it was Peggy Wilczewski who was taking notes, on the block with small squares (mathematical paper) of a fairly small size, possibly compact and certainly smaller than the usual letter (A) size. I clearly remember that, as I know that at some point I thought how she is going through the pages rather quickly. Her task, by her our declaration and the declaration of Lynne Burnett, was to take the notes from the meeting, so one would certainly expect that the notes would reflect what Lynne Burnett said at the beginning of the meeting, not just that "there was a recording" but in much more details, exactly as it was told. One would also expect that such an important statement by me such as: "No, I did not come uninvited as she clearly invited me in her room (also Cicvara Dep. page 69-71) – and you can check that by

looking at text messages exchanged", would also be captured at the notes, especially because the notes were taking in a very busy manner by Peggy Wilczewski, and she went through a lot of those small pages in during a 10 minutes interrogation, as she was flipping them fairly quickly.

45. There are so many constructed statements in the "official notes" that I could lose hours trying to clarify what was really stated and how it was misconstrued by somebody in Human Resources – I can't say with certainty by whom. I will not do that here as it could be all proven during the trial if Your Honor chose to have one, after a careful review of evidence from both sides.

46. During the meeting I stated that I told Bel: "when you do such things with your legs, one could rape you" (Cicvara Dep. page 86-88, pages 138-141). Whatever was constructed in the notes later, especially with respect to the word "rape" is not true, as the only time that word was ever used was in the instant described above, and in the context described above. As I stated in my deposition, it might have been a poorly chosen word by me. However later it appeared on the notes that I said – this and that – not true – the only context that I mentioned the word "rape" was in that particular sentence as that is EXACTLY what I said to Bel that evening in June 8, 2009 so there is no doubt that anything else was ever told in relation with a word "rape" (Cicvara Dep. pages 86-88, pages 138-141).

47. The Defendant, however, is repeatedly and continuously using the lies like: a) "he said "I will rape you" combined with b) "I could rape you" and c) "egregious conduct of sexual harassment" throughout all of their documents submitted to the Court, even though I clearly explained what happened in many places during the deposition. For example I explained that what I did was "neither the violation of PVPs nor the violation of WW Conduct Manual" (Cicvara Dep. page 78). But the Defendants boldly follow the saying (I believe it may have been Vladimir Ilyich Lenin): "A lie repeated often enough becomes truth"- throughout all of the documents they submitted to the Court in the last 18 months, not just the set of April 15, 2011.

48. I was never given any notes after the meeting on June 15th, even to the extent where I would be asked just to confirm by my signature that the notes reflect what was stated on the meeting without asking me to agree with what was said. By failing to provide me with the notes, Defendant was given an option to tailor the notes later, to omit what they did not want to present and to add what they wanted to add, and to create newly constructed thoughts in the form of interpretations by the creator of the "new – official notes".  The first time I saw the notes

(May 28th, 2010) – I did not believe my eyes, and wanted to jump out of my skin. I just couldn't comprehend how so many lies could have been compiled on three pages of paper (even though many more pages must have actually been written during the interrogation).

    49. Not only that I was not given the notes, I was never given the explanation why I was fired (Cicvara Dep, page 154). I was told at the end of the meeting by Lynne Burnett: "You are terminated with the cause, effective immediately". Then she left me with Kevin Babis and Peggy Wilczewski, to pick up my belongings (while the security guard was present at all times at my room door, with the dollies to transport the boxes with my belongings). This was the most embarrassing time of my life, as everybody who was passing by was aware of what was going on, and unfortunately, my room was at the longest possible distance from the lobby, so everybody could have seen me leaving the building in a presence of uniformed guard and Peggy from HR and my boss Kevin Babis - an excellent material for rumors that must have spread immediately throughout the building. Immediately after I had to face my wife, my son, my mother in law, my own mother and other members of my broader family. I have lost 20 pounds in the next two weeks, as was my wife too. Driving back to home on June 15, 2009, I was even contemplating suicide, for the first time in my life, that is how embarrassed and humiliated I felt (for what reason?). I took me one hour and a half to come home, even if it is a comfortable 35 minutes ride from Bethel to Fairfield, CT.

