Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

CIVIL ACTION NO. 3:09-CV-2054 (JCH)

----------------------------------------------x

PREDRAG CICVARA,                                    :

                                     Plaintiff,          :

                                                         :

             -versus-

                                                         :

THE GILLETTE COMPANY and PROCTER &                  :

GAMBLE COMPANY, Inc., DURACELL, AN

ENTITY OF UNKNOWN FORM and LYNNE                    :

BURNETT,

                                     Defendants.

----------------------------------------------x

                 Videotaped Deposition of PREDRAG CICVARA,

taken pursuant to Notice and the Federal Rules of

Civil Procedure, at the law offices of Levett

Rockwood P.C., 33 Riverside Avenue, Westport,

Connecticut, before June Keefer, RMR, RPR, Licensed

Shorthand Court Reporter, License No. 108, a Notary

Public in and for the State of Connecticut, on

December 21, 2010, at 10:03 a.m.

CICVARA v. PROCTER & GAMBLE                    December 21, 2010

```
                                              Page 2

 1   A P P E A R A N C E S:

 2

 3

            For the Plaintiff:

 4

            LAW OFFICES OF IGOR I. SIKORSKY, JR., P.C.

 5          121 Perry Street

            P.O. Box 38

 6          Unionville, Connecticut 06085

            Tel: (860)675-5313

 7          By:  IGOR I. SIKORSKY, JR., ESQ.

 8

 9

            For the Defendants:

10

            SEYFARTH SHAW LLP

11          620 Eighth Avenue

            New York, New York 10018-1405

12          Tel: (212)218-5500

            By:  EDWARD CERASIA, II, ESQ.

13               -AND-

                 HEMA CHATLANI, ESQ.

14

15

16

17   A L S O    P R E S E N T:

18

            LOUISE S. BROCK, Senior Counsel

19          Legal Division

            The Procter & Gamble Company

20          299 East Sixth Street

            Cincinnati, Ohio 45202

21

22          CHAD ROY, Videographer

            Geomatrix Productions

23          270 Amity Road

            New Haven, Connecticut 06525

24

25
```

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 3

1              S T I P U L A T I O N S

2

3

4          IT IS HEREBY STIPULATED AND AGREED by and

5   between counsel for the respective parties hereto that

6   all technicalities as to the proof of the official

7   character of the authority before whom the deposition is

8   to be taken are waived.

9

10         IT IS FURTHER STIPULATED AND AGREED by and

11  between counsel for the respective parties that any

12  defects in the notice are waived.

13

14         IT IS FURTHER STIPULATED AND AGREED by and

15  between counsel for the respective parties hereto that

16  the deposition may be signed before any Notary Public.

17

18         IT IS FURTHER STIPULATED AND AGREED by and

19  between counsel for the respective parties hereto that

20  all objections, except as to form, are reserved to the

21  time of trial.

22

23

24

25

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 4

1                    THE VIDEOGRAPHER:  On the record at 10:03

2    a.m.

3                    MR. CERASIA:  This is the deposition of

4    Predrag Cicvara recorded on December 21st, 2010, in

5    Westport, Connecticut.  This deposition is being taken in

6    the case of Predrag Cicvara versus The Gillette Company,

7    Procter & Gamble Company, Inc., Duracell An Entity of

8    Unknown Form, and Lynne Burnett, and was noticed by

9    myself, Edward Cerasia, Seyfarth Shaw, as counsel for the

10   Defendants.  The videotape operator is Chad Roy of

11   Geomatrix Productions, 270 Amity Road, in New Haven,

12   Connecticut.

13                    As far as stipulations, I assume you'll

14   have your client read and sign the transcript.

15                    MR. SIKORSKY:  Yes; otherwise standard

16   stipulations here.  We certainly waive any questions as

17   to the competency of the court stenographer, notice

18   because --

19                    MR. CERASIA:  We've agreed on the date.

20                    MR. SIKORSKY:  -- we agreed on the date

21   here, after several postponements, as I recall it.

22                    MR. CERASIA:  And we'll retain the

23   original of the exhibits in our office.

24                    MR. SIKORSKY:  Yes.

25                    MR. CERASIA:  We'll supply you with

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

1    copies obviously.

2              My name is Edward Cerasia, II, from

3    Seyfarth Shaw.  Mr. Cicvara --

4              MR. SIKORSKY:  My name is Igor Sikorsky.

5    I represent the Plaintiff in this action.

6                   *      *      *

7    P R E D R A G    C I C V A R A,

8    2122 North Benson Road, Fairfield, Connecticut 06824,

9        called as a witness, having been first duly sworn by

10       June Keefer, a Notary Public in and for the State of

11       Connecticut, was examined and testified as follows:

12   DIRECT EXAMINATION

13   BY MR. CERASIA:

14       Q.   Good morning, Mr. Cicvara.  I introduced myself

15   before the deposition.  As you know, I and my law firm

16   are counsel to the Defendants in the lawsuit that you

17   filed in Federal District Court in Connecticut against

18   Gillette and Procter & Gamble.  Have you ever given a

19   deposition before?

20       A.   No.

21       Q.   Have you ever been a witness in any kind of

22   proceeding where you gave sworn testimony?

23       A.   No.

24       Q.   Okay.  Let me just go over a couple of rules

25   and what's going to take place today.  First of all, it's

CICVARA v. PROCTOR & GAMBLE                     December 21, 2010

Page 6

1    important both for the stenographer as well as the

2    videographer that the two of us have to wait for each

3    other to finish speaking before we speak.  You may

4    anticipate some of my questions, but please let me finish

5    them before you speak, okay?

6         A.   Okay.

7         Q.   The other thing is you have to verbalize your

8    responses, so you can't wave your arms, nod your head;

9    you have to give a yes or no answer or other verbal

10   response, okay?

11        A.   Yes.

12        Q.   If at any point you don't understand one of my

13   questions, will you please let me know that?

14        A.   Sure.

15        Q.   Okay.  If you don't say anything to me about

16   whether or not you understand a question, I'm going to

17   assume that you do understand my questions, okay?

18        A.   Okay.

19        Q.   You realize that you're under oath?

20        A.   Yes.

21        Q.   Okay.  And you realize that it's your

22   obligation to give truthful answers to the best of your

23   ability?

24        A.   Yes.

25        Q.   Did you do anything to prepare for this

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 7

1  deposition today?

2      A.   Yeah.  I read a few things that were in the

3  material that you supplied.

4      Q.   Do you remember what it was that you read?

5      A.   Yeah, I remember.  There were many things,

6  like, for example, some things that Bel Liu said to

7  Duracell people when she was giving her deposition to

8  them or I don't know do you call it deposition, but it's

9  when she talked to the personnel from human resources.  I

10 also did read the certain documents that you might not

11 have possession of, which the documents that are about

12 whistle-blowing case, which I did brought to the

13 attention of people in Duracell in 2007, in December.

14 There were a few other documents, but they were all

15 supplied more or less by you.

16     Q.   You have a folder in front of you.  What's that

17 folder?

18     A.   There are certain things in it which I might

19 use to refresh my memory, so.

20     Q.   Did you review those documents before today?

21     A.   Yes.

22     Q.   Did you review them to refresh your memory in

23 preparation for your deposition testimony today?

24     A.   Yes.

25     Q.   May I see those documents?

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 8

1        A.    Yeah, sure, you can see them.

2        Q.    Have you taken any kind of medication that

3    would either impact your ability to understand my

4    questions today or to give truthful answers?

5        A.    No.

6        Q.    Have you consumed any alcohol in the last 12

7    hours?

8        A.    No.

9        Q.    Did you speak to anybody in preparation for

10   your deposition today?

11       A.    No, except to my lawyer a few minutes, no.

12       Q.    Did you meet with him to prepare for this

13   deposition?  I don't want to know what was discussed.

14   I'm just wondering if you met with him.

15       A.    He just came to my house and we drove to here

16   because he lives about one-hour-and-a-half driving up in

17   Connecticut.

18       Q.    So how long were you in the car together today?

19       A.    Oh, ten minutes, fifteen minutes.

20       Q.    From Fairfield?  Do you still reside in

21   Fairfield?

22       A.    Yes.

23       Q.    Have you ever been a party to a lawsuit before?

24       A.    Yeah, against my neighbor.  That was something

25   about him putting the addition to his house which was

CICVARA v. PROCTOR & GAMBLE                     December 21, 2010

Page 9

1    against the zoning regulations.

2         Q.    You sued your neighbor to stop the addition?

3         A.    No, not to stop, just to change it.

4         Q.    To change it?

5         A.    Yes, according to the rules.

6         Q.    When was that, sir?

7         A.    2004.

8         Q.    Was that in State Court, Federal Court or some

9    kind of zoning court?

10        A.    I believe it was in State Court or -- I don't

11   really know.

12        Q.    Did you have a lawyer?

13        A.    Yes.

14        Q.    Who was your lawyer?

15        A.    I don't recall.  It was not that important.

16        Q.    Other than the lawsuit where you sued your

17   neighbor somewhere around 2004, have you been a party to

18   any other kind of lawsuit?

19        A.    No.

20        Q.    Have you ever been involved in any kind of

21   arbitration or government agency proceeding?

22        A.    No.

23        Q.    Have you ever been arrested?

24        A.    No.

25        Q.    Have you ever been convicted of a crime?

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 10

```
 1      A.    No.

 2      Q.    You said you resided in Fairfield?

 3      A.    Yes.

 4      Q.    And how long have you resided there?

 5      A.    Twelve years.

 6      Q.    Where did you reside before Fairfield?

 7      A.    In Bethel, Connecticut.

 8      Q.    And how long were you in Bethel?

 9      A.    Oh, from 1993 to 1998.

10      Q.    Who do you reside with?

11      A.    My wife and my son.

12      Q.    How old is your son, sir?

13      A.    He's twenty-six.

14      Q.    And what's your wife's name?

15      A.    Lillian, L-i-l-l-i-a-n.

16      Q.    And how long have you been married?

17      A.    It will be from 1983, so 27 years.

18      Q.    How long have you been in the United States?

19      A.    Since 1991, September.

20      Q.    And where did you reside before then?

21      A.    In Zagreb, Croatia.

22      Q.    Is that where you were born?

23      A.    No.  I was born in Stara Morivica, Yugoslavia.

24   I have to spell it.  But is it important where I was

25   born?
```

CICVARA v. PROCTOR & GAMBLE                     December 21, 2010

1       Q.    No, no.

2       A.    S-t-a-r-a, and then the second word is

3   M-o-r-i-v-i-c-a.

4       Q.    And that's Yugoslavia?

5       A.    Yeah.   That was Yugoslavia at that time.

6       Q.    Right.

7       A.    So I'm just being precise.

8       Q.    When did you first become employed with

9   Duracell or Gillette?

10       A.    November 1st, 2000.

11       Q.    And who was your employer at that time or what

12   entity was your employer as you understood it?

13       A.    It was Duracell Corporation or Duracell, part

14   of Gillette Company.

15       Q.    And that was in Bethel?

16       A.    Bethel, Connecticut.

17       Q.    What role were you hired into?

18       A.    Manager of Worldwide Technical Services in the

19   OEM sales group.

20       Q.    What does OEM stand for, for the record?

21       A.    Original equipment manufacturer.

22       Q.    And what were your job duties as the Manager of

23   Worldwide Technical?

24       A.    I was in charge of technical issues which

25   salespeople were experiencing in that group.  Also in

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 12

1    charge of their computers, programs that we developed to

2    help them to sell direct to OEM manufacturers.  It means

3    like, if I have to clarify, Duracell is manufacturer of

4    batteries and part of what OEM sales group was doing is

5    selling batteries directly to manufacturer of devices so

6    that when you open up the device batteries would be

7    included.  It means like it's a part of marketing

8    basically.  And the sale price of such batteries is

9    usually much, much less than the retail price, which

10   opens up possibility for diversion, which was part of

11   whistle-blowing case.  And part of my duties, not only as

12   Worldwide Technical manager, but after that where I

13   became Manager of OEM Business Services, it means like I

14   actually was in charge of technical, also in charge of

15   marketing, forecasting, pricing, all that you can

16   imagine, because there was a big cut in Duracell in April

17   2002 when I got that position and part of my position was

18   to prevent diversion sales, which is very important in

19   this story.

20        Q.    Did you say diversion sales?

21        A.    Yes.  That's the sales where you would sell

22   supposedly to the OEM manufacturer who would then resell

23   that to retail, and that will open up a possibility to

24   get a pretty hefty profit on it, because we would sell --

25   double As sell for 10 cents and Duracell is selling those

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 13

1   cells for 40 cents to retail and you are paying, you

2   know, anywhere from 50 to a dollar per cell.  So the

3   difference is 30 cents per cell.  C-e-l-l, it means like

4   a piece of battery, double A.  And the difference is 30

5   cents.  If you sell 10 million per year, that opens up

6   possibility of gaining $3 million.  And diversion that I

7   found in 2007 was selling more than 10 million, it was

8   selling 70 million cells per year.

9        Q.    Okay.  This raises another issue with respect

10  to the rules for the deposition.  I'm going to ask you

11  questions.  I'm going to just ask that you answer the

12  questions that I ask you, okay?

13       A.    Okay.

14       Q.    And if I want more information I'll let you

15  know, okay?

16       A.    Yeah.  I would answer clearly to your question,

17  except you will have to give me space to explain how that

18  affects whatever we are actually talking about here.

19       Q.    Okay.  If you don't understand one of my

20  questions, you can let me know.

21       A.    I'll ask, yes.

22       Q.    When you were the Manager of OEM Business

23  Services, right --

24       A.    Yes.

25       Q.    -- did you -- who did you report to at that

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 14

1   time?

2       A.   When I was Manager of Business Services I

3   reported to Mani Parmar.  M-a-n-i, that's the first name.

4   The last name is P-a-r-m-a-r.

5       Q.   And you held the position of Manager of OEM

6   Business Services from, what, 2002 to 2008?

7       A.   From April of 2002 until March 31st, 2008.

8       Q.   And then in March -- or excuse me, April 1st of

9   2008 you had a new role as the Duracell Lighting Quality

10  Leader?

11      A.   I have to correct you.  I didn't have new role.

12  I was transferred to that role, to the role of, yes,

13  exactly what you said, Duracell Lighting Quality Leader,

14  which pretty soon became something else in a few months.

15      Q.   Okay.  But the Duracell Lighting Quality Leader

16  role was different than the manager of OEM; right?

17      A.   Yes.

18      Q.   Whether it was a transfer or whatever, you had

19  a new job and a new role?

20      A.   Yes, because partially I was asking for that

21  because I didn't want to report to the person that I told

22  or was sure was responsible for diversion.

23      Q.   Okay.  So in the role as the Duracell Lighting

24  Quality Leader you started to report to Harley Ballew?

25      A.   Yes.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 15

1       Q.    That's B-a-l-l-e-w?

2       A.    Yes.

3       Q.    Was there anybody else that you reported to at

4    that time?

5       A.    Yeah.  I reported to Kevin Babis a few months

6    after that because I was kind of promoted to the position

7    of QA manager.  B-a-b-i-s, Kevin.

8       Q.    How long did you remain in the role of Duracell

9    Lighting Quality Leader?

10      A.    Just two months or three months maybe.

11      Q.    So until the summer of --

12      A.    Yes.

13      Q.    -- 2008?

14      A.    Yes.

15      Q.    So your last year of employment at the company

16   what was your title?

17      A.    QA manager.

18      Q.    And you stopped reporting to Haley, right?

19      A.    Yes, and I started to --

20      Q.    Or Harley, I'm sorry.

21      A.    Harley, yes.  And I started to report to Kevin

22   Babis.

23      Q.    Okay.  And what was your -- what were your job

24   duties as a QA manager from about June of 2008 through

25   June of 2009?

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 16

1       A.    I was in charge of contractors.  That's a broad

2   definition, but contractors.  And just to make things

3   clear, Duracell bought many things directly from many

4   other companies and when they came in the form that is

5   ready to be sold directly to the shelves in retail, so if

6   you can brought product directly from the manufacturer,

7   which usually was in China to the retail, then in P&G

8   terms it is contractor.  So I was in charge of

9   contractors, and Duracell had about let's say anywhere

10  from 45 to 55 contractors at any given time in the world.

11  That's throughout the world, so China, Indonesia, Taiwan,

12  Japan, Europe, everywhere.  And also I was on my way to

13  become a section head in QA, which was I supposed to

14  become on July 1st, 2009 and I never did because I was

15  fired.

16      Q.    Did you have a good working relationship with

17  Kevin Babis?

18      A.    Excellent.

19      Q.    Did you have any animosity or hostility towards

20  him?

21      A.    No.

22      Q.    Did he ever exhibit any kind of animosity or

23  hostility toward you?

24      A.    No.

25      Q.    Did you trust him?

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 17

1        A.   Oh, I don't know.  I honestly cannot answer

2    that, because, you know, from the professional point of

3    view I didn't have any reason not to trust him, but, you

4    know -- and as I said we had an excellent relationship,

5    but to trust somebody you have to have a little bit

6    deeper thing.

7        Q.   Right, but from your professional dealings with

8    him you had no reason not to trust him?

9        A.   No.

10       Q.   In your dealings with him as your manager did

11   you find him to be a fair person?

12       A.   Yes.

13       Q.   Did you find him to be an honest person?

14       A.   I don't know.

15       Q.   In your dealings with him as a manager.

16       A.   In my dealings with him, yes, yeah, I would say

17   so.

18       Q.   Yeah, I'm just asking about your dealings with

19   him.

20       A.   Yeah, yeah.

21       Q.   Now, going back to when you said you were in

22   charge of contractors, does contractors also include

23   companies that supplied parts to the company?

24       A.   No.  No.  That was the distinction.  Whenever

25   somebody supplies the part, that is part for a product

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 18

1   that is later manufactured, in P&G world that's not

2   contractor, so that's either supplier, vendor or you call

3   it whatever your name, whatever name you want.  The

4   definition of contractor is somebody who is supplying the

5   product that is already packaged in Duracell packaging

6   which is ready to be sent to the shelves in retail.

7       Q.   So it is the final product?

8       A.   The final product, yes.  It means like Duracell

9   would put its name on the products.  And that's usual,

10  you know, that's not just Duracell, everybody is doing

11  that.  So it includes different types of batteries that

12  Duracell did not manufacture but it did sell under

13  Duracell name, and it did include flashlights, you know,

14  memory cards, all these other things that are not

15  directly connected to the batteries.

16      Q.   Are you familiar with a company out of Hong

17  Kong called Practical Lighting?

18      A.   Yes.

19      Q.   And is Practical Lighting one of the

20  contractors?

21      A.   Oh, I have to correct you.  I'm sorry.  When

22  you said out of Hong Kong, they don't have name Practical

23  Lighting in Hong Kong; they have some other name.  They

24  cannot use that name in Hong Kong because it's already

25  sold to somebody.  So I think, I believe their name in

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 19

1   Hong Kong is World Hint, I'm not sure, World Hint,

2   H-i-n-t, but I'm not sure even in that, but it's

3   different.  In Hong Kong per se it's a different name,

4   but it's Practical, yes.

5        Q.   Okay.  Where was -- where did you understand

6   Practical Lighting to be based out of?

7        A.   I had very good understanding of it.  Practical

8   Lighting had three manufacturing facilities.  One

9   facility was in Zhongshan, China.  It's

10  Z-h-o-n-g-s-h-a-n, Zhongshan, okay, that's in China.  The

11  other facility is in Bangkok, Thailand.  And the third

12  facility is in Medan, M-e-d-a-n, Indonesia.  So they had

13  three manufacturing facilities, and the third facility

14  didn't have even name Practical.  The name Practical was

15  only in Thailand and in Zhongshan in China.  The third

16  facility, let me try to refresh my memory just a second.

17  Oh, okay.  So here you can actually see exactly, if you

18  want, this P.T. Era Cipta, that's the name of the

19  company.

20       Q.   Can I see the card you're looking at?

21       A.   Yeah, sure.  That's the director.

22       Q.   What are the other cards that you have in your

23  hand?

24       A.   Oh, the other card, this is the owner of the

25  Practical Company, Mr. Andrew Yau.  I have Yuen Yau,

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 20

1    which is Practical Flashlight Company in Thailand.  And I

2    have Mr. Willies Kurniawan, P.T. Cipta Elektrik

3    Kreasindo; that is the second part of the P.T. Era Cipta

4    in Indonesia, which is son of the owner, who actually

5    drove us when we were doing audit in Indonesia.

6              MR. SIKORSKY:  May we have those copied

7    and then put in?

8              MR. CERASIA:  Sure, that's what I'll do.

9              MR. SIKORSKY:  Just a photocopy, since

10   they've become part of the testimony.

11             THE WITNESS:  These are originals, maybe

12   I would like to have them.

13        Q.   Andrew Yau --

14        A.   Yes.

15        Q.   -- was the chairman of Practical?

16        A.   Yes; correct.  He was the boss of Bel Liu,

17   B-e-l, L-i-u.

18        Q.   And he ran the Practical Company was your

19   understanding?

20        A.   Plus he ran some -- many other businesses.

21        Q.   Okay.  I need to go back to a question I asked

22   before you told me what the different name of Practical

23   was, maybe in Hong Kong.  Was Practical one of the

24   contractors that you've identified?

25        A.   Yes.  Yes, one of the contractors, with the

CICVARA v. PROCTOR & GAMBLE                December 21, 2010

Page 21

1    three manufacturing facilities, yes.

2         Q.    Correct.  And it was a contractor with respect

3    to the flashlights?

4         A.    Yes.

5         Q.    Which ones, the Daylite?

6         A.    Well, no.  There were many other contractors

7    for flashlights.

8         Q.    No.  I'm just asking about Practical, what did

9    it contract --

10        A.    Yeah, and in order for me to answer I have to

11   explain.  So if you allow me I will try to explain.

12   Daylite is a new product that Duracell launched and there

13   are many different types of flashlights for Daylite, it's

14   double A, triple A, there is a C and D, so five models at

15   least.  Two first models that were launched were not

16   given to Practical, they were given to Smart Light which

17   was another Chinese company that manufactured for

18   Duracell, which actually Practical didn't like, and they

19   didn't know that at the point.  We were trying not to

20   interfere with the businesses between the companies, but

21   they come to know it, and I don't even know how, but they

22   come to know it, so they actually make a lot of pressure

23   to Duracell to give them C and D businesses for Daylite,

24   which we did.

25             So that answers your question, yes, they were

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 22

```
 1   involved in the Daylite product, but they were not
 2   involved at the beginning, which they didn't like at all,
 3   because they felt they're losing business that they are
 4   entitled to have.  So I think it's very important to say
 5   that.
 6        Q.   So the relationship at some point was a little
 7   bit strained --
 8        A.   Yes.
 9        Q.   -- is that fair to say?
10        A.   Yes.
11        Q.   Because Mr. Yau and the folks at Practical were
12   upset with Duracell that they weren't getting more of the
13   business?
14        A.   Exactly.
15        Q.   What year was that?
16        A.   We launched Daylite in 2008 at the end.  So
17   basically the Daylite started to be, you know, processed
18   and manufactured throughout -- to be designed and
19   manufactured, double A and triple A, first two models, in
20   2008 throughout the year, and that was all with Smart
21   Light.  So the first time that Practical got involved was
22   towards the end of 2008 where they get D cell flashlight,
23   Daylite, and they were supposed to get certain orders by
24   the end of 2008 which they didn't, which again made them
25   very, very unhappy because their manufacturing facility
```

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 23

1   in China was practically empty.  In December 2008 when I

2   went there to audit that facility their manufacturing in

3   China was completely stopped, they didn't have one person

4   on the manufacturing floor of the factory that was pretty

5   big and had probably more than 15 lines of manufacturing,

6   not one of them was open, and Bel Liu was really

7   complaining about that, telling that, you know, Duracell

8   promised them that there will be orders coming and orders

9   didn't come.

10       Q.   And did Mr. Yau also complain, too, that you

11  know of?

12       A.   No, I don't know about that, because I

13  didn't -- I was not in contact with Mr. Yau.  I

14  actually -- I know that he did in one of his e-mails

15  where he used up whatever happened to his advantage where

16  he actually -- when he sent e-mail, and I think that

17  e-mail might be there in the set of documents that I

18  brought here, is where he sent e-mail at the end of, you

19  know, correspondence about my firing, sent e-mail to Erik

20  Lawson, telling him, look -- Eric, E-r-i-c, and

21  L-a-w-s-o-n, who is director of sales in Duracell, sent

22  him an e-mail telling him, look, let's forget what

23  happened and let's concentrate on business.  It means

24  like actually what he wanted is he used up whatever

25  happened to concentrate on business and then he said in

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 24

1   his e-mail you promised that the business is going to

2   grow with Practical, we expected lots of orders and it

3   never come, so maybe when we see each other next time we

4   should sit down and talk about how this is going to

5   change, which means that he actually used my firing and

6   my alleged harassing of Bel Liu, alleged harassing of Bel

7   Liu, in order to gain leverage over Duracell, which he

8   actually did straightforwardly in that e-mail.

9            MR. CERASIA:  By the way, Erik is with a

10  K.

11           THE WITNESS:  Oh, I'm sorry.

12           MR. CERASIA:  That's okay.  And Daylite

13  is D-a-y-l-i-t-e.

14           THE WITNESS:  D-a-y-l-i-t-e, yes.  It's a

15  very unusual spelling.  It's probably to avoid certain

16  things and to give it brand mark.

17       Q.   You've referred to the fact that you audited

18  one of Practical's facilities in China.  What do you mean

19  by auditing the facility?

20       A.   Well, auditing is about a two-day event where

21  you go over what they call QAKE 1 through 19, Q-A-K-E

22  capitalized, 1 through 19, which means Quality Assurance

23  Key Elements 1 through 19, which is P&G quality assurance

24  way of auditing facilities, and again this is important

25  for the whole story so I'll give a little bit of

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 25

1    background here.

2              All contractors are measured the same way as

3    would be the manufacturing facility of P&G in United

4    States.  So regardless of where in the world that

5    facility is they have to have at least 85 percent out of

6    100 percent to be proclaimed eligible to do business with

7    P&G.  If the company, the contractor on the first audit

8    doesn't have 50 percent, and, you know, the way of how

9    this is measured is not important, but if they don't have

10   50 percent they are out of business with P&G and there is

11   no way back.  So if on the initial audit the score is

12   below 50 percent that company is out of business with the

13   P&G, and keep that in mind, please, because it will

14   become very important when we come to the audit of

15   Practical Company in Bangkok, Thailand, which was from --

16   it was done on June 8 and 9, 2009.

17        Q.    Let's go back to the C and D cell Daylite that

18   Practical was manufacturing.  When do you claim that they

19   started to manufacture those?

20        A.    Oh, this is also important for the story.  They

21   were supposed to start that manufacturing in December.

