UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PREDRAG CICVARA, | : | CIVIL CASE NO. |
|    Plaintiff, | : | 3:09-cv-2054 (JCH) |
| | : | |
| v. | : | |
| | : | |
| THE GILLETTE COMPANY, et al., | : | NOVEMBER 22, 2011 |
|    Defendants. | : | |

**RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(DOC. NO. 74) & PLAINTIFF'S CROSS-MOTION FOR SUMMARY
JUDGMENT (DOC. NO. 85)**

**I.   INTRODUCTION**

This case arises from the termination of the employment of the plaintiff, Predrag Cicvara, as a Quality Assurance Manager for The Gillette Company, a subsidiary of The Proctor and Gamble Company (together, "Gillette").  In his Amended Complaint, Cicvara asserts breach of contract and unjust enrichment claims with regard to stock options, severance pay, and an annual bonus, as well as a statutory claim for unpaid wages under Connecticut General Statutes § 31-72.

On April 15, 2011, Gillette filed a Motion for Summary Judgment.  Doc. No. 74.  In response, Cicvara withdrew six of his claims, leaving only the breach of contract claim as to his stock options.  Cicvara also filed a Cross Motion for Summary Judgment on the stock options claim.  Doc. No. 85.  For the following reasons, the court grants the defendants' Motion for Summary Judgment and denies the plaintiff's Motion.

## II. FACTS[1]

Cicvara began his employment with Gillette on or about November 1, 2000. Defendant's Local Rule 56(a)(1) Statement (hereinafter "Def.'s 56(a)(1) St."), ¶ 11. From approximately June 1, 2008, until his termination on June 15, 2009, Cicvara held the position of Quality Assurance Manager ("QA Manager") for Gillette's Duracell division. Id. ¶ 12. As a QA Manager, Cicvara was required to interact with Gillette's suppliers on all quality-related issues and to participate in audits of the suppliers' factories. Id. ¶ 15. His job description explicitly included the following responsibility: "Provide professional representation of Duracell/P&G per the P&G Worldwide Business Conduct Manual. This is vitally important in dealing with Contractors and Suppliers in that plans, decisions, and commitments could have significant impact from a financial and/or confidentiality perspective." Id. ¶ 14; Cicvara Dep. Ex. 4.

### A. Plaintiff's Conduct in Thailand

In June 2009, Cicvara traveled to Indonesia, Thailand, and China to audit four factories owned by Practical Lighting ("Practical"), one of Gillette's flashlight suppliers. Def.'s 56(a)(1) St., ¶¶ 22, 16. Prior to the audits, the relationship between Practical and Gillette had become "strained" when Practical learned that Gillette had contracted with a competitor to produce certain models of its "Daylite" flashlight. Id. ¶ 19. In response, Gillette contracted with Practical to produce Daylite models utilizing type "C" and "D" cell Duracell batteries. Id. ¶ 19.

---

[1] In his response to Gillette's Statement of Undisputed Material Facts, the plaintiff frequently fails to comply with the requirements of Local Rule 56(a)(2). Where Gillette's asserted fact is supported by evidence in the record and Cicvara has either (1) failed to provide specific citations to support his denial of the fact, or (2) merely added commentary that does not deny the existence of the fact, the court will deem the fact to be admitted. L.R. 56(a)(3) ("[F]ailure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted.")

Practical's Chairman, Andrew Yau, and its general manager, Bel Liu, traveled from Practical's headquarters in Hong Kong to meet with Cicvara and Gillette's auditors at the factories. Id. ¶¶ 20-22. Liu was one of Gillette's primary contacts at Practical, and Cicvara and she had met on two prior occasions. Id. ¶¶ 20-21.