    50. On June 29th, 2009 I sent an official e-mail to Peggy Wilczewski asking that P&G provides me with all of the documents (that should have included the notes from June 15th meeting) that were kept in my personal P&G files with respect to my termination from June 15th, 2009 (Exhibit K). I also asked to be provided with the specific reason of why I was terminated for cause. The official answer, sent a day later, on June 30, 2009, by Peggy Wilczewski (who copied Lynne Burnett on her e-mail, which indicates this was an official position of Duracell HR Department) was: 1. <u>There are no any documents in your personal file that are related to your termination of June 15th, 2009,</u> and 2. You were terminated for violating the WW P&G Conduct Manual. If this is not the blatant and arrogant obstruction of justice, I do not know what is? So, the notes from the meeting did not exist at that time? Does that statement mean that the notes were never taken? Because, if it does not, and notes were taken, than it is a plain obstruction of justice from the position of force. At that time Defendant obviously did not anticipate the possible lawsuit action by me, that is why such an abuse was taking place throughout <u>the period</u>

16

of June 9th, 2009 until the moment they were served the summon – in November 2009. This particular e-mail was never provided by the Defendant during the document production phase, when Plaintiff asked for the additional documents, on the contrary their answer was that they have already provided all documents that were in their possession.

51. The hand written notes from June 15th, meeting, were provided to Plaintiff only after repeated requests, and only in February 2011. These notes appeared to be the exact, now hand written, replica of the typed noted that have been produced by the Defendant after June 29, 2009 as an "official notes" from the meeting on June 15, 2009 – described above (Exhibit L). Notes are written on the A size paper, not on the smaller compact paper used during the interrogation on June 15th, 2009.

52. The other important document, that was never provided to the Plaintiff, in spite of the repeated requests to produce all of the available evidence, contains 8 (eight) text messages that Bel Liu forwarded to Peggy Wilczewski on June 11, 2009 (Bates page 000612 – a part of the Exhibit G).

53. If one is allowed to forward text message as an only proof of something relevant, one is given an ample opportunity to distort the original message as much as one wants. While the original message remains intact on their phone, the content of the forwarded one can be manufactured at will. So Bel (or somebody else who might have helped her to strengthen the "harassment" accusations), was given an additional opportunity to produce support for her statements, which she, without question, used to her advantage. She (they) made the first big mistake here, in wrongly counting the messages that were exchanged during the period of 8:57 PM through 9:07 PM in Bangkok, so the additional – **sixth message** was added which states: "I know you are not and just wanted to be with you without dirty thoughts….so let me know I need few minutes for e-mails and then can bring desert (sic) to your room if you want." This is the message that was never exchanged and was completely fabricated in an attempt to make my intentions to come to Bel's room "dirty". Fortunately, an official T-mobile bill exists for June 2009, for the Blackberry (203-243-0079) I used while I was employed in Duracell, where one can see that there were 5 messages exchanged, not six (Bates pages 000415 and 000416 – Exhibit G), and those five were sent in a very different times than the times that Bel produced in her e-mail. (Exhibit G – all parts). This is a direct proof that the statements provided by Bel Liu are fabricated, with the pure intention to get me fired from P&G and to use the fact that P&G

17

employee "harassed" the GM of their company to their business advantage – to gain more business from Duracell (e-mail from Andrew Yau to Erik Lawson, Exhibit C).

54. Interestingly enough, Lynne Burnett knows very well the protocols that accompany these kinds of cases, as proven by her immaculate handling of another case: Ana Cardinale and Mani Parmar case, where investigation lasted longer than two months (from September 27th, 2007 until November 30, 2007) and was conducted with her giving all of the evidence to the "accused pair", making sure that everybody got a signed copy of conclusions from the investigation, and refusing to accept the printed files as evidence, because the original computer files were not preserved on the computer (and then the manipulation is possible "as we all know," in her own words); all this as opposed to having an "investigation" that lasted 10 minutes, giving the official answer to me that the notes do not exist at all in my personal HR file, and accepting forwarded text messages from Bel, that were obviously tampered with, as evidence in this case. Enough said.