22   People who designed that, the man who designed the

23   flashlights, two people, one is called Dave Mathieu --

24        Q.    Can I interrupt you for a minute?

25        A.    Yes.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 26

1      Q.    Because I just asked a specific question and

2  you need to answer my question.  I asked you when.  I

3  didn't want the background.  I just asked when.  You need

4  to answer my questions.  So can you tell me when they

5  started to manufacture the C and D cell Daylites?

6      A.    They started to see people to discuss design in

7  summer of 2008.  That's important because --

8      Q.    It may be important to you, Mr. Cicvara.  I'm

9  just here to ask you questions.  You need to answer my

10  questions.  My question was when they started to

11  manufacture, that's what I'd like to know.  If you don't

12  know the answer, then just tell you don't know the

13  answer.

14      A.    I know the answer.  I just have to think about

15  that.  They were promised to have it in December.  They

16  started to -- the first run somewhere in -- I think in

17  March 2009, so it was the first run that was supposed to

18  be qualified because it has to be qualified before it

19  goes into manufacturing, and they manufactured the first

20  46,000 of flashlights in April and May 2009.  The first

21  shipment of those flashlights -- do you want me to answer

22  this or it's not important?

23      Q.    So they first manufactured 46,000 in April or

24  May of 2009; correct?

25      A.    Yes.

CICVARA v. PROCTOR & GAMBLE                         December 21, 2010

Page 27

1        Q.    Okay.   That was my question.

2        A.    Okay.   Should I go on with the shipment?

3        Q.    No, because I didn't ask you yet about the

4   shipment.

5        A.    Okay.   Good.   Okay.

6        Q.    And those 46,000, they were C and D cell or

7   they were C cell or D cell or what were they?

8        A.    They were only D cells.

9        Q.    D cells.   During the time that you worked at

10  the company up until -- let me go back.   You were let go

11  from the company on June 15th, 2009?

12       A.    Yeah, correct.

13       Q.    Up until June 15th, 2009 did Practical

14  manufacture anything other than the D cell Daylites?

15       A.    Yeah, Practical manufactured many other

16  flashlights for Duracell, but I don't know that there was

17  order placed; I don't recall that there was.

18       Q.    You don't know if it was what?

19       A.    I don't know that ordered -- that we ordered

20  any other flashlights at that point.   I think that the

21  only big order we had was 46,000 D flashlights.   They

22  were manufacturing flashlights for Duracell before, not

23  just -- this was a new product.

24       Q.    I understand.

25       A.    So, yeah, I remember we placed order for

CICVARA v. PROCTOR & GAMBLE                              December 21, 2010

Page 28

1    certain other types of flashlights to their Indonesia

2    facility, to their facility in Indonesia, where they

3    shipped that in July 2009 and they had problem with that

4    shipment, similar problem that they had with the shipment

5    of 46,000, which we never accepted.

6         Q.   Let's just go through up to June 15th, 2009.

7    If I want to go past that date today I'll let you know,

8    okay?

9         A.   Yeah.

10        Q.   Okay.  Because you don't have any idea what

11   happened, no personal knowledge of what happened at the

12   company after June 15th, 2009, do you?

13        A.   I have a certain idea about certain things,

14   yes.

15        Q.   Okay.  But you weren't there anymore?

16        A.   No, but I talked to people.

17        Q.   And you claim that the 46,000 D cells that were

18   manufactured in April or May of 2006 -- or, pardon me,

19   2009 were not accepted?

20        A.   No, they were not accepted because there was a

21   problem with them and the problem was that they used

22   pallets which were not approved for the ocean transfer,

23   they were very prone to get humidity in and that humidity

24   reflected very badly to the corrugated paper that these

25   flashlights were packaged in and they were put in the

Sanders, Gale & Russell
(203) 624-4157

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 29

1    container, because it was contained, humidity was

2    contained, those corrugated boxes got humid, then the

3    blister packs got humid and then it all fell to each

4    other, so when we opened up the container the flashlights

5    were not usable, you couldn't send them to the shelves,

6    so we sent that back to Practical, 46,000 flashlights.

7         Q.   Okay.  When is it --

8         A.   They were not happy with that either.

9         Q.   When do you claim that you sent those back?

10        A.   Oh, somewhere in May we had made decision.  I

11   don't know when they were physically sent back, but we

12   made decision we are not going to accept these

13   flashlights, so we didn't pay for that either.

14        Q.   Who made that decision?

15        A.   That decision was not made only by me.  I was

16   part of the decision because I had quality assurance on

17   my -- as my responsibility, so as a quality assurance I

18   did make partially the decision, but the one who made

19   decision finally was probably Erik Lawson, who is

20   director of purchasing in Duracell.

21        Q.   Did you yourself physically inspect the

22   flashlights?

23        A.   No.  No.  The flashlights --

24        Q.   Someone just reported to you?

25        A.   Yeah, the flashlights were sent to some -- I

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 30

1  believe it was in either Illinois or Indiana or somewhere

2  in the warehouse.  So they were not accepted because they

3  were just not accepted in the warehouse because the

4  goods --

5      Q.   It sounded like a packaging defect?

6      A.   A packaging issue, yes.  So 46,000 flashlights,

7  whatever, you know, that we paid Practical that's about

8  $500,000 I believe, we didn't pay that and they had to,

9  you know, take them back and probably pay for the

10  shipping back too.

11      Q.   Did you ever have any communication with

12  Mr. Yau about the rejection of that shipment?

13      A.   No.

14      Q.   Did you ever have any communication with Miss

15  Liu about that shipment?

16      A.   Sure, yes.  Miss Liu, she did call me and she

17  asked me to help her to push this through and to claim

18  that this was not quality issue, which I didn't want to

19  do.  I did say straightforwardly that there is no doubt

20  that it's their responsibility, that our drawings for the

21  pallets, p-a-l-l-a-t-e-s I believe, maybe two t's, I'm

22  not sure, but pallets to be used are to be stamped for

23  the ocean transport and they didn't use the approved

24  pallets, they used some other pallets which I suppose

25  were much less -- less cost than the approved was, so in

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 31

1    order to cut the cost they actually did big damage to

2    themselves and to Duracell as well.

3        Q.   Other than you, are there any other people who

4    did quality assurance with respect to -- just with

5    respect to Practical as a contractor?

6        A.   Yeah, I mean there was a group of people.

7    Austin Lin was one of the persons who actually was

8    inspecting their facilities initially in March, and I

9    would say at the end of February 2008 and in March 2008

10   he spent six or seven weeks in China.  By the way, only

11   two weeks were supposed to be spent with regards to, as I

12   said one inspection is two days.  He spent seven weeks in

13   China inspecting five or six facilities where he could

14   have spent two weeks.

15       Q.   Okay.  Let's just focus on my question.  Who

16   were the other people who had responsibility with respect

17   to quality assurance concerning Practical?

18       A.   Austin Lin was one of them.  I can't recall the

19   name of the other employee, I'm sorry.  Fernando, I

20   don't -- I can't recall his last name.  But two employees

21   that were basically in that group before I came they were

22   actually involved in quality and any one of us could

23   perform the same function.  So it could be Austin Lin, it

24   could be Fernando I'm not sure, and it could be me.

25       Q.   When you went and did the audit you said in

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 32

1    December of 2008 --

2          A.    Yeah.

3          Q.    -- were you alone or was there someone else

4    from P&G?

5          A.    No, I was not the main auditor ever.  I was --

6    I could audit, but I could audit only internally.  So the

7    reason why I was accompanied -- I was always accompanying

8    other auditors, and the main auditor was Lori Leach,

9    L-o-r-i, L-e-a-c-h, Lori Leach, and she was actually

10   appointed as a P&G auditor for all Duracell contractors

11   until we audit all of them.  So Lori Leach was always the

12   main auditor and she would be the one who would lead the

13   audit.  I was there only to help her from the technical

14   point of view because her background was from the dog

15   food.  You know, one of the things that P&G is involved

16   with, I think Iams, they bought that company, so she came

17   from that background.  She was excellent QA auditor but

18   she didn't have technical knowledge about --

19         Q.    With respect to flashlights?

20         A.    With respect to flashlights and batteries.  So

21   it was always somebody from our group would actually go

22   and accompany her because she lacked the technical

23   knowledge.

24         Q.    Is there somebody named River?

25         A.    River.  Yes, the River was -- he was a Chinese

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 33

1   person and he was also accompanying her sometimes, yes,

2   and he would accompany us or he was accompanying us on

3   the audit for Zhongshan factory, yes, because we didn't

4   know Chinese and sometimes it was important.  So River

5   was supposed to be part of my group.  As I said, I was

6   supposed to become section head and he was supposed to

7   report to me as well.

8        Q.   Did Lori ever report to you?

9        A.   No, no.  Lori was independent.  She came from

10  Ohio.  Whenever she went to trips she lived in Ohio and

11  she's a P&G employee, not Duracell.

12       Q.   All right.  Did River ever report to you?

13       A.   He was supposed to report to me, but no.

14       Q.   No, no.  Answer my question, sir.

15       A.   No, he never reported to me, no.

16       Q.   And how about Austin Lin?

17       A.   Yes, Austin was reporting to me, yes.

18       Q.   Did he report to you right up until the date of

19  your termination in June of 2009?

20       A.   Yes, yes; correct.

21       Q.   And how about a woman named Tanya?

22       A.   Tanya was not reporting to me again.  She was

23  supposed to, but, no.  And she accompanied us on our

24  audits in China, on our last audit in Emerson,

25  E-m-e-r-s-o-n, factory in China.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 34

1    Q.   And she was a quality assurance person as well?

2    A.   Yes, and she was also inspector that we used

3 very heavily on inspecting flashlights, Daylite

4 flashlights especially, before the shipments are sent to

5 U.S.A., but she actually worked same as River, she worked

6 in Chinese Duracell factory.

7    Q.   Now, the position that you held over the last

8 year of your employment as the QA manager reporting to

9 Kevin Babis --

10    A.   Yes.

11    Q.   -- would you consider that to be a very

12 important role for the company?

13    A.   Yes, it was important.  I wouldn't say very

14 important.  It was important, yes.

15    Q.   Okay.  And in that role that you were the

16 Duracell face from a quality point of view to the

17 contractors?

18    A.   Yeah.

19    Q.   And you had interaction with the contractors;

20 right?

21    A.   Yes, I had interactions with the contractors,

22 yes.

23    Q.   On important quality issues?

24    A.   On every quality issues, on each and every

25 quality issue, not just important or not important, every

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 35

1    quality issue, starting with any document, with

2    everything that you can imagine from the quality point of

3    view, so yes.

4        Q.   And your relationship with those contractors

5    was important for Duracell's business, right?

6        A.   Yes.  Yes, it was.

7            MR. CERASIA:  Why don't we take a break

8    because there are some documents here that Mr. Cicvara

9    gave us that we have not seen before.  They were never

10   produced to us.  So I'd like to make copies of these.  I

11   don't know if you want to look at them first.  I don't

12   know if you've seen them.

13           MR. SIKORSKY:  Yes, if you want to mark

14   them for identification.

15           THE VIDEOGRAPHER:  Off the record at

16   10:52 a.m.

17           (Recess:  10:52 to 11:09 a.m.)

18           (Cicvara Exhibits 1 through 3: Described

19   in Index - marked for identification.)

20           THE VIDEOGRAPHER:  On the record at 11:09

21   a.m.

22   BY MR. CERASIA:

23       Q.   Mr. Cicvara, I'm going to show you what's been

24   marked as Cicvara Deposition Exhibits Numbers 1 and 2.

25   If you'd take a look at Exhibit 1, it's a document

CICVARA v. PROCTER & GAMBLE                    December 21, 2010

Page 36

1    entitled P&G Worldwide Business Conduct Manual Receipt

2    Confirmation.

3         A.   Yes.

4         Q.   And my question is, is that your signature

5    there?

6         A.   Yes.

7         Q.   Okay.  And that's dated 12/12/2005; correct?

8         A.   Yes.

9         Q.   And the second document you have in front of

10   you is a copy of the Worldwide Business Conduct Manual.

11   Have you seen that document before?

12        A.   Sure, I did, yes.  I actually read it a couple

13   of times.

14        Q.   You read it a couple of times?

15        A.   Yes, trying to find certain things in it.

16        Q.   Did you read it when you were employed with

17   Procter & Gamble?

18        A.   Yeah.  Everybody had to read it, so.  This is

19   stating that I actually did read it.

20        Q.   Why don't you take a look at the -- put Exhibit

21   1 to the side for a minute.  Take a look at Exhibit 2.

22   If you go to at the bottom you'll see there's small

23   numbers in the bottom right-hand?

24        A.   Yeah, sure.

25        Q.   And I'll refer to those numbers so we know

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 37

1   we're on the same page literally, okay?

2       A.   Okay.   Excellent.

3       Q.   If you look at page 330, which is the letter to

4   Dear Fellow Employees.

5       A.   Yes.

6       Q.   If you look at paragraph 4, starting with the

7   sentence, P&G has been built through the character of its

8   people through generations.

9       A.   Sure.

10      Q.   Do you see that?

11      A.   Yes.

12      Q.   And then it refers to in our purpose, values

13  and principles; do you see that?

14      A.   Yes.

15      Q.   Have you heard of the PVPs before?

16      A.   Yes, I did hear about that.

17      Q.   Okay.   I'm going to show you what's been marked

18  as Exhibit 3, which is a copy of the PVPs, and tell me if

19  you've seen that before, sir.

20      A.   Yes, I've seen that before.

21      Q.   And you saw that while you were employed by the

22  company?

23      A.   I believe I did.   I can't really recall that I

24  read it carefully, but, yes, I did see it.

25      Q.   Go back to the letter I was reading from on

CICVARA v. PROCTOR & GAMBLE                     December 21, 2010

Page 38

1    Exhibit 2.  Put Exhibit 3 just to the side for a minute.

2    So in that sentence it says, in our purpose, values and

3    principles and in how well we live them as individuals

4    and as a company, right, and then it says It is

5    consistent with our historic principle of doing the right

6    thing, period.

7         A.   Yes.

8         Q.   Integrity, trust and respect for others have

9    been fundamental P&G values since the company was founded

10   in 1837.

11        A.   Yep.

12        Q.   Did you understand that P&G lived by the PVPs?

13        A.   Sure, and I actually lived by PVPs as well.

14        Q.   And you believe that as a management level

15   employee of Procter & Gamble that it was important for

16   you to act with integrity?

17        A.   Yes.

18        Q.   So that the contractors and people with whom

19   you dealt trusted you; right?

20        A.   Yes.

21        Q.   And it was important for you as a manager of

22   the company to treat others with respect; right?

23        A.   Yes.

24        Q.   And you would have expected any employee to

25   report to you to also carry out those PVPs; right?

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 39

1        A.    Yes.

2        Q.    And that applied regardless of who you were

3   dealing with, right, whether it was a fellow employee of

4   Procter & Gamble or whether it was a supplier or a

5   contractor; right?

6        A.    Sure.  Yeah, I would agree with that.

7        Q.    And do you believe that as a manager at P&G it

8   was your responsibility to be accountable for your own

9   actions?

10        A.    And for the action of people who reports to me

11   too, very accountable.

12        Q.    As a manager do you think it was appropriate

13   for the company to terminate the employment of

14   individuals who did not carry out the PVPs?

15        A.    It depends.  It depends of is the investigation

16   carried out in a proper way and if the person who would

17   be discharged was given the right or was given

18   opportunity to explain things, and if after that

19   explanation and he would be given an opportunity, the

20   people who are responsible for firing still think that

21   that's the right thing to do, yes, I would say that's the

22   right thing to do, yes.

23        Q.    So if there was a determination, if you as a

24   manager determined that somebody violated the PVPs, you

25   think it would be appropriate for you to terminate their

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 40

1   employment?

2        A.   I would like you to be much more specific in

3   what you just said.  What does it mean violate?  I don't

4   understand that at all.

5        Q.   Okay.  That's fair enough.

6        A.   Violation of PVP doesn't tell me anything, I'm

7   sorry.

8        Q.   Okay.  Why don't you look at the document

9   numbered Exhibit 2 on page PG 346.

10       A.   346, okay.

11       Q.   It's section 6, called behavior in the

12   workplace.

13       A.   Okay.  Yep.

14       Q.   Do you remember being familiar with this

15   harassment discrimination policy?

16       A.   I don't really particularly remember that, but

17   I probably read it, yes.

18       Q.   Did you understand as a management level

19   employee of Procter & Gamble that it was against company

20   policy to make sexual advances towards women?

21       A.   I'm sorry, I don't understand that question.

22   Could you be more specific.

23       Q.   Sure.  Did you understand in your role as, for

24   example, QA manager --

25       A.   Yes.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 41

1        Q.     -- did you understand during the time that last

2    year you were employed that company policy prohibited you

3    from making sexual advances towards either female

4    customers or contractors or employees?

5        A.     Yes, I understood that, yes.

6        Q.     And did you understand that you could be fired

7    from Procter & Gamble if you in fact had made sexual

8    advances towards female contractors or employees?

9        A.     It would depend on the circumstances I would

10   say.

11       Q.     What do you mean by that?

12       A.     I wouldn't say that straightforwardly if I made

13   any sexual advances to contractor that I would be fired.

14   I don't think that that's written anywhere in here.  If

15   you find it you can read it to me.  I would really

16   appreciate that.

17       Q.     If you look at the summary of company policy

18   statement.

19       A.     Where is the summary?

20       Q.     That's on this page that you're looking at.

21       A.     Okay.

22       Q.     It's on the left-hand side.

23       A.     Okay.

24       Q.     It says the company's fundamental position is

25   that all employees should treat their colleagues with

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 42

1    respect.

2         A.   Yes.

3         Q.   You agree with that; right?

4         A.   Yes, I would agree with that.

5         Q.   And then it says the company will not engage or

6    authorize its employees to engage in discrimination or

7    harassment.

8         A.   Yes.

9         Q.   You agree with that too; correct?

10        A.   Yes, I would, yes.

11        Q.   Okay.  And now if you look at the second column

12   it says what are some situations that raise concerns; do

13   you see that?

14        A.   Yes.

15        Q.   Okay.  In the second bullet point it says a

16   woman is made uncomfortable when subjected to sexually

17   offensive jokes and/or comments by her male co-workers,

18   possible harassment; do you see that?

19        A.   Yeah, I see it.  Possible harassment, yeah.

20        Q.   And you would agree that that would raise

21   concerns; correct?

22        A.   Yes, sure.

23        Q.   And then below that it says what are the

24   Worldwide Business Conduct Standards; right?

25        A.   Uh-huh.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 43

1      Q.    And then in parentheses it says what do I need

2   to do or refrain from doing?

3      A.    Yes.

4      Q.    It's kind of a guide to you, right, as an

5   employee?

6      A.    Oh, sure, and I would strongly agree that's a

7   guide, yes.

8      Q.    And it says one of the things don't engage in

9   discrimination or harassment?

10     A.    Agreed, yeah.

11     Q.    Did you understand under the company's policy

12  in its Worldwide Business Conduct Manual that if you made

13  an unwelcomed sexual advance towards a contractor that

14  that would be a violation of the policy?

15     A.    Yes, if I made unwelcomed sexual advances to

16  the contractor it would be violation of this policy, yes,

17  I do agree with that wholeheartedly.

18     Q.    And you would agree with me that that would be

19  serious misconduct; right?

20     A.    That would be a serious misconduct if I had

21  done that, yes.  If I harassed a contractor it would be a

22  serious misconduct, I would agree with that, yes.

23     Q.    And would you agree that that would be -- that

24  kind of conduct would be something that could injure the

25  company's relationship with the employee of that

Sanders, Gale & Russell
(203) 624-4157

CICVARA v. PROCTOR & GAMBLE                          December 21, 2010

Page 44

1    contractor?

2         A.   Well, it would depend on the circumstances.

3         Q.   But it could; right?

4         A.   Yeah, it could, I agree, it could, but it would

5    depend on the circumstances as I said.

6         Q.   Sure.  But would you agree with me that in your

7    position as a quality assurance that the contractors that

8    you dealt with it was important for you to establish a

9    trusting relationship with them on a business point of

10   view?

11        A.   Oh, yes, I would agree, yes.

12        Q.   And that if they didn't trust you as a quality

13   assurance manager that that would have a negative impact

14   on Duracell's business?

15        A.   Sure, I would agree with that.

16        Q.   And vice versa?

17        A.   And vice versa, yes, I would agree with that,

18   yes.

19        Q.   Because Duracell needed those contractors in

20   order to help it make a profit; right?

21        A.   Absolutely.  Absolutely.

22        Q.   So --

23        A.   Duracell needed those contractors, yes.  Don't

24   forget, though, that Duracell had many contractors and

25   some of them didn't like position that they were in, so

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 45

1   what I'm saying is Duracell didn't depend on contractors

2   to the point that it will affect their business at any

3   point.  Duracell always had very smart policy about

4   contractors and never put their eggs in one basket.  It

5   means like even if they lost Practical, even if they lost

6   Practical completely, it wouldn't affect that business at

7   all, because there was other -- there were other

8   companies that could have done the same thing as

9   Practical and they already had tools to do the same thing

10  as Practical.  I'm just saying that's --

11      Q.   That's your opinion?

12      A.   No.  That's my statement, and that's not

13  hypothetical, that's true.

14      Q.   Well, you don't know it's true because during

15  the time that you were at the company it never severed

16  its relationship with Practical?

17      A.   No, no.  I don't even know what happened with

18  Practical.  I'm just saying it is true, because of the

19  facts that I know about the equipment that is in

20  possession of certain other companies that they can do

21  things that Practical could do, but nevertheless I agree

22  with what you said, yes.

23      Q.   And it was also important for Duracell to

24  protect its reputation with contractors; correct?

25      A.   Correct, yes, and especially reputation as

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 46

1    being very straightforward with the things that were

2    performed in auditing, so that if the company A were

3    audited and company A had 60 then you would say company B

4    if it had 60 you would expect more or less the same

5    circumstances as the company A had.  So if B and A had

6    the same score you would expect that those two companies

7    are equitable.  It's very important.

8          Q.    As far as Duracell's reputation, it obviously

9    can only impact its reputation through its managers like

10   yourself; right?

11         A.    Yeah, through every employee, not just

12   managers.

13         Q.    Right, I understand.

14         A.    Yes.

15         Q.    But you as a manager, let's just focus on you

16   for a minute, your conduct impacted Duracell's

17   reputation, whether negative or positive; correct?

18         A.    Yes.

19         Q.    All right.  So that your -- what you wanted to

20   do is you -- your charge from the company, so to speak --

21         A.    Yes.

22         Q.    -- was to act in accordance with its PVPs so

23   that you would enhance its reputation in the industry;

24   correct?

25         A.    Correct, yes, and I actually did act in

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 47

1    accordance to PVP, and because I acted in accordance to

2    PVP I actually paid the consequences dearly, and I'll try

3    to explain that when the time comes.

4                   MR. CERASIA:  Mark this as Exhibit 4

5    please.

6                   (Cicvara Exhibit 4: Job description -

7    marked for identification.)

8         Q.   You can give me back Exhibit 2 for now.

9         A.   This too?

10        Q.   No, no.  I'm going to have you hold that right

11   now.  I have a couple questions about Exhibit 3.  So

12   you're on the page marked with 181; correct?

13        A.   Yes.

14        Q.   Okay.  And this is of Exhibit 3, the values,

15   and it lists five values here; correct?

16        A.   Yes.

17        Q.   Integrity, leadership --

18        A.   Yes.

19        Q.   -- ownership, passion for winning, and trust;

20   right?

21        A.   Yes.

22        Q.   And it was your responsibility as an employee

23   of Procter & Gamble --

24        A.   Yes.

25        Q.   -- to live by these five principles?

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 48

1       A.   Yeah, true.

2       Q.   No question about it; right?

3       A.   No question about it.

4       Q.   And you were judged in your performance on

5   whether or not you lived by these principles and values;

6   right?

7       A.   I wish I was.  I wish I was.

8       Q.   You don't believe you were?

9       A.   No.  I was until certain date in time and then

10   I was not, yes, especially when I was Manager of OEM

11   Business Services when Mani Parmar was my boss.  So I

12   wish I was, yes.

13       Q.   Right now I just want to focus on the last year

14   of your employment, okay, and if I'm interested in any

15   other aspects of your employment we'll go back to it by

16   date, all right, but I'm just interested about whether

17   when you were a quality assurance manager reporting to

18   Kevin.

19       A.   Okay.

20       Q.   Okay?

21       A.   Good.

22       Q.   All right.

23       A.   I'll try not to go there too much, but if I

24   need to explain something I'll probably go there.

25       Q.   You understood that as a quality manager that

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 49

1    you were always supposed to try to do the right thing;

2    correct?

3         A.   Yes, which I always did.

4         Q.   And that you knew that you had to be honest and

5    straightforward in your dealings with contractors?

6         A.   Yes.

7         Q.   And that you had to respect the employees of

8    those contractors with whom you dealt; right?

9         A.   Sure, I understand that.

10        Q.   And that you were held personally accountable

11   for your conduct towards those employees of contractors;

12   correct?

13        A.   Yes.

14        Q.   Why don't you take a look at what's been

15   marked as Cicvara Exhibit 4 --

16        A.   Yeah, okay.

17        Q.   -- which is a job description.

18        A.   This description was just for the few months.

19        Q.   This was the job description you had when you

20   reported to Harley Ballew?

21        A.   Yes.

22        Q.   And it was for the time period of roughly you

23   thought from March -- or, excuse me, April 1 until --

24        A.   July probably.

25        Q.   July of 2008?

CICVARA v. PROCTOR & GAMBLE                         December 21, 2010

Page 50

1       A.   Yes.  Just to be -- I don't even know, but just

2   to be straight.

3       Q.   Roughly about that time period?

4       A.   Roughly, yes.

5       Q.   I understand that it's your best guess.  Did

6   your job duties when you became a quality assurance

7   manager change at all from this job?

8       A.   Yes.  Yes.  They changed considerably, because

9   I got two employees who are reporting to me.  Before this

10  Austin Lin was not a person who reported to me, he was a

11  person who reported to Harley.  Francisco Restrepo was

12  the other which I couldn't remember.  So Francisco,

13  F-r -- Francisco is Francisco.  Restrepo is

14  R-e-s-t-r-e-p-o.  Okay.

15      Q.   So Francisco and Austin started reporting to

16  you when you became a quality assurance manager?

17      A.   Yes.

18      Q.   So they reported to you roughly your last 11

19  months of employment at Procter & Gamble?

20      A.   Roughly, yes, you're right.

21      Q.   Okay.

22      A.   And they brought certain things with them which

23  they used to do before which I couldn't agree with, which

24  particularly affected Austin Lin very heavily.

25      Q.   Okay.  Why don't you look at qualification

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 51

1    number 6 on Exhibit 4 right on the first page right at

2    the bottom.