On June 8, 2009, while in Thailand, Cicvara had dinner with Yau, Liu, and another Practical employee. Id. ¶ 26. Liu left dinner early, because she was not feeling well. Id. After dinner, Cicvara sent Liu a text message and asked if he could bring dessert to her hotel room. Id. ¶ 27. Liu initially said no, but, in a subsequent text message, she consented to a visit. Cicvara Dep. at 69, lines 21-25. At some point after he entered Liu's hotel room, Cicvara removed his shorts and sat on her bed in his underwear. Id. at 136-38. He proceeded to massage her feet and back. Liu, who had not requested a massage, asked him to stop. Id. at 71-72, 126. At some point before leaving the hotel room, Cicvara said to Liu, "[W]hen you do that with your legs one could rape you." Id. at 86, lines 22-25.

The following day, June 9, Liu spoke with Austin Lin, a Gillette employee with whom she had worked previously. Def.'s 56(a)(1) St., ¶¶ 36, 24. Liu told Lin of Cicvara's behavior the night before. Lin encouraged her to report the incident to Andrew Yau, Practical's Chairman. Id. ¶ 36.

Also on June 9, Cicvara sent Liu the following text message: "I hope you will bew [sic] better soon. Feel terrible that can't be with you and pamper you." Id. ¶ 32. Liu responded, "Thx P. I'm fine but I have to re-emphasize that we are not either couples or lovers. Pls stop thinking about me." Id. Cicvara replied, "Right. No need to emphasize the obvious. Thx for the good time though. P." Id.

3

On either June 9 or 10, Liu left a Hard Rock Café shirt—which Cicvara had purchased for her earlier—outside his hotel room door. Compare Def.'s 56(a)(1) St., ¶ 31, with Pl.'s 56(a)(2) St. at 13. Upon discovering it, Cicvara went to Liu's room to ask why she had returned the gift. Def.'s 56(a)(1) St., ¶ 51. At this point, Liu called Andrew Lin, a Gillette employee with whom she had worked previously. Id. Part of the ensuing conversation between Liu and Cicvara was recorded on Lin's voicemail. Id.

On June 10, Cicvara texted: "Just wanted to tell you that I am still in a shock and disgusted by myself and my poor judgment of things that were going btw us. Forgive me if you can. P." Cicvara Dep. at 105, lines 4-14. On a flight from Thailand to China later the same day, Cicvara wrote Liu an email that included the following passage:

> I would love nothing more than to take back few emotional outbreaks that I experinced [sic] last few days. Had I known that I would have risked losing such a precious thing as our friendship, I wouldn't have ever attempted what I so foolishly did misjudging the nature of our closeness in the last few days.
>
> Maybe the cultural differences that you so graciously tried to point out in one of our conversations did ironically played the part in what transpired lately. I believe if you had taken a strong stance against my foolish attempts to get more out of our relation stopping it from the very beginning, I would have stopped then and would have still be in that special relation with you that meant so much to me. By being so polite and trying not to hurt my feelings, you have unconciously [sic] encouraged my (macho? possessive? animouse? [sic] stupid?) efforts to get more than you were ready to give.

Def.'s 56(a)(1) St., ¶ 34. Liu responded, "I'm sorry because I don't love you but I know you love me so. I appreciated you in the past because were just friend. What I cannot accept is what you did in the last few days. Without those dirty things we can be friends." Id. ¶ 35. Cicvara replied, "I can promise that never again I will be a 'dirty man' with you." Id.

4

    B.    <u>Gillette's Response</u>

At some point after speaking to Liu on June 9, Austin Lin told Dina Schumde, Gillette's Human Resource Manager in Bethel, Connecticut, about the incident in Liu's hotel room. Def.'s 56(a)(1) St., ¶ 36. Schmude, in turn, reported the incident to Lynn Burnett, Gillette's Global Human Resources Director. Id. ¶ 37.

On June 11, Schmude and Senior Human Resources Manager, Peggy Wilczewski, discussed the incident with Liu by phone. Id. ¶ 38. The following day, Liu forwarded copies of some of the text message and e-mails Cicvara and she had exchanged during the trip. Id. ¶ 40. She also reviewed and edited Wilczewski's notes of their phone interview for accuracy. Id.