55. All of the above facts point out that I was wrongfully fired by Duracell/P&G, so I should be compensated for all of my salaries, bonuses, pension contributions and future stock options that I would have earned at my position and my future positions within P&G. All of my stock options, that I have earned so far, from 2001-2005.should be reinstated immediately as proven earlier in my affidavit.

56. I would just like to add two things. The first: It required a lot of efforts to write this affidavit, and all accompanying documents, but it felt very good to finally being able to tell the whole truth about this case. I was given 10 minutes on June 15th, 2009 and did not stand absolutely any chance to express the truth. Then I spent seven hours giving the deposition, on December 21, 2010, and was prevented throughout it to tell the truth, by the Defendant lawyer who led my deposition. So, finally, right now, I got the chance and I managed to write down at least a part of the story (although there are much more details that would additionally prove who is right and who is wrong here, if the case goes to the Court). The second: It is interesting to see how a big company like P&G is stubbornly defending their employees, that they chose to keep away from the justice, and at the same time not hesitating to destroy a life of an employee whose only wrongdoing was to protect the interests of that same company, and who paid a terrible price for those intentions. Let's face it – what P&G is directly protecting here is the "opinion of four employees about my behavior" that is not supported by any valid evidence as the sworn

statement by Austin Lin and Bel Liu were never provided and it was directly proven that there intentions were insincere, to say the least. What P&G is indirectly protecting here is the reputation of the company, as the last thing they want is the negative publicity that the "diversion case" would cause in public. Maybe that is the reason why three very high Duracell's officers <u>were very quietly replaced in November 2010, without any announcement</u> – just a few months ago: Mr. Mark Bertolami, Duracell President, Mr. Duncan Adamson, Duracell VP of Finance and Mr., Rick June, Duracell VP of Marketing. Interestingly enough, it seems that P&G actually learned about the diversion case only after I asked for the additional evidence in this case – in June 2010 – and these "quiet removals" (as there is not a single word anywhere in the press, even on the omnipotent Google search, about the "deserved retiring of hard contributors to the business etc") happened just four months later. Coincidence? Maybe, it is possible, or maybe not.

Similarly, the retiring of Lynne Burnett happened abruptly as of January 1, 2010 – just a month after the lawsuit by me was filed in the Court. Coincidence? Maybe, it is possible; or maybe not. Enough said.

57. At the end I would like to ask Your Honor for a favor: Please let me prove to the arrogant and self-assured Defendants that **"A lie told often enough (regardless of the number of people who repeat it) remains exactly what it is: Just a plain lie."** Thank you very much.


I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated this __25th___ day of May 2011, at Fairfield, CT


　　　　　　　　　　　　　　　　　　　　　　　_____L/S_____

　　　　　　　　　　　　　　　　　　　　　　　　　Predrag Cicvara

**Exhibits to Cicvara affidavit:**

A) **A Letter about the stock options from Peggy Wilczewski – June 16, 2009**

B) **Notice of raise in salary.**

C) **E-mail from Andrew Yau to Eric Lawson**

D) **Part 1 of diversion (in Cicvara Dep. Exhibit B)**

E) **Part 2 of diversion (in Cicvara Dep. Exhibit C)**

F) **E-mail from Rob DaPra (in Cicvara Dep. Exhibit D).**

G) **T-mobile bill for June 2009 – Bates pages 000415 and 00416 + Bates Page 000612 + Exact Explanation Table**

H) **Dina Schmude e-mail about Austin reporting my harassment**

I) **Letter to Duracell's lawyer – from Michael Skiber – July 9, 2009**

J) **USB Memory Stick with the following files in the electronic form:**

   a. P&GBusinessConductManualWBCMREDUCED_Single_Page.pdf
   b. 1971_SOP_plan_10_2004_Gillette_Stock_Plan.pdf
   c. Letter to Hong Kong – 10 minutes on Monday.doc
   d. **Page 000526 – audio file:**
   e. **Page 000527 – audio file:**
   f. Entire Deposition by Plaintiff – December 21, 2010 – 200 pages

K) **E-mail to Peggy Wilczewski – June 29, 2009 and her answer June 30, 2009.**

L) **"Hand written official notes from June 15, 2009" provided only on February 7th, 2011.**