3          A.    Okay.  It says -- could I read that?

4          Q.    You can read it to yourself right now.

5          A.    Okay, excellent.

6          Q.    Tell me when you're done.  You should read

7    anything I give you.

8          A.    Okay.  Thank you.  Yes.

9          Q.    So job qualification number 6, which refers to

10   the P&G Worldwide Business Conduct Manual?

11         A.    Correct.

12         Q.    Do you believe that that was one of your job

13   qualifications when you were --

14         A.    Sure.

15         Q.    You've got to let me finish.

16         A.    Yeah, I believe that was.

17         Q.    You've got to let me finish.  Do you believe it

18   was one of your job qualifications when you were a

19   quality manager from July of 2008 through June 15th,

20   2009?

21         A.    Yes.  It was my duty to do according to this

22   not only from July to June 2009, but I would say

23   throughout my employment.  So that is nothing new there.

24         Q.    So job qualification 6 applied to every

25   position you held at the company?

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 52

1        A.   Yes, every position, and not only me but every

2   employee.

3        Q.   I understand.

4        A.   So if I find that employees who are not doing

5   their job according to this, it's my duty to report that

6   too, which I did.

7        Q.   Can you give me Exhibits 3 and 4.

8        A.   Yes.

9        Q.   I'm done with those for now.

10       A.   Sure (handing.)  Okay.

11       Q.   I just want to make sure that, you know, you

12   don't leave home with them, it's a holiday present or

13   something.

14       A.   Yeah, I have that at home.  Don't worry about

15   that.

16       Q.   When did you first meet Bel?

17       A.   You mean first -- I think in September 2008

18   when Practical visited Duracell with respect to Daylite

19   development.

20       Q.   Right.  And when I refer to Bel, you understand

21   I'm speaking about Bel you pronounce her name Liu?

22       A.   Yes.

23       Q.   L-i-u?

24       A.   L-i-u, yes.

25       Q.   I'll refer to her as Bel, though, okay?

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 53

1        A.    Okay.

2        Q.    All right.  So you first met her in September

3   of '08 when she came to Bethel, Connecticut?

4        A.    Yes.

5        Q.    Between September of '08, counting that trip,

6   until your last day of employment on June 15th of 2009,

7   how many times did you -- how many different trips did

8   you see Bel on?

9        A.    Two.

10       Q.    Two?

11       A.    Yes.

12       Q.    When else, other than September of '08 when was

13   the next time?

14       A.    The next time was December 2008 in China and

15   then it was June 2009 first in Indonesia and then in

16   Thailand.

17       Q.    So you saw her a total of three times?

18       A.    Yes.

19       Q.    Three different times?

20       A.    Three times, yes.

21       Q.    Multiple-day trips some of them; right?

22       A.    Correct, yes.

23       Q.    And what was her role within Practical as you

24   understood it?

25       A.    That was, as I understood she was general

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 54

1   manager of Practical, and if I'm not mistaken she became

2   vice president of Practical recently, but I'm not sure.

3        Q.   So while you knew her during that, you know,

4   eight, nine month period she was a general manager at

5   Practical?

6        A.   Yes, she was general manager at Practical.

7        Q.   Do you know what her job responsibilities

8   entailed?

9        A.   She was always in contact with design people in

10  Duracell, with marketing people in Duracell, with program

11  management in Duracell, with purchasing people in

12  Duracell, with QA people in Duracell.  So she was

13  basically in contact with everybody in Duracell,

14  everybody, very, very -- position which entailed many,

15  many different venues, and she was very strongly aligned

16  with Austin Lin.

17       Q.   What do you mean by strongly aligned?

18       A.   I mean that during the course of 18 months that

19  I was without work, since I was fired, I learned a lot of

20  things about Austin Lin and Bel Liu, but I actually

21  noticed things even before that.

22            So, for example, in September when she visited

23  Duracell she -- Austin Lin was not there, he had to go

24  somewhere, but she told me that Austin bought a bag for

25  her and that he told her that I will show her how to come

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

1    to his office to pick up the bag.  So she went in and

2    she -- I actually showed her the way and she picked up

3    the bag.  In the meantime she told me that Austin is very

4    good friend of her, and she told me that repeatedly,

5    many, many times.  She had a relationship with Austin

6    Lin, a relationship.  I'm not sure what the level of that

7    relationship was, but it was certainly stronger than

8    relationship that she had with me.  And there are

9    witnesses who could say that in summer 2008 Bel Liu tried

10   to seduce Dave Mathieu and in those attempts to seduce

11   Dave Mathieu she actually showed him very -- I don't know

12   how to say that politely, but raunchy e-mails from Austin

13   Lin that she received and she showed them to Dave trying

14   to make him jealous, and there are witnesses who can say

15   that, including Dave Mathieu, who was the one who was

16   object of her intense desire to have a relationship with

17   him.

18          That's about -- what I know about Bel Liu is

19   that she is a very complex person.  She had relationship

20   with Austin Lin, she wanted to have a relationship with

21   Dave Mathieu, but then Brian Hesse, H-e-s-s-e, who was in

22   contact with Dave and who was in charge of Daylite design

23   program advised Dave not to get into relationship with

24   Bel because his opinion about Bel was that she wants to

25   control people in Duracell so that they have control of

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 56

1   Practical business with Duracell through the people that

2   she's interacted with.

3          Q.    Do you claim that Brian ever told you that?

4          A.    Yes, he told me that, and he's ready to testify

5   about that, and he also saw the e-mails from Austin Lin

6   sent to Bel Liu.  And about Austin I have to tell you

7   something.  Austin, and you probably know because I

8   noticed you are laughing --

9          Q.    I'm not laughing, sir.

10         A.    You were, you know, grimacing.

11         Q.    Okay, whatever.

12         A.    Whatever, yeah, I would say so.  But Austin Lin

13  lied on his expense report to the company when he went in

14  China and Korea in March and April 2009.  He went to

15  Seoul, Korea, and he spent seven days there for a meeting

16  that lasted one hour, and the reason why he did that is

17  that he had a girlfriend, his girlfriend lives, she lives

18  in Seoul, in Korea, and he spent seven days with her on

19  account of the company.  He also spent four days a week

20  before that, after they finished their work in Fushun, in

21  China, and I don't know how to spell that correctly but

22  that's where the Nanfu factory is which is owned by

23  Duracell, he spent last four days there in a resort,

24  hotel, you know, resort in China, paid for by P&G, and

25  seven days after that in Seoul paid for by P&G.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

1            I caught him lying on his expense report.

2    Kevin Babis knows about this.  My big mistake was I

3    didn't go to human resources to tell them about this, I

4    went to my boss, who was Kevin Babis and told him, look,

5    we have a problem with this guy, and then we resolved the

6    problem eye to eye with Austin Lin, and he actually

7    admitted to whatever he was doing, he took some days

8    vacation, Kevin Babis, you know, said we will give you

9    two or three days, it doesn't matter, you had a tough

10   assignment in Nanfu, which is true, and he didn't like me

11   after that at all, so this might play a little bit of

12   what happened after that.

13            And by the way, I want to tell this because

14   it's important.  Please let me finish.

15       Q.   No, no.  There's no question pending, sir.

16       A.   Oh, I'm sorry.  We will come to that at some

17   point, so then I'll tell you.  Just go on.

18       Q.   All right.  Other than seeing Miss Liu on three

19   separate trips or occasions that you've identified,

20   September and December 2008, June 2009, did you speak

21   with her on the phone?

22       A.   Oh, sure, yes.

23       Q.   Regularly?

24       A.   No, no, no, we never spoke regularly on the

25   phone.  I spoke to her on the phone when she asked me to

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 58

1   help her about that case when the shipment was rejected.

2   She directly asked me to try to help her with that, and I

3   said, look, it is my position as a QA manager of P&G that

4   this is very straightforward and it is -- the one who is

5   responsible is Practical and you guys will have to

6   have -- you know, to brunt the consequences for that.

7          She also called me from Spain, I believe it was

8   January 22, and I know for sure it was January 22 because

9   on that record I found that I called her BlackBerry, she

10  just got BlackBerry and she was very excited about that

11  and she wanted to try it, so she called me from the

12  normal phone to my office phone asking me to call her in

13  Spain on the BlackBerry number, which I did, just to try

14  the number, and by the way she was in Spain on the trip

15  and she asked me if I can help her with that.  Do you

16  want me to continue or you want me to answer the

17  question?

18      Q.   Well, number one, I just want you to answer the

19  question, but you've identified January 22, I assume

20  that's 2009?

21      A.   Yes.

22      Q.   Because before September of 2008 you didn't

23  know Bel, did you?

24      A.   No.  Maybe I did know Bel as a person in

25  Practical, maybe we exchanged some e-mail messages about

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 59

1   quality assurance, the requirements which I sent

2   regularly to everybody.  In that sense, yes, but not in

3   person.  So first time I saw Bel was in September 2008,

4   yes.

5       Q.   Okay.  Between September of 2008 and the next

6   time you saw her in December of 2008 when you saw her in

7   China, did you have any phone contact with her then?

8       A.   No, not phone contact, just e-mails, and

9   e-mails were going back and forth about when are we going

10  to come to audit Zhongshan factory, and that was just

11  part of the trip where we were actually auditing five

12  companies within a span of probably from Monday through

13  Friday, so 13 or 12 days in China.

14      Q.   Okay.  There were e-mails of a business nature

15  between September and December of 2008; right?

16      A.   Yes.

17      Q.   Okay.  And how about between the trip in China

18  and January 22nd, 2009, did you have any phone calls with

19  Bel?

20      A.   I didn't have any phone calls.  I had a lot of

21  e-mails because she sent e-mails to me.

22      Q.   Okay.  Hold on.  Just answer my question.  My

23  question dealt with phone calls, okay?

24      A.   No, I didn't have any phone calls I'm pretty

25  sure.  Oh, there were phone calls in December, yes, but

CICVARA v. PROCTOR & GAMBLE                     December 21, 2010

Page 60

1    not after that.

2        Q.   Okay.  Well, I'm asking once you left the China

3    trip in December of '08 and January 22 of 2009 if there

4    were any phone calls.

5        A.   No, not that -- I can't recall that, no.

6        Q.   Okay.  Let's go back to the January 22, 2009

7    call.

8        A.   Yes.

9        Q.   So did you call her to see if her new

10   BlackBerry would work?

11       A.   Yes.

12       Q.   Did you have a conversation with her then?

13       A.   Yeah, I had a conversation about how are you

14   doing and what were you doing.  I believe they were in

15   Barcelona, and since I was in Barcelona I think I asked

16   her if they've seen Sagrada Familia or some other stuff

17   there, you know, like Casa Mila or some other things that

18   Gaudi did.  K-a-u-d-i, that's an architect in Spain.

19       Q.   How long did that conversation last?

20       A.   I don't know.  A few minutes.  It was just to

21   check, nothing else.  And I was very surprised --

22       Q.   Okay, I don't have any questions pending, okay?

23       A.   Okay.  We'll come to it.

24       Q.   And then you said that there was a conversation

25   that you had with her in May of '09 that dealt with the

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 61

1    rejected shipments as a result of the poor packaging?

2         A.    Correct; yes.

3         Q.    Okay.  Let's talk between January 22nd, 2009

4    and the conversation you had with her in May, do you

5    recall any phone calls with her during that time?

6         A.    No, I don't.  It's possible, but I don't

7    recall, and even if it was, it was business, and I don't

8    recall I actually had, but there were many, many e-mails,

9    many e-mails going back and forth, especially from her,

10   especially from Spain, many e-mails in March about her

11   buying a motorcycle and trying to ask me to get her -- is

12   she going to buy black or white or red, many e-mails

13   about certain gentleman who broke her heart, older

14   gentleman who promised to her that he's going to bring

15   her to United States with him and then he dumped her for

16   his girlfriend which actually later on became his wife.

17   She never told me she's married and it seems that her

18   trip to Spain was actually her wedding trip.  Never told

19   me she was with her husband.  In December she told me she

20   was not married and she actually married in December.  I

21   learned that later.  And she married because her boss

22   told her to marry in order to prevent the rumors between

23   her and her boss.  That's her word, and I'm under oath.

24        Q.    You claim she told you that?

25        A.    Yes, she told me that.  Her boss told her to

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 62

1  marry her husband.  She didn't like her husband, she just

2  married him.

3      Q.   Who do you claim her boss was?

4      A.   Her boss is Andrew Yau.

5      Q.   Andrew Yau?

6      A.   Andrew Y-a-o or u, I'm not sure.  I'm not sure.

7  I think it's u.  That's kind of weird, isn't it?  Oh, by

8  the way, she also asked me --

9      Q.   There's no question pending.

10     A.   Yeah.  I'm trying to explain about her

11  character.

12     Q.   Yeah, I understand, but, you know --

13     A.   I think it's very important for the story.

14     Q.   Mr. Cicvara, let me explain something.

15     A.   Yes.

16     Q.   Did you ever get invited to a party?

17     A.   Oh, yeah.

18     Q.   Okay.  And you go to somebody's house for a

19  party, right?

20     A.   Uh-huh.

21     Q.   Yes?

22     A.   Yes.

23     Q.   Okay.  And the host throws the party?

24     A.   Sure.

25     Q.   Decides what drinks to give, what food to

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 63

1  provide; correct?

2       A.   Yeah, yeah.

3       Q.   You don't tell them what drinks to provide,

4  what food to provide?

5       A.   Oh, if I like certain drinks I would tell them.

6       Q.   Beforehand?

7       A.   I would tell them, you know, I like this

8  particular wine, if you have it I would be really happy.

9       Q.   Okay.  I get that.  You know, today I'm taking

10  your deposition, it's like my party.

11       A.   Oh, I'm sorry, I didn't catch it.  Okay.

12       Q.   I get to ask the questions that I want to ask.

13  You may not like my questions, you might think I should

14  ask you other questions, but it's my prerogative.

15       A.   Oh.

16       Q.   Okay?  So I'm going to ask you the questions, I

17  want you to answer them, because the more and more you

18  just keep speaking the longer we're going to be here.

19       A.   I don't mind.  I thought --

20       Q.   You may not mind --

21       A.   I thought --

22       Q.   Excuse me.  I'm not done, sir.

23       A.   I thought the issue here is to learn the truth,

24  isn't it?

25       Q.   Okay.  I'm going to ask you the questions,

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 64

1    you're going to answer them.  I don't want you to keep

2    going on and talking about other things that you think

3    are important.

4         A.   Why?

5         Q.   Because that's not what we're doing here today.

6    You're here to answer my questions.

7         A.   Oh, I'm really sorry.  I thought we are here to

8    learn the truth about the case.

9              MR. SIKORSKY:  Just for the record let me

10   say --

11        Q.   I do want you to testify to the truth, but

12   you're answering my questions, you're not just here to

13   give a speech and a narrative, okay?

14        A.   Okay.

15             MR. SIKORSKY:  But I would want to make

16   it clear that I listened carefully to the responses of my

17   client, I think the questions are very frequently

18   open-ended, for example on the whole relationship with B,

19   you asked general questions and he's tried to be as

20   honest as he could about answering them.

21             MR. CERASIA:  I haven't said anything

22   about his honesty.  I just want him to answer my

23   questions.

24             MR. SIKORSKY:  All right.  He will do

25   that, but he will also answer them as completely as

Sanders, Gale & Russell
(203) 624-4157

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 65

1    they're called for.

2              MR. CERASIA:  Many of them call for

3    one-word answers, yes or no, and he goes on for two

4    pages, so I don't think it's necessary.

5        A.   Well, I'm really sorry.  I think this is the

6    time to tell the truth about this.  You know, I didn't

7    have time to tell the truth in ten minutes interrogation

8    that was done on June 15th.

9        Q.   Okay.  There's no question, Mr. Cicvara, okay?

10       A.   Okay.

11       Q.   On the trip -- or, excuse me, the time that you

12   saw Bel Liu in September of 2008, did you ever kiss her?

13       A.   No.

14       Q.   Did you ever hug her?

15       A.   No.

16       Q.   How about in December when you saw her in

17   China, did you ever kiss her?

18       A.   No.

19       Q.   Or did you ever hug her?

20       A.   No.

21       Q.   How about when you saw her in June of 2009, did

22   you ever hug her?

23       A.   Well, I hugged her when I saw her in the

24   airport like I hug the other people as well, hi, how are

25   you, yes, I did.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 66

1      Q.   You only hugged her once?

2      A.   No.  I hugged her many times and she hugged me

3  too.

4      Q.   Okay.  Did you ever kiss her --

5      A.   No.

6      Q.   -- on the trip -- excuse me.  You've got to let

7  me finish.  Remember we had that rule from the beginning?

8      A.   You said did I ever kiss her.

9      Q.   Excuse me.  I didn't finish.

10      A.   My answer is no.

11      Q.   You didn't let me finish.

12      A.   I'm sorry.  Then finish.

13      Q.   My question was going to be, you might have

14  anticipated it, as I told you at the beginning of the

15  deposition you would, but my question was on the trip in

16  June of 2009 did you ever kiss her?

17      A.   No.

18      Q.   Did you ever try to kiss her on the trip in

19  June of 2009?

20      A.   No.  I have never tried to kiss her on my trip

21  in June 2009, and I have very specific reasons for why I

22  didn't try to kiss her.  Do you want to hear the reason

23  or it's enough to say no?

24      Q.   I haven't asked you any more questions.

25      A.   Okay.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 67

1      Q.   How many times do you claim that you hugged her

2  on the trip in June of 2009?

3      A.   I don't know.  I can't claim.  Maybe two or

4  three times.  She hugged me.  She put her hand on my

5  thigh when we were driving in the SUV in Indonesia.  Then

6  she told me you don't like Austin, do you?

7      Q.   Don't like what?

8      A.   You don't like Austin, do you?  And I said why

9  would you say that?  And she said he told me that, you

10 don't like him, do you?

11     Q.   What was your response?

12     A.   I said we had our, you know, disagreement on

13 certain issues, but I like Austin as much as anybody else

14 in the company.  So I was trying to be, you know, polite

15 and give her a polite answer about that.

16          Oh, by the way, that thing about Austin, he

17 also wanted to --

18     Q.   There's no question.

19     A.   Okay.  Sorry.  I just tried to put things into

20 perspective.

21     Q.   No question.  When you hugged Bel on the trip

22 in June of 2009 was there anybody present when you hugged

23 her?

24     A.   I don't recall.  I don't think there was

25 anybody present when I hugged her, no.

CICVARA v. PROCTOR & GAMBLE                          December 21, 2010

Page 68

1       Q.    One time --

2       A.    Except that time at the airport.

3       Q.    So one time was at the airport?

4       A.    Yeah.

5       Q.    And where were the -- what were the other

6   times?

7       A.    Well, the other times were on June 8th in the

8   room, you know, in that room.

9       Q.    When you say in that room, you're referring to

10  her hotel room?

11      A.    Yes, to the hotel room where she invited me to

12  come.  This is very important.  I would like you to put

13  that in.  She invited me to come to the room.

14      Q.    Did you ever -- when you hugged her did you

15  ever put your hands on her body other than her back?

16      A.    No.  No, I never touched her body.  I never

17  touched her breasts, if you mean that.  I never touched

18  any part of her body which would be considered private,

19  never.  I touched her back, I touched her legs, I

20  massaged her feet for a while, which I'm actually ashamed

21  of doing because I usually do that to my wife, ashamed of

22  doing now, but I never touched her body in a sexual

23  sense, never.

24      Q.    Why did you massage her legs and her feet?

25      A.    Because she told me that she felt bad, that she

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 69

1    felt -- she didn't feel good, and when I came to her

2    room --

3        Q.   Was that in her room?

4        A.   Yes.  When I came to her room, she opened up

5    dressed very inappropriately.  When I say that I mean she

6    was dressed nearly undressed and it was very, very

7    unusual because I was before in her room and she would

8    never be dressed like that, especially when she called me

9    to come.

10       Q.   Okay.  What do you mean by she was dressed

11   inappropriately?

12       A.   She was dressed in shorts which was very, very

13   short, very, very short, naked legs, dressed in a blouse

14   which was white, clear basically, nearly clear, so you

15   would -- you know, you would kind of see her through it,

16   and I was very surprised because the reason I actually

17   asked her can I come to your room to have dessert with

18   you, before that we had dinner and after dinner there was

19   a special dessert brought to each of us which was mango

20   with rice, which was very special, which was special

21   dessert for Thailand.  I sent text message to her asking

22   her I would like to come to your room to have dessert

23   with you.  The second text message was I don't want you

24   to come, I'm tired.  The third was, okay, I accept that,

25   from me.  The fourth was I changed my mind, you can come

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 70

1   to my room.  And the fifth was, okay, I'm coming.  All of

2   that within a span of five minutes and all of that I gave

3   you the proof on that -- those two pages of text

4   messaging.

5           Just for the record it says that all messages

6   are outgoing there, but there is a technical explanation

7   about that, which is -- oh, I think it's very important.

8   Again you can laugh.

9       Q.   I'm smiling because, you know what, you're

10  going on and on and on.  I can't even get a question in.

11  You're talking about subject matters that --

12      A.   You know why I'm going on and on and on,

13  because I was told --

14      Q.   Excuse me.

15      A.   -- that I came to her room unannounced, which

16  is not true, and I felt very strongly about that.

17      Q.   I'm asking you very simple questions and you're

18  going on to talk about -- giving answers to questions I

19  never even asked.  So here's my question --

20      A.   But it's very important.

21      Q.   It might be important, and I never said we

22  won't get to it, but can you please just answer the

23  question?

24      A.   I'll try to.  Sorry.

25      Q.   All you just talked about, the exchange back

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 71

1    and forth by text messages, was this June 8th, 2009 that

2    you're referring to?

3        A.   Yes, it was June 8th, 2009 between 8 -- I would

4    say 8:50 p.m. Thailand time and 9:05 p.m. Thailand time,

5    so in the span of five or ten minutes.  That time,

6    Pacific Time is between 7:00 something a.m.  I'm telling

7    that because everything that you have, all the trace of

8    records that you have, phone records, are Pacific Time

9    U.S.A. and there is a 14 hours difference.  It's not that

10   easy to decipher.  It's very important, though.

11       Q.   And when you said you massaged her feet and her

12   legs, that was on June 8th, 2009?

13       A.   Yes.

14       Q.   Is that the only time that you claim that you

15   touched her other than hugging her?

16       A.   Yes.

17       Q.   You never touched her any other time?

18       A.   No, not in that sense, no.

19       Q.   Did she ask you to massage her feet?

20       A.   She didn't object.

21       Q.   Did she ask you to massage her feet?

22       A.   No.

23       Q.   Did she ask you to massage her legs?

24       A.   I didn't massage her legs, just her back.  I'm

25   sorry.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 72

1      Q.    I think you testified that you massaged her

2   feet and her legs.

3      A.    I didn't massage her legs.  I massaged her feet

4   and back.

5      Q.    And her back?

6      A.    Yeah.

7      Q.    Did she ask you to massage her back?

8      A.    She didn't ask me to massage anything, but --

9      Q.    You just -- so you did it on your own?

10      A.    Yes, I did it on my own, yes.

11      Q.    Okay.  And do you think it was appropriate for

12   you as a quality manager to massage the feet of a general

13   manager for a contractor?

14      A.    In the circumstances that we were on, yes, in

15   the circumstances that we were on I would say that,

16   because she did -- as I said she touched my leg when we

17   were driving in the SUV in Indonesia.

18      Q.    You said she touched your tie.

19      A.    (Indicating.)

20      Q.    Oh, your thigh?

21      A.    Thigh, not this tie (indicating).  She put her

22   hand on my thigh.  She was sitting in front.  I was

23   sitting in back.  She put it and she actually did grab my

24   thigh, and the man who was next to me who was auditor in

25   Indonesia, Dave Arnsperger -- girl, I'm not sure how to

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 73

1    spell it, I'll try to spell it if it's important -- he

2    might have seen that and he didn't say anything, he was

3    polite.

4         Q.   You don't know if he saw it?

5         A.   I don't -- I think he saw it, he just was

6    pretending that he don't see it.

7         Q.   Did you ask him if he saw it?

8         A.   No, I didn't, I didn't.  I made the mistake of

9    not evidencing certain things.

10        Q.   How many days before you decided to massage her

11   feet and her back do you claim that she touched your

12   thigh?

13        A.   I'll tell you exactly the dates.  Just let me

14   think about that.  I started in Indonesia on some other

15   company and I started it on Tuesday, January 2nd I

16   believe, so January 2nd -- no, June 2nd and June 3rd,

17   2009 I was in that other company in Indonesia, then we

18   flown to Medan, Indonesia, so I think it was -- it was

19   Thursday June 4th or 5th, I don't know.

20        Q.   So three or four days before you massaged her

21   feet and her back you claim she touched your thigh?

22        A.   Yes, and she put her head here (indicating),

23   she leaned on me when we were driving in taxi in

24   Singapore.  She did many, many things that were kind of

25   like this is allowed between us.  Also she claimed I

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 74

1    actually held her hand, you can read that in her

2    statement, she actually held my hand when we were coming

3    out and then she let it go and then she --

4        Q.    Let's try to focus day by day, okay?

5        A.    Okay.

6        Q.    Because you're going all over the place.

7        A.    Okay.  Good.  We'll try to focus.

8        Q.    So between June 4th or 5th and June 8th was

9    there any kind of physical touching between the two of

10   you?

11       A.    Physically just what I explained right now.

12       Q.    Her hand on your thigh?

13       A.    Her hand on my thigh, her head on my shoulder

14   (indicating), leaning on me in taxi.

15       Q.    Was anybody else in the taxi or just the two of

16   you?

17       A.    No.  Just the two of us.

18       Q.    Where were you going or coming from?

19       A.    It was in the taxi in Singapore.  That was not

20   in Indonesia.  That was when we were coming from the

21   airport to Singapore and it was when we were leaving

22   Singapore as well.  It was in the plane from Medan,

23   Indonesia to Singapore as well.

24       Q.    She put her head on your shoulders?

25       A.    Yes, she did.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

1      Q.    Did you ever tell her not to do that?

2      A.    No, I didn't.

3      Q.    Why not?

4      A.    Because, as I said, there were exchanges of

5  numerous e-mails where, you know, I came to basically

6  become close to her through those e-mails and I would say

7  it was mostly on her part, I never, you know, went into

8  the intimate details about my life but she went into

9  intimate details about her life.  As I said, she did say

10  in her e-mails that there was an older gentleman she had

11  a relationship with that broke her heart in March.  She

12  did say in e-mail that she went to Rod Stewart concert in

13  Hong Kong in March.  She did ask me about what kind of

14  motorcycle should I buy, this or that, she sent me a

15  picture of that.  She sent me a picture with Brian Hesse

16  and Dave Mathieu and her being on the resort in Thailand

17  in summer 2008 when she proposed to me, when I said I

18  will have to schedule the audit of Practical in Thailand,

19  she said when we finish audit I offer you a weekend in a

20  resort in Thailand, which I didn't know what to do with

21  that, I didn't even know how to tell my wife, should I

22  tell her, how to explain that I'm staying a weekend

23  after.  I didn't ever respond to that e-mail because I

24  didn't know what to respond.  It was very unusual to me

25  that somebody is offering that, like we can spend

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 76

1    weekend.