On June 14, Andrew Yau, Practical's Chairman, emailed Nitesh Singh, Gillette's Senior Purchasing Manager, to let him know that Cicvara had made "inappropriate sexual advances toward [Liu]" and that Cicvara was no longer welcome at Practical. Id. ¶ 42; Cicvara Dep. Ex. 12.

On June 15, Burnett, Wilczewki, and Cicvara's supervisor, Kevin Babis, met with Cicvara to discuss Liu's allegations. Id. ¶ 44. At the meeting, Cicvara admitted that he had gone to Liu's hotel room on June 8 and that, while there, he had touched her. Id. ¶ 45. He also admitted that he made the comment, "When you do such things with your leg, one could rape you." Id.; Pl.'s 56(a)(2) at 23.

At the end of the meeting, Burnett, Babis, and Wilczewski left the room to confer privately. Id. ¶ 48. After unanimously deciding that Cicvara's misconduct warranted termination, they informed Cicvara that he was being discharged from his position at Gillette. Id.

C. <u>Forfeiture of Plaintiff's Stock Options</u>

Over the course of his employment at Gillette, Cicvara was awarded several thousand stock options pursuant to the Gillette 1971 Stock Option Plan ("the Plan"). Section 6(f) of the Plan provides: [I]f an employee Participant is discharged for Cause, as hereinafter defined, all his options shall immediately be cancelled effective as of the date of termination of his employment. Cicvara Dep. Ex. 15 at 8. The Plan further states that "a discharge for 'Cause' shall have occurred where a Participant is terminated because of . . . (B) the Participant's engaging in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Company or the subsidiary." <u>Id.</u> at 8-9.

The Plan is administered by a Compensation Committee, which is granted express authority to "decide all questions and settle all controversies and disputes which may arise in connection with the Plan." <u>Id.</u> at 2. The Plan further provides that "[a]ll decisions, determinations and interpretations of the Committee shall be binding on all parties concerned." <u>Id.</u> at 2.

Finally, the Plan states that it, and each option issued under it, "shall be governed by and construed in accordance with the laws of the State of Ohio." <u>Id.</u> at 16.

Cicvara attempted to exercise his stock options on July 2, 3009. Def.'s 56(a)(1) St., ¶ 61. Gillette rejected the attempt, maintaining that, because Cicvara had been terminated for cause, his stock options were automatically forfeited pursuant to Section 6(f) of the Plan. <u>Id.</u>

6

**III.    SUMMARY JUDGMENT STANDARD**

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000). Once the moving party has met its burden, in order to defeat the motion, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record to address questions of fact, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38. Summary judgment "is properly granted only when no rational finder of fact could find in favor of the non-moving party." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised, on the basis of the evidence presented, the question must be left to the finder of fact. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

**IV.    DISCUSSION**

   A.    Applicable Law

The Plan provides that it and each option issued under it "shall be governed by and construed in accordance with the laws of the State of Ohio." Cicvara Dep. Ex. 15 at 16. Under Connecticut law, a choice-of-law clause will typically be given effect,

7

provided the choice was made in good faith. Messler v. Barnes Group, Inc., 1999 WL 61034, at *3 (Conn. Super. Feb. 1, 1999). Here, neither party disputes the validity of the Plan's choice of Ohio law. Accordingly, the court looks to Ohio law to evaluate Cicvara's breach of contract claim regarding the termination of his stock options.

    B.    Scope of Review

To prevail on his breach of contract claim, Cicvara must establish the existence of a contract, performance by him, a breach by Gillette, and damage or loss to him. See, e.g., Doner v. Snapp, 649 N.E.2d 42, 44 (Ohio Ct. App. 1994). Gillette does not dispute that the Plan constituted a contract, but it argues that Civara cannot establish that he performed and that Gillette breached its duties under the Plan. Def.'s Mem. in Supp. at 10.