2         Q.   But you didn't stay away from her, what you did

3    was you then went to her room four days later and you

4    rubbed her feet and her back, right?

5         A.   No, I didn't.   Yes, I didn't stay away from

6    her, and that was --

7         Q.   Why not?

8         A.   Because I -- basically to a point I believe I

9    was attracted to her, yes, and she actually played the

10   attraction card with me pretty strongly.

11        Q.   So you wanted to have a relationship with her

12   that was other than business, right?

13        A.   I am not sure that that's a correct statement.

14        Q.   Let me ask you this, Mr. Cicvara.   You had been

15   employed at that point for about eight-plus years by

16   Procter & Gamble; correct?

17        A.   Yes.

18        Q.   Had you ever had any occasion prior to then

19   where you would give a massage either on the feet or the

20   back to any other contractor or supplier or employee of

21   Procter & Gamble?

22        A.   No.   No.

23        Q.   Okay.   So this was -- according to you this is

24   the first time that you ever engaged in that kind of

25   conduct?

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 77

1      A.   Yes.  Yes.

2      Q.   Isn't it true that at that time you wanted to

3  have a relationship with Bel that was other than a

4  professional relationship?

5      A.   As I said, I'm not really sure that that's --

6  the way you said it it's true.  I would agree that there

7  was something going on, yes, but I'm not sure that I

8  wanted to have a relationship.  It just happened that

9  that day was very unusual behavior of her which actually

10  probably prompted me to think that there could be

11  something between us more than just friendship, and

12  according to her it was wrong.  According to her it was

13  wrong.

14      Q.   Okay.  Did you feel coerced into rubbing her

15  feet?

16      A.   No.

17      Q.   Did you feel coerced into rubbing her back?

18      A.   No.

19      Q.   You did that voluntarily?

20      A.   Yes.

21      Q.   Do you believe that was consistent with the

22  PVPs, that you would massage --

23      A.   I wouldn't --

24      Q.   Excuse me.

25      A.   I wouldn't agree with that.

CICVARA v. PROCTOR & GAMBLE                          December 21, 2010

Page  78

1        Q.    Excuse me.

2              That you would massage the feet or back of a

3     general manager of a contractor, do you think that was

4     consistent with the PVP?

5        A.    That is a very convoluted question.  I'm not

6     sure how to answer that.  I don't think that there is

7     anything in PVP which says anything about massaging feet

8     of anybody, but if you want me to answer that question I

9     would say that under the circumstances, under what was

10    going on in e-mails from her in the last six months

11    before that, I wouldn't think that that's something that

12    would violate any PVP values or anything that was written

13    in the conduct manual.  My behavior certainly didn't

14    violate that.  What I violated is my wife's trust.  That

15    I -- you know, there is nothing I can say about that.  I

16    am very ashamed of what I did to my wife.  But I'm not

17    ashamed of what I did to her and I never in any

18    circumstances crossed the line of doing something

19    inappropriate, doing -- whenever -- if she said no, I

20    would stop doing things, if she said no.  And when she

21    said no I did stop doing things.  So I wouldn't say that

22    that was violation of PVPs, no, and I wouldn't say that

23    was violation of conduct manual, no.

24       Q.    You wouldn't?

25       A.    No, I wouldn't.

Sanders, Gale & Russell
(203) 624-4157

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 79

1       Q.   Do you think that a personal relationship --

2  did you consider what you had with her as a personal

3  relationship?

4       A.   Yes, to a point, yes.

5       Q.   Would you describe it as a romantic

6  relationship?

7       A.   It's possible, yes.  I wouldn't deny that.

8  Yeah, it's possible to describe it that way.

9       Q.   Let me show you page PG 359 of Exhibit 2, the

10  business conduct manual, all right?

11      A.   Okay.

12      Q.   If you look at that document, it talks about --

13  the title of it is business, financial and personal

14  relationships, right?

15      A.   Okay.

16      Q.   And on the left-hand side it says all employees

17  are obligated to act at all times solely in the best

18  interest of the company, right?

19      A.   Yes, which I did, in the best interest of the

20  company.

21      Q.   Okay.  And then the right-hand side at the top

22  it says what are some situations that raise concerns, do

23  you see that?

24      A.   Yes, I see that.

25      Q.   Look at the sixth bullet point down which is

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 80

1    the second from the last.

2         A.    Uh-huh, yes, when an employee, okay.

3         Q.    When an employee has a romantic relationship

4    with a current or a potential supplier, contractor or

5    customer or an employee of any such entity when the

6    company employee has direct or indirect decision-making

7    authority or influence with respect to the underlying

8    business relationship.

9         A.    Yeah, okay.  What was -- what's the point?

10        Q.    You had a -- the point is you knew that this

11   was against company policy; correct?

12        A.    No.

13        Q.    You didn't know that having a business --

14   having a personal relationship with a --

15        A.    When the company employee --

16        Q.    Excuse me, I'm not done.

17        A.    -- has direct or indirect decision-making

18   authority.

19        Q.    Sir, I'm not finished.  You need to let me

20   finish my question.

21        A.    Oh, I'm sorry.  I thought that you are reading

22   this paragraph.

23        Q.    I did.  Now I have a question.

24        A.    Okay.

25        Q.    Okay.  You understood as an employee of

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 81

1   Procter & Gamble that it was against company policy for

2   you to have a romantic relationship with an employee of a

3   contractor; correct?

4        A.   No.   It's when the company employee has direct

5   or indirect decision-making authority or influence with

6   respect to the underlying business relationship.

7        Q.   You had no such authority?

8        A.   No.   I don't have any authority.

9        Q.   You had no authority with respect to that

10  relationship?

11       A.   No.   No.   With respect to the business

12  relationship between Duracell and Practical, I'm not in a

13  position to offer any orders to that employee, I'm not in

14  the position to do any decision that may harm them or --

15  decision making, I'm talking about decision making here,

16  or put that company into better position with respect to

17  Duracell, and I have never done that.

18       Q.   Okay.

19       A.   So, yes, I agree there was a romantic -- not --

20  kind of emotional relationship, but not of this kind.   I

21  didn't use that relationship to advance Practical to a

22  better standing or worse standing.   Actually I was very

23  straightforward with Practical on audit on June 8th,

24  which might have strong consequences on what happened

25  that night and what happened after that.

CICVARA v. PROCTOR & GAMBLE                        December 21, 2010

Page 82

1       Q.    Okay.  Do you claim that you had no involvement

2  whatsoever in decisions that were made between Duracell

3  and Practical?

4       A.    Not in these kind of decisions, no.

5       Q.    What do you mean in these kind?

6       A.    Let me read.

7       Q.    I didn't ask you a question about the policy.

8  I asked you a question do you claim that you had no

9  involvement in any decision making with respect to the

10  relationship between Practical and Duracell.

11       A.    I can only voice my opinion.  I don't have

12  decision authority, yes, I don't have it.

13       Q.    I didn't say decision-making authority.  I

14  asked you whether or not you had any involvement in

15  decisions that impact the relationship between Practical

16  and Duracell?

17       A.    Yeah, I have it, but I didn't -- that never

18  affected those decisions.

19       Q.    I didn't say that.  But your quality auditing,

20  for example, could impact the relationship between

21  Practical and Duracell; correct?

22       A.    Yes, it could, but don't forget I'm not the

23  leading auditor, I'm there just in technical capacity, so

24  I'm there just to offer technical explanation of things.

25       Q.    Do you claim that Bel ever -- strike that.  Did

CICVARA v. PROCTER & GAMBLE                    December 21, 2010

Page 83

1  Bel ever tell you to stop massaging her feet or her back?

2      A.   She never told me to stop.  She did tell me

3  once don't do that anymore, and when she told me I didn't

4  do it anymore.  And actually, as I said, I was kind of

5  ashamed of myself for doing that anyway, so.

6      Q.   Do you claim that you only touched her back and

7  her feet?

8      A.   Yes.

9      Q.   How long --

10     A.   I also claim I never tried to kiss her.  Again

11 I'm stressing this because at one point I think she said

12 that I tried to kiss her all over her face.  Nothing

13 further from the truth and I can explain that why, if

14 you'll allow me.  It's not really something I'm proud of,

15 but I can explain.

16     Q.   Would you agree with me that it was poor

17 judgment as a manager at Procter & Gamble for you to

18 massage Bel's feet?

19     A.   I don't know what does it have to do anything

20 with management.  It's massaging the feet of a woman who

21 told me to come into her room.  When I came into her room

22 she went straight to the bed, she dimmed the light, not

23 me, she dimmed the lights, she put me in the position.  I

24 expected to go to the kitchen to sit down and eat the

25 dessert.  I actually brought the dessert with me.  What

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 84

1   she didn't say is that we actually ate the dessert at the

2   end of the encounter, we ate the dessert and we left

3   amicably.  I left her room.  It was nothing.  There was

4   no, you know, you harassed me, you did this to me.  It

5   was nothing.  We actually listened to music.  We ate

6   dessert and I left the room.

7          In the meantime her husband called her, she

8   talked to him 15 minutes in Chinese.  She called her

9   boss.  She gave him -- and that's when I thought that she

10  actually left the phone open and she recorded what was

11  going on in the room, because I was told that there is a

12  recording from her room on her boss' answering machine

13  when meeting with HR started on June 15th.  That was not

14  in the notes of meeting purposely.  That was the start of

15  opening sentence of Lynne Burnett was we have the

16  recording.

17      Q.   Okay.  You're going far beyond.  This has

18  nothing to do with my question.

19      A.   It's very important.

20      Q.   It might be important, okay, but I'm asking

21  specific questions, okay?

22      A.   Yeah, good.

23      Q.   Did you ever tell Bel Liu that you loved her?

24      A.   I don't recall that I told her in that sense.

25  I couldn't tell her I loved her.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 85

1        Q.   Did you tell her you were falling in love with

2    her?

3        A.   I could have told her something like that, yes.

4        Q.   Well, what is it that you think you told her?

5        A.   I didn't tell her I'm falling in love with you,

6    no.  I told her that she -- I might have feelings for

7    her, yes.

8        Q.   Did you say anything else other than I might

9    have feelings for you?

10       A.   I never told her I love her.  I never told her

11   that because that wouldn't be true.  I don't love her.

12       Q.   What do you recall are the specific words that

13   you uttered to her, that I have feelings for you?

14       A.   If I told her anything, then I told her

15   something along those lines, yes.  I don't recall really

16   what I told her.  I can strongly say I never said I loved

17   her.  That would be too much.

18       Q.   But you did want to have sex with her, right?

19       A.   That I'm not really sure, the way you just said

20   it.  I didn't want to have sex with her.  I didn't come

21   to the room to have sex with her.

22       Q.   I didn't ask you --

23       A.   So, no.  I felt -- you know, I felt something

24   when I saw a woman opening the door and dressed like she

25   was I felt something, obviously there was a thought in my

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 86

1   mind, but I didn't come to that room to have sex, and I

2   would never, I would never have sex with a woman who said

3   no, never.  So I'm just not that person.

4        Q.   Okay.  When you saw her at the door did you

5   then want to have sex with her?

6        A.   No, at that point, no, I was very surprised

7   actually.

8        Q.   How about when you were rubbing her feet, did

9   you want to have sex with her?

10       A.   That is sensual, yes.  I didn't want to have

11   sex with her, but I thought about that, yes.  It wouldn't

12   be, you know.

13       Q.   How about when you were rubbing her back, did

14   the thoughts come to your mind to have sex with her?

15       A.   I don't -- I'm not sure.  For me it's much more

16   sensual to have feet than the back.  I'm not sure I was

17   thinking about that.  As I said I massage my wife and I'm

18   really sorry of what I did to my wife.  That would be the

19   extent of what I did to her.

20       Q.   Did you ever tell her that you had a feeling

21   that you would rape her?

22       A.   No.  That is very misinterpreted in that -- in

23   those notes.  I never said I would rape you.  I said when

24   you do that with your legs one could rape you.  That's

25   exactly what I said.

Sanders, Gale & Russell
(203) 624-4157

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 87

1      Q.    When you do what with your legs?

2      A.    What she did with her legs is she actually

3  uncovered herself and she spread her legs just enough so

4  that you can take a look and then she closed her legs and

5  she was laughing at me, and then I said when you do such

6  things one could rape you, and then we had academic

7  discussion about rape.  She probably expected me to act

8  upon that, and actually when she said what is rape, I

9  started to explain what is rape and I said rape is when

10  somebody is, you know, attempting to forcefully have sex

11  with you and blah, blah, blah.  That was the extent of

12  it.

13      Q.    What do you mean by --

14      A.    And I'm very sorry.

15      Q.    What do you mean by when you say she uncovered

16  herself?

17      A.    Oh, she was like -- you know, she was in -- how

18  you call that, whatever is on the bed, you know, she was

19  covered by that, and then she actually did this and she

20  showed her leg to me (indicating).

21      Q.    Do you claim that she was in the bed in

22  something other than this blouse and her shorts?

23      A.    No.  No.  She was in her blouse and her shorts,

24  but when she did that she was turning -- spreading her

25  legs and putting her legs like this (indicating).  I

CICVARA v. PROCTOR & GAMBLE                December 21, 2010

Page 88

1   don't know why she did that.

2       Q.   But she had her shorts on?

3       A.   Yes, yes, she had her shorts on.

4       Q.   And you claim she spread her legs and then she

5   crossed her legs?

6       A.   Yes, and she did that repeatedly.

7       Q.   Why didn't you walk out?

8       A.   Well, you know, I ask myself that question

9   because there was something strange about all of the

10  situation I must say.  I didn't because it's just that, I

11  felt I would be with her, and I actually was invited to

12  the room, don't forget that.

13      Q.   I understand, but she didn't tie you down, did

14  she?

15      A.   No, she didn't.  I mean why would I leave the

16  room?  What did I do to leave the room?  I mean why would

17  I leave the room?

18      Q.   Were you uncomfortable when she spread her legs

19  and crossed them?

20      A.   I was feeling very strange, yes.

21      Q.   And you still didn't leave the room?

22      A.   No, I didn't.

23      Q.   Did you think that was poor judgment on your

24  part?

25      A.   Yes, it was.  I would agree it was poor

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 89

1    judgment on me, yes.

2                     MR. CERASIA:  I was told that we have to

3    go off because the tape is running out.

4                     THE VIDEOGRAPHER:  Off the record at

5    12:18 p.m.

6                     (Lunch Recess:  12:18 to 1:27 p.m.)

7                     THE VIDEOGRAPHER:  On the record at 1:27

8    p.m.

9    BY MR. CERASIA:

10       Q.    Mr. Cicvara, do you understand that you're

11   still under oath?

12       A.    Yes.

13       Q.    Okay.  Did you review any documents during the

14   break, the lunch break for the deposition?

15       A.    Documents per se I don't think so.  Talking

16   just about a few things.

17       Q.    Did you review any pieces of paper?

18       A.    No.

19       Q.    Okay.  When you say we were talking, meaning

20   with --

21       A.    The lawyer.

22       Q.    With your lawyer, okay.  By the way, do you

23   claim that Bel Liu ever touched you anywhere other than

24   on your thigh that one time in the car?

25       A.    I said she put her -- she put her head on my

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 90

1   shoulder numerous times.

2       Q.   Right, but I'm talking about touching with her

3   hand.

4       A.   Oh, touching.  She did took me on the hand when

5   we were in -- oh, boy, Singapore I think, yeah, in

6   Singapore when we were going to visit the store where she

7   bought certain T-shirts.

8       Q.   And what did you claim she did?

9       A.   Oh, she took my hand.  Actually she hold me on

10  the hand when we were walking down the street from hotel

11  to the store.

12      Q.   Did you ever tell her not to do that?

13      A.   No, I don't think I did tell her anything.

14      Q.   Did you ever touch or hold her hand at dinner?

15      A.   She did touch and hold my hand at dinner.  I

16  didn't.  She did touch and hold my hand when we were

17  walking out of the dinner in Indonesia.

18      Q.   How about in the dinner itself at the table?

19      A.   No, I don't recall that I did, no.

20      Q.   At any time that she touched your hand did you

21  ever tell her not to touch your hand?

22      A.   No.  No, I didn't.

23      Q.   How about when you claim she put her head on

24  your shoulder, did you ever tell her not to do that?

25      A.   No.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 91

1       Q.   Did you welcome it?

2       A.   I didn't do anything.  I didn't welcome.  I

3   didn't unwelcome.  Just I accepted it.  I didn't act upon

4   it, if you mean that.  I didn't try to do anything more

5   because she did that.  I was actually -- I was feeling

6   very strange when she put her hand on my thigh, I did,

7   but I didn't say anything because it was inside the car

8   and somehow I felt if I say something it will be very bad

9   to put her in such position, so I just kept my mouth

10  closed.

11      Q.   When you claim she touched your thigh, did she

12  rub your thigh or just put her hand on your thigh?

13      A.   She did put her hand and she didn't just keep

14  her hand, so it was a pressure, so.

15      Q.   But did she move it back and forth or she just

16  put it on and squeeze, what do you remember?

17      A.   I can't -- I wouldn't -- I don't know, I can't

18  say that, you know, for sure, but it was there and it was

19  there for more than just touching.

20      Q.   How long was it there, two seconds, three

21  seconds?

22      A.   No.  It was more than that.  She was

23  actually -- oh, that was when she was asking me about

24  Austin, Austin Lin.  That was actually -- when she put

25  her hand on my thigh she said you don't like Austin, do

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 92

1   you, and I said no, no, why would you say that, and she

2   said, well, he told me something about you, and then I

3   said, you know, we had this -- by the way, we had not

4   just one discussion about his expense report, that was

5   when he cheated.  He also wanted immediately after that

6   to go in Florida to some seminar and wanted us to pay for

7   his weekend in hotel, which I told him, look, Austin, you

8   maybe did this when you had Harley as a boss, just please

9   don't do it anymore, you can't do it, you can stay in

10  hotel paid by your own.  So he didn't like that either.

11       Q.   Let's get back to Bel for a minute.  When you

12  claim in the car she put her hand on your thigh and there

13  were other people in the car you said, she mentioned

14  whether you liked Andrew in front of --

15       A.   If I liked Austin.

16       Q.   Not Andrew, I'm sorry, Austin in front of other

17  people?

18       A.   In front of Willies, yes.  W-i-l-l-i-e-s, if

19  I'm not mistaken again.  I have his card.  And in front

20  of Dave Arnsperger, who was official QA auditor there in

21  Indonesia.

22       Q.   For Procter & Gamble?

23       A.   Yes.  He was in Indonesia, then he stayed in

24  Singapore, and then Lori came to Bangkok, she was auditor

25  in Bangkok and in China after that.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 93

1        Q.   Let me ask you something about the time you

2   said that you were in her room on June 8th, 2009.  Was

3   that the only time that you went into her room anywhere?

4        A.   No.  There was a time before that I went once

5   in Indonesia.

6        Q.   And how long did you stay that time?

7        A.   I don't know.  15 minutes maybe.

8        Q.   Did you ever hug her during that time in

9   Indonesia?

10       A.   No.  No, I didn't hug her.  We were sitting

11  together on the sofa, but I didn't hug her, and as I said

12  I think she leaned on me again.  That was the time when

13  she told me that she was very unhappy with her marriage,

14  that her boss actually forced her to marry her husband,

15  that she has a relationship with the older gentleman,

16  which I suspect was her boss but she never told me that

17  so I cannot claim that, but from whatever she was talking

18  about it might have been her boss.

19            She was very -- in very unusual relationship

20  with Andrew.  She asked me to tell good things to Andrew

21  during the dinner on the 7th in Bangkok, when we came to

22  Bangkok, because she wanted more money from him.  So she

23  was very manipulative as well, which I did actually, I

24  did tell him, look, she's very valuable to your team,

25  because I think she is actually, she's very good in what

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 94

1    she's doing, more than good, and she's doing things that

2    you wouldn't expect from normal employee, like, you know,

3    trying to get certain type of control over certain people

4    that she's communicating with, like Austin, like Dave

5    Mathieu who was the designer of the new flashlights, like

6    Al Peterson.

7            She asked me straightforwardly during the

8    dinner in December 2008 in Hong Kong, do you want me to

9    find you a girl so that you can go to karaoke, which I

10   said very straightforward, no, I don't want you, and she

11   said, well, you know, there are certain people in

12   Duracell who are doing that every time they come, and she

13   mentioned Al Peterson.  I hope this is not going to kill

14   him, but she did say that.

15           So, you know, there is -- and then, you know,

16   she obviously tried to do similar thing to me, to have a

17   control, certain type of control over people which they

18   can exercise when they need to, which they did in my

19   case, they exercised the control over the people.  They

20   didn't like me in the position that I had.  And Austin

21   had that position before me, he was the guy who went

22   initially as I said to China to do the initial inspection

23   before the official one of five companies --

24       Q.   Okay.  You're now spinning off on a tangent.

25       A.   I'm just trying to explain certain things,

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 95

1    because Austin was the guy who went to human resources to

2    tell them, Austin Lin was the guy who told human

3    resources that I have improper things with Bel Liu.  How

4    would he know?

5        Q.   Do you know whether or not Bel ever told him?

6        A.   I don't know.  But that is answering your

7    question.  There is no business relationship supposed to

8    be between Bel Liu and Austin Lin from April 2008,

9    nothing, nothing.

10       Q.   But you already answered you have no idea if

11   she called him up to tell him that?

12       A.   Obviously she did, and I asked for records,

13   which were denied, you know, e-mail, telephone records

14   between Bel and Austin, that was never provided to me.

15       Q.   Okay.  Do you claim -- you understand that Bel

16   has -- had told the company that you made unwanted sexual

17   advances towards her?

18       A.   No.

19       Q.   You never knew that?

20       A.   No.  I knew what she said in her statement.

21       Q.   Okay.  Okay.  Then listen to my question, okay?

22       A.   Yeah.  I knew --

23       Q.   You understand and you know what her

24   allegations are, that you made unwanted sexual advances

25   and you engaged in other conduct towards her; you know

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 96

1   that she's claiming that, right?  I'm just asking you.

2        A.    Yeah.  She said that on Wednesday, June 10th.

3   Before that certain things happened, before she said

4   that.  And she apologized to me on Tuesday, she

5   apologized to me on Tuesday night, she said I did

6   terrible thing to you, and I asked what did you do, she

7   said I can't tell you, you will see one day.

8        Q.    Can you go back to please listen to my

9   question?

10       A.    Yes.  I want this to be put down.

11       Q.    But you know what --

12       A.    This is not my --

13       Q.    I ask the questions, you answer, okay?

14       A.    Yeah.  Well, I think it's --

15       Q.    You understand what it is that she claims

16   happened, which is you touched her inappropriately, you

17   kissed her inappropriately; do you understand that she

18   said that?

19       A.    I understand that she said that, yes.

20       Q.    That's all I'm asking.

21       A.    Yes, yes, yes, I understand what she said.

22       Q.    Okay.  Do you claim that she made that up in

23   order for you to get fired?

24       A.    She made up certain things that she said, yes.

25   I'm not saying she did that in order to get me fired,

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 97

1    because she apologized to me, she apologized to me twice,

2    once on Tuesday night and once on Wednesday morning, and

3    she apologized profusely, she said I'm so sorry that this

4    is happening to you but it was out of my control, that's

5    exactly what she said, she said out of my control.  Now

6    you think --

7        Q.   Did you ask her what she meant?

8        A.   Yes.  And she said I can't tell you, you will

9    see, I can't tell you.  Apologized to me.  Why would

10   somebody that I harassed apologize to me?

11       Q.   There's no question.

12       A.   She had all the time in the world --

13       Q.   There's no question, Mr. Cicvara.

14       A.   Okay.  I understand.

15            MR. CERASIA:  Mark that as 5 please.

16            (Cicvara Exhibit 5: Email - marked for

17   identification.)

18       Q.   Showing you what's been marked as Exhibit 5, if

19   you look down at the bottom, first of all it's a document

20   bearing number PG 470?

21       A.   Uh-huh.

22       Q.   Under the section marked SMS, the text, you see

23   it down at the bottom?

24       A.   Yeah.

25       Q.   Was (203)243-0079 either your cell phone or

CICVARA v. PROCTOR & GAMBLE                     December 21, 2010

Page 98

1   BlackBerry number?

2        A.   BlackBerry number.

3        Q.   Okay.  And did you send this text message or

4   SMS to Bel?

5        A.   Yes.

6        Q.   Was this the day after you were in her hotel

7   room June 8th?

8        A.   Yes, it was.

9        Q.   When you say -- I think there's a typo there,

10  it says I hope you will, it says b-e-w, but I assume it's

11  to be be, be better soon, what was wrong with her?

12       A.   I don't know.  She was -- we were told that she

13  is not there the second day on audit.  I don't know what

14  was wrong.  She said she's -- the guy said she's sick.

15       Q.   Who told you that?

16       A.   After Yuen told Predrag I was -- let me just

17  take a look, because I don't want to guess.  I think this

18  gentleman, Yuen Yau.

19       Q.   Y-u-e-n?

20       A.   Y-u-e-n, and last name Y-a-u.  He told us that,

21  because he picked me and Lori at hotel that morning and

22  he said she's going to be out for today because she's

23  sick.

24       Q.   And then you say to her in this text feel

25  terrible that can't be with you and pamper you?

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 99

1        A.    Yes, I did say that.

2        Q.    How were you going to pamper her?

3        A.    Just to make her feel good.  I don't think --

4        Q.    Rub her feet?

5        A.    -- there was anything special in the word

6    pamper.  Maybe I used the wrong word.  Just -- you know,

7    just to make her feel good.  I still didn't understand

8    what I understood after the next message, which was, hey,

9    we are not a couple so why are you saying this, and I

10   just couldn't understand that coldness coming out of her

11   at that moment.  I was really shocked with that.

12              MR. CERASIA:  Mark that as 6 please.

13        Q.    All right, Mr. Cicvara, why don't you give me

14   number 5, if you can give me that back, please.

15        A.    Sure.  I think you have to put --

16        Q.    Yeah, you've got to wait.  You took it from

17   her.  Give it back.

18        A.    Sorry.

19              (Cicvara Exhibit 6: PG000471 - marked for

20   identification.)

21        Q.    Showing you what's been marked as Cicvara

22   Exhibit 6, which is another text message, it's PG 471.

23   If you look at the bottom, is that the reply you received

24   from Bel?