As discussed earlier, the Plan provides that, if an employee is fired for "Cause," his stock options shall "immediately be cancelled." Cicvara Dep. Ex. 15 at 8. Further, it defines "Cause" to include "gross misconduct which is materially and demonstrably injurious to the Company or the subsidiary." Id. at 8–9. Cicvara argues that the determination of whether he performed and Gillette breached is dependent on a determination of whether his behavior in Thailand can fairly be considered "gross misconduct which is materially and demonstrably injurious to the company or the subsidiary." While acknowledging that his behavior "could be deemed inappropriate," Cicvara contends that the question of whether it rose to the level of "gross misconduct" is a disputed issue of fact that must be decided by the jury. Pl.'s Mem. in Opp. at 6.

Gillette, on the other hand, argues that "an employer's decision to terminate an employee's non-ERISA benefits, such as stock options, should be set aside only if the

8

employer's decision was arbitrary and capricious." Def.'s Mem. in Supp. at 13. Under this standard of review, the court need not make an independent determination of whether Cicvara's behavior was, in fact, gross misconduct. Instead, it simply needs to decide whether Gillette had "a reasonable basis" for its own determination. Id.

The court's survey of Ohio law reveals no decisions that specifically address the extent to which a court should review a company's decision to terminate an employee's stock options. As such, the court must "carefully predict how [Ohio's] highest court would resolve [the issue]." Travelers Ins. Co. v. Carpenter, 411 F.3d 323, 329 (2d Cir. 2005) (internal quotation marks and citations omitted). In doing so, the court should "give the fullest weight to pronouncements of the state's highest court . . . while giving proper regard to relevant rulings of the state's lower courts." Maska U.S., Inc. v. Kansa Gen. Ins. Co., 198 F.3d 74, 78 (2d Cir. 1999). Finally, it "may also consider decisions in other jurisdictions on the same or analogous issues." Id.; see also Santalucia v. Sebright Transp., Inc., 232 F.3d 293, 299 (2d Cir. 2000) (finding that the New York Court of Appeals would likely "follow the majority of states" on an issue); Vigortone AG Prods., Inc. v. PM AG Prods. Inc., 316 F.3d 641, 644 (7th Cir. 2002) ("[T]he best guess is that the state's highest court, should it ever be presented with the issues, will line up with the majority of the states.")

Several courts outside of Ohio have held that, where a stock option plan expressly grants an employer discretion to interpret its terms, the employer's decision to cancel an employee's options is subject only to arbitrary-and-capricious review. See, e.g., Noonan v. Staples, Inc., 556 F.3d 20, 33 (1st Cir. 2009) (surveying decisions in other states and predicting that the Massachusetts Supreme Court would overturn an

employer's determination that an employee engaged in "willful misconduct" only if that decision was "arbitrary, capricious, or made in bad faith"); Weir v. Anaconda Co., 773 F.2d 1073, 1078 (10th Cir. 1985) (under Kansas law, "the plan committee's decision [to terminate stock options] must be upheld if it was properly within the committee's discretion and not arbitrary, in bad faith, or fraudulent"); Welland v. Citigroup, 2003 WL 22973574, at *11 (S.D.N.Y. 2003) ("Under New York law, an employer's decision regarding non-ERISA benefits may be set aside only where it was made in bad faith was arbitrary or was the result of fraud."); W.R. Berkley Corp. v. Hall, 2005 WL 406348, at *4 (Del. Super. Feb. 16, 2005) ("[W]hen a stock option committee is vested with final, binding, and conclusive authority to determine a participant's right to receive or retain benefits, that decision made in accordance with the provisions of the agreement will not be second guessed by the Court absent a showing of fraud or bad faith."); McIntyre v. Phila. Suburban Corp., 90 F. Supp.2d 596, 600 (E.D. Pa. 2000) (holding that a compensation committee's decisions regarding administration of a stock option plan should be afforded significant deference).