25        A.    Yes.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 100

1       Q.    And that's the reply to Exhibit 5; right?

2       A.    Yes.

3       Q.    Okay.

4       A.    And that was really kind of shocking, the way

5   she wrote it, because first of all I never thought that

6   we are couples and I never thought we are lovers, and

7   when she said please stop thinking about me that was

8   really strange because she actually did everything in her

9   power for me to think about her within six months, you

10  know, from December to June.

11      Q.    Right.

12      A.    I just couldn't, you know, get rid of her

13  messages, e-mail messages, which I asked for and they

14  were never produced because computer was -- disappeared.

15      Q.    So that's the reply.  But let me ask you this.

16  Do you have any female friends?

17      A.    Do I have any female friends?

18      Q.    Yeah.

19      A.    I probably do.

20      Q.    Any of them who get sick and you write to them

21  that you want to pamper them?

22      A.    No.  No.  No.  Sometimes maybe.  I don't know.

23  If I'm very close maybe I don't pamper but I would like

24  to help.

25      Q.    Right.  Pamper suggests that you wanted to be

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 101

1    something other than a friend, right?

2         A.   I understand and I am saying I might have used

3    the wrong word, and I have to explain one thing.  English

4    is not my native language, not that I'm trying to make

5    any excuses, but sometimes I'm going to use the wrong

6    word and I usually am given time to explain because

7    people are used to it.

8         Q.   Right.  But, frankly, with Bel you had feelings

9    other than just as a friend at that point?

10        A.   As I said, yeah, it is possible, yes.

11        Q.   Okay.  Do you know whether or not she was

12   offended by your conduct on June 8th in her hotel room?

13        A.   She never said that, never said that to me, and

14   as I said it was hotel room, she was on the phone with

15   her husband 15 minutes during this less than one hour

16   that I was in the room, she was on the phone with her

17   boss and left a message about certain pricing, and during

18   that I saw the message on her BlackBerry from her boss

19   which was telling, A, you are doing great job, the next

20   thing that we need to do is to find a way to sack the

21   gentleman who is manager of the Zhongshan factory, and

22   then when she saw me seeing that e-mail she said you are

23   seeing too much, you are not supposed to read this.  I

24   said, look, it was on your BlackBerry, and BlackBerry

25   don't have Chinese characters, so obviously they have to

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 102

1   send English messages on the BlackBerry, so I saw it,

2   what can I do, and she said you know too much, you are

3   not supposed to read these messages.  Obviously they

4   decided to sack the guy who it was --

5        Q.    Shock?

6        A.    Sack, s-a-c-k.  Sack the guy who headed the

7   Zhongshan operation of Practical because it was under his

8   umbrella that they send 46,000 of D flashlights

9   wrongfully.  What is really strange is he said to her we

10  have to find a way to sack this guy.  Well, I don't know

11  what that tells you about relationship between Andrew and

12  her.  It tells me a lot, so.

13       Q.    Let me ask you this.  Did she talk on the phone

14  or get this BlackBerry message before or after you rubbed

15  her back and her feet?

16       A.    For sure she talked to her husband after, and I

17  think she actually used her BlackBerry after I rub her

18  feet, yes, because she said I need to send -- I need to

19  actually tell my boss the pricing for the offer that we

20  are preparing for Duracell.  That was the moment that I

21  was under impression she left that on and there was a

22  recording on her boss' answering machine, which I was

23  told by Lynne Burnett at the beginning of the meeting

24  that there was a recording from what was going on in that

25  room and she can play it back to me.  I was embarrassed

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 103

1    to hear me, you know, saying things sort of, or, you

2    know, whatever it was in the room, so I said, no, you

3    don't have to play it because I know what happened in

4    that room and I was in that room.  She also mentioned,

5    you know, like cameras, but she mentioned specifically

6    there was a recording from her boss' answering machine of

7    what was going on in that room, which came out not to be

8    true as you know.  The recording was from Wednesday, June

9    10th, in the morning.  There was no ever any recording

10   from that room.

11                    MR. CERASIA:  Can you mark this as 7.

12        A.   So I was lied to.

13        Q.   Okay.  There's no question.

14        A.   Okay.  I think it's important.  And it's not in

15   the notes.

16        Q.   There's no question.

17        A.   It's not in the notes, which means the notes

18   are not valid.  I never saw the notes too.

19        Q.   Mr. Cicvara, there's no question, please.

20        A.   Okay.  Good.  I got this --

21        Q.   There's no question.

22        A.   I'm saying I shouldn't be reading this.

23                    (Cicvara Exhibit 7: PG000472 - marked for

24   identification.)

25        Q.   I'm showing you what's been marked as Exhibit

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 104

1   7, which is Bates number PG 472.  Let me ask you if this

2   is the response to your text message which was Exhibit 6?

3        A.   Right.  It says Thanks for the good time

4   though, P.  It might be.  I'm not sure that I ever

5   used --

6        Q.   Well, that's your --

7        A.   -- P point after I sent a message.  I usually

8   use either Predrag or I'm not using anything.  So

9   obviously it is, but somehow it doesn't look like I did

10  it.  It must have been a new computer --

11       Q.   Well, you were doing different things that you

12  had never done before according to you during that time,

13  right, like rubbing the feet --

14       A.   Oh, like rubbing another woman's feet, yes, I

15  would agree, yes, I was doing that.

16       Q.   All right.  I have no other question about

17  Exhibit 7.

18       A.   Okay.

19       Q.   Give it back.

20            MR. CERASIA:  Mark this as 8 please.

21            (Cicvara Exhibit 8: PG000473 - marked for

22  identification.)

23            (Cicvara Exhibit 9: PG000474 - marked for

24  identification.)

25       Q.   I'm going to show you what's marked as Exhibit

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

                                                    Page 105

1    9, which is Bates number PG 474, it's a text message from

2    you June 10th, 2009 at 11:15.  And if you look at Exhibit

3    7, you had sent that at 11:14, right?

4         A.   That was June 9 and this is June 10.

5         Q.   Oh, it's a whole day difference.  Okay.  I

6    might have been looking at Exhibit 8.  Thank you for

7    correcting me.

8         A.   Okay.

9         Q.   So on the 10th you write to her, just wanted to

10   tell you that I am, and dot, dot, dot, just wanted to

11   tell you that I am still in a shock and disgusted by

12   myself and my poor judgment of things that were going

13   between us, forgive me if you can, P.

14        A.   Yeah.

15        Q.   What did you mean by that?

16        A.   I was trying to apologize for the thinking that

17   at some point it might be -- instead of friendship our

18   relationship might be a little bit more than that, and I

19   actually found out that it was very unusual that she sent

20   message as she did like we are not couple and we are not

21   this, so I apologized for me ever thinking about -- that

22   there could be something more going on between us than

23   that.  That was the reason why I did this.

24        Q.   Because you thought that there was more going

25   on between you, right?

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 106

1       A.   As I said, I can't deny that it's crossed my

2   mind, yes.   I wouldn't deny that.   And I also said that

3   one of the things I really did wrong is I did wrong to my

4   wife on whatever I did with this woman.   So that -- I

5   feel strongly about that, but I didn't harm the company

6   at all, at all.

7       Q.   Then why were you in shock?

8       A.   I don't know.   It might be a poor choice of

9   words again.

10      Q.   You've got a lot of poor choice of words; do

11  you blame that again on your lack of command of the

12  English language?

13      A.   No, I don't blame it on lack of command.   I

14  blame it maybe on text messaging where you are expected

15  to send answer quickly.

16      Q.   Well, did anybody tell you you had a certain

17  amount of time to send her this text message?

18      A.   No, nobody told me that.   I had all the time in

19  the world to do it, but usually what I did when I

20  answered text message is I answered immediately.   You

21  will notice that from the text messages that were

22  exchanged.   You have the record.

23      Q.   Why were you disgusted with yourself?

24      A.   I don't know.   I thought that it's not a good

25  thing that you would go over friendship if the other

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 107

1   party doesn't want that and I realized that from her

2   message that was sent to me the day after, which was June

3   9th, so that's why.  Nothing that has to do anything with

4   whatever happened on June 8th.  As I told you nothing

5   happened there which I should be ashamed of.

6        Q.   Okay.  Why do you say that you had poor

7   judgment?

8        A.   Because I thought that there could be something

9   going on between us and it didn't, so I had poor

10  judgment.

11       Q.   And you were disappointed that there weren't --

12  there wasn't more going on between you than friendship?

13       A.   I think probably I was, yes, because it was six

14  months of her confining to me and causing some emotional

15  reaction on my part, yes, and I don't think it's

16  inappropriate.  It's maybe inappropriate for her to send

17  me that.  I don't think it's inappropriate in the sense

18  of me working for P&G.  I don't think that there's

19  anything inappropriate about that except maybe I should

20  have stopped that from the beginning but I didn't.

21       Q.   Because she was an employee of a contractor,

22  right?

23       A.   Not because of that.  Because she was an

24  employee of a company, not because of me having any

25  influence over her, because I didn't have that.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 108

1        Q.    I'm not asking you about influence.

2        A.    Because she was an employee of another company,

3   yes.

4        Q.    That P&G had a business relationship with?

5        A.    That might be very poor judgment on my part,

6   yes, I would say so, but that's about it.

7        Q.    Why did you ask her to forgive you?

8        A.    Because I did say that there might be something

9   going on, yeah, and, you know, at some point I did, you

10  know -- I did massage her feet, which at some point she

11  said no and I said okay.  So, you know, we ate dessert

12  after that.  If I harassed her, that was in the hotel and

13  it was going on for 40 minutes, she could have screamed,

14  she could have called somebody, she could have said to

15  her husband on the phone there is a guy here, in Chinese.

16  She didn't.  She could have said to her boss there is

17  something going on.  She didn't.  She could leave the

18  message.  She didn't.  We sat down, we ate dessert, and

19  we amicably split.  I went to my room.  Nothing happened.

20       Q.    So you think just because she didn't scream or

21  tell anybody else that you think it was appropriate to do

22  what you did?

23       A.    No, no, no, I didn't do anything.  I said if I

24  did anything, she had all the means in the world to

25  express that something was wrong and she never did.  She

CICVARA v. PROCTOR & GAMBLE                December 21, 2010

Page 109

1   never even told me that she felt bad.  She told me don't

2   rub -- don't rub my feet anymore; I stopped.

3        Q.   Why don't you look at Exhibit 8, which is a

4   June 10th, 2009 text message from you to Bel 6:27,

5   bearing Bates number PG 473.

6        A.   Okay.  Yes.

7        Q.   Did she --

8        A.   That was when she apologized to me.

9        Q.   Did you buy her a T-shirt?

10       A.   Yes.

11       Q.   And she returned it to you?

12       A.   She returned it to me after all this happened,

13  yes.

14       Q.   Why did you buy her a T-shirt?

15       A.   Because she was like, oh, I need to buy this

16  T-shirt, she bought two already, and then, well, I spent

17  already too much for this, oh, should I buy this T-shirt,

18  no, I spent too much already, and she's actually

19  collecting T-shirts from -- what's the name of the store

20  that the stars, the rock stars -- I forgot, it doesn't

21  matter -- Hard Rock Cafe, okay, so she's collecting those

22  shirts and she wanted to buy the shirt but she already

23  bought two, so I said I'll buy it as a present for you.

24  I paid with my personal card and my wife found that, so I

25  had something to explain to my wife about this.  But,

CICVARA v. PROCTOR & GAMBLE                        December 21, 2010

Page 110

1   yes, I bought her a shirt and she returned -- she put it

2   on the door outside of my room on Wednesday morning.  But

3   you wouldn't talk about the other text message that I

4   sent her, which was like why did you apologize to me.

5        Q.   I didn't get to there, Mr. Cicvara.

6        A.   Okay.  Sorry.

7        Q.   Remember I ask the questions.

8        A.   Sorry, sorry, you ask the questions.

9        Q.   And according to her you sent this text message

10  before you saw her returning the shirt.  In the first

11  message you send to her, the first line says good

12  morning, still sleeping or don't want to answer after

13  all?

14       A.   Because I sent a message before this that she

15  didn't answer it, where it was the same question, what is

16  it that you did that you told me you were so sorry about

17  and that you told me you didn't have a way to influence

18  it?  She said that, she said I didn't have a way to

19  influence what happened.

20       Q.   But you don't know what -- you don't have --

21       A.   Let me see.  I actually wrote down what she

22  said.  I was left no choice; that's exactly what she

23  said.

24       Q.   When did you write that down in front of you,

25  at lunch?

CICVARA v. PROCTOR & GAMBLE                     December 21, 2010

Page 111

1      A.    In front of me.  We talked in the car, and he,

2   my lawyer, asked me exactly please try to recall --

3              MR. SIKORSKY:  All right.  That's --

4      A.    -- what did she say exactly.  I was left no

5   choice, that was one sentence.  It was out of my control

6   and I really apologize to you, I did terrible thing to

7   you.

8              In the middle of the night I couldn't sleep

9   about thinking what the heck is terrible thing what she

10  did, and I asked once, she didn't answer, then I sent

11  another, and I said are you sleeping, I have a question,

12  why did you say I will understand, why are you sorry,

13  sent to her BlackBerry, okay, and she didn't answer this

14  one either, and then in the morning I found that shirt

15  outside of my room and that is when I went to her room

16  asking her, you know, why did you return this to me, I

17  bought it, it's a present, I bought it for you, keep the

18  present, and she kept it, and that is when I asked again

19  please tell me what did you do, because honestly I felt

20  she maybe said something to my wife, you know, like I had

21  a relationship, because I realized that she is -- I don't

22  even know how to say that, might be a little bit unstable

23  in relationships, so she was quick to make decisions like

24  decision don't come to my room and then five minutes

25  later come to my room, I changed my mind, decisions like

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 112

1  destroying life of other people quickly, you know, so I

2  felt all the time she might call my wife.  It never

3  crossed my mind that she would do what she did or Austin

4  did basically, because according to her she said I was

5  left no choice, it means like maybe I didn't think that

6  you deserved that, but Austin did what he did and Andrew

7  told me to follow.

8       Q.   You're just guessing now?

9       A.   No, no, I'm not guessing.

10      Q.   Well, did she ever tell you that?

11      A.   No.

12      Q.   Okay.  So you're guessing?

13      A.   Because she told me she can't tell me what she

14  did.  That's what she told me.  And she told me I really

15  apologize to you.

16      Q.   Right, and you're guessing what she meant?

17      A.   I am not guessing.

18      Q.   Well, she never told you, right?

19      A.   I'm not guessing.  I saw what e-mail Dina

20  Schmude sent to her where she was saying Austin came to

21  human resources, told us this and that.  Hey, who is

22  Austin?  Austin is the guy who hates me because I caught

23  him lying on his expense report, guy who hates his future

24  boss because he told me, he told me I can't really use up

25  the company the way I used to, to spend seven months

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 113

1   in -- seven weeks in China to inspect five factories.   I

2   spent two weeks in China inspecting five factories

3   together with Lori in December.   He spent six weeks, and

4   she told me she actually taught him Mandarin because he

5   speaks only Cantonese and she was his teacher for six

6   weeks in China.

7        Q.   So do you think that there was a conspiracy out

8   to get you?

9        A.   Yes, I think there was a conspiracy, yes.   I

10  think that Austin Lin wanted to retaliate to me, that's

11  one of the reasons why this happened to me.   The other

12  is -- there are three reasons, big reasons.   The second

13  reason is lack of work for Practical where Andrew found

14  the way to get leverage over Duracell by claiming that I

15  harassed her.

16       Q.   Okay.   Do you have any personal knowledge that

17  Practical ever got any additional orders --

18       A.   No, no.

19       Q.   Excuse me.

20       A.   I hope they didn't.

21       Q.   You've got to let me finish.   Do you have any

22  personal knowledge that after Andrew wrote an e-mail

23  telling Erik about your unwanted sexual advances towards

24  Bel that Practical got any future orders or additional

25  orders from Duracell because of that e-mail?

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

                                                    Page 114

1        A.    Okay.  Let me just correct you in one thing.

2    You said unwanted sexual advances.  I said alleged

3    unwanted sexual advances.  Please, that's one thing.

4        Q.    That's not what his e-mail says.

5        A.    Second, I don't have any knowledge, yes.

6        Q.    That's all I want to know.

7        A.    And I hope they didn't because they don't

8    deserve it.  Their business practices are terrible,

9    dishonest too.

10       Q.    Do you know whether or not, sitting here today,

11   Austin Lin ever told anybody in human resources

12   specifically what Bel had alleged?

13       A.    They wrote it in the e-mail.

14       Q.    I'm asking you if you have personal knowledge.

15       A.    No, I didn't hear that, but I saw that written

16   in the e-mail.

17       Q.    There are no specifics in the e-mail, it's

18   just --

19       A.    Can we go through this?

20       Q.    We will at some point.

21       A.    Okay.  Good.

22       Q.    I'm asking you whether you have personal

23   knowledge.

24       A.    No problem.  And the third --

25       Q.    Why don't you answer my question first.

CICVARA v. PROCTOR & GAMBLE                     December 21, 2010

Page 115

1        A.    You didn't hear the biggest reason why I was

2    fired.

3        Q.    Why don't you answer my question.

4        A.    Okay, I'll answer it when it comes to it.

5        Q.    Do you have any personal knowledge that Austin

6    Lin ever gave any specifics as to what Bel told him

7    happened?

8        A.    Nothing except whatever is written in that

9    e-mail, and whatever is written we all know, it's

10   written.

11       Q.    Okay.  Right.  And what is the third reason

12   that you believe --

13       A.    Oh, the third reason is retaliation of certain

14   people in Duracell who didn't want me to go on with

15   whatever I found about the diversion of cells, millions

16   and millions of cells.

17       Q.    In 2007?

18       A.    Yes, that were shipped from U.S.A. to Hong Kong

19   and then on the ship to Latin America -- and then from

20   Hong Kong immediately shipped to Latin America and sold

21   to retailers in Latin America, Venezuela, Argentina and

22   some other states there.

23       Q.    The judge already ruled that's not relevant to

24   this case.

25       A.    Well, there will be another case I suppose.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 116

1   You will be a very busy man.  And I have enough evidence,

2   so.  Because you did say unfounded claims in your

3   response.  I would like to see those unfounded claims.

4              MR. CERASIA:  Could you mark that as 10,

5   please.

6        A.  I apologize if I'm falling into flames

7   sometimes.  I will try to get calm.  It's just that I

8   want truth to come out, all of it.

9              (Cicvara Exhibit 10: PG000475-476 -

10  marked for identification.)

11       Q.  Why don't you take a look at what's been marked

12  as Exhibit 10.  It's two pages of e-mail identified as

13  PG 475 to 476.  Tell me after you've had a chance to look

14  at this.

15       A.  Yes.  Okay.

16       Q.  Am I correct that the bottom e-mail you wrote

17  an e-mail while you were in the plane or typed the e-mail

18  while you were in the plane?

19       A.  I guess.

20       Q.  On the way back to the United States?

21       A.  No.  This was not written on the way back to

22  United States.

23       Q.  Where was it written?

24       A.  This was written on my way to China.

25       Q.  China?

Sanders, Gale & Russell
(203) 624-4157

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 117

1        A.    Yes.

2        Q.    From Indonesia or from --

3        A.    I was doing a lot of work for company, so in

4   less than two weeks I went to Indonesia, I had two

5   quality assurance inspections there, then I went to

6   Thailand, I had one quality assurance inspection there,

7   then I went to China and I had another quality assurance

8   there, and I returned to United States on Saturday, June

9   13th, very late in the night.

10       Q.    So you were on the plane when you typed this?

11       A.    Yes, to China.

12       Q.    Right.  And you didn't see her after you sent

13  this message?

14       A.    No.

15       Q.    The last time you saw Bel was on June 8th or

16  June 9th?

17       A.    No.  It was June 10th when I went to her room

18  to return the returned T-shirt and that was when she

19  actually -- when you had those recordings that Lynne

20  Burnett says that there are recordings from the answering

21  machine of her boss, those recordings came out to be from

22  the answering machine of Austin Lin that he -- she called

23  in the morning, I don't know why, to probably record me

24  trying to threaten her, which I never wanted to, I was

25  just asking her what did you do.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 118

```
 1      Q.    Okay.  So the simple answer to my question is

 2  the last time you saw her was June 10th?

 3      A.    June 10th in the morning, yes, before I went to

 4  the airport to China.

 5      Q.    In the first line to her it says Hi ma Belle,

 6  B-e-l-l-e, Hi, m-a, ma Belle?

 7      A.    Yes.

 8      Q.    What did you mean by that?

 9      A.    It was between me and Bel.  It came out to be

10  the way of writing e-mails back and forth.  She liked it

11  a lot.  Ma Belle means there is a song from Beatles which

12  is Michelle, ma belle, so I told her that and then I used

13  ma Belle as my how are you Bel.  So it was just a polite

14  way of addressing her, nothing, between us again.

15      Q.    In the last sentence -- line of that first

16  paragraph it talks about your warm feelings about her?

17      A.    Yes.

18      Q.    And that's what you've already testified to or

19  is there something different?

20      A.    No.  I had feelings about her, yes, which were

21  pretty normal feelings about a human being.

22      Q.    And then it says my desire to protect you and

23  inexplicable closeness that I felt towards you all this

24  time?

25      A.    Yes.
```

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 119

1        Q.     What's the inexplicable closeness?

2        A.     That's -- I don't want to say because you are

3   going to attack me, but that's maybe a way of expressing

4   my thoughts in English, nothing -- it doesn't mean

5   anything special.  I felt close to that person, nothing

6   else, because of the --

7        Q.     You just said you don't want to say.  What is

8   it you don't want to say?

9        A.     No, no.  I don't want to say -- I don't want to

10  excuse myself because of my English language.  So, yes, I

11  felt close to that person and that's why I said that.

12       Q.     Okay.  What were you protecting her from?

13       A.     Oh, from the pain that she had; you know, she

14  was complaining about having broken heart because older

15  gentleman left her while she was married to her husband

16  three months in marriage, which I didn't know at the

17  time.  She told me that she's married only in June.  I

18  didn't know that she was married.  I didn't know she went

19  to Spain with her husband.  She never told me that.  She

20  said I'm going alone.

21       Q.     But you knew she was married when you rubbed

22  her feet?

23       A.     Yes, I did.  She told me that.

24       Q.     Second paragraph, it says, It was you whom I

25  chose to confine my thoughts when I had troubles.  Like

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 120

1   what?

2        A.   That means nothing, I'm really sorry.

3        Q.   You just write words you don't mean?

4        A.   No, I don't write words that I don't mean.

5   This was -- this e-mail is the worst thing and the worst

6   piece of written material that I ever did.  I did it

7   partially because I was still afraid that she might go to

8   my wife and tell her what was going on between me and

9   her, and I actually got the brunt of my wife in spite of

10  her telling me, because I was forced to tell my wife the

11  truth obviously and I did tell my wife the truth.  So

12  partially this e-mail was written as trying to appease

13  somebody who is dangerous.  So I did actually learn that

14  she can do very bad things and I was trying to protect

15  myself actually.  So I was trying to come out as good as

16  possible towards her and I really don't enjoy myself

17  writing these things but I did write them.  So this is to

18  the point exactly what I wrote.

19       Q.   So you say that what you wrote here is a lie?

20       A.   No.  It was trying -- I didn't lie.  I was

21  trying to appease a woman who was dangerous.

22       Q.   Is there anything in here that's not truthful?

23       A.   Oh, let me go through it.  Maybe there is.  If

24  I have to do it under oath I'll try to.  So let's go

25  sentence by sentence.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 121

1          This paragraph is true.  This is no change

2    today --

3          Q.    Okay.  The question was whether there's

4    anything untruthful, it's either yes or no.

5          A.    No, there is nothing really untruthful here,

6    no.

7          Q.    In the last -- third paragraph, the second

8    sentence says I would love nothing more than to take back

9    few emotional outbreaks that I experienced last few days.

10   What emotional outbreaks did you have?

11         A.    I don't think I had any outbreaks.  I --

12   emotionally probably, I can say that, you know, doing

13   that rubbing of feet and getting close in that way it was

14   not really a good thing to do.  So it probably is the

15   only thing I could refer to that was experienced last few

16   days, and also the shock that I had when she sent me that

17   text message where she said we are really not lovers and

18   we are not couple, which meant actually I don't want to

19   go on with this relationship anymore, so it was kind of

20   surprising to me, it was a shock.

21         Q.    But what emotional outbreaks did you have?

22         A.    Well, maybe when I returned the e-mail, my

23   message I did say, you know, okay, thank you for whatever

24   and ever, yes, we are not, you don't have to state the

25   obvious.  It was not really the nice thing to say.  So I

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 122

1    had a few things which I could have worded probably

2    better than what I did actually.

3        Q.    It then says Had I known that I have risked

4    losing such a precious thing as our friendship, I

5    wouldn't ever have attempted what I so foolishly did.

6        A.    Which is --

7        Q.    What did you attempt?

8        A.    I didn't attempt physically anything, but in my

9    mind there was that thing about possibility that we have

10   more than just friendship, emotional, and I would stop

11   right there.

12       Q.    So you didn't really -- when you wrote the word

13   I wouldn't ever have attempted, you're now saying that

14   you never attempted anything?

15       A.    No, beyond what I did, I never attempted

16   anything, no.

17       Q.    And then it says you were misjudging the nature

18   of our closeness in the last few days.

19       A.    Yeah, because I told her there is more than

20   just friendship and then she said very coldly and calmly,

21   no, it's not even friendship.  The other reason why this

22   e-mail was written the way it is is I realized that I

23   will have to stay in business relationship and we are

24   coming here to business, so basically in order to try to

25   bridge the misunderstandings between us I did try to say

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 123

1   let's stay in friendship and let's forget what happened.

2   She did say pretty strongly that she didn't want what she

3   did, but she also apologized for what she did twice,

4   which is very important because you wouldn't do it if you

5   were harmed by somebody.  She also said in her statement,

6   if I'm not mistaken, we will come to that, but she said

7   that -- she said I never meant any harm, I never did any

8   harm to her, never, and was always very polite, that's

9   what she said.

10        Q.   Do you know if she was ever afraid of you?

11        A.   No, she never said that, so I wouldn't say that

12   she was -- ever had any reasons to be afraid of me.  I

13   never did anything to jeopardize her safety in any way,

14   and as I said it's not in my nature to be forceful with

15   any human being, let alone with a woman.  I wouldn't ever

16   do that.

17        Q.   The last sentence on the first page says, Maybe

18   the cultural differences that you so graciously tried to

19   point out in one of our conversations did ironically

20   played the part in what transpired lately.

21        A.   Yeah.

22        Q.   What do you mean by she so graciously tried to

23   point out; did she try to tell you at some other point

24   that you were just friends?