Furthermore, while Ohio courts have not addressed the standard of review for termination of employee stock options, they have approved limited review in the context of other employment benefit disputes. See, e.g., Rehor v. Ohio Case Western Reserve University, 331 N.E. 2d 416, 422 (Ohio 1975) (upholding a university board's contractually reserved right to change the retirement age for tenured faculty members where such change was reasonable and uniformly applicable); State ex rel. Merrill v. Greenbaum, 84 N.E.2d 253, 255 (Ohio Ct. App. 1948) (interpreting pension fund rule stating that a board "may" grant benefits to eligible employees as conferring discretion

to deny benefits to any employee so long as that denial was not "captious, arbitrary, or unreasonable"). Additionally, in breach of contract suits for wrongful discharge, Ohio courts have expressed a reluctance to second-guess an employer's interpretation of what constitutes "cause" for termination. See, e.g., Washington v. Cent. State Univ., 699 N.E.2d 1016, 1019 (Ohio Ct. Cl. 1998) ("The court has previously acknowledged that it may not substitute its judgment for that of the employer and may not second-guess the business judgments of employers making personnel decisions.") (internal citations omitted"); Lynch v. EG&G Mound, Inc., 1999 WL 34790, at *8 (Ohio Ct. App. Jan. 29, 1999) (stating same general rule).

In light of these precedents and the Plan language stating that Gillette's Compensation Committee "shall have authority . . . to decide all questions and settle all controversies and disputes which may arise in connection with the Plan," Cicvara Dep. Ex. 15 at 1–2, the court predicts that the Ohio Supreme Court would hold that Gillette's decision that Cicvara had engaged in "gross misconduct which is materially and demonstrably injurious to the company or the subsidiary" may be reviewed only to determine if it was arbitrary, capricious, or made in bad faith.

C.  Reasonableness of Gillette's Determination

On the basis of the evidence presented, no rational trier of fact could find that Gillette failed to exercise its discretion reasonably and in good faith. Cicvara disputes none of the following: Gillette received information suggesting that he had made unwanted sexual advances toward Bel Liu, an employee of Practical, a Gillette supplier. When contacted by Gillette representatives, Liu confirmed the allegations and provided copies of emails and text messages that corroborated her version of events.

11

Additionally, Cicvara does not dispute that Gillette's relationship with Practical was already strained prior to this incident, or that, upon learning of the incident, Practical's Chairman informed Gillette that Cicvara was no longer welcome at his company's facilities.  Finally, while Cicvara challenges the accuracy of Wilczewski's notes from the meeting at which he was terminated, Pl.'s 56(a)(2) at 21, he does no dispute that, at this meeting, he admitted that he went to Liu's hotel room, touched her, and said, "When you do such thing[s] with your legs, one could rape you." Id. at 24.

In the face of the aforementioned undisputed facts, no rational juror could find that Gillette lacked a reasonable, good faith basis to determine, first, that Cicvara had engaged in gross misconduct, and, second, that this misconduct was materially and demonstrably injurious to Gillette.[2]  As a result, Cicvara cannot show that Gillette breached a contractual duty when it terminated his stock options pursuant to Section 6(f)(B) of the plan, and Gillette is entitled to summary judgment on this claim.

**V.   CONCLUSION**

For the foregoing reasons, the defendants' Motion for Summary Judgment (Doc. No. 74) is **granted**, and the plaintiff's Cross Motion for Summary Judgment (Doc. No. 85) is **denied.**

---

[2] Cicvara questions Lin's motives for reporting the incident in Bangkok, alleging that Lin and Liu had an "intimate relationship." Pl.'s 56(a)(2) St. at 17.  He further suggests that Yau and Liu conspired to entrap him, id. at 20, and that Yau intended "to use [the] alleged sexual harassment of Bel Liu as leverage, to improve his business with Duracell." Id. at 17.  Lin's, Liu's, and Yau's motivations or biases, however, are irrelevant to the question of whether Gillette's evaluation of the information they provided regarding Civara's conduct—the essence of which was admitted to by Cicvara—was arbitrary, capricious, or made in bad faith.

**SO ORDERED.**

Dated at Bridgeport, Connecticut, this 22nd day of November, 2011.

                                             /s/ Janet C. Hall
                                            Janet C. Hall
                                            United States District Judge