25        A.   No.  No, no, no, she didn't try to point that

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 124

1  out.  I think in one of the conversations she did say

2  that she would do a lot of things for the customers,

3  things that her boss is asking her to do, she would just

4  do it.  So I think that she once said that in China when

5  somebody -- somebody is trying to be polite to the point

6  where they wouldn't say no ever, and I think what I meant

7  here is if you said one time you don't want any

8  relationship with me over our friendship I would have

9  accepted that immediately, which I did actually.

10      Q.   So you blamed her for not coming out so

11  strongly?

12      A.   No, no, I didn't blame her.  I didn't blame

13  her.  If you read this carefully there is no blame in

14  this.  It just said maybe ironically it played a little

15  bit of something.  Let me just read it.  I said maybe the

16  cultural differences that you so graciously tried to

17  point out in one of our conversations did ironically

18  played the part in what transpired lately.  So what I was

19  trying to say is if you ever just said no, I would accept

20  no, and when she said no I accepted no as a word.

21      Q.   And at the top of page 2 it says I believe if

22  you had taken a strong stance against my foolish attempts

23  to get more out of our relation stopping it from the very

24  beginning, I would have stopped then and would have still

25  be in that special relation with you that meant so much

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 125

1    to me.

2          A.    Yeah.

3          Q.    You again use the word attempts.  What attempts

4    did you make, what foolish attempts did you make to get

5    more out of the relationship other than rubbing her feet

6    and her back?

7          A.    Those were the attempts and it probably

8    switched in my mind at some point where I thought that

9    there is possibly more, and I'm not blaming anybody for

10   that, it's me.

11         Q.    And then you use some words that are harsh of

12   your conduct, where it says if she wasn't so polite and

13   she wasn't trying to hurt your feelings, you have

14   unconsciously encouraged my, and then you got in brackets

15   macho, possessive, blah, blah, blah, efforts to get

16   more --

17         A.    That might be massaging --

18         Q.    Excuse me.

19         A.    Okay.  Sorry.

20         Q.    -- to get more than you were ready to give.  So

21   you think that, you know, you were being possessive with

22   her?

23         A.    No, I don't think I have been possessive with

24   her.  I think exactly what I write here.

25         Q.    It says she encouraged your macho, possessive,

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 126

1   animouse, stupid efforts.

2        A.   Which is massaging her back and getting her to

3   the point where she actually said no, stop this, I don't

4   like this, and then I stopped it, and because of that I

5   think we lost the precious thing, which is friendship,

6   and if she said that before, I would stop.

7        Q.   And then you refer to yourself as a foolish

8   dirty old man.

9        A.   Oh, there you go.  Okay.  Foolish dirty old man

10  is something that is again between us, it was just

11  attempt to diffuse the situation to the point where we

12  could laugh it off, and I'll explain why.

13       Q.   How long did it take you to think of that

14  answer, since you got fired?

15       A.   No, no.  I didn't think of the answer.  I'm

16  telling the truth.  In the plane when we were flying to

17  Singapore she picked up the brochures of Singapore.  In

18  the brochure there was a sentence which was saying you

19  can take a tour in the topless bus.  I was laughing at

20  topless bus and telling her in the plane, wow, that must

21  be exciting to be in the topless bus.  I just said that,

22  didn't mean anything else.  I meant what I meant.  And

23  she read it and she said, well, you dirty old man.  So

24  what she meant by that is I meant topless as a meaning of

25  topless.  That became words between us.  I didn't think

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 127

1    about that or think that I was fired.  It was just a

2    thing that happened on the plane between us and she said

3    to me you dirty old man.  That's why I used it here,

4    nothing else.

5        Q.   And then in the next -- you skip a paragraph,

6    it says, Again I can only say I am sorry for what I did

7    to you and I know there is no real excuse for it.  What

8    is it that you did to her that you have no excuse for?

9        A.   You know, when she acted like she acted, when

10   she sent that text message where she said that there is

11   nothing between us, I have to tell you that was really

12   shocking to me, because I just couldn't understand it.

13   You know, she was confining to me things like her husband

14   went to China and had inappropriate relationship with

15   somebody.  She hated her husband.  She was confining to

16   me things like her boss was forcing her to marry the guy

17   so that he stops rumors about them going together on

18   trips, like if you are married woman that will stop the

19   rumors.  That came from her.  So she was confining to me

20   these things and then all of a sudden she's telling me

21   stop being close to me.  I was not even close to you, you

22   were close to me.  It was shocking to me.  I just

23   couldn't understand where this is coming from, so.

24       Q.   So she's telling you this stuff, but in

25   exchange you're rubbing her feet and her back and you're

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 128

1   saying that she was the one who was inappropriate but you

2   weren't?

3        A.    No, I'm not saying it was inappropriate.  I

4   said it was very inappropriate with respect to my wife,

5   nothing else.  I didn't -- I was never in the position to

6   make any decision about business relationships.

7        Q.    I know.  You said that about four times now.

8        A.    Well, I would like you to understand that.

9        Q.    That's what you keep saying.  All right.  And

10  her response to you was, I'm sorry because I don't love

11  you but I know you love me so.  I appreciated you in the

12  past because we were just friend.  What I cannot accept

13  is that -- is what you did in the last few days.  Without

14  those dirty things, we can be friend.

15       A.    You will have to ask her.

16       Q.    Well, you then respond to her and you never say

17  I haven't done any dirty things to you?

18       A.    No.  I just said I can promise that never again

19  I will be a dirty man and I did put this in parentheses

20  because that was meant again to be between me and her and

21  to laugh it off.

22       Q.    Oh, it's just a joke then?

23       A.    No, it's not just a joke.  It's something that

24  happened between me and her and she will understand in

25  what context this was.  So it's not just a joke.  And if

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 129

1   you want to ask her what she meant by what I did in last

2   few days ask her why did she apologize, ask her why did

3   she do the same thing that she did to me to Al Peterson,

4   tried to do it to Dave Mathieu, did it to Austin Lin,

5   wanted me replaced because she counted Austin who was in

6   charge of flashlights before I came will become in charge

7   of flashlights again.  We never talked about what

8   happened on the audit the first day, which actually was

9   the trigger I think for whatever happened from that day

10  on, and actually changed her relationship with me

11  immediately.

12          Q.   By the way --

13          A.   So we talk about that or not?

14          Q.   Just so I'm clear, when you went to her room on

15  June 8th you were the one who first reached out to her to

16  find out if you could bring the special dessert to her

17  room, right?

18          A.   Yes.  I was, yes, but I didn't come uninvited.

19          Q.   I only had one question and you answered it.

20          A.   Okay.

21               MR. CERASIA:  Why don't we take a break.

22               THE VIDEOGRAPHER:  Off the record at 2:27

23  p.m.

24               (Recess:  2:27 to 2:37 p.m.)

25               THE VIDEOGRAPHER:  On the record at 2:37

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 130

1   p.m.

2   BY MR. CERASIA:

3       Q.    Mr. Cicvara, if an employee of a contractor

4   came to you and told you that she was subjected to

5   unwanted sexual advances or comments by your boss, do you

6   believe that you'd have an obligation under the Worldwide

7   Business Conduct Manual and policy to report that?

8       A.    Could you repeat that question.

9       Q.    Sure.  If an employee of a contractor of

10  Procter & Gamble came to you and said I've been subjected

11  to unwanted sexual advances or comments from your boss,

12  do you believe that you'd have an obligation under the

13  Worldwide Business Conduct Manual or the policies to

14  report that to the company?

15      A.    It depends on the situation.

16      Q.    What would it depend upon?

17      A.    It depends upon is it truth or not.

18      Q.    Is it what?

19      A.    Is the allegation truth or not.

20      Q.    So you think you first have to find out whether

21  or not it's true before you decide whether you have an

22  obligation to report it?

23      A.    First of all I think that employee of a

24  contractor of a company that works for Duracell or for me

25  have a right to go directly to human resources and report

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 131

1   their claim directly.

2        Q.   Okay.  That's not the question I asked.

3        A.   And they can also go to director of purchasing

4   if they actually contact that person and tell him about

5   this as well.  I don't understand why would somebody who

6   is contractor for Duracell go to a person who reports to

7   me and tell him to tell human resources about what is

8   happening with her.

9        Q.   That's not the question I asked you.  Why don't

10  you focus on the question I asked you.  If you can't

11  answer it tell me.

12       A.   I think I do understand what you are asking me,

13  and as I said if you think that that's true, you would

14  probably do it, yes, I would answer that, but I am glad

15  that I had, you know, other things too, that I said other

16  things, because it's important.  There is a way of

17  picking up the phone and call directly person you are

18  communicating with business-wise if you are making claim

19  of sexual harassment.  You don't afraid to do that.  If

20  you are harassed you pick up the phone and call the

21  person.

22       Q.   Okay.  That's not the question, Mr. Cicvara.

23       A.   Good.  I know what you asked me and I tried to

24  answer the best possible way I can.

25                 MR. CERASIA:  Can you mark this please as

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 132

1    I think we're on 11.

2                    (Cicvara Exhibit 11: PG000498-501 -

3    marked for identification.)

4        Q.   Mr. Cicvara, I'm showing you what's been marked

5    as Exhibit 11, a series of notes identified with numbers

6    PG 498 through 501, and have you seen these before?

7        A.   I've seen this on May 28, 2010 --

8        Q.   Okay.

9        A.   -- when it was provided to us.

10       Q.   Okay.  The answer would be yes.

11       A.   Oh, yes.  I believe the answer was yes.

12       Q.   I just asked you whether you saw it.

13       A.   Yes, I did.

14       Q.   And isn't it true that on May 15th, 2009 you

15   met with --

16                    MR. SIKORSKY:  June 15th.  You just said

17   May I think.

18                    MR. CERASIA:  Oh, then I have the wrong

19   date.  Thank you, Igor.

20       A.   June.

21       Q.   Isn't it true on June 15th, which by the way is

22   my birthday, you'd think I'd remember the date, but June

23   15th, 2009 you met with Lynne Burnett, your boss Kevin

24   Babis, and Peggy Wilczewski?

25       A.   Yes, it's true.

CICVARA v. PROCTOR & GAMBLE                     December 21, 2010

Page 133

1        Q.    And it was at that meeting that you were

2   notified that you were going to be terminated; correct?

3        A.    Correct.

4        Q.    Okay.  Do you have any reason to believe that

5   meeting did not start at 9:15 a.m.?

6        A.    It's irrelevant.  It doesn't matter.  It might

7   have been 9:14 or 9:17, it doesn't matter.

8        Q.    Did Kevin speak at all during the conversation,

9   during the meeting I mean?

10       A.    I don't think he did.  I also don't think he

11   did know that it was Austin Lin who reported this.

12       Q.    That's not the question.

13       A.    It is because he told me --

14       Q.    No, no.  You've got to just answer my

15   questions, okay?

16       A.    Okay, yeah.  He didn't know that, by the way.

17       Q.    Do you know whether or not Kevin knew what was

18   going to be discussed at this meeting?

19       A.    No, I didn't know that.  I was not told that he

20   knew or he doesn't know.

21       Q.    Do you know who made the decision to terminate

22   your employment?

23       A.    I believe that was Lynne Burnett.

24       Q.    And on what basis do you have that belief?

25       A.    Because she is a HR director.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 134

1      Q.    And you believe that just because of her title

2  she's the one who made the decision to terminate your

3  employment?

4      A.    I think it's irrelevant because the decision --

5      Q.    Well, I don't care what you think is

6  irrelevant.

7      A.    -- the decision to terminate my employment was

8  made on the wrong premises.

9      Q.    Okay.  That's not the question.

10     A.    It's irrelevant.

11     Q.    Why is it irrelevant?

12     A.    There were three people in the meeting.  At

13 some point of the meeting I was told that the people --

14 that these three people will go to a separate room and I

15 was to wait for their decision.  They went to a separate

16 room.  After they came back it was Lynne Burnett who told

17 me exactly this, you are terminated as of this date for a

18 cause.  She never said why.  In spite of the fact that

19 here it does say for harassment, it never said that.  She

20 never said why.  She said for the cause.  Who did the

21 decision it doesn't matter.

22     Q.    So the answer is you don't know who did the

23 decision?

24     A.    Is it Kevin Babis or Lynne Burnett, it doesn't

25 matter.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 135

1       Q.   You know --

2       A.   The decision was wrong.

3       Q.   -- there's two things that you should do, A,

4   answer questions, and, B, not make decisions whether

5   something is irrelevant or relevant.  So just answer the

6   question.  So I assume from your answer, which is

7   evasive, that you do not know who made the decision to

8   terminate your employment?

9       A.   Sure I don't know.  I know who told me about

10  that.

11      Q.   Thank you.

12      A.   Lynne Burnett, she told me I was fired for the

13  cause.

14      Q.   Okay.  You said that.  Thank you.  Isn't it

15  true that Lynne told you during that meeting that she had

16  documentation of e-mails that you had between you and --

17  or text messages between you and Bel?

18      A.   I don't recall she said that.  I recall she

19  said there is a recording on her boss' answering machine,

20  and she also said I don't even know was it intentional or

21  not and it didn't matter, but she did say there is a

22  recording on her boss' answering machine of the things

23  that went on in the room, have you been in that room?

24  And I said yes.  The moment I said yes, I was fired,

25  regardless of what is written here.  So there was intent,

CICVARA v. PROCTOR & GAMBLE                     December 21, 2010

Page 136

1    a pre-intent to fire me immediately when I say I was in

2    the room, which I never denied.  It was like she expected

3    me to struggle with the fact that I was in the room

4    because I was told there are cameras in hotel which can

5    prove that you went to her room uninvited.  This is very

6    important.  I'm stressing this.  I was told that I came

7    into her room uninvited, almost forcefully came into her

8    room.  No, I was not, and I said that.

9        Q.    Okay.  Mr. Cicvara, do you have any idea or any

10   personal knowledge as to what was considered or discussed

11   in making the decision to terminate your employment?

12       A.    No, I don't.

13       Q.    Okay.

14       A.    I never said -- heard that.

15       Q.    It says here when they asked you the question

16   at the bottom of page 1, did you take off your clothes in

17   her hotel room, and you said no?

18       A.    No, I didn't.

19       Q.    You never took off a shirt, you never took off

20   your socks?

21       A.    I took off my shorts, yes, because --

22       Q.    Your shorts?

23       A.    Yes, because I wouldn't lay on somebody's bed,

24   you know, even, you know, sit on somebody's bed without

25   taking off the stuff that I was out in.  So I --

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

                                                          Page 137

1       Q.   So you took your pants off?

2       A.   I wouldn't say pants, because I had my shorts,

3   it was 110 degrees.

4       Q.   Okay.  When you say shorts, you mean like

5   Bermuda shorts kind of shorts or do you mean shorts as

6   in, you know, short term for underwear, what did you take

7   off?

8       A.   No, no, no.  I took Bermuda shorts, yes.  I had

9   underwear on myself, yes.

10      Q.   Okay.  So you took your shorts off and you only

11  had your underwear on?

12      A.   Yes, I did.

13      Q.   Did you take your shirt off?

14      A.   No, I didn't.

15      Q.   So you had a shirt on and your underwear?

16      A.   Yes, as far as I -- yes, I think so.

17      Q.   Okay.  And do you believe that that was

18  appropriate conduct?

19      A.   No, I don't believe it was appropriate conduct,

20  but in the circumstances where somebody went directly

21  into the bed and dimmed the lights and I was left

22  basically with no choice but to sit down on her bed, I

23  actually did it just so that I don't, you know, spoil

24  somebody's bed sheets.

25      Q.   All right.  Was there something that you sat on

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 138

1    with your shorts, like you sat in mud or you sat on oil?

2         A.   No.  I just don't do that.

3         Q.   So you took your shorts off and sat on the bed

4    with your underwear to be polite?

5         A.   Yes, I did, yes.  Yes.  Before we go on can I

6    just say something?

7         Q.   No.  I don't have a question.

8         A.   Well, these notes here --

9         Q.   I don't have a question.

10        A.   There wasn't --

11        Q.   I don't have a question.

12        A.   Okay.

13        Q.   And then they asked you the question did you

14   tell her that you wanted to rape her?

15        A.   No, I never said that.  I never told her --

16        Q.   Did you ever say, look, it was in a hotel and

17   she was dressed in a way, I told her that I had a feeling

18   I would rape her --

19        A.   No.

20        Q.   -- but never had that in my mind and didn't

21   think she'd think about it seriously?

22        A.   No, I never said that.  I said I never said I

23   would rape her and that's what I said, and that's why I

24   said these notes don't reflect what was talking about at

25   that meeting, they don't reflect it.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 139

1           I wanted to say something and you cut me off.

2     There is a question here which says did she invite you to

3     her hotel room?  There is no answer here.  Why do you

4     think there is no answer here?  There is another

5     question, did she ask you to leave and did you refuse to

6     leave?  There is no answer.  Why do you think there is no

7     answer?  Do you think she didn't ask me that?  These

8     notes are written --

9           Q.   So you think if it said that you got invited

10    there it would be okay because you were in there and you

11    were a polite man and you took off your clothes to your

12    underwear --

13          A.   No, no.

14          Q.   -- you rubbed her feet and you rubbed her back

15    and that's okay?

16          A.   I never said that.  I said that I was lied to

17    when she said there is a recording from that room on her

18    boss' answering machine and she even added I don't care

19    was it intentional or not.  I was lied to.

20          Q.   Okay.  Did you --

21          A.   I said these notes don't have my answer to did

22    you go to her room, what -- did she invite you to her

23    hotel room.  I said yes, she invited me, and she said,

24    no, she said you came uninvited.  There is nothing about

25    that here.  Why?

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 140

1      Q.    Well, you told me that she didn't invite you,

2  you told me that you invited yourself and she said okay

3  after some time?

4      A.    No, I didn't invite myself.  I asked can I come

5  to your room to have dessert with you?  I didn't invite

6  myself.  I was told yes, come to my room, I changed my

7  mind, in her text message.  You know, she did choose text

8  messages to send to Duracell, but she never sent all text

9  messages, she never sent all her e-mails, and I told you

10 I need those e-mails and I was told computer disappeared,

11 there is no computer, there are no traces of e-mails.

12     Q.    Did you ever tell Peggy and Lynne and Kevin

13 that I'm a man and it looks like I could rape you like

14 that --

15     A.    No.

16     Q.    -- because she had very short shorts on?

17     A.    No, I never said I could rape you like that.  I

18 said when you do those things with your legs one could

19 rape you, and as I said she said then what is rape, and I

20 said whatever the rape is, and we went on about that

21 academically, nothing else.

22     Q.    Did you tell Bel she was showing off?

23     A.    No, I never said that to Bel and I never said

24 to these people that she was showing off.  I said she was

25 dressed very unusually and I was very surprised with that

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 141

1   when she called me in her room.  I never said that.

2        Q.   Did you ever tell them that you had a feeling

3   that you had to protect her from harm?

4        A.   Look, my English doesn't know for the term put

5   her in harm way.  I wouldn't ever say that.  So whatever

6   is written here is not true.  And I said, since I never

7   saw this before May 28th this could have been written in

8   a totally different way.  I don't know how are you going

9   to say that this is piece of evidence.  For what?  For

10  what somebody wanted to write down here?  Ask Kevin Babis

11  did she tell me that she had recordings from her room.

12  Ask Kevin Babis what I answered to the question did she

13  invite you to her hotel room.  Why it is not in the

14  notes?

15       Q.   Okay.

16       A.   Why was not I given these notes when I was

17  fired?

18       Q.   You said that.  Did you ever tell your wife

19  that you took your pants off in that room?

20       A.   What does it have to do with this case?

21       Q.   Did you ever tell your wife that you took your

22  pants off in her room?

23       A.   I'll answer it when you tell me what does it

24  have to do with this case.

25       Q.   You don't ask questions.  I ask questions.  You

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 142

1   answer questions.

2        A.    Yes, I did tell my wife.  I did tell my wife

3   many, many things about this, many more things about this

4   because she was curious to learn.  I did pass through

5   that in the last 18 months, yes.

6        Q.    And you think that somebody in your position as

7   the quality manager who is out to audit a contractor that

8   it was appropriate for you to be in the room of a general

9   manager of that contractor, A, with your underwear on

10  and, B, massaging her feet and rubbing her back, do you

11  think that's appropriate?

12       A.    I think under the circumstances where she was

13  not any better dressed than I was, even worse, when I

14  undressed myself, it might not be appropriate according

15  to some rules, written rules, but for that circumstances

16  it might be.

17       Q.    Did Bel ask you to take your clothes off?

18       A.    No.

19       Q.    Did she tell you to put your clothes back on?

20       A.    As a matter of fact, when she said no she --

21  for some reason after we discussed that thing about rape,

22  she got very mad at me, I don't know why, she went on,

23  she said I have to go to the bathroom and please put your

24  shorts on, I hate your underwear.  That's what she said,

25  I hate your underwear.  So I said okay and I did put it

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 143

1   on.  That was when she got very mad and she did tell me

2   to put my shorts on.  I did it, yes.

3        Q.    And did you have your shorts on --

4        A.    And I never said the same thing to her.

5        Q.    Did you rub her feet before or after you put

6   your shorts back on?

7        A.    Before.

8        Q.    So you were in your underwear when you rubbed

9   her feet and her back?

10       A.    Yes, but I was also in my underwear when she

11  called her boss and when I saw that e-mail and when she

12  told me, you know, this is not what you should see.  I

13  was also in my underwear 15 minutes when she talked to

14  her husband that she didn't mention and after that she

15  got mad at me and I put on -- we went to discuss a few

16  things and then we went to kitchen and we ate our

17  dessert, as I said we listened to the music, and that was

18  it for that night, so.

19       Q.    Do you think she provoked you or tricked you

20  into --

21       A.    Look, I don't want to think anything, I don't

22  want to assume anything, but I think they have a way of

23  doing business which is dishonest.  I think they are

24  actually trying to pinpoint people who are involved.  I

25  remember one day she told me something about Nitesh

CICVARA v. PROCTOR & GAMBLE                                December 21, 2010

Page 144

1   Singh, S-i-n-g-h, she said I don't like him and I don't

2   like the way Duracell is changing their people so quickly

3   because I'm just used to somebody and then there is

4   somebody new, and she didn't like Nitesh because for some

5   reason obviously Nitesh didn't like her and it seems like

6   she was not used to that.

7        Q.   Did you think before June 8th when you went in

8   her room and you stripped down to your underwear that she

9   was a dishonest person before then?

10       A.   I didn't know many, many things about that

11  woman that I learned after, like, for example, about her

12  attempt to seduce Dave Mathieu, about e-mails from Austin

13  Lin, about relationship from Austin Lin.  I had my doubts

14  about that because there were other instances where she

15  was telling me I can call Austin any time in the night,

16  no problems.

17       Q.   When did you learn that information, after?

18       A.   After what?  After I was fired, yeah, I learned

19  this information about that she was trying to seduce Dave

20  Mathieu, and Brian Hesse, H-e-s-s-e, advised him to get

21  out of that possible relationship, so don't continue

22  having anything with that woman.

23       Q.   But you never thought it was appropriate to,

24  you know, figure out --

25       A.   It was appropriate to do what?

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 145

1     Q.   Well, if you'd let me finish a question I'd get

2   there.

3     A.   Okay.

4     Q.   You didn't think it was appropriate then to

5   find out who you were dealing with before you decided to

6   go in her room and strip down to your underwear?

7     A.   Well, unfortunately, yes.  Unfortunately I

8   didn't know many things.  As I told you I didn't know

9   that she was married.  She never told me.  I didn't know

10  that there was a relationship possible with her boss.  I

11  didn't know that she was on that trip in Spain with her

12  husband.  I didn't know many things.  I learned a lot

13  during that trip.  I learned a lot after that trip as

14  well, so.  One thing that I can tell you is there was

15  nothing I could have done to, you know, improve their

16  position with Duracell or to decrease their position with

17  Duracell.  One thing that might have triggered her

18  behavior is our findings during the quality audit, which

19  since you didn't ask me I never came to discuss that, but

20  if you want we can do that.

21             MR. CERASIA:  Can you mark this.

22    A.   We found out that they might be --

23    Q.   No, no, I don't have any question.

24    A.   -- below 50 percent in their score, so I think

25  they were very afraid of it on Monday.  On Tuesday we

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 146

1    actually did score them to 55 and that was a little bit

2    of this (indicating), a little bit.

3         Q.   What does this mean?

4         A.   This means that I discussed -- we discussed,

5    Lori discussed with me certain things that we found.  We

6    found inappropriate or falsifying documents.  They

7    falsified the quality records.  They were claiming that

8    the certain machine that they used to manufacture

9    reflectors were in good shape when actually for months

10   one part of that machine was not working.  Then they show

11   us the records which were showing that they were working

12   and they actually recorded every day off the instrument

13   that was broken and every day they recorded the right

14   thing.  So at some point I think they thought they're

15   going to fail, in their mind --

16        Q.   But this was after you were confronted with the

17   allegations?

18        A.   No.  No.  This was on June 8, during the day.

19   June 8 during the night she changed her mind and first

20   said don't come, I'm tired, and I said okay, and then she

21   said come, I'm not tired.

22        Q.   Let me ask you this.  Your claim that they got

23   scored at 55 percent, when do you claim that was

24   communicated to Practical?

25        A.   The day after.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 147

1       Q.   The day after what?

2       A.   After June 8th.  So it was communicated on June

3  9 in the afternoon.  That night she apologized to me

4  profoundly.  She said I'm so sorry but --

5       Q.   I know.  You've been over this four times, but

6  you don't know why she apologized, you're just surmising

7  as to why she did.

8       A.   Okay.

9            MR. CERASIA:  Can you please mark this as

10  12.

11      Q.   Can I have that 11 back please?

12      A.   Are you finished with this?

13      Q.   For now.

14      A.   Let me just say something.

15      Q.   No.  You say nothing.  No, you say nothing.

16      A.   It says I was violating company PVP and I was

17  engaging in harassing behavior by harassing company

18  supplier.  That was never told, never said that to me.

19  She said you're fired because of --

20      Q.   Okay.  Thanks for letting me know.

21      A.   She never said because of what.

22      Q.   Okay.  There's no question pending.

23      A.   I asked in one of my e-mails please let me know

24  why I was fired.  The answer was you violated conduct

25  manual, Worldwide Conduct Manual.  There was no other

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 148

1    answer.  At this meeting I was told you are fired for

2    cause, nothing else.  That's how I was fired, in ten

3    minutes; nine years of work in ten minutes.

4         Q.   That's what happens when you strip to your

5    underwear.

6         A.   Sure, yes.  Good.  And that's why computer

7    disappeared with all the reports about the diversion.

8         Q.   I don't know what you're talking about,

9    Mr. Cicvara.

10        A.   I know you don't, because the judge says, and

11   you said it was unfounded claim in your answer.

12        Q.   Okay.  There's no question pending.

13        A.   Good.

14             (Cicvara Exhibit 12: PG000525 - marked

15   for identification.)

16        Q.   Okay, Mr. Cicvara, I'm showing you what's been

17   marked as Exhibit 12, which is identified as PG 525, it

18   is an e-mail of June 14th, 2009 from Andrew to Nitesh

19   Singh, and you understand that to be Andrew Yau?

20        A.   Yes.

21        Q.   And when did you first see this, during

22   discovery in the lawsuit?

23        A.   May 28th.

24        Q.   2010?

25        A.   Yes.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 149

1        Q.   Second paragraph says I want to let you know in

2    no uncertain terms that he is no longer welcome in

3    Practical in the future, kindly send someone else for the

4    job next time.

5        A.   So?  What do you want me to say?

6        Q.   I didn't ask a question yet.

7        A.   Okay.

8        Q.   I'm just pointing you to something, okay?

9        A.   Okay.

10       Q.   So you got the chairman of Practical Lighting

11   saying that you're not welcome there anymore, right?

12       A.   Yeah.  That's the same chairman who is sending

13   e-mail messages to Bel saying we need to sack that guy

14   who is reporting to him.

15       Q.   Okay.  What's that have to do with the price of

16   tea in China?

17       A.   Nothing.  It has nothing to do with anything.

18       Q.   All right.  So Procter & Gamble, would you

19   agree that if one of their contractors said that they

20   didn't want you on site because you had been sexually

21   harassing one of its employees, that they should no

22   longer send you there, would you agree with that?

23       A.   Sure, as long as the investigation that will

24   prove that there were inappropriate sexual advances is

25   conducted in a proper way and they prove that that is

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 150

1   true, yes, I would strongly agree with that.

2        Q.    Okay.  Now what happens if by some chance it

3   was investigated and the opposite conclusion was reached,

4   and that being that, you know what, we heard what you

5   said, Mr. Yau, but we've investigated and we don't

6   believe that there's been inappropriate sexual

7   advances --

8        A.    And then you would --

9        Q.    Can I finish?

10       A.    Yes.

11       Q.    Do you believe that Procter & Gamble at that

12   point should say to its contractor too bad, we're sending

13   Mr. Cicvara back to you no matter what you say?

14       A.    No.

15       Q.    You've got to respect the wish of the

16   contractor; right?

17       A.    Yeah, I would think that maybe they would

18   change the person, they will send another person, but

19   they will not fire the person, there is no reason to.

20   Why would you fire a person who is not guilty, because

21   somebody says that, is that enough reason?

22       Q.    Don't you believe that from Mr. Yau's point of

23   view, if he's the chairman of the company and he's

24   writing this to Nitesh Singh, that, you know, this is

25   something that is viewed as not being helpful to the

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 151

1   Practical-Duracell relationship?

2        A.   I found this very odd that he is actually

3   sending this e-mail to Nitesh Singh.

4        Q.   Why is that?

5        A.   Because Nitesh Singh reports to -- I forgot her

6   name, but she reports to Erik Lawson.  In normal

7   communication between Andrew and -- would go through Erik

8   Lawson.  I believe this was done on purpose so that he

9   has another person in Duracell who knows about alleged

10  sexual harassment so that it's like a stamp on my destiny

11  in Duracell, it's like it's not enough that it's HR, it's

12  not enough that it's Erik Lawson, let's put this guy too

13  in the game.  So I found this very odd that Andrew Yau

14  would contact person who is Nitesh Singh.  Yes, Nitesh

15  Singh was in charge of flashlights, but Andrew Yau never

16  contacted him before.  You can ask --

17       Q.   Do you have personal knowledge that he never

18  contacted him before?

19       A.   Not for this kind of matters, that's for sure.

20  Because this would be discussed between two persons who

21  are at the same level.  Like he did discuss later his

22  business with Duracell, where he send directly to Erik

23  Lawson and he told Erik, look, let's forget about this,

24  let's talk about business, you promised there will be

25  business coming and growing and I didn't see it, so now

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 152

1  it's time next time when we see each other let's talk

2  about business.  This was just, you know what, let's make

3  sure that this guy will never come here again.

4       Q.   That's part of your conspiracy theory, right?

5       A.   No.  There is no conspiracy theory.  That's

6  true.  There is no theory here.

7       Q.   Okay.  Do you know what --

8       A.   It's all facts.

9       Q.   Do you know what Mr. Singh's title was at P&G?

10      A.   A buyer.  Mr. Singh's title was a buyer for

11  flashlights and he reported to Christina Dilko and

12  Christina Dilko reported to Erik Lawson.  So Christina

13  Dilko was on my level and Nitesh Singh was on Austin's

14  level.  What I'm saying is it's not normal that general

15  manager or chairman of the company is going to send this

16  kind of e-mail to Nitesh Singh, and first of all Nitesh

17  is not the one who is actually deciding who is going to

18  be sent, it's my boss, Kevin Babis, not Nitesh.  Nitesh

19  has nothing to do with QA.

20      Q.   Do you know if Andrew Yau had a relationship

21  with Kevin?

22      A.   I don't know.

23      Q.   Okay.  But he had a relationship with Nitesh

24  Singh, right?

25      A.   I don't think he did, a relationship.  He just

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 153

1    knew him because he was buyer, nothing else.

2        Q.    On the day that you were fired do you recall

3    whether or not you called Peggy to ask her about your

4    stock options and your bonus?

5        A.    On the date when I was fired.  I'm not sure was

6    it on that date or day after.  I did call, yes, but I'm

7    not sure was it on that date or day after.

8        Q.    And you spoke to Peggy?

9        A.    Yes.

10       Q.    And she -- do you remember her telling you that

11   you could not exercise your stock options because they

12   were forfeited when you were terminated from the company?

13       A.    I remember that she said that, yes.

14       Q.    And in response to that did you call somebody

15   else in the stock option administration department?

16       A.    No.  I called them before.  I called them the

17   day before and they told me that I have 30 days to

18   exercise.

19       Q.    Do you remember who you spoke with in the stock

20   option administration?

21       A.    No.

22       Q.    When you called stock option administration to

23   ask questions about your ability to exercise your stock

24   options, did you tell them that you had been terminated

25   for cause?

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 154

1        A.   Yes.

2        Q.   Did you tell them the reasons you had been

3   terminated, what the cause was?

4        A.   No, because I didn't know that.

5        Q.   Well, you knew the allegations against you were

6   that you had engaged in inappropriate conduct towards

7   Bel, right?

8        A.   As I said, until today's date I really don't

9   know why I was fired.  I don't know why I was fired.  I

10  asked not once, I asked many times and I asked in

11  writing, I said please, because I was advised by my

12  lawyers to ask, and I was always told you were terminated

13  because of violating Worldwide Conduct Manual.  Look --

14       Q.   So you were told the reason?

15       A.   No, I was not told the reason.  Because in

16  Worldwide Conduct Manual there are about 20,000 reasons

17  for why you can be fired, and I was asking for a reason,

18  specific reason, not violating conduct, tell me what did

19  I violate.  I don't know to this date why I was fired.

20  You are saying alleged harassment.  She did write that in

21  the notes, but I was never told that during the meeting.

22  I was only told you are fired for cause, as of this date,

23  that's it.

24       Q.   So all you did was you told the person in the

25  stock option administration that you were fired for

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 155

1   cause?

2        A.    For cause, yes.

3        Q.    You didn't give any specific facts, nothing?

4        A.    No, I didn't get into specifics because I

5   couldn't even tell specifics, I would be lying.

6        Q.    Right.  And you didn't know if this was a

7   person who had made decisions under the stock option

8   plan?

9        A.    She -- no, the person told me if you are fired

10  for cause, and she didn't tell me that there are

11  specifics, you have 30 days until when you left the

12  company to exercise those stock.  That is when I called

13  Peggy -- I think next day I called about that, and then I

14  was told that I was -- it was not a correct answer and

15  they regret that they gave me incorrect answer.  Then I

16  called Peggy about what is going on and asked her to

17  explain this to me.

18       Q.    Okay.

19       A.    And then she -- I was sent, you know, that

20  rules about how you exercise and I was told that because

21  of certain things materially injurious to the company, I

22  cannot exercise.  I think that's what came out.

23             MR. CERASIA:  Mark that as 13 please.

24             Do you have an exhibit there?

25             THE WITNESS:  No.  I don't have anything

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 156

1   here.

2                    MR. CERASIA:  Okay.

3                    (Cicvara Exhibit 13: PG000506-508 -

4   marked for identification.)

5                    MR. CERASIA:  If you want to mark that as

6   14 while you're doing that, that would be great too.

7                    (Cicvara Exhibit 14: PG000516-522 -

8   marked for identification.)

9        Q.   Okay, Mr. Cicvara, showing you what's been

10  marked as Exhibit 13, which is a letter to you dated June

11  16th, 2009, identified as PG 506 to 507, from Peggy.

12       A.   Uh-huh.

13       Q.   Tell me after you've had a chance to review

14  that.

15       A.   Yeah, okay, I reviewed it.  I saw that letter

16  before.

17       Q.   And in this letter, if you look, it's the

18  second sentence of paragraph 1, it says as we discussed

19  earlier today your stock options were canceled because

20  your employment was terminated for cause; right, do you

21  see that?

22       A.   I would say that's probably not the only

23  reason.  It's not enough that it's terminated for cause,

24  there are other reasons here.  It's not just terminated

25  for cause you don't have right to options.  There must be

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 157

1   something else.

2        Q.   What do you mean by that?

3        A.   I mean that there should be either A, B or C

4   involved.

5        Q.   Well, the definition of discharge for cause

6   includes A, B or C?

7        A.   Yes.

8        Q.   Right, that's what the plan says?

9        A.   Exactly, yes.  The definition of discharge for

10  cause includes each of the following, yes, which is A, B

11  or C, yes.

12       Q.   Did you understand that that came directly from

13  the stock option plan?

14       A.   Yeah, I understood.

15            MR. CERASIA:  Can you mark that as 15

16  please.

17       A.   Just tell me which one of A, B and C is

18  applicable to this case.

19            (Cicvara Exhibit 15: PG000184-201 -

20  marked for identification.)

21       Q.   If you look at the second page of the letter,

22  Peggy tells you that she apologizes for any confusion

23  that resulted from conflicting information that you

24  received from the administrator in the stock option

25  department, right?

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 158

1        A.    Yeah, sure.

2        Q.    And then she tells you that the plan is clear

3    and that the administrators didn't have access to all of

4    the facts, right?

5        A.    Sure.

6        Q.    And then she enclosed a copy of the plan?

7        A.    Yes.

8        Q.    And I'm showing you what's been marked as

9    Exhibit 15.  Is that the copy of the plan that she

10   enclosed?

11       A.    Yes.

12       Q.    Had you --

13       A.    That's the copy, yes.

14       Q.    Had you seen that plan before?

15       A.    Well, I'd probably seen it.  I didn't go

16   through it before this happened, but after this happened,

17   yes, I did.

18       Q.    Part of your compensation over prior years was

19   you received stock options that vested?

20       A.    2001, 2002, '3, '4 and '5, yes.

21       Q.    And those vested after three years --

22       A.    Yes.

23       Q.    -- from the granting?

24       A.    So all of them were vested, yes.  I could have

25   exercised them in 2006, but I didn't, or any year after

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 159

1   that.

2        Q.   Well, the last award you got was 2005, right?

3        A.   Yeah.

4        Q.   And it takes three years to vest?

5        A.   Yeah.  So 2008 I could have done that, but I

6   didn't.  But as I said, could you tell me which one of A,

7   B and C is applicable?

8        Q.   Let me have the documents back please.

9        A.   Sure.

10       Q.   Thank you.

11       A.   You're welcome.

12       Q.   And you also had a question to Peggy with

13  respect to your bonus, right?

14       A.   Well, I was told that I will receive my bonus.

15       Q.   Who told you that?

16       A.   She told me that.

17       Q.   Do you know what your bonus -- what amount of

18  bonus you expected to receive?

19       A.   That doesn't really matter, is it 3,000, 5,000,

20  10,000, it doesn't matter, it's a bonus.

21       Q.   Well, it matters because I'm asking the

22  question.

23       A.   I don't -- you know, 8 percent of my salary is

24  a target bonus, but bonus could be --

25       Q.   Is discretionary?

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

1        A.   No.  It could be affected by many things.  It's

2   not discretionary, it's 8 percent of my salary, but it

3   does include, you know, how P&G performed in that year,

4   how the specific division of P&G performed.  There are

5   many things going into the formula.  So it could be 8

6   percent, it could be 5 percent, it could be 10 percent.

7   That's why I'm saying it's irrelevant, it's given.

8        Q.   I understand.  And you claim that there's no

9   discretion in it?

10       A.   I claim there is no discretion in it except

11  maybe in the case you are fired, maybe.  So I didn't

12  receive bonus, but I was told I will receive bonus, but,

13  hey, it doesn't matter, it really doesn't matter.  I was

14  told that I would receive bonus.

15       Q.   Look at Exhibit 14, please.

16       A.   Yes.

17       Q.   This is an e-mail that you sent to Peggy on

18  September 15th, 2009?

19       A.   Yes.

20       Q.   Where you ask her about the bonus, right?

21       A.   Yes.  And I said that last time we spoke you

22  have stated that while my options are not going to be

23  valid I will be eligible for bonus and will receive it in

24  September; that's what she said.

25       Q.   Okay.  And she wrote back to you, per the

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

                                                      Page 161

1    attached guidelines, which are attached to the e-mail,

2    you must be an active employee as of June 30th of the

3    fiscal year to get the bonus?

4         A.    Perfectly clear.

5         Q.    And you were terminated before June 30th of the

6    fiscal year, right?

7         A.    As I said perfectly clear.

8         Q.    So do you admit that if you were fired that you

9    were not entitled to the bonus because you had not been

10   there on June 30th?

11        A.    I don't have to admit anything, it's here, it's

12   written.  I just say I was told differently, nothing

13   else, and I was told differently.  I have to admit I

14   probably didn't read this document carefully.  If I read

15   it, I probably would find the same thing, but as I said I

16   was told by human resources person that I would receive

17   it.  I wouldn't otherwise ask.

18        Q.    Okay.  But let's go back to the question.

19   Wouldn't you agree that under the short term achievement

20   award policy that you do not receive a bonus if you are

21   not employed on June 30th of that year?

22        A.    Just a second.

23              Yes, because it says remember you must be an

24   active employee on date of payment -- oh, these are stock

25   options, I'm sorry.  But it's probably the same thing,

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 162

1   yes, I would agree.

2        Q.   Okay.  So you agree that you were not entitled

3   to a bonus for that year?

4        A.   Sure, if I am fired, no.  The question is why

5   I'm fired, but that's beyond the point.

6        Q.   But you were fired before June 30th of that

7   year?

8        A.   Sure.

9        Q.   So you were not an active employee; correct?

10        A.   True.  All I'm saying is I was told

11   differently, nothing else, and obviously anybody can tell

12   you anything, but what is written is true, so yes.

13        Q.   Did you ever rely on the statement that you

14   claim Peggy made to you that you would be eligible to

15   receive a bonus in September?

16        A.   In what sense?  I don't understand.

17        Q.   Did you make any decisions based on it, did you

18   spend the money?

19        A.   How would I spend the money that I don't have?

20        Q.   Okay.  According to this e-mail, in June of '09

21   you say she told you you're going to get your bonus and

22   you're going to get it in September?

23        A.   Yes.

24        Q.   Okay.  From June '09 to September '09 did you

25   make any decisions to spend money in reliance on your

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 163

1  belief that you were getting a bonus?

2      A.   No, I have not made any decisions.  I never do

3  that.

4      Q.   Okay.

5      A.   I spend only money that I have.

6      Q.   That you have in your hand?

7      A.   Lately I don't have much, but I don't spend

8  money that I don't have, so.  I didn't make any decision.

9  But my wife is working two jobs because that's the only

10 way we can pay for mortgage, so.

11                 MR. CERASIA:  Can you mark that as 16 and

12 17 please.

13                 (Cicvara Exhibit 16: PG000509-513 -

14 marked for identification.)

15                 (Cicvara Exhibit 17: PG000514-515 -

16 marked for identification.)

17     Q.   Did you have a chance to look at these?  Oh,

18 sorry.  They weren't handed to you.

19     A.   They weren't given to me.

20     Q.   Because I didn't give them to you, you're

21 right.

22     A.   I'm not trying to touch anything before I'm

23 given it.

24     Q.   Okay.  I'm showing you what's been marked as

25 Exhibit 16 and 17.  Exhibit 16 is a letter from you dated

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 164

1    July 3 to Procter & Gamble addressed to the stock option

2    administrator and it's stamped as PG 509 through 512, and

3    16 -- or, excuse me, 17 is a July 6th, 2009 letter from

4    Peggy to you.

5        A.   Uh-huh.

6        Q.   Why did you send the letter of July 3 after

7    receiving Peggy's letter of June 16th telling you that

8    your options had been canceled?

9        A.   I sent it just to make sure that I did what I

10   thought I should be doing in the first 30 days after I

11   was fired.  So I did send it just to make a trace of

12   documents, if you wish, which is exactly what you are

13   showing me, and I was advised so by my lawyer at that

14   time.

15       Q.   That would be Mr. Skiber?

16       A.   Yes.

17       Q.   You say in the last paragraph, it says I fully

18   intend to exercise the final grant, 1,950 shares granted

19   6/16/2005 should it become economically feasible.  Were

20   those options underwater at the time?

21       A.   Yes.

22       Q.   Okay.  And then you receive in response a

23   letter from Peggy, July 6th, 2009, telling you that as

24   she explained to you in her June 16th, 2009 letter your

25   options were canceled pursuant to the terms of the plan

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 165

1  because you were terminated for cause, right?

2       A.   There was a question I asked that you never

3  answered and I don't think -- I'm not sure if you intend

4  to answer it.

5       Q.   I'm not here to answer questions.  I think I've

6  told you that a couple times.

7       A.   Okay.  I was asking A, B or C, but you didn't

8  answer it.

9       Q.   Sir, I don't answer questions.

10      A.   Because as I said terminated for cause is not

11 enough to stop somebody's options, there should be either

12 A, B or C.  I was clearly asking you which one of these

13 three is applicable to my case and I didn't hear an

14 answer.  It's the same thing as I asked why I was fired

15 and I never heard an answer.

16      Q.   Okay.  At any point after July 6th, 2009 after

17 you received the letter from Peggy --

18      A.   Yes.

19      Q.   -- did you ever submit any letter to Procter &

20 Gamble, to the stock option administration department,

21 appealing the decision?

22      A.   No.

23      Q.   No?

24      A.   No.  Why would I appeal the decision?

25      Q.   I don't know.  You never asked -- you never

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

                                                        Page 166

1    submitted anything in writing asking for a reason as to

2    why you weren't given the options or for them to

3    reconsider the decision?

4         A.   Come on.

5         Q.   I'm just asking whether you did it.

6         A.   No, I didn't.

7         Q.   Okay.  Are you taking notes?

8         A.   No.

9         Q.   What are you doing?

10        A.   I'm just going through the notes that I put

11   here and just putting plus, minus.  You have the copy of

12   it.

13        Q.   Okay.  What are the plus and minuses mean?

14        A.   It means like I did say something about this

15   and I should say something about which is minus.

16        Q.   Those are your notes that you took and you gave

17   us at the beginning of the deposition?

18        A.   Yes.

19             MR. CERASIA:  Okay.  Will you please mark

20   that as 18 please.

21        A.   Is that something I shouldn't be doing or can I

22   do that?

23        Q.   I'm just curious as to what notes you're

24   taking, that's all.  If you're taking notes at the

25   deposition I have a right to know what notes you're

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 167

1   taking.

2       A.   Okay.  That's good.  I'm not taking notes, just

3   signs.

4               (Cicvara Exhibit 18:  First Amended

5   Complaint - marked for identification.)

6       Q.   Showing you what's been marked as Exhibit 18,

7   which is a copy of the Amended -- First Amended Complaint

8   that was filed by your prior lawyer in this case on

9   January 6, 2010.  Have you ever seen this document

10  before?

11      A.   Yes.

12      Q.   Did you see it before it was filed?

13      A.   Oh, I believe I saw, yeah, the draft of it.

14      Q.   Do you understand everything in here to be true

15  and accurate?

16      A.   I think the question is too broad.  If you can

17  ask me specifically.

18      Q.   Okay.  Is there anything in here that's not

19  true or accurate?

20      A.   If you can ask me specifically I will answer

21  specifically.  I just don't want to make this statement

22  without looking.

23      Q.   You can look at it.

24      A.   Okay.  So can I look at it, can I take the time

25  and read?

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 168

1        Q.    Sure.

2        A.    Okay.

3              MR. CERASIA:  We might as well cut while

4    he's reading the document.

5              THE VIDEOGRAPHER:  Off the record at 3:31

6    p.m.

7              (Recess:  3:31 to 3:46 p.m.)

8              THE VIDEOGRAPHER:  On the record at 3:46

9    p.m.

10   BY MR. CERASIA:

11       Q.    Okay.  Mr. Cicvara, I'm looking at the

12   complaint, amended complaint which is Exhibit 18, and the

13   question I had asked you was whether or not there's

14   anything in there that you believe to be -- that is not

15   true or accurate.

16       A.    Well, according to my knowledge I don't think

17   there is anything here that is not true.

18       Q.    Okay.

19       A.    Except maybe legal things about, you know --

20       Q.    I'm not asking you about legal things, just

21   really the facts.

22       A.    Okay, because I don't want -- yeah, okay.

23       Q.    As I understand it, you have essentially four

24   claims here, right?  You're seeking your -- the value of

25   stock options?

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 169

1        A.    Yeah.

2        Q.    Right?  You were seeking what you call a

3   severance package; correct?

4        A.    Yes.

5        Q.    And then you said that you were seeking an

6   annual bonus, right?

7        A.    Yes.

8        Q.    Okay.  My question was the annual bonus, were

9   you seeking the annual bonus under the STAR plan?

10       A.    Yes.

11       Q.    Okay.  That we already addressed, right?

12       A.    We already addressed the case if you are fired

13  you don't have a right to have bonus, yes.  The question

14  is why was I fired.

15       Q.    I understand.  Is there any other bonus that

16  you are seeking other than the STAR bonus in this

17  lawsuit?

18       A.    No.  It was about that, yes.

19       Q.    Okay.  What is the severance package you're

20  referring to; is there any written document relating to

21  this severance package?

22       A.    I didn't receive any written document that I

23  recall about severance package, no, but there is a

24  severance package for people who are normally fired.  It

25  means normally without cause.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 170

1      Q.   Oh, who are fired like in a reduction in force

2  or a layoff you mean?

3      A.   Yeah, yeah, yeah.

4      Q.   Okay.  So that's the kind of severance package

5  you think you're entitled to?

6      A.   Yes.  And that would be bonus too.

7      Q.   Pardon me?

8      A.   In that case it would be bonus as well because

9  if I were fired, you know, for no reason, then I'm not

10  sure that the bonus is not applicable, it probably is

11  prorated.

12      Q.   Okay.  So one of the elements of the severance

13  package would be a bonus and maybe salary or something;

14  is that what you're saying?  I'm just trying to

15  understand what you're saying.

16      A.   Well, usually when you fire people there is,

17  you know, a document which says if you worked for the

18  company let's say five years, I'm just giving an example,

19  then you have a right to have 26 weeks of pay plus

20  whatever, those kind of documents.

21      Q.   Were you ever involved in any situation where

22  any employee who reported to you was laid off?

23      A.   No.  No.

24      Q.   Are you aware of any employee who received

25  severance pay under this formula that you've discussed?

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 171

1        A.   Yes, many.  Many people who were let go after

2    P&G took over --

3        Q.   Oh, after the merger?

4        A.   -- Duracell or Gillette, they got severance

5    package.  Many people who were fired, people who are

6    normally fired they get severance package.

7        Q.   When you say normally fired --

8        A.   It means like --

9        Q.   Without cause?

10       A.   Yeah.  It means because of restructuring,

11   because of other issues.  Well, let's say without the

12   involvement of the employee.  It means like company made

13   decision to downsize for whatever reason --

14       Q.   Or go out of business?

15       A.   -- they usually get severance package.  That's

16   the package I'm talking about, yes.

17       Q.   Okay.  You're not aware of any employee who was

18   terminated for performance-related problems getting a

19   severance package, are you?

20       A.   No, I don't.  And I was not terminated for that

21   purpose.

22       Q.   I understand.  I'm just asking you.

23       A.   No, I was not terminated for that purpose, so

24   I -- and I am not aware of it, yes, that if you would be

25   terminated because of performance you might not, you

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 172

1    know, be receiving that, I don't know.  Maybe that's

2    true, I don't know.

3         Q.   Are you aware that your claim against Lynne

4    Burnett was dismissed?

5         A.   No, I was not aware of it.  Was it dismissed?

6         Q.   It was dismissed.

7         A.   Okay.

8         Q.   In July.

9         A.   So it's not on the case anymore?

10        Q.   Correct.

11        A.   Okay.  I was not aware of that.  Many things

12   happened between July and now, so, yeah.

13        Q.   What do you mean by that?

14        A.   Well, what I mean by that is I changed lawyers,

15   we asked for the postponement.  That's what I meant.

16             MR. CERASIA:  Can you mark this, please,

17   as 19.

18             (Cicvara Exhibit 19: Notes - marked for

19   identification.)

20        Q.   Mr. Cicvara, before I show you 19, which is the

21   last exhibit I have today, when you were in Bel's hotel

22   room on June 8th and you say she was speaking with her

23   husband, was she speaking in English or Chinese?

24        A.   Chinese.

25        Q.   The whole time?

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 173

1      A.   The whole time.

2      Q.   So you don't -- do you speak Chinese?

3      A.   No.

4      Q.   So you don't know what she said to her husband?

5      A.   No.  And I'm not even sure that it was her

6  husband.  I was told it was her husband.

7      Q.   Well, she was speaking to somebody in Chinese?

8      A.   Yes.  I don't know to whom.

9      Q.   And you don't know what she said?

10     A.   No.

11     Q.   Okay.  I'm showing you Exhibit 19, which is one

12  of the documents you gave us at the beginning of the

13  deposition which was in your folder?

14     A.   Yeah.  You asked for it.  I didn't give it to

15  you.

16     Q.   What's that?

17     A.   You asked for it.

18     Q.   I asked for it and you gave it to me.  I didn't

19  wrestle you for it or anything like that.

20     A.   Yeah, okay, yeah.

21     Q.   What language is that written in?

22     A.   Croatian.  It probably is a mix between

23  Croatian and maybe there are some English words.

24     Q.   There's a few English words, maybe people's

25  names and months, but I don't know Croatian.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 174

1      A.    It's Croatian language, yeah, and it's slang,

2   it's slang language too.

3      Q.    Okay.  And when was this written?

4      A.    Yesterday.

5      Q.    You prepared this yesterday?

6      A.    Yes.

7      Q.    Why did you prepare this?

8      A.    Because I wanted to refresh my memory about the

9   things that I would like to talk and I talked about a few

10  of them and I didn't talk about others.  I was not given

11  opportunity to talk.

12     Q.    Is there anywhere -- will you please look at

13  your original because I only have this copy here.

14     A.    Okay.

15     Q.    Is there anything in here that relates to Bel?

16     A.    Oh, yeah, there are things that relates to Bel,

17  yes.

18     Q.    Where, what page?

19     A.    Let me see.

20     Q.    And what number?

21     A.    Many pages.  It's on the page 1 there are

22  things with respect to Bel, on the page 2 there are

23  things that are indirectly related to Bel, and page 3

24  many things related to Bel, and if you want I can go one

25  by one and I can tell you.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 175

1        Q.    When did you write the handwriting on the

2   bottom of page 3, yesterday or today?

3        A.    Let me see.  On the bottom of page 3 this

4   morning, part of it, and then there is something written

5   here which I don't think you have.

6        Q.    And when did you write that?

7        A.    I don't think you have this thing which I

8   added --

9        Q.    At lunchtime?

10       A.    -- a few minutes now.

11             No, no.  I just added them a few minutes ago.

12   This thing I wrote this morning (indicating) because you

13   have a copy, so obviously it was written before I came

14   here.  And this is the thing I told you that she called

15   her boss and there was a message from her boss where he

16   was talking about how she's doing a nice job and the next

17   task is to find a way to sack the general manager of

18   Zhongshan factory in China, s-a-c-k, to get rid of

19   general manager in China, to find ways to do it, and she

20   said you saw too much, you're not supposed to read this.

21             MR. CERASIA:  I don't have any further

22   questions at this point, but I am going to reserve my

23   right to recall him based on this document and the other

24   documents that he gave us, some of which we didn't have.

25             THE WITNESS:  Well, you never asked for

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 176

1   this, and you did say that it was unfounded claim by

2   Predrag about diversion that took place, unfounded with

3   such strong evidence that only a blind man wouldn't see

4   it or --

5                 MR. CERASIA:  Mr. Cicvara.

6                 THE WITNESS:  -- a man with a very strong

7   power in Duracell would prevent it from being seen.

8                 MR. CERASIA:  Okay.  You need to

9   understand something because you weren't at the hearing

10  in July.  In July the judge said that anything that

11  happened back in 2007 or 2005, for that matter, or 2008

12  or 2004 was irrelevant and she was not going to order the

13  production of documents.

14                THE WITNESS:  I agree.  I agree.  Yes.

15                MR. CERASIA:  So I don't wear a robe, she

16  does, and that's the decision.

17                THE WITNESS:  True.  For this case it is

18  irrelevant.  It might not be in the future, but that's

19  not --

20                MR. CERASIA:  Are you threatening my

21  clients?

22                THE WITNESS:  No.  Why would I threaten

23  anybody?  I mean who am I to threaten to anybody?

24                MR. SIKORSKY:  I'm taking the position of

25  counsel, and I'm asking for a stipulation, that the claim

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 177

1   of whistle-blowing which was the subject of the

2   discussion before Judge Hall is not encompassed here and

3   in no way is res judicata for any further proceedings

4   that he may wish to raise.  Now, that's the position

5   you're taking and -- taken in the discovery and we're

6   free to proceed in any way that we feel appropriate.

7                  MR. CERASIA:  I have no idea what that

8   means, Igor.

9                  MR. SIKORSKY:  Okay.  Well, that's too

10  bad, but perhaps we'll have the opportunity to enlighten

11  you on that.

12                 Now, I'm going to show you -- are you

13  finished?

14                 MR. CERASIA:  Well, not today you're not

15  because it has nothing to do with discovery in this case.

16  The judge was very clear on that.

17                 MR. SIKORSKY:  Well, that will be decided

18  in due course.

19                 MR. CERASIA:  No.  It's already been

20  decided.  You weren't part of the case then.  The judge

21  already decided the scope of discovery.

22                 MR. SIKORSKY:  Are you saying I can't ask

23  questions about that?

24                 MR. CERASIA:  That's correct.  The judge

25  said that's not within the scope of discovery.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 178

 1                    MR. SIKORSKY:  Well, that's your

 2   position.  I've got some questions to ask.  Let's go

 3   through this.

 4                    MR. CERASIA:  Well, no.  Excuse me.  You

 5   should have read the hearing transcript before you came

 6   today.

 7                    MR. SIKORSKY:  I am --

 8                    MR. CERASIA:  Have you read it?

 9                    MR. SIKORSKY:  -- very well aware of his

10   rights, Counsel.

11   CROSS EXAMINATION

12   BY MR. SIKORSKY:

13       Q.   I'm going to go through some of the documents

14   that we've already given.  I'm going to ask you to go

15   through these one at a time and identify.  This, by the

16   way, is not a complete --

17       A.   Document, no.  This is just a part of it.

18       Q.   Well, can you identify what this page -- I'm

19   showing you now a document identified with a docket

20   number 391.  Can you identify that?

21       A.   Yeah.  That's the part of the hearings of

22   relationship between Mani Parmar and Ana Cardinale.  The

23   part which is -- Ana Cardinale, Cardinale is the famous

24   actress, C-a-r-d-i-n-a-l-e, and Ana is just A-n-a, and

25   Mani Parmar you already have.  There was a relationship

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 179

1   and there was a business side of that relationship that I

2   was very negatively affected with.  I only learned when I

3   got the documents --

4                  MR. CERASIA:  Excuse me.  Before you get

5   into the question I'm objecting on the ground that it's

6   beyond the scope of discovery as ruled by the judge on

7   July 20th, 2010, and I suggest you read the transcript.

8   She ruled that any discovery --

9                  MR. SIKORSKY:  Look, Counsel, I'm

10  entitled to put my exhibits in.

11                 MR. CERASIA:  Have you read the

12  transcript?

13                 MR. SIKORSKY:  I'll ask that that be

14  marked.

15                 MR. CERASIA:  Okay.  Well, I'll have a

16  standing objection then because you didn't read the

17  transcript because I don't even know that there is one,

18  so why would you represent that there's -- you read a

19  transcript?

20                 MR. SIKORSKY:  I said I haven't read it.

21  You asked me had I read one and I said I haven't.

22                 MR. CERASIA:  You could have ordered one.

23  So then you don't know what her rulings were.

24                 MR. SIKORSKY:  May that be marked as

25  Plaintiff's Number 1.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 180

1               MR. CERASIA:  And I have an objection to

2    any questions relating to Mr. Parmar or Miss Cardinale.

3               THE WITNESS:  Okay.

4               MR. CERASIA:  Based on the judge's

5    ruling.

6               MR. SIKORSKY:  Let her mark those.

7               (Plaintiff's Exhibit A: PG000391 - marked

8    for identification.)

9       Q.   All right.  Now I'm showing you a second

10   document.  Can you identify that?  You don't need to

11   testify except as to my questions.  I just want you to

12   identify what that document is.

13              MR. CERASIA:  And what document are you

14   showing him?

15      A.   First part, important to remember, not

16   disclosed yet.  This is what I gave to Mr. --

17              MR. CERASIA:  Excuse me.  I need to know

18   what you're referring to.

19              MR. SIKORSKY:  Well, it's the second in

20   order of what we've already provided you.

21              MR. CERASIA:  Well, it's not the order

22   that I had.

23      A.   It says first part, important to remember, not

24   disclosed yet.

25              MR. SIKORSKY:  It's in the material that

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 181

1   we gave to you in the very beginning of the deposition.

2        A.   Three pages or four pages.  There are two

3   documents, one is called first part and the other is

4   called facts put in chronological order.  So these two

5   documents we can talk about --

6        Q.   Separate.

7        A.   -- separately.

8             MR. SIKORSKY:  Would you mark that.

9        A.   The first part is talking about alleged

10  diversion which took place in -- actually took place from

11  2002 until -- to the best of my knowledge until 2008 at

12  least, so six years of diversion going on where the cells

13  that were supposed to be put in the devices of OEM

14  manufacturers --

15             MR. CERASIA:  Okay.  That's another

16  subject that was ruled on by the judge, so I've got

17  another standing objection to questions relating to that

18  as being outside the scope of discovery as ruled by the

19  judge.

20             MR. SIKORSKY:  Can you mark that as

21  Exhibit B.

22             (Plaintiff's Exhibit B: Document entitled

23  First part, Important to remember - marked for

24  identification.)

25        Q.   (Handing.)

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 182

1      A.   So this document is just continuation of the

2  other one and it's called Facts put in chronological

3  order, for your reference.  This is just going on of the

4  same thing and it gives a whole story about what was

5  really going on and who was involved according to the

6  best of my knowledge and it does have hard evidences for

7  all what is stated here.  All these evidences were given

8  to Rob DaPra.

9           MR. SIKORSKY:  Can you mark that as

10  Exhibit C.

11      A.   R-o-b, D-a and then capital P, but one word,

12  r-a, DaPra.  It's spelled as I told you, D small a,

13  capital P, small r-a, and he is Vice President of

14  Business Development.

15           MR. CERASIA:  I have the same objection.

16           MR. SIKORSKY:  Mark it please.

17           (Plaintiff's Exhibit C: Document entitled

18  Facts put in chronological order - marked for

19  identification.)

20      Q.   (Handing.)

21      A.   This is an e-mail that Rob DaPra sent to me on

22  January 4th, 2008 where he was --

23           MR. CERASIA: Excuse me.  When you say

24  this, you've got to tell me what you're referring to.

25      A.   Oh, sorry.  It says subject in the e-mail which

CICVARA v. PROCTOR & GAMBLE                December 21, 2010

Page 183

1    was sent from Rob DaPra to Predrag Cicvara, it says

2    subject, summary of recent discussions.

3         Q.   Does it have a date?

4         A.   Yes.  Date is January 4th, 2008, and in this --

5                   MR. SIKORSKY:  No.  Just I'll mark it.

6                   MR. CERASIA:  Same objection.

7                   THE WITNESS:  Can you just mark it.

8                   (Plaintiff's Exhibit D: Email - marked

9    for identification.)

10        Q.   (Handing.)

11        A.   This next one is the page PG 486.  So this is

12   part of material you gave to us.  It says --

13        Q.   Well, all right, just the date.

14                  MR. CERASIA:  Is this Exhibit E now?

15        A.   Exhibit E.  And the date is Tuesday, June 9,

16   2009.  It's sent from Dina Schmude to bell@practical.com

17   and it says that Austin Lin was the guy who came to human

18   resources and reported.

19                  (Plaintiff's Exhibit E: Email - marked

20   for identification.)

21        Q.   Identify this (handing).

22        A.   This is the e-mail sent by Andrew Yau to Erik

23   Lawson which is telling about how the promises about

24   growing business with Duracell were not followed up, they

25   were working hard but they didn't see many orders coming

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

                                                      Page 184

1    from Duracell.

2              MR. CERASIA:  Is that 480?

3         A.   480 page, yes.  That's the telling about they

4    are true -- well, I'll not discuss this.  This is just in

5    evidence, nothing else.

6              (Plaintiff's Exhibit F: PG000480 - marked

7    for identification.)

8              MR. SIKORSKY:  Objection to this?

9              MR. CERASIA:  No.  I produced that.

10        Q.   You can identify that from the number.

11        A.   Yeah.  This is PG 415 and 416 pages from the

12   charges for the telephone number 243 -- (203)243-0079,

13   which was my BlackBerry, where you can see that there

14   were five messages exchanged on June 8 starting with 6:57

15   a.m. Pacific Time, which was 8:57 p.m. Thailand time, and

16   going to 7:07 a.m. which is 9:07 p.m. Thailand time.

17   Those five messages were can I come to your room, no you

18   cannot, okay, oh, you can I changed my mind, okay, I'm

19   coming, even though it was I came uninvited to her room

20   according to her and according to Lynne Burnett.

21             (Plaintiff's Exhibit G: PG000415-416 -

22   marked for identification.)

23        Q.   (Handing.)

24        A.   There are four pages coming.  So the first one

25   is future stock option lost Band 4.  It's telling about

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 185

1   future stock options that might have been assigned to me

2   had I stayed in the same position and being promoted to

3   Band 4 after certain time.  So this is just an example of

4   the loss in wages, future wages.  And there are certain

5   assumptions there which are shown, they are written, so.

6        Q.   All right.

7        A.   That's the page about stock options.

8                  MR. CERASIA:  Objection to that as well

9   based on the fact this was never produced to us in

10  discovery.

11                 THE WITNESS:  You never asked for it.

12                 (Plaintiff's Exhibit H:  Future stock

13  options - marked for identification.)

14       Q.   (Handing.)

15       A.   The next page is calculation of bonuses that I

16  was entitled to in P&G and it was calculated 8 percent

17  for Band 3 and 15 percent for Band 4 with the assumption

18  that I would be Band 4 somewhere in 2013.  I already had

19  about 15 years in Band 3, so it would be a good

20  assumption.  So that's the page about bonuses.

21                 MR. CERASIA:  And that was I?

22                 MR. SIKORSKY:  I.

23                 THE WITNESS:  That's I.

24                 MR. CERASIA:  Object to that too

25  including on the grounds it was never produced to us.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 186

1    I'm going to object to that too including on the grounds

2    it was never produced to us.

3         Q.   When was this -- when were these, all of this,

4    the statements of losses, when would you have prepared

5    those?

6         A.   I believe somewhere in October of this year.

7         Q.   Of this year?

8         A.   Yes.

9         Q.   After the production -- after --

10        A.   After, yes, yes.

11             MR. CERASIA:  Under the Federal Rules of

12   Civil Procedure there's a continuing obligation to

13   produce documents.

14             MR. SIKORSKY:  Thank you, Counselor.

15             (Plaintiff's Exhibit I: Calculation of

16   bonus - marked for identification.)

17        Q.   (Handing.)

18        A.   The next one is talking about loss in salaries,

19   the first under assumption that I never found a job and

20   the second under assumption that I will find a job but it

21   does not pay the same that my job was.

22             MR. CERASIA:  And this will be J?

23             I'm going to object to this because it's

24   completely irrelevant, you don't have a claim for loss of

25   salary in the case, I don't know what it relates to, plus

CICVARA v. PROCTOR & GAMBLE                     December 21, 2010

Page 187

1    it was never produced.

2                    THE WITNESS:  I believe if you'll look at

3    the number 7 there there is something.

4                    (Plaintiff's Exhibit J: Loss of salary -

5    marked for identification.)

6         Q.   (Handing.)

7         A.   Oh, the next one is a pension fund that usually

8    in P&G there is a formula of how you calculated pension

9    depending on how long have you been with P&G.  It could

10   be anywhere from 5 to 18 percent of your salary.  So this

11   is just what I lost just by not being in P&G from the

12   pension fund.

13                   MR. CERASIA:  This would be K?

14                   THE WITNESS:  I guess.

15                   MR. SIKORSKY:  J, K.

16                   MR. CERASIA:  I'm just going to object to

17   this on the grounds that it's not relevant, there's no

18   claim for lost pension in this case and it wasn't

19   produced to us.

20                   (Plaintiff's Exhibit K: Pension fund

21   document - marked for identification.)

22        Q.   (Handing.)

23        A.   And this is the page which shows that there was

24   a telephone communication with Spain, me calling Bel's

25   BlackBerry number, where she called me first and asked me

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 188

1   to call her back, which happened on January 22nd, 2009.

2   It's page 431.

3                  MR. CERASIA:  Pardon me, is this L?

4                  MR. SIKORSKY:  Yes.

5                  (Plaintiff's Exhibit L: PG000431 - marked

6   for identification.)

7        Q.   Now, just a few questions for you from the

8   direct.  Approximately when in time was the decision made

9   to return 46,000 items from Practical Lighting that had

10  been produced by Practical Lighting?

11       A.   In May 2009.

12       Q.   And did Bel call you concerning that decision?

13       A.   Yes.

14       Q.   And what did she say?

15       A.   She was asking me to try to alleviate that

16  position or to try to help her to go through it without

17  negative consequences for Practical.

18       Q.   And what was your response to her?

19       A.   Well, my response was that I don't have that

20  kind of decision-making authorities and that I am

21  firmly under the -- my position is firmly that it was

22  mistake, their error and they are responsible for it, so

23  that's my position about this.

24       Q.   But did you make any -- what reference did you

25  make, if any, concerning whether you had authority to --

Sanders, Gale & Russell
(203) 624-4157

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 189

1        A.    I told her that --

2        Q.    -- reverse that decision?

3        A.    Well, I told her that it's out of my scope,

4   that it's not my decision, I can only say, you know, from

5   the quality point of view that the shipment was not good

6   and it was not supposed to be accepted, but it's not my

7   decision to reject that shipment, it was somebody else's.

8   I didn't see the shipment.

9        Q.    Did you note -- or what difference in her

10  attitude to you -- towards you did you notice after you

11  stated that you had no authority to --

12       A.    I believe that that might have been the start

13  of, you know, changes in the attitude.

14       Q.    What was -- can you describe the changes in

15  attitude that followed that?

16       A.    Probably it was colder to a point, which might

17  have led to certain other things.  It was not as warm as

18  before.

19       Q.    Counsel asked you a number of questions about

20  ethics and the ethical standards.  What was your -- can

21  you describe what --

22            THE VIDEOGRAPHER:  Your microphone.

23            MR. SIKORSKY:  Sorry.

24       Q.    Can you give us any examples of efforts that

25  you made to protect the interest of Duracell?

Sanders, Gale & Russell
(203) 624-4157

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 190

```
 1        A.   Yes.  I did -- it's ironic that this case is

 2   actually about me being good to Duracell and P&G and

 3   paying the price for it.  It's -- starting with this

 4   46,000, going to that discovery on June 8 where I

 5   discovered something very wrong with the documentation

 6   and it might have played a part in what happened after

 7   that.  I found in Indonesia that they actually used the

 8   same pallets that were not allowed to be used again, and

 9   I asked Bel Liu did you actually ship anything with these

10   pallets again, and the answer was no, while actually she

11   knew that they -- in the meantime they shipped a big

12   shipment of flashlights which took about five weeks to

13   come to P&G.  That shipment was rejected for the same

14   reason.  So they lied to us in order to get better score

15   and they did get a pretty good score in Indonesia.  She

16   knew that this was going to be caught as a lie at some

17   point because she knew that there is a risk that the same

18   thing is going to happen.  So it was a plain lie to me.

19             There were other instances that like she was

20   asking me to help her that time, I said no.  I actually

21   protected Duracell when I caught Austin Lin, just to get

22   whatever he got get back to me.  It was always me

23   defending Duracell.  Like in that diversion case as well

24   me defending.  As a manager of OEM Business Services one

25   of my tasks was to prevent diversion, and then I was
```

CICVARA v. PROCTOR & GAMBLE                          December 21, 2010

Page 191

1    actually scolded because I found diversion and everything

2    was taken from me and I got an e-mail back, it was like,

3    hey, stop doing what you are doing, it's not your job.

4    It was part of my job to prevent this.  So by doing that

5    actually it was my opinion that I helped the company and

6    indirectly or directly I actually paid a big price for it

7    down the road, as judge, you know, ruled out.

8              I'm still wondering, I was told that it's going

9    to be processed through P&G channels, was it ever

10   processed, was it ever worked on in the legal channels of

11   P&G or not, because there were so many hard evidences

12   there that it was impossible, impossible not to make the

13   right decision about that, impossible.  So every time

14   that I was trying to protect and going according to the

15   rules of conduct manual, every time I paid for it dearly.

16                    MR. SIKORSKY:  Okay.  I'd like to take a

17   five-minute break and see if we're finished with this.

18                    MR. CERASIA:  Okay.

19                    THE VIDEOGRAPHER:  Going off the record

20   at 4:25 p.m.

21                    (Recess:  4:25 to 4:27 p.m.)

22                    THE VIDEOGRAPHER:  On the record at 4:27

23   p.m.

24                    MR. SIKORSKY:  I'm all through.  I'm

25   finished.

CICVARA v. PROCTOR & GAMBLE                         December 21, 2010

Page 192

1                    MR. CERASIA:  Okay.  I have a couple

2   questions.

3   REDIRECT EXAMINATION

4   BY MR. CERASIA:

5        Q.   Exhibit B, when did you prepare this?

6        A.   Oh, this was not prepared.  This was from 2007,

7   original document.

8        Q.   You prepared it in 2007?

9        A.   This was sent to Rob DaPra in 2007.  This is

10  just a copy of the document.  He must be in the

11  possession of it or legal in P&G must be in possession of

12  it.

13       Q.   How about Exhibit C?

14       A.   Same thing.

15       Q.   2007?

16       A.   2007.  I have electronic files which are 2007.

17       Q.   Okay.

18       A.   I didn't touch them.  I didn't change them.

19       Q.   What do you mean you have electronic files,

20  where?

21       A.   On my computer.

22       Q.   Your home computer?

23       A.   Actually I gave them to my lawyer.  It was on

24  (indicating).

25       Q.   What else do you have on this -- what, do you

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 193

1   have a thumb drive?

2       A.   Yeah, I have a thumb drive, yeah.

3       Q.   You copied it from P&G?

4       A.   No.  It was on my hard disk, yes.

5       Q.   On your hard disk on your work laptop computer?

6       A.   No.  On the hard disk of something else.  It

7   was actually sent to me.  I'm sorry.  I'm sorry.

8       Q.   Was it sent to you at your address, at your

9   e-mail address at Procter & Gamble?

10      A.   No, no, no.  No.  It was sent at my home

11  address.

12      Q.   By whom?

13      A.   By a woman who copied files from my hard drive

14  and sent it to me.

15      Q.   When?

16      A.   I don't know when.  Probably in -- I don't

17  know.  Somewhere when I was fired.

18      Q.   After you were fired?

19      A.   Yes.

20      Q.   Who was the woman?

21      A.   A secretary in P&G.

22      Q.   Who is the secretary?

23      A.   Kevin Babis' secretary, whoever she is.

24      Q.   You called her and asked her for this

25  information?

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 194

1        A.    I actually asked Kevin Babis for that

2    information, I said there is a file on my disk which is

3    called whatever it is called, and they copied it, they

4    sent it to me, so.

5        Q.    This was after you were fired?

6        A.    After I was fired, yes.

7        Q.    Okay.

8        A.    Also it was Kevin Babis who told me about this

9    shipment in July which was rejected from Indonesia from

10   Practical.

11       Q.    Exhibit H, when did you produce this?

12       A.    I believe in October, to the best of my

13   knowledge.

14       Q.    Of 2010?

15       A.    Yes.

16       Q.    And you prepared it?

17       A.    Yes.

18       Q.    Okay.

19       A.    I prepared it.

20       Q.    And how about Exhibit I?

21       A.    What is that?

22       Q.    (Indicating.)

23       A.    Oh, same thing.

24       Q.    You prepared it?

25       A.    Yes, I prepared it.

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 195

1       Q.    In October of 2010?

2       A.    Yes.

3       Q.    Exhibit J, salary?

4       A.    Same thing.

5       Q.    October of 2010 prepared by you?

6       A.    Same thing, yes.

7       Q.    Exhibit K --

8       A.    Yes.

9       Q.    -- prepared by you in October of 2010?

10      A.    Yeah, to the best of my knowledge.  It might

11   have been, you know, October 30th, November 1st, I don't

12   really know, it's not that relevant, but I prepared it,

13   yes.

14                   MR. CERASIA:  I have nothing else at this

15   time.

16                   THE VIDEOGRAPHER:  Off the record at 4:30

17   p.m.

18                   (Deposition adjourned:  4:30 p.m.)

19

20

21

22

23

24

25

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

```
                                                    Page 196
 1                    I, PREDRAG CICVARA, have read the

 2    foregoing transcript of the testimony given at my

 3    deposition on December 21, 2010 and it is true and

 4    accurate to the best of my knowledge and belief as

 5    originally transcribed and/or with the changes as

 6    noted on the attached Correction Sheet.

 7

 8

 9                         _____

10                         PREDRAG CICVARA

11

12

13                    SUBSCRIBED AND SWORN TO BEFORE ME, the

14    undersigned authority, on this the _____ day

15    of_____, 2011.

16

17                         _____

18                         Notary Public

19

20

21

22    My commission Expires: _____

23

24

25
```

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 197

```
 1                        WITNESS INDEX

 2                                                      PAGE

 3   Direct Examination by Mr. Cerasia                     5

 4   Cross Examination by Mr. Sikorsky                   178

 5   Redirect Examination by Mr. Cerasia                192

 6

 7

 8                        EXHIBIT INDEX

 9

10   CICVARA            DESCRIPTION                      PAGE

11

        1        P&G Worldwide Business Conduct Manual

12               Receipt Confirmation                     35

13      2        P&G Worldwide Business Conduct Manual     35

14      3        PG000180-183                             35

15      4        Job description, PG000172-173            47

16      5        PG000470                                 97

17      6        PG000471                                 99

18      7        PG000472                                103

19      8        PG000473                                104

20      9        PG000474                                104

21     10        PG000475-476                            116

22     11        PG000498-501                            132

23     12        PG000525                                148

24     13        PG000506-508                            156

25
```

Sanders, Gale & Russell
(203) 624-4157

CICVARA v. PROCTOR & GAMBLE                                December 21, 2010

                                                              Page 198

 1

 2                          EXHIBIT INDEX

 3                           (Continued)

 4

 5    CICVARA                DESCRIPTION                        PAGE

 6

 7     14      PG000516-522                                     156

 8     15      PG000184-201                                     157

 9     16      PG000509-513                                     163

10     17      PG000514-515                                     163

11     18      First Amended Complaint, 1/6/09                 167

12     19      Notes in foreign language                       172

13

14

15

16

17

18

19

20

21

22

23

24    NOTE:   Cicvara Exhibits retained by Attorney Cerasia.

25

CICVARA v. PROCTOR & GAMBLE                    December 21, 2010

Page 199

1                    EXHIBIT INDEX
2                    (Continued)
3

4

5  PLAINTIFF'S              DESCRIPTION                PAGE
6       A    PG000391                                 180
7       B    Document, First Part - Important
             to Remember                              181
8
        C    Document, Facts put in
9            chronological order                      182
10      D    Email to Predrag from Rob DaPra, 1/4/08  183
11      E    Email from Dina Schmude, 6/9/09          183
12      F    Email from Andrew to Erik Lawson,
             PG000480                                 184
13
        G    PG000415-416                             184
14
        H    Future stock options Band 4             185
15
        I    Calculation of bonus                     186
16
        J    Loss of salary document                 187
17
        K    Pension fund document                    187
18
        L    PG000431                                 188
19

20

21

22

23

     NOTE:  Plaintiff's Exhibits retained by Attorney
24  Sikorsky.
25